**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GREATER-BIRMINGHAM ALLIANCE TO
STOP POLLUTION
2320 Highland Avenue South, Suite 270
Birmingham, AL 35205;

CLEAN AIR COUNCIL
200 First Avenue, Suite 101
Pittsburgh, PA 15222;

ENVIRONMENTAL LAW & POLICY
CENTER
35 East Wacker Drive, Suite 1600
Chicago, IL 60601;

CITIZENS FOR PENNSYLVANIA'S
FUTURE
610 North Third Street
Harrisburg, PA 17101;

SIERRA CLUB
2101 Webster St., Suite 1300
Oakland, California 94612;

JUST TRANSITION NORTHWEST
INDIANA
PO Box 8847
Michigan City, Indiana 46361;

HOOSIER ENVIRONMENTAL COUNCIL
3951 N. Meridian, Suite 100
Indianapolis, IN 46208; and

NATURAL RESOURCES DEFENSE
COUNCIL, INC.
40 West 20th Street, 11th Floor
New York, New York 10011;

　　　　　　　*Plaintiffs*,

Case No.

v.

DONALD TRUMP, President of the United
States, in his official capacity;

U.S. ENVIRONMENTAL PROTECTION
AGENCY; and

LEE ZELDIN, Administrator of the U.S.
Environmental Protection Agency, in his official
capacity;

*Defendants*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.    Plaintiffs Greater-Birmingham Alliance to Stop Pollution ("GASP"), Clean Air

Council, Environmental Law & Policy Center, Citizens for Pennsylvania's Future

("PennFuture"), Sierra Club, Just Transition Northwest Indiana ("JTNWI"), Hoosier

Environmental Council ("HEC"), and Natural Resources Defense Council ("NRDC")

(collectively "Plaintiffs") bring this action against Donald Trump, in his official capacity as

President of the United States, the U.S. Environmental Protection Agency ("EPA"), and Lee

Zeldin, in his official capacity as Administrator of the EPA, (collectively "Defendants") for

exceeding the authority granted by Section 112(i)(4) of the Clean Air Act, 42 U.S.C. §

7412(i)(4), by exempting coke oven facilities from complying with applicable hazardous air

pollutant standards adopted in EPA's 2024 revisions to rules for Coke Oven Batteries ("COB")

(40 C.F.R. Part 63, Subpart L) and Pushing Quenching Battery Stacks ("PQBS") (40 C.F.R. Part

63, Subpart CCCCC) (together, the "Coke Ovens Rule").

2.    Coke oven facilities manufacture metallurgical coke—which is used as a fuel in

certain steelmaking processes—by superheating coal to remove impurities. The coking process

2

results in the emission of numerous hazardous air pollutants, from benzene and other volatile organic compounds to mercury and other toxic metals.

3.      EPA updated the hazardous air pollutant emission standards for coke ovens in 2024. All sources were required to comply with most of the Coke Ovens Rule's requirements by July 7, 2025.

4.      Before that compliance date came, EPA issued an Interim Final Rule revising the compliance deadlines to July 5, 2027. EPA then took public comments on the Interim Final Rule and held a public hearing on September 4, 2025. EPA was sued, and on October 2, 2025, issued a notice withdrawing the Interim Final Rule. In the withdrawal action, EPA noted that it had reviewed information submitted in public comments on the Interim Final Rule and concluded "the EPA does not believe that the currently available information supports a conclusion that regulated parties would face significant immediate compliance challenges" meeting the 2024 standards. 89 Fed. Reg. 56011.

5.      Six weeks later, President Trump issued a proclamation purporting to exempt all eleven coke plants subject to the 2024 Coke Ovens Rule from those standards. *Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security*, 90 Fed. Reg. 54517 (Nov.26, 2025) (Coke Ovens Proclamation) (Ex. 1). The Coke Ovens Proclamation stated that the President "determin[ed]" that the "technology to implement the Coke Ovens Rule is not available "because "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance with the Coke Ovens Rule by the compliance dates in the Coke Ovens Rule."

6.      The President granted these sweeping exemptions by seizing on a narrow and, until this year, never-before-used provision of the Clean Air Act: Section 112(i)(4). That

provision allows the President to exempt a source from a hazardous air pollutant standard for up to two years only if "the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4). Neither of those predicates are met here.

7.    No President had used section 112(i)(4) in the fifty-five years since Congress enacted it. To date, President Trump has done so seven times for more than 180 facilities. Besides the Coke Ovens Proclamation, President Trump issued proclamations exempting nearly one-third of U.S. coal-fired power plants from mercury and other air toxics standards, 50 chemical manufacturers from ethylene oxide and other hazardous air pollutant standards, one of two copper smelters from toxic metals standards, and the entire taconite iron-ore processing industry.

8.    President Trump's sweeping Coke Ovens Proclamation grossly exceeds the bounds of the Section 112(i)(4) exemption authority. The Coke Ovens Proclamation exempts all eleven coke plants from these requirements without any standard- or facility-specific analysis to show that the exempted facilities meet section 112(i)(4)'s standards.

9.    The scope, content, and context of the Coke Ovens Proclamation show it for what it really is: a pretext to relieve these polluters from complying with the Coke Ovens Rule and its critical public-health protections while EPA reconsiders it, even though Congress explicitly prohibited that sort of delay pending administrative reconsideration. 42 U.S.C. § 7607(d).

10.    The Coke Ovens Proclamation violates the Clean Air Act and exceeds the President's lawful authority. Plaintiffs ask the Court to enter appropriate relief declaring the Coke Ovens Proclamation unlawful and invalid, and enjoining EPA and its Administrator from implementing or giving effect to it.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States, including the Clean Air Act.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants reside in this judicial district, and because a substantial part of the events giving rise to the claim occurred in this judicial district.

13.     The Court has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

## PARTIES

### *The Plaintiffs*

14.     Plaintiff Greater Birmingham Alliance to Stop Pollution ("GASP") is a nonprofit corporation organized and existing under the laws of Alabama. GASP advocates for the reduction of air pollution, advancement of environmental justice, and promotion of climate solutions.

15.     Plaintiff Clean Air Council ("CAC") is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania. As an environmental health advocacy organization, CAC is focused on protecting people's health from the harmful impacts of pollution.

16.      Plaintiff Environmental Law & Policy Center ("ELPC") is a Midwest-based nonprofit public interest organization dedicated to action and advocacy for improving environmental quality—including air quality—and protecting natural resources. ELPC's

headquarters is in Chicago, Illinois, with additional offices in Iowa, Ohio, Michigan, and Washington, D.C.

17.     Plaintiff Citizens for Pennsylvania's Future ("PennFuture") is a membership nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania. PennFuture is dedicated to the transition to a clean energy economy and to the protection of air, water, and land. PennFuture's activities include advocating for legislative action on a state and federal level; providing education for the public; and engaging in legal actions to ensure environmental protections. PennFuture's mission is to lead the transition to a clean energy economy in Pennsylvania and beyond. PennFuture works to protect our air, land and water, and to empower citizens to build sustainable communities for future generations. PennFuture has members who live, work, and spend time near the Clairton Coke Works facility.

18.     Plaintiff Just Transition Northwest Indiana ("JTNWI") is a nonprofit corporation organized and existing under the laws of the State of Indiana. JTNWI educates and organizes Northwest Indiana communities and workers to support a just transition to a regenerative economy that protects the environment, climate, and future generations. JTNWI has members who live, work, and spend time near the Cleveland Cliffs Burns Harbor and Indiana Harbor Coke facilities.

19.     Plaintiff Hoosier Environmental Council ("HEC") is a nonprofit corporation organized and existing under the laws of the State of Indiana. HEC is Indiana's largest environmental public policy organization, working to improve people's health, the economy, and the environment for forty years, through education, technical assistance, and advocacy. HEC has members who live, work, and recreate near the Burns Harbor and East Chicago coke ovens that received presidential exemptions.  Many of the members near these facilities are aware of them,

are concerned about the pollution they are exposed to, suffer from health issues, and alter their routines to minimize exposure to pollution from these sources.

20.     Plaintiff Sierra Club is a nonprofit corporation with its headquarters located in Oakland, California. The Sierra Club is a national membership organization dedicated to the protection of public health and the environment and regularly advocates for policies that protect clean air. It has chapters in Alabama, Illinois, Indiana, Michigan, Ohio, Pennsylvania, and Virginia and more than 600,000 members residing in all 50 states, the District of Columbia, and Puerto Rico. Sierra Club has members who live near each of the coke oven facilities that received an exemption.

21.     Plaintiff Natural Resources Defense Council ("NRDC") is a national nonprofit environmental membership organization with hundreds of thousands of members nationwide. NRDC's purpose is to safeguard the Earth—its people, its plants and animals, and the natural systems on which all life depends. Part of NRDC's core mission is to improve air quality and safeguard public health by combating hazardous air pollutant emissions.

*The Defendants*

22.     Defendant Donald Trump is the President of the United States. He resides and conducts his duties in Washington, D.C., and is sued in his official capacity.

23.     Defendant EPA is a federal agency of the United States is headquartered in Washington, D.C.

24.     Defendant Lee Zeldin is the Administrator of the EPA. He resides and conducts his duties in Washington, D.C. and is sued in his official capacity.

## LEGAL BACKGROUND

*The Clean Air Act's Program to Address Hazardous Air Pollution and Procedural Requirements*

25.     The Coke Ovens Rule was promulgated under Section 112 of the Clean Air Act, which establishes the framework for EPA's regulation of "hazardous air pollutants" from stationary sources, including industrial facilities.

26.     "Hazardous air pollutants" for Section 112 purposes are a group of 188 air pollutants determined by Congress and EPA to be particularly harmful to human health. The Coke Ovens Rule regulates hazardous air pollutants in coke oven emissions, such as benzene. EPA's most recent estimate is that coke ovens emit nearly 2,400 tons of hazardous air pollutants annually. Coke Ovens Risk and Technology Review: Data Summary, EPA-HQ-OAR-2002-0085-0809, at B-2 Tbl. B-1 (May 1, 2023).

27.     Section 112 requires EPA to regulate hazardous air pollutants by issuing emissions standards for categories and subcategories of stationary sources of such pollutants. Emissions standards must require the maximum degree of reduction that EPA deems "achievable," taking into consideration cost and any non-air quality health and environmental impacts and energy requirements. 42 U.S.C. § 7412(d)(2), (3)(A)-(B).

28.     The Clean Air Act also provides procedures for reconsidering a promulgated rule. The EPA Administrator can "convene a proceeding for reconsideration of the rule" but must "provide the same procedural rights as would have been afforded" in the original proceeding. 42 U.S.C. § 7607(d)(7)(B). The Clean Air Act states, however, that reconsideration "shall not postpone the effectiveness of the rule," except that the Administrator or a reviewing court may stay the effectiveness of the rule "for a period not to exceed three months." *Id*. Section

7607(d)(7)(B) is the sole authority EPA has to stay a rule after its effective date has passed. *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

*Presidential Exemption Provision*

29.    Clean Air Act Section 112(i)(4) authorizes the President, in narrowly prescribed circumstances, to "exempt any stationary source from compliance" with hazardous air pollutant standards promulgated under Section 112, "for a period of not more than 2 years if the President determines [1] that the technology to implement such standard is not available and [2] that it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4).

30.    Section 112 allows the President to extend the exemption "for 1 or more additional periods, each period not to exceed 2 years." 42 U.S.C. § 7412(i)(4).

## FACTUAL AND PROCEDURAL BACKGROUND

*Coke Ovens National Emissions Standards for Hazardous Air Pollutants*

31.    Coke oven facilities manufacture metallurgical coke, which is used as a fuel in certain steelmaking processes. Metallurgical coke is made by the destructive distillation of coal at two types of coke facilities: (1) byproduct recovery ("ByP") plants, where chemical by-products are recovered from coke oven emissions at a co-located coke byproduct chemical recovery plant; and (2) heat nonrecovery ("HNR") plants. 89 Fed. Reg. 55684, 55688 (July 5, 2024).

32.    The primary hazardous air pollutants emitted from coke facilities are "coke oven emissions," which contain volatile and semi volatile organic compounds such as polycyclic aromatic hydrocarbons, benzene, toluene and xylene.

33.    Coke oven emissions are likely to cause cancer through a mutagenic mode of action. 70 Fed. Reg. 19992, 19993 (Apr. 15, 2005).

34.     Benzene comprises a significant portion of coke oven emissions from coke oven doors, "which are fugitive emissions[.]" 89 Fed. Reg. at 55698.

35.     The hazardous air pollutants emitted by coke ovens are associated with a variety of adverse health effects, including chronic disorders (e.g. cancers, blood disorders, central nervous system and respiratory effects) and acute disorders (e.g. irritation of skin, eyes and mucous membranes and depression of the central nervous system). EPA, "Revised Coke Ovens Residual Risk Rule and Preamble" (May 28, 2004), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0169.

36.     In 1993, EPA promulgated the first hazardous air pollutant standards for COBs at 40 C.F.R. part 63, subpart L and in 2003 promulgated the first standards for PQBS at 40 C.F.R. part 63, Subpart CCCCC. 58 Fed. Reg. 57898 (Oct. 27, 1993); 68 Fed. Reg. 18008 (Apr. 14, 2003). Standards for COBs and PQBS were both revised in 2005. 70 Fed. Reg. 19992 (Apr. 15, 2005); 70 Fed. Reg. 44285 (Aug. 2, 2005).

37.     Presently, the U.S. has eleven operating coke plants, in Alabama, Illinois, Indiana, Michigan, Ohio, Pennsylvania and Virginia. Six of these are ByP facilities (ABC Coke, U.S. Steel Clairton Coke Works, Cleveland-Cliffs Burns Harbor, Cleveland-Cliffs Monessen, Cleveland-Cliffs Cleveland Works, DTE Vantage-EES Coke Battery) and five are HNR ovens operated by SunCoke.

*The 2024 Coke Ovens Rule*

38.     In 2024, EPA updated the hazardous air pollutant standards for Coke Oven Batteries (COB) (40 CFR Part 63, Subpart L) and Pushing Quenching Battery Stacks (PQBS) (40 CFR Part 63, Subpart CCCCC) (together, the "Coke Ovens Rule"). Various parts of the COB and PQBS standards apply to both ByP and HNR facilities.

39.     The Coke Ovens Rule created new PQBS Maximum Achievable Control
Technology ("MACT") standards for previous unregulated hazardous air pollutants; a fenceline
monitoring standard for benzene emitted from ByP facilities; reduced COB leak limits; modified
the equation used to estimate emissions from coke oven doors for ByP facilities; removed
startup, shutdown and malfunction ("SSM") exemptions; required PQBS weekly opacity
monitoring at HNR bypass/waste heat stacks; and introduced COB visual oven door emissions
monitoring, daily pressure monitoring, and oven door leak limits at HNR coke oven batteries. 89
Fed. Reg. at 55686.

40.     The Coke Ovens Rule was the result of a court order secured by frontline
communities who sued EPA for a years-long pattern of failing to update Clean Air Act Standards.
*Citizens for Pennsylvania's Future v. Wheeler*, 469 F. Supp. 3d 920 (N.D.*/-/z Cal. 2020). The
Coke Ovens Rule includes sensible requirements that would better protect the health of people
living near and working in coke plants.

41.     The Coke Ovens Rule included new MACT standards for previously unregulated
hazardous air pollutants like acid gases; dioxins and furans; formaldehyde; hydrogen cyanide;
mercury; polycyclic aromatic hydrocarbons; and volatile organic hazardous air pollutants.

42.     EPA explained that the new MACT standards ensured that "emission of
[hazardous air pollutants] [does] not increase and that air quality does not degrade over time." 89
Fed. Reg. at 55723.

43.     The Coke Ovens Rule also established requirements for PQBS and COB
standards for ByP facilities. Those requirements included: fenceline monitoring for benzene (40
C.F.R. §§ 63.314 and 63.311(j)–(l)); revised leak standards for doors, lids, and offtakes (40
C.F.R. §§ 63.302(a)(4), 63.302(d), 63.304(b)(8), and 63.311(h) through (i)); and battery stack

standards for previously unregulated HAP (40 CFR §§ 63.7283(d), 63.7290, 63.7296(c) through (f), 63.7300(c)(4), 63.7320(a), 63.7321, 63.7333, and 63.7341(f)).

44.    The Coke Ovens Rule also established requirements for PQBS and COB standards for HNR facilities. Those requirements included: opacity monitoring and action opacity limits for bypass/waste heat stacks (40 C.F.R. § 63.7299); revised pressure monitoring requirements for oven doors and common tunnels (40 C.F.R. § 63.303(a)(1)(i)–(ii)); and MACT floor standards for previously unrelated hazardous air pollutants (40 C.F.R. §§ 63.7290(b)–(d), 63.7297(a)–(d), and 63.7298(a)–(e)).

45.    In finalizing the Coke Ovens Rule, EPA concluded that the changes were modest and achievable, mostly through work practices, and "facilities will be able to comply with these limits without the need for any new [or additional] controls." *Id*. at 55696; 55707.

46.    EPA finalized the Coke Ovens Rule in July 2024. 89 Fed. Reg. 55684.

47.    The Coke Ovens Rule established compliance deadlines for each of the new standards, which ranged from July 7, 2025 (lowered leak limits and fenceline monitoring), to January 5, 2026 (new MACT floor standards). 89 Fed. Reg. at 55690.

*EPA announces reconsideration, tries to suspend compliance deadlines*

48.    On March 12, 2025, in a press event billed as "the greatest day of deregulation our nation has seen," EPA announced that it would "reconsider" the Coke Ovens Rule and 31 other regulations protecting human health and the environment. EPA, News Release, *EPA Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025), *available at* https://perma.cc/EXL5-FAMQ (last visited Dec. 18, 2025).

49.    Along with its press release, EPA published a "fact sheet" about its planned reconsideration of the Coke Ovens Rule and seven other recent hazardous air pollutant rules.

That fact sheet included an invitation that "[a]ny source interested in a Presidential exemption" from any of the eight rules, "should provide their recommendations to EPA by March 31, 2025." EPA, *Oil and Gas Regulations: Powering the Great American Comeback Fact Sheet* 3, *available at* https://perma.cc/E8UM-RN3K (last visited Oct. 21, 2025). The Fact Sheet further explained, "Sources need only provide why technology is unavailable and why it is in the national security interests of the United States to provide the exemption." *Id.*

50.     Following up on its invitation to request exemptions, on or about March 24, 2025, EPA posted a new webpage announcing it had established "an electronic mailbox"— airaction@epa.gov—"to allow the regulated community to request a Presidential Exemption under section 112(i)(4)." EPA, *Clean Air Section 112 Presidential Exemption Information* (last updated Apr. 14, 2025), *available at* https://perma.cc/WKL5-44FC (last visited December 17, 2025). EPA asked that requests be submitted "by March 31, 2025," a week after the webpage was posted. *Id.*[1]

51.     Facility owners and operators across multiple source categories sent exemption requests to that email inbox. EPA did not solicit any information from the public or provide any opportunity for public comment.

52.     On March 31, 2025, all five companies operating coke plants—Cleveland-Cliffs, U.S. Steel, SunCoke, Drummond Company and DTE Vantage—requested Section 112(i)(4) exemptions from the President. On July 3, 2025, EPA signed an Interim Final Rule extending the compliance deadlines of the Coke Ovens Rule by 2 years.

53.     EPA was sued over the Interim Final Rule, in a case captioned *GASP v. EPA.*

---

[1] EPA has since removed much of the information in an April 14, 2025 update to the webpage. *See* EPA, *Clean Air Act Section 112 Presidential Exemption Information,* https://perma.cc/WKL5-44FC (last visited Dec. 17, 2025).

54.    On October 2, 2025, EPA signed an action withdrawing the Interim Final Rule, reinstating the Coke Ovens Rule's original compliance deadlines. EPA explained that the Agency "does not believe that the currently available information supports a conclusion that regulated parties would face significant immediate compliance challenges meeting" the Coke Ovens Rule standards. 90 Fed. Reg. at 56011.

55.    The notice withdrawing the Interim Final Rule was published in the Federal Register on December 5, 2025.

*The Coke Oven Exemption Proclamation.*

56.    On November 21, 2025, President Trump issued a proclamation exempting all eleven coke oven facilities from "all compliance deadlines established under the Coke Ovens Rule," "with each such deadline extended by 2 years from the date originally required for such deadline." The Coke Ovens Proclamation included "Annex I," a list of the facilities to which the exemptions apply.

57.    The Coke Ovens Proclamation and Annex I were published in the Federal Register on November 26, 2025. 90 Fed. Reg. 54517.

58.    The Coke Ovens Proclamation cited "authority vested in [the President] by the Constitution and the laws of the United States, including Section 112(i)(4) of the Clean Air Act, 42 U.S.C. § 7412(i)(4)." 90 Fed. Reg. 54517.

59.    The Coke Ovens Proclamation included what it referred to as two "determinations."

60.    First, the Coke Ovens Proclamation purported to "determine" that "[t]he technology to implement the Coke Ovens Rule is not available," stating "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance

with the Coke Ovens Rule by the compliance dates in the Coke Ovens Rule." 90 Fed. Reg. at 54518.

61.    Second, the Coke Ovens Proclamation purported to determine that "[i]t is in the national security interests of the United States to issue this Exemption for the reasons stated in paragraphs 1 and 3 of this proclamation." 90 Fed. Reg. at 54517. The President generally invoked the vital role of steel in the United States economic and daily life, including infrastructure, manufacturing, and various other industries. *Id.* The Coke Ovens Proclamation asserts that 70 percent of steel is made using metallurgical coke. *Id.* The Coke Ovens Proclamation states that the Coke Ovens Rule places severe burdens on the coke production industry and, through its indirect effects, on the viability of our Nation's critical infrastructure, defense, and national security. 90 Fed. Reg. at 54517.

62.    The Coke Ovens Proclamation included no facility-, standard-, or technology-specific determinations. Instead, the Coke Ovens Proclamation broadly and conclusory purported to "determine" that the technology to implement the Coke Ovens Rule (in its entirety) was not available and that exemptions are in the national security interests of the United States.

63.    The Coke Ovens Proclamation's unsupported determinations are unambiguously contradicted by factual evidence, including EPA's own findings and record for the Coke Ovens Rule. The determinations were further contradicted in EPA's December 5, 2025 withdrawal of the Interim Final Rule where the agency stated *"[a]fter reviewing the information received, EPA does not believe the information before it establishes that the applicable air toxics standards would have been exceeded if the compliance dates had not been extended, regardless of whether facilities installed additional controls*." 90 Fed. Reg. at 56011 (emphasis added).

*Presidential Exemptions for ByP facilities*

64.     The President exempted ByP facilities from three requirements in the Coke Ovens Rule: 1) fenceline monitoring, 2) limits on leaks from coke oven battery doors, lids and offtakes and related reporting requirements, and 3) new MACT and work practice standards for coke oven pushing and battery stacks and related performance testing and reporting requirements. Technology necessary to implement each of those standards is available, as discussed below.

<u>Fenceline Monitoring</u>

65.     Technology to implement the COB fenceline monitoring standard is available.

66.     The Coke Ovens Rule fenceline monitoring standard requires that operators purchase and install sorbent tubes for collecting benzene concentrations at the perimeter of the coke oven facilities. Operators are to install the sorbent tubes following EPA Method 325A. Operators must then send the tubes to a lab that will analyze according to Method 325B. 89 Fed. Reg. 55694 (codified at 40 C.F.R. § 63.314)

67.     There are six ByP facilities regulated by the Coke Ovens Rule. Four of those, ABC Coke, U.S. Steel Clairton Coke Works, Cleveland Cliffs' Burns Harbor plant and, DTE Energy-EES Coke Battery conducted six months of fenceline monitoring in 2022 as part of EPA's Information Collection Request ("ICR") Section 114 of the Clean Air Act.

68.     Sorbent tubes needed to implement the fenceline monitoring standard according to Method 325A are commercially available.

69.     If, after a year of collecting fenceline data, a facility's fenceline benzene concentrations exceed an action level specified in the Coke Ovens Rule and the operator is unable to determine the root cause within thirty days, that facility would be required to conduct

monitoring with real time benzene sensors. 89 Fed. Reg. 55740 (codified at 40 C.F.R.

§ 63.314(d)(1)(ii)(B))

70.    Technology to implement real-time benzene sensors is available. These monitors

are commercially available through Aeroqual. Refineries across the U.S. also deploy real-time

benzene monitors. Moreover, the refinery sector has been required to perform fenceline

monitoring following Method 325A/B for the past five years 85 Fed. Reg. 6064 (Feb. 4, 2020)

(codified at 40 C.F.R. § 63.658). The technology that is used by refineries to comply with

fenceline monitoring requirements is the same technology that is necessary to comply with the

Coke Ovens Rule fenceline monitoring requirement. The monitoring technology is available for

refineries to purchase, and they are still conducting fenceline monitoring.

<u>Reduced leak limits from doors, lids and offtakes</u>

71.    Technology to implement the leak limits of the Coke Ovens Rule is available.

72.    The leak limit standards do not require facilities to obtain or deploy any new

"technology" within the meaning of Section 7412(i)(4).

73.    The Coke Ovens Rule leak limit standards are achieved by applying operational

and maintenance work practice standards, not through additional air pollution control devices or

other equipment. 89 Fed. Reg. 55695 (codified at 40 C.F.R. § 63.302).

74.    Industry commenters on the Coke Ovens Rule stated that "across the cokemaking

industry leak control for doors, lids, and offtakes is achieved through operational and

maintenance work practices, not through add-on pollution controls or other equipment." Env't

Prot. Agency, Summary of Public Comments and Responses for Coke Ovens: Pushing,

Quenching, and Battery Stacks Residual Risk and Technology Review, and Coke Oven Batteries

Periodic Technology Review (May 2024) ,153, *available at*

https://www.regulations.gov/document/EPA-HQ-OAR-2002-0085-1613. Based on available data, the EPA expected that coke oven "*facilities will be able to comply with these limits without the need for any new controls*." 89 Fed. Reg. 55696 (emphasis added).

75.    EPA "estimated that there would be no reductions in actual emissions and there would be no control costs, but the lower limits would reduce the allowable emissions." *Id*. at 55695.

<u>New MACT floor and work practice standards</u>

76.    Technology to implement the new MACT floor limits is available.

77.    The Coke Ovens Rule establishes new standards for hazardous air pollutants for which EPA had not previously established hazardous air pollutant standards. These standards for previously unregulated pollutants are stated either as a MACT floor or as work practice standards under 42 U.S.C. § 7412(h).

78.    The new MACT floor standards apply to acid gases, hydrogen cyanide, mercury and particulate matter (as a surrogate for nonmercury HAP metals). 89 Fed. Reg. at 55694 (codified at 40 C.F.R. §§ 63.7283(d); 63.7296(c)–(f); 63.7300(c)(4); 63.7320(a); 63.7321; 63.7333; 63.7341(f)))

79.    New work practice standards apply to battery stacks (based on good combustion in battery waste heat flues) for polycyclic aromatic hydrocarbons, dioxin and furans, and volatile organic hazardous air pollutants emissions from battery stacks at ByP facilities for existing and new sources based off available test data. 89 Fed. Reg. at 55694.

80.    Technology to implement new work practice standards is available.

81.    Sources are capable of complying with the new MACT limits without installing additional air pollution controls or other technologies.

18

82.    In the Coke Ovens Rule preamble, EPA estimated that "*all sources can meet the new MACT floor limits and would not have to install controls to meet the limits*." 89 Fed. Reg. at 55720 (emphasis added).

83.    Facilities do not need to obtain or deploy any new "technology" within the meaning of Section 7412(i)(4) to comply with the new work practice standards. The work practice standards consist of operational practices that that prevent and minimize emissions.

*Presidential Exemption for HNR facilities*

84.    The President exempted HNR facilities from four requirements in the Coke Ovens Rule: 1) opacity limits for bypass/waste heat stacks, 2) Method 303A and daily pressure monitoring, 3) MACT numeric emission limits, and 4) initial performance tests. Many of these standards do not require any technology, and where technology is necessary it is available and already in use by the facility, as discussed below.

<u>Opacity limits for bypass/waste heat stacks</u>

85.    In the Coke Ovens Rule, EPA finalized opacity observation requirements for bypass/waste heat stacks and established a corrective action threshold of 20 percent opacity. 89 Fed. Reg. at 55744 (codified at 40 C.F.R. § 63.7299).

86.    Under the Coke Ovens Rule, any HNR facility that emits exhaust through a bypass/waste heat stack for more than an hour continuously on a given week must perform visual emissions monitoring that week. The one continuous bypass facility that regularly exceeds this threshold — SunCoke's Jewell facility in Virginia — is already subject to an equivalent weekly monitoring requirement in its Title V permit. *Id*. at 55706. Intermittent bypass HNR facilities must only conduct visual emissions monitoring on weeks that they bypass continuously for over an hour.

87.     No technology is required to implement this weekly monitoring. The weekly monitoring must be performed according to EPA Method 9, which "involves the determination of plume opacity by qualified observers" who "observe the plume momentarily at 15-second intervals" using the naked eye. *See* EPA Method 9, Appendix A-4 to 40 C.F.R. Part 60.

88.     If visual observations determine that opacity is greater than 20 percent, the facility must undertake corrective action to reduce the emissions.

89.     EPA noted that the 20 percent opacity limit "is currently required and achieved at the one HNR facility with continuous bypass." 89 Fed. Reg. at 55707.

<u>Method 303A and daily pressure monitoring</u>

90.     The Coke Ovens Rule requires daily pressure monitoring for HNR facilities in either the common battery tunnel or each oven during use, and also requires zero leaks from oven doors. *Id.* at 55733 (codified at 40 C.F.R. § 63.303(a)).

91.     The technology to implement the mandated pressure monitoring is already owned by and used at the facilities subject to this regulation. As EPA summarized, all HNR facilities "already monitor negative pressure in the common tunnel electronically on a continuous basis." *Id*. at 55703. This negative pressure monitoring was performed to comply with regulations prior to the 2024 update, and no facility requested an exemption from the updated pressure monitoring requirements codified at 40 C.F.R. § 63.303(a)(1)(ii).

92.     To determine the percentage of leaking coke oven doors, the Coke Ovens Rule requires operators to perform visual observations pursuant to EPA Method 303 or 303A. 40 C.F.R. § 63.303(a)(1)(i) (citing procedures found in *id*. § 63.309(d)(1) and Appendix A to 40 C.F.R. Part 63). These procedures are not technology based, but "rel[y] on observing [visible emissions] emanating from the ovens." 89 Fed. Reg. at 55689.

93.     In promulgating the Coke Ovens Rule, EPA commented that it is already "current SunCoke practice to observe oven doors to maintain zero leaks" and the rule is merely codifying current practices into regulations. 89 Fed. Reg. at 55703.

<u>MACT numeric limits</u>

94.     EPA finalized MACT floor standards for various pollutants present in HNR pushing, main stack, and bypass/waste heat vent stack emissions based on available test data and additional data provided by industry during the rulemaking process. Specifically, EPA finalized:

95.     MACT floor standards for mercury, acid gases, and PAH emitted from pushing operations, 89 Fed. Reg. 55743 (codified at 40 C.F.R. § 63.7290(b)–(d));

96.     MACT floor standards for particulate matter (as a surrogate for nonmercury HAP metals), mercury, acid gases, and hydrogen cyanide emitted from HNR HRSG main stacks, 89 Fed. Reg. 55744 (codified at 40 C.F.R. § 63.7297(a)–(d)); and

97.     MACT floor standards for particulate matter (as a surrogate for nonmercury HAP metals), mercury, acid gases, hydrogen cyanide, and formaldehyde emitted from HNR bypass/waste heat vent stacks. 89 Fed. Reg. 55744 (codified at 40 C.F.R. § 63.7298(a)–(e)).

98.     The Coke Ovens Rule also set forth specific deadlines for HNR facilities to comply with the performance test required by the general NESHAP regulations. 40 C.F.R. § 63.7320(a) (setting forth the deadline for HNR MACT performance tests); *id.* § 63.7(a)(2) (the performance test requirement that applies across NESHAP source categories).

99.     EPA proposed and finalized these new MACT floor limits expecting all sources to be able to meet them "without the need for additional controls." 89 Fed. Reg. at 55717; Maximum Achievable Control Technology Standard Calculations, Cost Impacts, and Beyond-

the-Floor Cost Impacts for Coke Ovens Facilities under 40 CFR part 63, subpart CCCCC—Final Rule, Docket ID Nos. EPA–HQ–OAR–2002–0085 and EPA–HQ–OAR–2003–0051.

*The Court's equitable authority to review ultra vires Executive action*

100.    The Coke Ovens Proclamation exceeds the President's statutory authority because, by granting sweeping exemptions to the entirety of regulated sources in the COB and PQBS categories without making facility-, standard-, or technology-specific determinations, the Proclamation exceeds the bounds of the President's Section 112(i)(4) authority.

101.    The Coke Ovens Proclamation in effect categorically amends the compliance dates of the Coke Ovens Rule, an action outside the bounds of Section 112(i)(4). Section 112(i)(4) is a narrow exemption applicable in specific statutorily defined circumstances; it does not give the President authority to amend EPA standards. Only EPA may amend those standards and only after notice and comment rulemaking.

102.    D.C. Circuit case law generally allows for review of presidential actions to ensure conformity with statutory requirements, provided that "the authorizing statute or another statute places discernible limits on the President's discretion." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (citing, *inter alia*, *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)).

103.    The statutory provision at issue, Section 112(i)(4), provides such discernable limits on the President's discretion by requiring a determination that, for specific facilities, "technology to implement" a standard "is not available" and that the exemption "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4).

104.    The Court has the power to review the Coke Ovens Proclamation to discern whether the President's exercise of statutory authority was unlawful because the necessary

factual predicate required by the Clean Air Act is not present, and because the Coke Ovens

Proclamation unlawfully exercises authority not conveyed by Section 112(i)(4), contrary to

Congress's explicit restrictions on stay regulations and compliance deadlines.

105.    The Court has the power to declare the Coke Ovens Proclamation is unlawful and

*ultra vires*.

**STANDING**

106.    Plaintiffs' members live, work, and recreate in areas affected by the hazardous air

pollutants that are and will be emitted from the exempted facilities. Plaintiffs' members are

harmed by breathing air pollution from the exempted facilities and are concerned that exposure

to hazardous air pollutants from the exempted facilities could have harmful impacts on their

health.

107.    According to EPA, "[c]oke oven emissions are among the most toxic of all air

pollutants." EPA, Fact Sheet-Coke Oven NESHAP, at 1 (*available at*

https://www.epa.gov/sites/default/ files/2016-01/documents/cokefact.pdf). Exposure to coke

oven emissions, including benzene, emitted by exempted coke ovens causes adverse health

effects. Plaintiffs' members and their families that live near coke ovens suffer from pulmonary

disease, cancer and other health issues that they believe are caused by breathing toxic emissions

from the coke ovens.

108.    Plaintiffs' members stood to benefit from the emissions reductions required by the

Coke Ovens Rule, which were slated to go into effect July 7, 2025. Exempted facilities are now

able to emit coke oven emissions, including benzene, at higher levels than otherwise would have

been allowed, for years beyond the Rule's mandate.

109.    Plaintiffs' members are harmed by the excess emissions that will result from the Coke Ovens Proclamation exemptions. Plaintiffs have members that live in close proximity to exempted facilities now face a significant risk of exposure to harmful emissions as a result of the Coke Ovens Proclamation.

110.    Because all eleven coke oven facilities did not begin implementing work practice requirements to meet the MACT limits for the previously unregulated hazardous air pollutants, Plaintiffs' members are deprived of the protections the Coke Ovens Rule provides for their exposure to those hazardous air pollutants.

111.    Because the lower leak limits for ByP facilities would reduce the allowable emissions, Plaintiffs are deprived of these protections from fugitive coke oven emissions from the COB, including benzene.

112.    Because the five HNR facilities no longer have to monitor for negative pressure or for door leaks, leaks may take longer to detect which will increase Plaintiffs' members' exposure to pollutants. Similarly, without weekly opacity monitoring for HNR bypass/waste heat stacks and a mandatory action threshold, operators may not detect emissions or take action to reduce them, thereby increasing Plaintiffs' members' exposure to pollutants.

113.    Plaintiffs' members also stood to benefit from the fenceline monitoring requirements that were to go into effect July 7, 2025.

114.    The Coke Ovens Rule requires that sources make available the data collected from fenceline monitoring to EPA's Compliance and Emissions Data Reporting Interface ("CEDRI") and be available to the public via the Web Factor Information Retrieval System ("WebFIRE"). 89 Fed. Reg. at 55690, 55701; 40 C.F.R. § 63.311(j).

115.    The Coke Ovens Proclamation denies Plaintiffs and their members the emissions information those reports would provide.

116.    Plaintiffs' members were looking forward to results of benzene concentrations at ByP facilities being publicly available. They would use this information to improve their understanding of the levels of benzene they are exposed to and the resultant health risks they are subject to. They would have used this information to limit their time at home and/or outdoors if the results were high and inform neighbors and friends about benzene concentrations in their communities.

117.    Plaintiffs and their members would use such information to raise public awareness of air pollution and to further Plaintiffs' and their members' advocacy, education, and outreach efforts to reduce air pollution and protect public health. Plaintiffs and their members will be deprived of information they would have used to evaluate their pollution exposure and health risks in areas affected by emissions from the exempted facilities. That information would also allow some Plaintiffs to make educated decisions about how they engage in advocacy to reduce air pollution. Plaintiffs and their members are therefore harmed by the Coke Ovens Proclamation.

## CLAIMS FOR RELIEF

### COUNT ONE:
**Unlawful Executive Action in Violation of the Clean Air Act**
**(Nonstatutory Review for Violations of Federal Law by Federal Officials;**
**Against All Defendants)**

118.    Plaintiffs incorporate by reference Paragraph 1–117.

119.    The President has limited authority to exempt stationary sources from duly promulgated hazardous air pollutant regulations solely by virtue of the authority delegated by

Congress in Section 112(i)(4). The President lacks any independent authority under the U.S. Constitution to issue the exemptions.

120.    Section 112(i)(4) permits the President to exempt a source from a hazardous air pollutant standard only if "the technology to implement such standard is not available" and if an exemption is in the national security interests of the United States.

121.    Whether technology to implement a standard is or is not available is a discrete, yes-or-no factual inquiry that limits the President's discretion to grant exemptions.

122.    Section 112(i)(4) establishes a judicially manageable standard with clear and precise limits of the sort federal courts routinely construe to determine whether officials have acted consistent with law.

123.    There is no statutory basis for the President's indiscriminately broad determinations that technology to implement the Coke Ovens Rule is not available or that granting exemptions from that Rule is in the national security interests of the United States. The President patently misconstrued the statutory terms "technology" and "not available" in purporting to exercise the Section 112(i)(4) exemptions authority.

124.    The Coke Ovens Proclamation's purported determination that technology needed to implement the various standards of the Coke Ovens Rule is a conclusory statement without specific findings as to any specific standard, any specific technology, or any specific facility.

125.    EPA did not quantify benefits with the Coke Ovens Rule because "all covered facilities already have [hazardous air pollutant] emissions levels that are below the final limits, based on facility data available to EPA." 89 Fed. Reg. at 55686. However, EPA anticipated that the Coke Ovens Rule would allow for "earlier corrective action and prevent pollution increases that would otherwise occur." *Id*.

126.    Technology to implement the Coke Ovens Rule is in fact available. The relevant technologies to implement each aspect of the Coke Ovens Rule standards are already in use throughout the cokemaking industry.

127.    The technology for fenceline monitoring for ByP facilities is available and already in use at all 115 refineries.

128.    The Coke Ovens Proclamation is ultra vires as to the fenceline monitoring requirement for ByP facilities.

129.    The fenceline monitoring requirement of the Coke Ovens Rule rests, in part, on statutory authority independent of 42 U.S.C. § 7412—and hence beyond the scope of the exemption provision, which is limited to standards promulgated under "this section." 42 U.S.C. § 7412(i)(4). The fenceline monitoring requirement was grounded, in part, on Section 114(a)(1)(C) of the Clean Air Act, 42 U.S.C. § 7414(a)(1)(C) (authorizing EPA to require "any person who owns or operates any emission source … or who is subject to any requirement of this chapter" to install, use, or maintain monitoring equipment). 89 Fed. Reg. at 55697 ("CAA section 114 independently provides ample authority to require monitoring"); *Id*. (promulgating fenceline monitoring requirement based, in part, on "additional authority" under 42 U.S.C. § 7414).

130.    The MACT floor standards for ByP and HNR ovens are met through work practices that do not require the installation of any controls.

131.    For ByP and HNR facilities, compliance with the reduced limits for leaking components of COB is achieved through work practices that do not require the installation of additional controls.

132.    The work practice standards necessary to meet the Coke Ovens Rule standards do not meet the definition of "technology" under Section 7412(i)(4). For HNR facilities, PQBS and

COB mandatory opacity and door leak monitoring must be performed visually by a human observer and do not require any technology to implement.

133.    The five exempted HNR facilities already have pressure monitors in the common tunnels that are capable of operating continuously and complying with the daily pressure monitoring standard.

134.    The purported determination that technology to implement the standards is not available is unambiguously contradicted by factual evidence. The Coke Ovens Proclamation's cursory and conclusory statements to the contrary cannot be credited.

135.    The President's purported determination that the technology to implement the Coke Ovens Rule is not available rests on an unlimited, untenable interpretation and application of the authority conveyed by Section 112(i)(4) of the Clean Air Act.

136.    Because the President grossly exceeded the bounds of his statutory authority by purporting to exempt stationary sources from standards for which the technology to implement is available, the Coke Ovens Proclamation is plainly in excess of the President's delegated powers and contrary to the statute's specific limitations on those powers.

137.    The President's action is contrary to the Clean Air Act and is ultra vires.

138.    The Court possesses inherent equitable power to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Congress has nowhere foreclosed review of the interpretation and application of Section 112(i)(4). There is no alternative statutory procedure for review of Plaintiffs' claim.

139.    Because the Coke Ovens Proclamation violates the Clean Air Act and is ultra vires, EPA actions implementing or giving effect to the proclamation likewise violate the Clean Air Act and are ultra vires.

**COUNT TWO:**

**Ultra Vires, De Facto Rulemaking Without Statutory Authority**
**(Nonstatutory Review of Action in Excess of Statutory Authority by Federal Officer;**
**Against All Defendants)**

140.    Plaintiffs incorporate by reference Paragraph 1–117.

141.    Congress required EPA to provide for existing sources' compliance with hazardous air pollutant standards "as expeditiously as practicable," and set concrete boundaries on EPA's flexibility to set compliance deadlines "in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A).

142.    Congress gave EPA and state permitting authorities discrete, limited authority to grant an existing source "up to 1 additional year to comply" with standards promulgated under subsection (d) "if such additional period is necessary for the installation of controls." 42 U.S.C. § 7412(i)(3)(B).

143.    Congress further conferred discrete, limited authority on EPA to stay the effectiveness of rules, including hazardous air pollutant standards, for no more than three months. 42 U.S.C. § 7607(d)(7)(B).

144.    Congress directed EPA to provide for public notice and comment on EPA actions to revise hazardous air pollutant standards, their compliance dates, or to grant source-specific deadline extensions. 42 U.S.C. § 7607(d)(5), (h).

145.    The exemption authority conveyed in Section 112(i)(4) must be construed congruously with the authorities and limitations Congress enacted in Sections 112 and 7607.

146.    Interpreting Section 112(i)(4) to authorize exemptions for all operating sources of the regulated source category, from every standard and other requirement of a rule, without facility- or standard-specific justification tied to the statutory factors, is contrary to the context, purpose, and structure of the Clean Air Act.

147.    The Coke Ovens Proclamation's sweep of the entire cokemaking industry reflects an interpretation of the Section 112(i)(4) authority that would swallow and render superfluous statutory limits.

148.    The content, context, and scope of the Coke Ovens Proclamation demonstrates that the Coke Ovens Proclamation is not an "exemption" within the meaning of Section 112(i)(4).

149.    The Coke Ovens Proclamation is functionally a rulemaking and/or stay pending reconsideration granted without observance of the procedural and substantive limitations Congress enacted in Sections 112 and 307 of the Clean Air Act. The Proclamation was issued despite the statutory requirements for conducting rulemaking or for granting a stay pending reconsideration.

150.    EPA invited requests for presidential exemptions explicitly in the context of its announced reconsideration of the Coke Ovens Rule and seven other hazardous air pollutant rules. *See* supra ¶¶ 49, 50. EPA stated that the exemptions are offered "while EPA reconsiders" the underlying rule. *See* EPA, Clean Air Act Section 112 Presidential Exemption Information, *available at* https://perma.cc/NPT5-RAQY (last accessed Oct. 20, 2025).

151.    The President indiscriminately granted exemptions from all compliance obligations of the Coke Ovens Rule, without particularized consideration of the specific standards, technologies or practices needed to comply, or facilities and their particular products

and processes, all of which is necessary to determine whether technology is not available to implement the standards and whether an exemption is in the national security interests of the United States.

152.    The Coke Ovens Proclamation 's purported exercise of Section 112(i)(4) exemption authority is in fact an exercise of rulemaking and/or stay authority despite the President lacking such power. The Clean Air Act gives only EPA that authority and only after following certain procedures in certain circumstances.

153.    The sweeping Coke Ovens Proclamation exceeds the narrow bounds of Section 112(i)(4) to achieve improper goals prohibited by other provisions of the Clean Air Act. In granting compliance relief that far exceeds the Section 112(i)(4) authority, the President bypassed and contravened the statutory requirements on rulemaking and reconsideration to accomplish sweeping compliance exemptions unauthorized by law and in excess of the President's statutory authority.

154.    The Coke Ovens Proclamation is beyond the authority conveyed by the Clean Air Act and is *ultra vires*.

155.    Because the Coke Ovens Proclamation is beyond the Clean Air Act authority and ultra vires, EPA actions implementing or giving effect to the proclamation are similarly ultra vires.

## RELIEF REQUESTED

WHEREFORE Plaintiffs request that the Court:

A.  Declare that the Coke Ovens Proclamation is unlawful and invalid and that the Annex I sources remain subject to the Coke Ovens Rule as promulgated;

B.  Issue injunctive relief:

      i.     prohibiting EPA and Administrator Lee Zeldin from implementing, relying on, or giving effect to the Coke Ovens Proclamation, including through implementation of the Clean Air Act's Title V operating permit program; and

      ii.    directing EPA to promptly notify, in writing, the operators of facilities listed in Annex I and relevant state, local, and/or Tribal permitting authorities that the Coke Ovens Proclamation is unlawful and invalid, and that any facilities that the Coke Ovens Proclamation purported to exempt may not lawfully delay or avoid compliance with the deadlines promulgated by the Coke Ovens Rule by relying on the Coke Ovens Proclamation .

C.     Award Plaintiffs their fees and costs of litigation as authorized by law;

D.     Grant such other relief as the Court deems just and proper.


Dated:  December 22, 2025           Respectfully submitted,

/s/ Abel Russ
Abel Russ (D.C. Bar No. 1007020)
888 17th Street, NW
Suite 810
Washington, DC 20006
aruss@environmentalintegrity.org
Tel: (802) 482-5379

/s/ Haley Lewis
Haley Lewis (AL Bar No. ASB-1008-R66I)
888 17th Street, NW
Suite 810
Washington, DC 20006
hlewis@environmentalintegrity.org
Tel: (202) 263-4449
*Pro Hac Vice Application Pending*

/s/ David Bookbinder
David Bookbinder (D.C. Bar No.  455525)
Environmental Integrity Project
888 17th Street, NW
Suite 810
Washington, DC 20006
dbookbinder@environmentalintegrity.org
Tel: (202) 301-751-0611

*Counsel for Plaintiff Greater-Birmingham Alliance
to Stop Pollution and Clean Air Council*

/s/ Sarah A. Buckley
Sarah A. Buckley (D.C. Bar No. 90035401)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
sbuckley@nrdc.org
Tel: (202) 836-9555

/s/ Shampa Panda
Shampa Panda (D.C. Bar No. 90030605)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
spanda-bryant@nrdc.org
Tel: (202) 836-9333

*Counsel for Plaintiff Natural Resources Defense
Council*

/s/ Tosh Sagar
Tosh Sagar (D.D.C. Bar No. D00497)
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
Tel: (202) 793-2075
tsagar@earthjustice.org

*Counsel for Plaintiffs Citizens for Pennsylvania's Future, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club*

/s/ Mark Sabbath
Mark Sabath (D.C. Bar No. 90002735)
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001-5862
Telephone: 434-977-4090
Msabath@selc.org

/s/ Christina Tidwell
Christina Tidwell (Ala. Bar No ASB-9696-D10R)
Southern Environmental Law Center
2829 2nd Avenue S, Suite 282
Birmingham, AL 35233
Tel: 205-745-3060
Ctidwell@selc.org
*Pro Hac Vice Application Pending*

/s/ Jaclyn Brass
Jaclyn Brass (Ala. Bar No. ASB-5340-B19L)
Southern Environmental Law Center
2829 2nd Avenue S, Suite 282
Birmingham, AL 35233
Tel: 205-745-3060
Jbrass@selc.org
*Pro Hac Vice Application Pending*

*Counsel for Plaintiff Greater-Birmingham Alliance to Stop Pollution*

/s/ Brian Lynk
Brian Lynk (D.C. Bar No. 459525)
Environmental Law & Policy Center
740 15th St. NW, Suite 700
Washington, D.C. 20005
Tel: 240-461-4241

*Counsel for Environmental Law & Policy Center*