# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GREATER-BIRMINGHAM ALLIANCE TO STOP POLLUTION, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | Civil Action No. 1:25-cv-04469-CRC |
| v. | ) ) | |
| DONALD TRUMP, President of the United States, in his official capacity, et al., | ) ) ) ) | |
| *Defendants*. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................2

I.    STATUTORY BACKGROUND ...................................................................................2

    A.    The Act's Requirements for Setting Standards ................................................2

    B.    The President's Section 7412(i)(4) Exemption Authority ................................5

II.    FACTUAL AND PROCEDURAL BACKGROUND.........................................................5

    A.    Basics of Coke Ovens .....................................................................................5

    B.    The Long Overdue 2024 Coke Ovens Rule ....................................................6

        1.    Standards for Oven Batteries Category.............................................7

        2.    Standards for Pushing-Quenching-Stacks Category .........................8

    C.    President Trump's Clean Air Act Rollback Agenda.........................................9

    D.    The Administration's Failed Efforts to Delay the Coke Ovens Rule ...............10

    E.    The Coke Ovens Exemption Proclamation......................................................11

STANDARD OF REVIEW ....................................................................................................12

ARGUMENT ......................................................................................................................12

I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE PROCLAMATION...........12

    A.    Plaintiffs Have Established Injury to Their Members and Supporters. ................14

        1.    Threats to health are a cognizable injury. ...................................................14

        2.    Aesthetic and recreational harms are cognizable injuries.........................15

        3.    The deprivation of monitoring information is a cognizable informational injury. ..................................................................................15

    B.    Plaintiffs Have Established Causation and Redressability. ..................................16

II.    THE PROCLAMATION IS JUDICIALLY REVIEWABLE ...........................................17

A.      Congress Has Not Barred Judicial Review, and There Is No Alternative Mechanism for Review of Plaintiffs' Claims. ......................................................19

B.      The President's Exemption Authority Is Susceptible to Review Because It Is Bounded by the Act's Terms. ........................................................................20

C.      Judicial Review Is Available to Discern Whether the Proclamation Evinces a Patent Misconstruction of the Authority Conferred. ...........................23

      1.      Plaintiffs' claims fit within the established framework for reviewing *ultra vires* claims..........................................................23

      2.      The Court can review whether the President's action is not authorized by law. ...................................................................25

III.    THE PROCLAMATION EXCEEDS THE PRESIDENT'S AUTHORITY ...................27

A.      On Its Face, the Proclamation Grossly Exceeds the President's Authority. ..........28

      1.      Section 7412(i)(4) prohibits the President from second-guessing EPA's determination that standards are achievable...................................29

      2.      The Proclamation grossly exceeds the limits and prohibitions in Section 7412(i)(4) in order to roll back the Coke Ovens Rule. .................33

B.      The Proclamation's Findings Are Directly Contrary to the Executive's Own Findings Made Mere Weeks Earlier, Demonstrating Bad Faith .................34

C.      The Proclamation Exceeds the President's Authority Because It Evinces a Patent Misconstruction of Section 7412(i)(4) and Is Predicated on Bad Faith. ........................................................................................................35

      1.      The Proclamation's sweeping findings disregard the Act's plain requirements..................................................................36

      2.      The Proclamation unlawfully exempts standards that are ineligible for an exemption because no technology is needed to implement them..................................................................36

      3.      The Proclamation unlawfully exempts standards where the technology needed to implement them is available. ................................41

IV.    THE PROCLAMATION'S BAD FAITH OVERCOMES ANY PRESUMPTION OF REGULARITY ................................................................................43

V.     THE PROCLAMATION SHOULD BE DECLARED UNLAWFUL AND EPA ENJOINED FROM IMPLEMENTING IT........................................................44

CONCLUSION....................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
   321 F.3d 1166 (D.C. Cir. 2003) ........................................................................24

*Air All. Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ........................................................................32

*Am. Fed'n of Labor and Congress of Indus. Orgs. v. Dept. of Labor*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ...................................................................23

*Am. Forest Res. Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023) .....................................................................17, 20

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) ....................................................................18, 24, 26, 27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..........................................................................................12

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ..........................................................................................17

*Ass'n of Battery Recyclers v. EPA*,
   716 F.3d 667 (D.C. Cir. 2013) ....................................................................15, 16

*Bluewater Network v. EPA*,
   370 F.3d 1 (D.C. Cir. 2004) ..............................................................................21

*Bowen v. Mich. Acad. of Fam. Physicians*,
   476 U.S. 667 (1986) ..........................................................................................19

*Carroll v. Safford*,
   44 U.S. 441 (1845) ............................................................................................17

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .............................................................17, 27, 44

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ..........................................................19, 24, 25, 36

*Chiron Corp. v. NTSB*,
   198 F.3d 935 (D.C. Cir. 1999) ..........................................................................15

*Citizens for Pa.'s Future v. Wheeler*,
  469 F. Supp. 3d 920 (N.D. Cal. 2020) ...................................................................6

*Clean Wis. v. EPA*
  964 F.3d 1145 (D.C. Cir. 2020) .................................................................14, 15

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ...............................................................................................44

*Dalton v. Specter*,
  511 U.S. 462 (1994) ...............................................................................................22

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ........................................................................................17, 26

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ...............................................................................19

*Env't Def. Fund v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019) ...............................................................................15

*Fed. Educ. Ass'n v. Trump*,
  795 F. Supp. 3d 74 (D.D.C. 2025) .........................................................................43

*Fed. Educ. Ass'n v. Trump*,
  No. 25-5303, 2025 WL 2738626 (D.C. Cir. 2025) ....................21, 22, 24, 25, 28, 33, 36, 43

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ...............................................................................................26

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...............................................................................................20

*Glob. Health Council v. Trump*,
  153 F.4th 1 (2025) .......................................................................................18, 19, 20

*Harmon v. Brucker*,
  355 U.S. 579 (1958) ...............................................................................................17

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
  71 F.4th 59 (D.C. Cir. 2023) ............................................................................24, 30

*Int'l Harvester Co. v. Ruckelshaus*,
  478 F.2d 615 (D.C. Cir. 1973) ...............................................................................21

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
  477 U.S. 274 (1986) ...............................................................................................13

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ................................................................................17

*Laufer v. Naranda Hotels, LLC*,
   60 F.4th 156 (4th Cir. 2023) ....................................................................15

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ................................................................................26

*La. Env't Action Network v. EPA*,
   955 F.3d 1088 (D.C. Cir. 2020) .................................................................3

*Mass. Lobstermen's Ass'n v. Raimondo*,
   141 S. Ct. 979 (2021) ..................................................................17, 20, 23

*Mass. Lobstermen's Ass'n v. Ross*,
   945 F.3d 535 (D.C. Cir. 2019) .....................................................23, 25, 27

*Mayorga v. Merdon*,
   928 F.3d 84 (2019) ..................................................................................12

*Mountain States Legal Found. v. Bush*,
   306 F.3d 1132 (D.C. Cir. 2002) ...................................................18, 23, 25, 27

*Murphy Co. v. Biden*,
   65 F.4th 1122 (9th Cir. 2023) ..................................................................25

*Nat. Res. Def. Council v. EPA*,
   529 F.3d 1077 (D.C. Cir. 2008) .................................................................4

*Nat. Res. Def. Council v. EPA*,
   749 F.3d 1055 (D.C. Cir. 2014) ...............................................................14

*Nat. Res. Def. Council v. EPA*,
   755 F.3d 1010 (D.C. Cir. 2014) ...............................................................16

*Nat. Res. Def. Council v. EPA*,
   808 F.3d 556 (2d Cir. 2015) ....................................................................21

*Nat'l Ass'n of Postal Supervisors v. USPS*,
   26 F.4th 960 (D.C. Cir. 2022) ....................................................18, 21, 23

*Nat'l Lime Ass'n v. EPA*,
   233 F.3d 625 (D.C. Cir. 2000) ...............................................................3, 4

*Nat'l Treasury Emps. Union v. Trump*,
   780 F. Supp. 3d 237 (D.D.C. 2025) ..........................................................21

*New York v. Biden*,
   636 F. Supp. 3d 1 (D.D.C. 2022) ....................................................................44

*Nielsen v. Preap*,
   586 U.S. 392 (2019) ....................................................................................29

*Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   103 F.4th 45 (D.C. Cir. 2024) ...............................................................24, 30

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ....................................................................................26

*Patel v. Garland*,
   596 U.S. 328 (2022) ....................................................................................19

*President v. Vance*,
   627 F.2d 353 (D.C. Cir. 1980) ....................................................................44

*Sierra Club v. EPA*,
   479 F.3d 875 (D.C. Cir. 2007) ..............................................................30, 37

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012) ....................................................................14

*Sierra Club v. EPA*,
   755 F.3d 968 (D.C. Cir. 2014) ....................................................................14

*Sierra Club v. EPA*,
   895 F.3d 1 (D.C. Cir. 2018) ........................................................................38

*Sierra Club v. EPA*,
   926 F.3d 844 (D.C. Cir. 2019) ........................................................13, 14, 15

*Train v. City of New York*,
   420 U.S. 35 (1975) ......................................................................................26

*Tulare County v. Bush*,
   306 F.3d 1138 (D.C. Cir. 2002) ............................................................21, 23

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016) ..................................................................4, 32

*United States v. Lee*,
   106 U.S. 196 (1882) ....................................................................................18

*United States v. Miller*,
   604 U.S. 518 (2025) ....................................................................................30

*United States v. Palomar-Santiago,*
  593 U.S. 321 (2021)................................................................22

*Ysleta Del Sur Pueblo v. Texas,*
  596 U.S. 685 (2022).........................................................20, 31

**Statutes**

5 U.S.C. § 7101.......................................................................21

16 U.S.C. § 431.......................................................................21

42 U.S.C. § 7411(a)(3)..............................................................31

42 U.S.C. § 7412(a)(3)..............................................................31

42 U.S.C. § 7412(b)(1)................................................................6

42 U.S.C. § 7412(c)....................................................................2

42 U.S.C. § 7412(d)(1)...........................................................3, 31

42 U.S.C. § 7412(d)(2)................................................4, 30, 31, 37

42 U.S.C. § 7412(d)(3).........................................................4, 9, 31

42 U.S.C. § 7412(d)(6)..............................................3, 4, 8, 30, 37

42 U.S.C. § 7412(f)(2)............................................................3, 31

42 U.S.C. § 7412(f)(2)(A)............................................................3

42 U.S.C. § 7412(i)(3)(A)............................................................5

42 U.S.C. § 7412(i)(3)(B)............................................................5

42 U.S.C. § 7412(i)(4)........................................1, 5, 18, 21, 28, 29, 36, 37

42 U.S.C. § 7414(c)..................................................................16

42 U.S.C. § 7475(d)(2)(D)(ii).....................................................20

42 U.S.C. § 7604(a)..................................................................19

42 U.S.C. § 7604(a)(2)..............................................................19

42 U.S.C. § 7607(b)..................................................................19

42 U.S.C. § 7607(b)(1)...........................................................19, 32

42 U.S.C. § 7607(d)(7) ........................................................................................32, 33

Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, 104
    Stat. 1485 (1990)...........................................................................................22

**Federal Register Notices**

88 Fed. Reg. 55858 (Aug. 16, 2023)......................................................................4, 42

89 Fed. Reg. 55684 (July 5, 2024)...........................................6, 7, 8, 9, 14, 38, 40, 41

90 Fed. Reg. 29997 (July 8, 2025)......................................................................10, 34

90 Fed. Reg. 54517 (Nov. 26, 2025)....................1, 11, 12, 25, 28, 33, 35, 36, 37

90 Fed. Reg. 56010 (Dec. 5, 2025) ....................................1, 11, 12, 25, 34

**Regulations**

40 C.F.R. pt. 60, app. A-4 (2025) ..............................................................................39

40 C.F.R. pt. 63, app. A (2025)..................................................................................40

40 C.F.R. pt. 63, subpt. CCCCC (2025) ......................................................................6

40 C.F.R. pt. 63, subpt. L (2025) ................................................................................6

40 C.F.R. § 63.301 (2025) .........................................................................................39

40 C.F.R. § 63.302(a)(4) (2025) ................................................................................41

40 C.F.R. § 63.303(a) (2025).......................................................................................8

40 C.F.R. § 63.303(a)(1)(i) (2025) ............................................................................40

40 C.F.R. § 63.303(a)(1)(ii) (2025) ...........................................................................41

40 C.F.R. § 63.309(a) (2025) .......................................................................................7

40 C.F.R. § 63.311(j) (2025)......................................................................................16

40 C.F.R. § 63.314 (2025) .............................................................................7, 41, 42

40 C.F.R. § 63.314(d)(1)(ii)(B) (2025) .......................................................................7

40 C.F.R. § 63.314(d) (2025).......................................................................................7

40 C.F.R. § 63.314(e) (2025).......................................................................................7

40 C.F.R. § 63.7283(d) (2025).....................................................................................8

40 C.F.R. § 63.7290(a) (2025) ..............................................................................8

40 C.F.R. § 63.7290(b) (2025) ........................................................................8, 38

40 C.F.R. § 63.7290(c) (2025) ........................................................................8, 38

40 C.F.R. § 63.7290(d) (2025) ........................................................................8, 38

40 C.F.R. § 63.7290(e) (2025) ..............................................................................8

40 C.F.R. § 63.7296(c)–(f) (2025) ..................................................................8, 38

40 C.F.R. § 63.7297(a)–(d) (2025) ..................................................................8, 38

40 C.F.R. § 63.7298(a)–(e) (2025) ..................................................................8, 38

40 C.F.R. § 63.7299 (2025) .............................................................................9, 39

40 C.F.R. § 63.7299(a)–(c) (2025) .......................................................................40

40 C.F.R. § 63.7300(c)(4) (2025) ....................................................................8, 38

40 C.F.R. § 63.7320(a) (2025) ..............................................................................8

40 C.F.R. § 63.7321 (2025) ..................................................................................8

40 C.F.R. § 63.7333 (2025) ..................................................................................8

40 C.F.R. § 63.7341(f) (2025) ..............................................................................8

**Other Authorities**

*Achievable*, Merriam Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/achievable.......................................................................31

*Achieve*, Merriam Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/achieve............................................................................31

*Available*, Merriam Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/available .........................................................................29

*Available*, Black's Law Dictionary (6th Ed. 1990)..........................................................29

Fed. R. Civ. P. 56(a) ...............................................................................................12

U.S. Const. art. III, § 2, cl. 1 ..................................................................................17

# INTRODUCTION

In November 2025, acting under Clean Air Act Section 7412(i)(4), President Trump issued a proclamation that provides coke ovens—facilities that superheat coal to create metallurgic coke, creating toxic air pollution in the process—with two-year exemptions from updated hazardous pollutant standards established in a 2024 rule (here, the "Coke Ovens Rule"). The Proclamation claimed that the standards "place[] severe burdens on the coke production industry," and it parroted the statutory language needed to issue a waiver: that "[t]he technology to implement the Coke Oven[s] Rule is not available." 90 Fed. Reg. 54517, 54517–18 (Nov. 26, 2025) ("the Proclamation"); *see* 42 U.S.C. § 7412(i)(4).

Just weeks before, the President's own EPA said the opposite. EPA issued a notice rescinding a July 2025 rule that had granted the coke oven industry a near-identical two-year extension of their compliance deadlines. In doing so, EPA reviewed the industry's own data, along with other public comments, and concluded that EPA "does not believe that the currently available information supports a conclusion that regulated parties would face significant immediate compliance challenges meeting" the updated standards. 90 Fed. Reg. 56010, 56011 (Dec. 5, 2025).

The Proclamation is a blow to communities harmed by coke ovens' toxic emissions, who have been waiting for updated standards for more than 20 years. They had to sue EPA to get these updates, and, in 2020, a district court held that EPA had unlawfully failed to revise coke oven standards and ordered EPA to conduct the rulemaking that led to the Coke Ovens Rule.

Now, with the stroke of his pen, President Trump has exempted the entire coke ovens industry from that Rule for two years. On its face, the Proclamation demonstrates a patent misconstruction of his statutory exemption authority, turning a narrow authority meant for granting relief to individual facilities that cannot access needed technology into a broad power

for second-guessing EPA's standard-setting. Its findings are demonstrably false and at times absurd. It exempts facilities from a standard for which they did not ask for relief. It claims that technology is unavailable for standards that do not require any technology, such as the requirement that facilities visually observe for leaks with the naked eye. And it claims technology is not available to implement any of the standards, which is irreconcilable with EPA's findings from weeks prior.

Sanctioning the President's sweeping use of this narrow authority would allow an end-run around the Act's mandatory requirements for setting, revising, and reconsidering air toxic standards. That is already happening. No previous president had ever used the Section 7412(i)(4) exemption authority, but President Trump has used it seven times in the last year to exempt more than 180 facilities from hazardous air pollutant standards. Each proclamation is pretextual, reciting conclusory determinations unmoored from reality and from the statutory text. The Coke Ovens Proclamation is part of this lawless power-grab and should be declared *ultra vires*.

## BACKGROUND

### I.    STATUTORY BACKGROUND

Clean Air Act Section 7412 creates a comprehensive scheme for regulating facilities that emit hazardous air pollutants. It includes strict timelines for EPA to set standards and then to periodically update the standards to reflect improvements in pollution controls and the need to protect public health. For any new or revised standard, Section 7412 mandates prescriptive compliance deadlines while containing a few, narrow provisions to extend those deadlines for individual facilities, including the Presidential exemption authority at issue here.

#### A.    The Act's Requirements for Setting Standards

The Act mandates that EPA identify and list all categories of major sources of hazardous air pollutants ("HAPs"). 42 U.S.C. § 7412(c). For each listed "category" (i.e. an industry), EPA

must (1) establish initial standards, then (2) periodically review and revise those standards if certain statutory criteria are met. *Id.* § 7412(d)(1), (d)(6), (f)(2). EPA has a "clear statutory obligation" to establish limits for each HAP that a category emits. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000), *as amended on denial of reh'g* (Feb. 14, 2001). As discussed below, at every step EPA sets standards that are achievable, either because they have already been achieved by sources in the category or EPA found they can be achieved.

EPA first sets the maximum allowable emission levels, known as "floors," and then determines whether more stringent "beyond-the-floor" standards are "achievable," considering cost and other factors. *Id.* at 629. EPA refers to the standards that result from this first step as maximum achievable control technology or "MACT." *See id.* at 630.

After it has established the initial MACT standards, EPA must review those standards every eight years and revise them "as necessary" taking into account "developments" in pollution control technologies and practices. 42 U.S.C. § 7412(d)(6). During this review, EPA may discover that it entirely failed to establish MACT standards for one or more HAPs emitted by a category, and EPA must rectify that failure by establishing MACT limits for the first time. *La. Env't Action Network v. EPA*, 955 F.3d 1088, 1096–1100 (D.C. Cir. 2020) ("*LEAN*"). Additionally, within eight years after the promulgation of standards under Section 7412(d), EPA must review the health and environmental risks and revise the existing standards if needed to ensure an ample margin of safety to protect public health. 42 U.S.C. § 7412(f)(2)(A).

Whether establishing or revising standards, EPA sets standards that it determines are achievable by the industry, considering factors like the emissions reductions that have already been achieved, the means of doing so (i.e., whether through improvements in technology or processes), and, in some cases, costs. For example, EPA sets the MACT floors to reflect the

emissions levels that have already been "achieved" by the best performing facilities in a category, which establishes their achievability by their peers. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (cleaned up), *on reh'g en banc*, 671 F. App'x 822, and *on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016); 42 U.S.C. § 7412(d)(3). Similarly, for beyond-the-floor standards, EPA sets standards that it "determines [are] achievable" by the category, ensuring sources can comply by taking costs and other relevant factors into account. 42 U.S.C. § 7412(d)(2); *Nat'l Lime Ass'n*, 233 F.3d at 629.

EPA also ensures achievability when reviewing standards under Sections 7412(d)(6) and 7412(f)(2), even though those provisions do not mention achievability. When conducting the 7412(d)(6) review, EPA ensures achievability by basing any new standards on "developments in practices, processes, and control technologies" and evaluating factors like technical feasibility and estimated costs (among others). 42 U.S.C. § 7412(d)(6); Statement of Undisputed Material Facts ("SUMF") ¶ 15 (88 Fed. Reg. 55858, 55867 (Aug. 16, 2023)). Similarly, before setting new standards to protect health under 7412(f)(2), EPA evaluates the potential costs of any new standards. *See Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1083 (D.C. Cir. 2008) (allowing EPA to consider costs in 7412(f)(2) reviews); *see also* 88 Fed. Reg. 55863 (describing EPA's approach to 7412(f)(2) reviews).

Though EPA sets standards that are achievable by an industry, some individual facilities within an industry may need to take steps to reduce their emissions to comply. *See U.S. Sugar Corp.*, 830 F.3d at 594 (noting that floor standards "[ensure] that all [] sources at least clean up their emissions to the level that their best performing peers have shown can be achieved." (cleaned up)). For each new standard, the Act requires EPA to set strict deadlines for compliance by all existing sources. EPA must establish a compliance date that "provide[] for compliance as

4

expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). EPA may only extend the compliance date by one additional year for an individual facility that demonstrates "such additional period is necessary for the installation of controls." *Id.* § 7412(i)(3)(B).

### B.      The President's Section 7412(i)(4) Exemption Authority

Section 7412(i)(4) authorizes the President to "exempt any stationary source from compliance" with hazardous air pollutant standards promulgated under Section 7412, "for a period of not more than 2 years if the President determines [1] that the technology to implement such standard is not available and [2] that it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4). Section 7412 allows the President to extend the exemption "for 1 or more additional periods, each period not to exceed 2 years." *Id.* Additionally, the President must "report to Congress with respect to each exemption (or extension thereof)." *Id.* Before 2025, no President had ever used this authority.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Basics of Coke Ovens

Coke is a high-carbon fuel, used to melt metals, that is made by placing coal into an oven where it is heated for hours to remove impurities from the carbon. *See* SUMF ¶ 3. Multiple connected ovens are known as an oven battery, and coke oven facilities are made up of one or more batteries. *Id.* ¶ 4. There are currently 11 operating coke oven plants. *Id.* ¶ 38.

EPA estimates coke ovens emit well in excess of 2,000 tons of hazardous air pollution annually. *Id.* ¶ 8. These emissions likely cause cancer and are associated with other adverse health effects like breathing problems. *Id.* ¶¶ 41–47.

There are two types of designs for coke oven batteries, which handle the oven waste gases in different ways. *Id.* ¶¶ 5–6. At byproduct ovens, waste gases are removed through an

exhaust system and sent to an on-site chemical plant (known as a byproduct recovery plant) that recovers chemicals for commercial use. *Id.* ¶ 5. At non-recovery ovens, waste gases are either sent to a heat recovery steam generator, which produces power by burning the waste, or are vented to the air through waste heat stacks. *Id.* ¶ 6. At both types of coke ovens, after the coking cycle is complete, the oven doors are opened and the incandescent coke is "pushed" out of the oven into a quench car, i.e., an open top rail car. *Id.* ¶ 7. Of the eleven operating coke facilities, six are byproduct ovens, operated by a number of different companies. *Id.* ¶ 39. Five are non-recovery ovens, all operated by SunCoke. *Id.* ¶ 40.

### B.    The Long Overdue 2024 Coke Ovens Rule

Congress identified "coke oven emissions" as a HAP in the 1990 Clean Air Act Amendments. 42 U.S.C. § 7412(b)(1). EPA has subdivided coke oven facilities into two distinct regulatory categories that cover different emission points, each with its own set of standards: (1) Coke Oven Batteries ("Oven Batteries"), 40 C.F.R. pt. 63, subpt. L (2025); and (2) Pushing, Quenching and Battery Stacks ("Pushing-Quenching-Stacks"), 40 C.F.R. pt. 63, subpt. CCCCC (2025). The Oven Batteries category covers emissions from charging (i.e. loading) coal into the ovens and from leaks during the coking (i.e. heating) process. SUMF ¶ 10 (89 Fed. Reg. 55684, 55688 (July 5, 2024)). The Pushing-Quenching-Stacks standards cover emissions from: pushing finished coke out of the ovens and quenching it with water; battery stacks at byproduct ovens; and heat recovery steam generator main stacks and bypass/waste stacks at non-recovery ovens. *Id.* ¶ 11 (89 Fed. Reg. 55689).

Historically, EPA has engaged in piecemeal, halting, and deficient regulation of coke ovens, repeatedly ignoring its statutory duties to timely revise and update the standards for both coke oven categories. *Citizens for Pa.'s Future v. Wheeler*, 469 F. Supp. 3d 920, 924–25 (N.D. Cal. 2020) (summarizing EPA's history of inaction). Accordingly, a coalition of environmental

6

and public health groups sued the EPA for its years-long failure to revise the Section 7412

standards for coke ovens. *Id.* The Court found EPA had unlawfully failed to update standards for

"15 years," and ordered EPA to complete mandatory reviews of both categories. *Id.*

EPA subsequently completed a combined rulemaking in 2024, which finalized updated

Section 7412 standards for both categories (the "Coke Ovens Rule"). SUMF ¶ 13 (89 Fed. Reg.

55684). The Coke Ovens Rule comprised several different standards, and for most standards

EPA set a compliance deadline of July 7, 2025, with the remainder set at January 6, 2026.

### 1.  Standards for Oven Batteries Category

Byproduct ovens were required to:

1.    <u>Conduct fenceline monitoring and corrective action</u>—i.e., air quality sampling at

the perimeter of the facility—for benzene using sorbent tubes (installed following an established

EPA methodology, Method 325A), which are then analyzed in a lab (according to another EPA

methodology, Method 325B). 40 C.F.R. § 63.314 (2025). Where benzene concentrations exceed

a specified "action level," the facility operator must conduct a "root cause" analysis to identify

the cause of the exceedance and take "corrective action" to remedy it. *Id.* § 63.314(d)–(e).

Additionally, if the operator is unable to determine the root cause within thirty days, the facility

would be required to conduct monitoring with real-time sampling techniques. *Id.*

§ 63.314(d)(1)(ii)(B). The compliance date for this requirement was July 7, 2025. *Id.* § 63.314.

2.    <u>Reduce pollutant leaks from doors, lids and offtakes using work practice</u>

<u>standards and daily visual observations.</u> 40 C.F.R. § 63.309(a) (2025). EPA explained that

operators could achieve compliance with the leak limits "without the need for any new controls

or operating costs." SUMF ¶ 52 (89 Fed. Reg. 55696). The compliance date for this requirement

was July 7, 2025. *Id.* ¶ 16 (89 Fed. Reg. 55690).

Non-recovery ovens were required to:

1.    <u>Achieve zero percent leaking doors and conduct daily pressure monitoring.</u> 40 C.F.R. § 63.303(a) (2025). Operators demonstrate compliance with the zero percent leaking door requirement through daily visual observations. EPA explained that it was simply codifying "the current SunCoke practice to observe oven doors to maintain zero leaks." SUMF ¶ 95 (89 Fed. Reg. 55703). The compliance date for this requirement was July 7, 2025. *Id.* ¶ 16 (89 Fed. Reg. 55690).

All of the standards for the Oven Batteries Category were promulgated as part of the Section 7412(d)(6) review, meaning that EPA evaluated the costs to industry (and other factors) before determining the industry could comply. *Id.* ¶¶ 14, 15; 42 U.S.C. § 7412(d)(6).

## 2.    Standards for Pushing-Quenching-Stacks Category

1.    <u>Both byproduct and non-recovery ovens were required to comply with new MACT floor standards for previously unregulated HAPs.</u> 40 C.F.R. §§ 63.7290(a)–(e), 63.7296(c)–(f), 63.7297(a)–(d), 63.7298(a)–(e) (2025). EPA recognized that it had left multiple HAPs unregulated in prior rules, and finalized 17 new floor standards for a number of pollutants, including: acid gases, hydrogen cyanide, polcyclic aromatic hydrocarbons, formaldehyde, mercury, and particulate matter (as a surrogate for nonmercury HAP metals). SUMF ¶¶ 57, 58. Operators of byproduct ovens must also implement a work practice standard based on good combustion practices. 40 C.F.R. § 63.7300(c)(4) (2025); SUMF ¶ 60. And EPA finalized performance testing requirements to ensure compliance with the new standards. 40 C.F.R. §§ 63.7283(d), 63.7320(a), 63.7321, 63.7333, 63.7341(f); SUMF ¶ 59.

EPA concluded that all sources could meet the new floor limits without having to install control technologies. SUMF ¶ 61 (89 Fed. Reg. 55720) ("all sources can meet the new MACT floor limits and would not have to install controls to meet the limits."); *id.* (89 Fed. Reg. 55717)

(concluding ovens can comply "without the need for additional controls"). The compliance date for these requirements is January 5, 2026. *Id*. ¶ 16 (89 Fed. Reg. 55690).

2.    <u>Non-recovery ovens were required to limit opacity to 20% for bypass/waste heat stack emissions.</u> 40 C.F.R. § 63.7299 (2025). EPA finalized opacity observation requirements for bypass/waste heat stacks and established a corrective action threshold of twenty percent opacity. SUMF ¶ 84 (89 Fed. Reg. 55744). Operators must conduct visual emissions monitoring using a qualified observer. *Id.* ¶¶ 84, 87. The compliance date for this requirement was July 7, 2025. *Id.* ¶ 16 (89 Fed. Reg. 55690).

Both sets of MACT floor standards were issued under 7412(d)(3), meaning EPA determined they were already being "achieved" by the best performers in the category. *Id.* ¶¶ 57, 63; 42 U.S.C. § 7412(d)(3). The opacity limits were issued under 7412(d)(6), meaning EPA considered the costs to industry. *Id.* ¶¶ 14–15.

### C.    President Trump's Clean Air Act Rollback Agenda

Just weeks after entering office, the Trump Administration targeted for rollback many of the recent Clean Air Act rules promulgated by its predecessor, including the Coke Ovens Rule. On March 12, 2025, in a press event billed as "the greatest day of deregulation our nation has seen," EPA announced that it would "reconsider" the Coke Ovens Rule and thirty-one other regulations protecting human health and the environment. SUMF ¶ 26. The Office of Information and Regulatory Affairs estimated that it would take until July 2026 for EPA to complete final reconsideration of the Coke Ovens Rule. *Id.* ¶ 27.

Not content to wait for EPA to complete reconsideration, the administration began laying the groundwork to exempt coke ovens and other industries from Section 7412 rules. After announcing reconsideration of the Coke Ovens Rule and thirty-one other regulations, EPA published a fact sheet on its webpage inviting "[a]ny source interested in a Presidential

9

exemption" from any of the outlined rules, including the Coke Ovens Rule, "should provide their recommendations to EPA by March 31, 2025." *Id.* ¶ 28. On or about March 24, 2025, EPA posted a new webpage announcing it had established "an electronic mailbox"— airaction@epa.gov—"to allow the regulated community to request a Presidential Exemption under section [7412(i)(4)]." *Id.* ¶ 29. EPA asked that requests be submitted "by March 31, 2025," a week after the webpage was posted. *Id.* ¶ 28. All coke oven operators submitted requests for a Presidential exemption by March 31, 2025. *Id.* ¶ 32.

**D.      The Administration's Failed Efforts to Delay the Coke Ovens Rule**

On July 8, 2025, the day after sources were required to comply with the Coke Ovens Rule, EPA, without notice and comment, published an interim final rule that delayed compliance with most of the Rule's requirements for two years. SUMF ¶ 18 (90 Fed. Reg. 29997 (July 8, 2025) ("Delay Rule")). The Delay Rule expressed EPA's concern that the Coke Ovens Rule posed "compliance challenges" making the compliance deadlines for certain standards "infeasible for sources to adhere to." *Id.* ¶ 19 (90 Fed. Reg. 30001). EPA then took public comments and held a public hearing on the Delay Rule. *Id.* The coke ovens industry submitted extensive comments in support of the delay. *Id.* ¶ 21.

On August 6, 2025, several of the plaintiffs here petitioned for review of the Delay Rule in the D.C. Circuit. *Id.* ¶ 22. Petitioners asked the Court to summarily vacate the Delay Rule, or alternatively, stay the Delay Rule. *Id.* ¶ 22.

Instead of filing a brief, on September 18, 2025, EPA notified the Court that it had reviewed public comments, including industry comments, and that "EPA does not believe the information before it establishes that the applicable air toxics standards would have been exceeded if the compliance dates had not been extended, regardless of whether facilities installed

additional controls." *Id.* ¶ 23. EPA signaled that it would withdraw the Delay Rule "within

fourteen days" and "explain the Agency's analysis and rationale." *Id.*

On October 2, 2025, EPA published a final rule rescinding the Delay Rule on its

website.[1] *Id.* ¶ 24. EPA reiterated that it "does not believe that the currently available

information supports a conclusion that regulated parties would face significant immediate

compliance challenges meeting" the Coke Ovens Rule standards and that they were rescinding

compliance deadline extensions "to promote compliance with the standards." *Id.* ¶ 25 (90 Fed.

Reg. 56011).

### E.    The Coke Ovens Exemption Proclamation

Just a few weeks later, on November 21, 2025, President Trump issued a proclamation

exempting all eleven coke oven facilities from "all compliance deadlines established under the

Coke Oven[s] Rule," "with each such deadline extended by 2 years from the date originally

required for such deadline." 90 Fed. Reg. 54517–21. To support this across-the-board exemption,

the President parrots the two determinations required by the statute that: 1) "the technology to

implement the Coke Oven[s] Rule is not available" because such technology "does not exist in a

commercially viable form sufficient to allow implementation of and compliance with" the Coke

Ovens Rule; and 2) it is in the national security interest to issue the Exemption. *Id.* at 54518.

At bottom, the Proclamation disputes EPA's conclusions that the standards in the Coke

Ovens Rule are achievable by the compliance deadlines. Instead, it contends that "the Coke

Oven[s] Rule requires compliance with standards premised on the application of emissions-

control technologies that do not yet exist in a commercially demonstrated or cost-effective

form," such as testing and monitoring requirements that "rely on technologies that are not

---

[1] The recission was not published in the Federal Register until December 5, 2025. 90 Fed. Reg. 56010.

practically available, not demonstrated at the necessary scale, or cannot be implemented safely or consistently under real world conditions." *Id.* at 54517. While his own EPA concluded that on-schedule compliance with the Coke Ovens Rule would not "trigger immediate compliance difficulties," mere weeks later, the President found that the Rule's "onerous implementation and compliance schedule for these standards" would place coke oven facilities in an "impossible position" that might lead to facilities shutting down entirely. *Compare* SUMF ¶ 25 (90 Fed. Reg. 56011), *with* 90 Fed. Reg. 54517.

While none of his predecessors has ever used Section 7412(i)(4), President Trump has done so seven times to exempt more than 180 facilities from standards promulgated under the prior administration. SUMF ¶ 1.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of a suit under governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mayorga v. Merdon*, 928 F.3d 84, 89 (2019) (cleaned up); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE PROCLAMATION

With the stroke of a pen, the President has deprived Plaintiffs' members of vital protections that were years overdue. That decision is currently harming Plaintiffs' members and supporters who live, work, and spend time immediately adjacent to exempted coke ovens facilities. SUMF ¶ 103; *see id.* ¶¶ 102–11. Some have lived in these communities for decades. Ex. 14, Franklin Decl. ¶ 1. Pollution from coke ovens coats their homes and befouls their air.

SUMF ¶ 104. They must take measures to avoid exposure, retreating inside or even leaving town for extended periods. *Id.* ¶ 108. Many have health conditions that are exacerbated by coke oven emissions. *Id.* ¶ 105.

The Coke Ovens Rule offered Plaintiffs' members and supporters real protections. For example, under the old standards, coke oven facilities could emit unlimited amounts of various HAPs, and the Coke Ovens Rule finally put a limit on these emissions. *Id.* ¶ 57. It also ensured there would be zero leaking doors at non-recovery ovens. *Id.* ¶ 94. And at byproduct ovens the Rule required a system of fenceline monitoring and corrective action that would ensure facilities identified and remedied excess emissions more quickly. *Id.* ¶¶ 67–70. The Rule would have provided members and supporters with fenceline monitoring data, *Id.* ¶ 71, that they would use to "educate [] neighbors about the information . . . so that they could also reduce their exposure to the air pollution," Ex. 13, Evans Decl. ¶ 6.

The President exempted coke ovens from these standards (and more). Thus, but for the President's unlawful Proclamation, the exempted facilities would be following the Coke Ovens Rule. The deprivation of the Rule's benefits harms Plaintiffs' members and supporters.

Accordingly, Plaintiffs have standing to challenge the Proclamation on behalf of those members and supporters because they satisfy the three-part test for associational standing. *See Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019). First, the litigation is plainly "germane to [Plaintiffs'] purpose[s]." *Id.*; *see* SUMF ¶ 101. Second, it does not "require[] the participation of individual members." *Id.*; *see Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287-88 (1986) (member participation was unnecessary as the claim "raise[d] a pure question of law"). Third, as established below, Plaintiffs' members and supporters "would otherwise have standing to sue in their own right" because they have

established they suffer an "injury in fact," which is "fairly traceable" to the Proclamation and "is likely to be redressed by a favorable decision." *Sierra Club*, 926 F.3d at 848 (cleaned up).

A.    **Plaintiffs Have Established Injury to Their Members and Supporters.**

Plaintiffs' members and supporters have demonstrated injury based on (1) health harms, (2) recreational and aesthetic harms, and (3) deprivation of information. Each is independently sufficient to confer standing. *See Sierra Club v. EPA*, 755 F.3d 968, 976 n.2 (D.C. Cir. 2014).

1.    **Threats to health are a cognizable injury.**

Members and supporters have "realistic health concerns" and experience "adverse health effects" sufficient to establish injury. *Clean Wis. v. EPA*, 964 F.3d 1145, 1157 (D.C. Cir. 2020); *Nat. Res. Def. Council v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014) (Kavanaugh, J.) (finding injury where "members will suffer from [] higher emissions"). Plaintiffs' members and supporters suffer from adverse health impacts such as frequent headaches and asthma. SUMF ¶ 105. Plaintiffs' members and supporters have expressed concerns about the "higher levels of toxic pollution" that have resulted from the Proclamation and the "adverse health effects that are associated with increased exposure." *Id.* ¶ 110; Ex. 13, Evans Decl. ¶ 10.

Those concerns are more than realistic. EPA has deemed "[c]oke oven emissions [] among the most toxic of all air pollutants." SUMF ¶ 43. Many members and supporters live within one mile of a coke oven and are exposed to excess pollution given their proximity. *Id.* ¶¶ 103, 104; *see id.* ¶ 47 (89 Fed. Reg. 55724–27) (finding people living within 10 km face excess risks as a result of exposure to coke oven emissions). Plaintiffs' members thus "unquestionably live within zones" impacted by coke oven emissions that will continue unabated because of the Proclamation. *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012).

Indeed, the mere fact of additional coke ovens emissions and exposure is a sufficient injury. *Clean Wis.*, 964 F.3d at 1158 ("more [pollution] is more [pollution]").

14

### 2.     Aesthetic and recreational harms are cognizable injuries.

Because of their proximity to coke ovens, members and supporters are forced to flee inside while gardening, avoid recreating in their communities, or suffer diminished enjoyment of their time in national parks and other outdoor spaces, all of which are cognizable injuries. *See* SUMF ¶ 107 (collecting declarations). *See Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (finding standing based on members averments that "they live or work in close proximity to [relevant facilities] and have reduced their time outdoors in response to concerns about pollution—precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact"); *Clean Wis.*, 964 F.3d at 1156–57 (similar); *Sierra Club v. EPA*, 926 F.3d at 848–49 (finding standing based on recreational and aesthetic injuries).

### 3.     The deprivation of monitoring information is a cognizable informational injury.

Here, the 2024 Coke Ovens Rule requires reporting of fenceline monitoring data that would be published and made publicly available, and the Coke Ovens Proclamation deprive Plaintiffs of that information. This "[denial of] information to which [plaintiffs] clai[m] entitlement" is sufficient for an informational injury. *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 165 (4th Cir. 2023) (holding denial of information gave rise to Article III standing, where claim of entitlement arose from a regulation); *see*, *e.g.*, *Chiron Corp. v. NTSB*, 198 F.3d 935, 942 (D.C. Cir. 1999) (concluding no informational injury existed where plaintiffs pointed to no entitlement in "statute, regulations, or other sources of law"); *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) ("[A] denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." (cleaned up)).

The Coke Ovens Rule requires reporting of fenceline monitoring data, which both the Act and EPA's implementing regulations require EPA to publicly disclose, and the Proclamation injures Plaintiffs by depriving them of that helpful information. 42 U.S.C. § 7414(c); 40 C.F.R. § 63.311(j) (2025); *see also* SUMF ¶ 71. That data would be helpful in many ways. For example, Plaintiffs' members and supporters include a scientist studying air pollution, who would benefit from fenceline data. *Id.* ¶ 108. She and other members and supporters would also use the fenceline monitoring data to: (1) educate their neighbors about emissions so that they could reduce their own exposure; or (2) advocate in front of state and local policy makers for greater protections than those afforded under the Act. *Id.*

**B.    Plaintiffs Have Established Causation and Redressability.**

Finally, causation and redressability are established because the Proclamation allows coke ovens to operate in a manner that would be unlawful if the compliance deadlines of the Coke Ovens Rule were in effect. *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) ("It is well-established that standing will lie where a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." (cleaned up)). And a declaration that the Proclamation is unlawful and the purportedly exempt facilities remain subject to the Coke Ovens Rule would redress Plaintiffs' injuries by resuscitating the "more stringent[]" standards of the Coke Ovens Rule. *Ass'n of Battery Recyclers, Inc.*, 716 F.3d at 673. In other words, Plaintiffs would receive protection from the new, stricter standards, along with access to fenceline monitoring information they currently lack. This is sufficient to establish causation and redressability.

16

## II.    THE PROCLAMATION IS JUDICIALLY REVIEWABLE

When an official steps beyond legal limitations and acts *ultra vires*, "courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (cleaned up); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (holding that where the Executive's "powers are limited by statute, his actions beyond those limitations . . . are ultra vires his authority" and "may be made the object of specific relief.").

Both the D.C. Circuit and the Supreme Court have recognized that "a claim alleging that the President acted in excess of this statutory authority is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023); *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981) (resolving on the merits a claim that the President and the Treasury Secretary went "beyond their statutory and constitutional powers"); *see also Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980–81 (2021) (Mem.) (Roberts, C.J. respecting the denial of certiorari); *Reich*, 74 F.3d at 1332 ("[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions.").

The Supreme Court has long recognized that even in the absence of a statutory cause of action, federal courts can, pursuant to their inherent equitable power, "prevent an injurious act by a public officer" taken without legal authority. *Carroll v. Safford*, 44 U.S. 441, 463 (1845); *see* U.S. Const. art. III, § 2, cl. 1 (granting federal courts the "Judicial Power" to decide "all Cases, in Law and Equity"); *see also Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958) (explaining that federal courts have equitable jurisdiction to provide relief "to one who has been injured by an act of a government official which is in excess of his express or implied powers"). This "reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v.*

17

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Courts "generally have jurisdiction to grant relief" when an official acts beyond his statutory authority. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). This ensures that "[n]o officer of the law may set that law at defiance with impunity." *United States v. Lee*, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.").

Review of the Proclamation is consistent with these principles and precedents. Congress conferred on the President a narrow authority to issue exemptions under specific circumstances—where "the technology to implement [the] standard is not available," 42 U.S.C. § 7412(i)(4), and Plaintiffs allege the President has grossly exceeded that authority in light of the undisputed facts. *See McAnnulty*, 187 U.S. at 110 (explaining that where there is "a clear mistake of law as applied to the admitted facts," the courts "must have power in a proper proceeding to grant relief").

And, as described below, the Court has jurisdiction to review those claims under the DC Circuit's governing precedents. *See Glob. Health Council v. Trump*, 153 F.4th 1, 20 (2025). First, the Act neither prohibits nor provides an alternative cause of action for our claims. *See id.* Second, the authority is also not so wholly committed to the President's discretion that it is unreviewable. *See Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). And, third, the review we seek is consistent with the scope of review recognized by the D.C. Circuit and supported by a long history of cases examining *ultra vires* executive action. *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

A.     **Congress Has Not Barred Judicial Review, and There Is No Alternative Mechanism for Review of Plaintiffs' Claims.**

Here "(1) review is not expressly precluded by statute, [and] (2) 'there is no alternative procedure for review of the statutory claim.'" *Glob. Health Council*, 153 F.4th at 20 (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)).

First, the Court's equitable jurisdiction to remedy lawless executive action is not displaced, either expressly or impliedly, by the Act's judicial review provisions. Those provisions, located at Section 7604 and 7607(b), provide a cause of action or judicial review for action or inaction "of the [EPA] Administrator," and neither explicitly govern nor bar judicial review of Presidential action under the Act. 42 U.S.C. §§ 7604(a), 7607(b). Section 7604 authorizes civil suits "against the Administrator" for nondiscretionary actions he has failed to take. *Id.* § 7604(a)(2). Section 7607(b) provides for judicial review of "action[s] of the Administrator." *Id.* § 7607(b)(1). As the Supreme Court has repeatedly held, statutes that provide specifically for review of <u>some</u> actions do not foreclose review of others. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 674 (1986) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967)).

That is consistent with the courts' presumption that judicial review of executive determinations is available, even "when [the] statute is silent." *Patel v. Garland*, 596 U.S. 328, 346 (2022). As the D.C. Circuit has stated: "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority. Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior[.]" *Dart v. United* States, 848 F.2d 217, 224 (D.C. Cir. 1988).

This is not that "rare[]" circumstance. *Id.* In fact, there are stronger than usual reasons to find that review of the President's Proclamation is not implicitly precluded. Congress has shown

19

elsewhere in the Clean Air Act that when it intends to prohibit judicial review of Presidential action, it does so explicitly. Congress gave the President authority to approve variances from certain preconstruction requirements for major emitting facilities "if he finds that such variance is in the national interest." 42 U.S.C. § 7475(d)(2)(D)(ii). Congress then stated that that "[n]o Presidential finding shall be reviewable in any court." *Id*. There is no such prohibition in Section 7412(i)(4). But Congress has not prohibited judicial review of Presidential exemption proclamations and that Congressional choice must be given effect. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022).

Second, there is also "no alternative procedure" for review of our claims. *See Glob. Health Council*, 153 F.4th at 20. The Act does not provide a mechanism for review. The Administrative Procedure Act does not provide a mechanism for review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). And there is no agency action required to effectuate the Proclamation; the exemption from the Coke Ovens Rule exists now by operation of law. The *ultra vires* review Plaintiffs seek, then, is available.

## B.    The President's Exemption Authority Is Susceptible to Review Because It Is Bounded by the Act's Terms.

The limited exemption authority is also not so committed to the President's discretion that the Proclamation can escape judicial review. The bar for truly unreviewable discretion is high, as even discretionary presidential actions have been subject to judicial review. *See*, *e.g.*, *Am. Forest Res. Council*, 77 F.4th at 797 (explaining that courts review *ultra vires* claims challenging national-monument designations "notwithstanding the broad discretion the Antiquities Act vests in the President"); *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 980–81. "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress

has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971.

That is the case here. Section 7412(i)(4) plainly delineates the outer limits of the President's authority by specifying the determinations the President must make to issue an exemption: first, whether "the technology to implement [the] standard is not available," and second, whether "it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4). Setting aside the second prong, what constitutes "the technology [necessary] to implement [the] standard" and whether it is "available" is not the kind of delicate political question within the President's unique constitutional competence. In fact, assessing whether such terms have been appropriately interpreted and applied is a familiar inquiry for federal courts.[2] Much like the monument designation criteria of the Antiquities Act of 1906, *see* 16 U.S.C. § 431, or the exclusion criteria in the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 ("FSLMRS"), Section 7412(i)(4)'s requirements "cabin the President's discretion and delineate the outer bounds of his authority, thereby readily enabling *ultra vires* review." *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *8 (D.C. Cir. 2025) (Pan, J., concurring); *see, e.g.*, *Tulare County v. Bush*, 306 F.3d 1138, 1140–41 (D.C. Cir. 2002) (reviewing monuments designation); *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 258–59 (D.D.C. 2025) (reviewing FSLMRS exclusions as *ultra vires*).

---

[2] *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 570 (2d Cir. 2015) (reviewing EPA treatment of "available" water pollution control "technologies"); *Bluewater Network v. EPA*, 370 F.3d 1, 22–23 (D.C. Cir. 2004) (reviewing EPA determination about availability of technologies to achieve emission reductions from nonroad engines); *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 628029 (D.C. Cir. 1973) (reviewing EPA's interpretation of whether alternative control technologies for motor vehicle emissions "are not available or have not been available for a sufficient period of time").

Section 7412(i)(4)'s limits are entirely unlike the broad grants of discretion that courts have concluded commit unreviewable discretion to the President. In *Dalton v. Specter*, 511 U.S. 462 (1994), the Base Closures and Realignment Act simply stated that the President "shall" submit a report to Congress "containing the President's approval or disapproval" of the Defense Base Closure and Realignment Commission's recommendations. Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, § 2903(e)(1), 104 Stat. 1485, 1812 (1990). It provided no criteria for the President to apply—or for a court to review—leaving the Supreme Court to conclude that "nothing in § 2903(e) prevents the President from approving or disapproving the recommendations for whatever reason he sees fit." *Dalton*, 511 U.S. at 476.

The fact that one of the two determinations that the President must make relates to national security does not pull the exemptions authority into *Dalton*'s ambit. Even if the President's determination had alluded to national security concerns in good faith, Section 7412(i)(4)'s determination requirements are joined by the conjunctive "and": the President must both determine that "technology to implement such standard is not available" and determine that granting an exemption is in "the national security interests of the United States." *See United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) ("The requirements are connected by the conjunctive 'and,' meaning defendants must meet all three."). The inquiry as to whether "technology" is "not available" is thus both conceptually and grammatically removed from nation security considerations, and falls firmly within the competence and jurisdiction of courts to interpret.

In the end, Section 7412(i)(4) "does not confer absolute discretion on the President such that courts cannot discern the limits of his authority," and is therefore "'susceptible to review for *ultra vires* acts that clearly violate its terms.'" *Fed. Educ. Ass'n*, 2025 WL 2738626, at * 7

(emphasis added) (citing *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971). Accordingly, this Court has the constitutional duty and equitable authority "to 'reestablish the limits on' executive authority 'when an executive acts *ultra vires*." *Am. Fed'n of Labor and Congress of Indus. Orgs. v. Dept. of Labor*, 778 F. Supp. 3d 56, 88 (D.D.C. 2025) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

> **C.    Judicial Review Is Available to Discern Whether the Proclamation Evinces a Patent Misconstruction of the Authority Conferred.**

Our claims are entirely consistent with the scope of review under the *ultra vires* standard however that standard is formulated. We do not ask the Court to nit-pick the President's factual findings, but rather to ask whether the face of the Proclamation and the undisputed facts demonstrate that the President's determination evinces either a patently unreasonable misconstruction of the statute or bad faith.

> **1.    Plaintiffs' claims fit within the established framework for reviewing *ultra vires* claims.**

In *ultra vires* review of Presidential actions, the D.C. Circuit has distinguished between "two types of claims," (1) "those justiciable on the face of the proclamation," which involve "questions of statutory interpretation" that can be decided "'as a matter of law'" and (2) "those requiring factual development." *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 540 (D.C. Cir. 2019) (quoting *Tulare*, 306 F.3d at 1140), *cert. denied*, 141 S. Ct. 979 (2021).

As to the first category, the D.C. Circuit has long held that "[judicial] review is available to ensure that the [President's] Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). If "in any view of the facts," an official has made a "clear mistake of law," courts have the equitable authority to declare that mistake and protect the public from "the absolutely uncontrolled and arbitrary action of a public . . . officer, whose

23

action is unauthorized by any law." *McAnnulty*, 187 U.S. at 109–110; *see also Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) (an "agency construction of a statute" is *ultra vires* if "the disputed [action] defies the plain language of a statute" or "the agency's construction is utterly unreasonable and impermissible").

Some recent cases have stated the standard as whether a government official has acted "plainly in excess of [his] delegated powers and contrary to a specific prohibition in [a] statute." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (quoting *Glob. Health Council*, 153 F.4th at 20). But these cases provide different glosses on that requirement. One described it as involving an "unexplained and obvious deviations from statutory text," a "situation[] where the President has grossly exceeded the bounds of his statutory authority" or when the government's interpretation would "lead to an absurd result." *Id.* (cleaned up). Another described it as "[o]nly error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, <u>or</u> that violates some specific command of a statute." *Changji*, 40 F.4th at 722 (cleaned up) (emphasis added).

Whatever the gloss, the D.C. Circuit has framed it as a question of statutory interpretation. Consistent with basic principles of interpretation, the scope of the President's exemption authority must be read in the context of the statutory requirements and any other mandated limitations. *See Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 50 (D.C. Cir. 2024) ("[Statutory] text must be read in the context of the entire statute."). And in context, the very conferral of carefully delineated authority may also establish the prohibition of alternatives. *See Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen mention one thing, like a grant of authority it necessarily, or at least reasonably, implies the preclusion of alternatives." (cleaned up)).

As to the second, for "those [claims] requiring factual development," "the precise 'scope of judicial review' remains an open question," but the facts must show some aspect of the action "that exceeds the President's statutory authority." *Ross,* 945 F.3d at 540 (quoting *Mountain States*, 306 F.3d at 1133); *accord Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023). The Circuit has also noted that "a showing that the government has attempted to enlarge its authority in bad faith can bolster an *ultra vires* claim." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (citing *Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 294 (D.C. Cir. 2000)). Additionally, rebutting the presumption of regularity allows review of erroneous factual conclusions. *Id.*

The review we seek is consistent with these precedents. As we demonstrate below, the President has plainly misinterpreted the authority conveyed in Section 7412(i)(4), which is evident from the face of the Proclamation and the standards from which the entire coke ovens industry is now exempt. *Infra* Section III.A, III.C. Indeed, it contravenes specific statutory prohibitions in multiple, independent ways. *Id.* And the President has seized this new, expansive authority in bad faith: the Proclamation's determination that "technology to implement the Coke Oven[s] Rule is not available" is directly contrary to EPA's statement just weeks before that "the currently available information" does not "support[] a conclusion that regulated parties would face significant immediate compliance challenges" to meet the Coke Ovens Rule standards. 90 Fed. Reg. 54518; SUMF ¶ 25 (90 Fed. Reg. 56011); *see infra* III.B. And the many factual and legal inaccuracies underlying the Proclamation overturn any presumption of regularity. *Infra* IV.

## 2. The Court can review whether the President's action is not authorized by law.

Although the D.C. Circuit has stated in some *ultra vires* cases that plaintiffs must show both that the action is in excess of delegated powers "and contrary to a specific prohibition in the statute that is clear and mandatory," *Changji*, 40 F.4th at 722 (cleaned up), that standard does not

apply here. The "specific prohibition" language in *Global Health Council* and others has its

origins and application in cases like *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), where Congress

has channeled judicial review to a particular statutory structure for judicial review. In such cases,

where review in equity may amount to "an easy end-run" around statutory limitations to review,

courts have required challengers seeking equitable relief outside of that scheme to demonstrate

that the action is not only in excess of delegated powers, but also contrary to a specific

prohibition. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). In such cases, the

standard makes sense: if a plaintiff can get review of an official's action in violation of law

through a specifically delineated process, then a higher bar for equitable, *ultra vires* review

avoids rendering that process moot.

Because this "end run" concern does not apply here, neither should the "specific

prohibition" barrier. Consistent with Supreme Court and D.C. Circuit precedent, the ordinary

*ultra vires* standard applied in *McAnnulty* and elsewhere applies to claims like ours: that the

President has acted in excess of his statutorily delegated authority, and there is no alternative

process that we are dodging by calling on the Court's equitable jurisdiction. *See supra* II.A; *see

also Train v. City of New York*, 420 U.S. 35, 47 (1975) (holding that the President's order to

impound funds was unauthorized by the statute); *Fed. Energy Admin. v. Algonquin SNG, Inc.*,

426 U.S. 548, 551–52 (1976) (stating the scope of review as "whether [the statute] also

authorizes" the President's action); *Dames & Moore*, 453 U.S. at 671–74 (holding that the

President's actions were authorized by the statute).

Notably, showing <u>both</u> that the President's action is in excess of the authority conferred

<u>and</u> that it is contrary to a specific prohibition has not been a feature of the D.C. Circuit's

monuments jurisprudence, the precedents most on point for the claims asserted here. *See*, *e.g.*,

*Mountain States,* 306 F.3d at 1136; *Ross*, 945 F.3d at 540. Indeed, the D.C. Circuit rejected the "specific prohibition" formulation in *Reich*, finding "it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President claims that he is acting pursuant to" some statutory grant. *Reich*, 74 F.3d at 1332. Rather, *Reich* adopted the simple standard articulated in *McAnnulty, Harmon,* and other cases over the last century: "judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Reich*, 74 F.3d at 1327 (cleaned up); *see id.* at 1327–30.

In sum, the Court has equitable jurisdiction to review our claims, which fall squarely within the long tradition of *ultra vires* review.

## III.    THE PROCLAMATION EXCEEDS THE PRESIDENT'S AUTHORITY

The Proclamation is *ultra vires* for three independent reasons, regardless of the precise formulation of *ultra vires* review the Court applies. First, on its face the Proclamation simply second guesses EPA's determination that new standards are "achievable" industry-wide, and thus strayed far beyond the outer bounds of the President's authority to decide whether the technology to implement the standards is "available" at individual facilities. Second, the Proclamation's findings are clearly in bad faith, as just weeks earlier the President's own EPA reaffirmed that all sources within the industry could timely comply with the new standards without having to install any new control technologies. Third, looking at the standards demonstrates that either no technology is needed for implementation or that the relevant technology is widely and readily available, demonstrating that the President has exceeded his authority and acted in bad faith.

27

### A.    On Its Face, the Proclamation Grossly Exceeds the President's Authority.

The President "grossly exceeded" his authority under 7412(i)(4) because, on its face, the Proclamation does not address the availability of compliance technology at individual facilities. *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9. Instead it questions the validity of—and the premises underlying—the standards established in the Coke Ovens Rule, suggesting the standards are not achievable at all. That is *ultra vires*. In giving the President authority to exempt a source only where he determines the requisite technology is not available, the statute in turn "prohibits" the President from exempting sources just because the President believes EPA's standards are not achievable and that different standards should apply. *Id.*

In the underlying rulemaking, EPA set standards that it concluded coke ovens could achieve, taking into account numerous factors including technologies, practices, processes, and cost where appropriate. But, per the Proclamation, an exemption is warranted because, "[s]pecifically, the Coke Oven[s] Rule requires compliance with standards <u>premised</u> on the application of emissions-control technologies that <u>do not yet exist</u> in a commercially demonstrated or cost-effective form" and "rel[ies] on technologies that…<u>cannot be implemented</u> safely or consistently." 90 Fed. Reg. 54517 (emphases added). Thus, it simply contests the "premise[s]" underlying the exempted standards and EPA's determination that those standards can be achieved by the coke ovens industry, *id.*, and fails to address whether "the technology to implement [the] standard[s] is not <u>available</u>," 42 U.S.C. § 7412(i)(4) (emphasis added).

If the President believes EPA got the coke ovens standards wrong, he may (as he has) direct EPA to conduct a new rulemaking to reconsider those standards. He may not, however, circumvent that process by abusing Section 7412(i)(4) to issue exemptions to an entire industry.

1.    **Section 7412(i)(4) prohibits the President from second-guessing EPA's determination that standards are achievable.**

Section 7412(i)(4) grants the President narrow, carefully delineated authority to "exempt any stationary source from compliance with any standard or limitation under this section…if the President determines that the technology to implement such standard is not available." 42 U.S.C. § 7412(i)(4). First, the tools of statutory construction establish that the President may grant an exemption to an individual facility for which he determines that the technology for compliance— as determined by EPA in the rulemaking—is not ready for immediate use or cannot be accessed or obtained. Second, they establish that Section 7412(i)(4) prohibits the President from using that authority to second-guess whether EPA set standards that are achievable.

Under the plain terms of the provision, the President may only grant an exemption where the technology needed to implement the standard is "not available," meaning not "present or ready for immediate use" or not "accessible [or] obtainable." *Available*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/available (last visited Feb. 27, 2026); *see also Available*, Black's Law Dictionary (6th Ed. 1990) ("[s]uitable; <u>usable; accessible; obtainable; present or ready for immediate use</u>" (emphasis added)). "Present," "accessible," obtainable" all speak to the physical presence of or physical access to a piece of technology.

And the President is further constrained by EPA's determination of which technology is needed to implement the standard. The statute's use of the phrase "<u>the</u> technology to implement such standard," 42 U.S.C. § 7412(i)(4) (emphasis added), presupposes that a particular technology has been "previously specified" as necessary for implementation of the standard, *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (cleaned up). "Here grammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.'" *Id.* (quoting Merriam-Webster's Collegiate

29

Dictionary 1294 (11th ed. 2005)). And statutory context establishes that it is EPA, in the Section 7412 rulemaking, that specifies relevant technologies to implement a final standard. *See Noble*, 103 F.4th at 50 ("[Statutory] text must be read in the context of the entire statute."); *United States v. Miller*, 604 U.S. 518, 533 (2025) (similar). When setting standards EPA typically accounts for whether technology is needed to implement a standard and, if so, which technologies can successfully do so. *E.g.,* 42 U.S.C. § 7412(d)(6) (EPA must "tak[e] into account developments in…control technologies"); 42 U.S.C. § 7412(d)(2) (enumerating different "measures" that EPA may determine facilities can apply to achieve Section 7412(d) standards, including both technology and non-technology measures); *Sierra Club v. EPA,* 479 F.3d 875, 882–83 (D.C. Cir. 2007) (discussing EPA's consideration of both "air pollution control technology" and "non-technology pollution prevention techniques" such as material type).

Thus, in order to grant an exemption to a facility, the President must first determine that the EPA-identified compliance technology is not accessible, obtainable, or ready for use. That delineates the outer bounds of the President's authority. The logical corollary of those limits is that the President may not grant an exemption if that predicate is not satisfied. *See Heating, Air Conditioning & Refrigeration Distribs. Int'l*, 71 F.4th at 67 ("When draftsmen mention one thing, like a grant of authority it necessarily, or at least reasonably, implies the preclusion of alternatives." (cleaned up)). By limiting Presidential authority to instances where technology is unavailable, the Section 7412(i)(4) prohibits granting an exemption in all other instances.

In particular, it prohibits the President from using his exemption authority because he disagrees that EPA's standards are achievable. First, the text of the Act distinguishes between availability and achievability, and it is EPA's role to determine whether a standard is achievable, not the President's. When setting MACT standards, EPA: (1) sets floors for the category writ

large, based on EPA's determination that those standards have already been "achieved" by the

best performing facilities within the source category; and (2) sets beyond-the-floor standards

based on EPA's determination that the standards are "achievable" for "sources in the category."

42 U.S.C. § 7412(d)(2), (3). Thus, EPA determines whether a standard has been "reach[ed]" or is

"capable of being" reached. *Achieve*, Merriam Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/achieve (last visited Feb. 27, 2026) ("to reach or

bring about a desired end or goal"); *Achievable*, Merriam Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/achievable (last visited Feb. 27, 2026) ("capable

of being achieved"). Similarly, when updating and revising standards, EPA ensures that

standards are achievable, by assessing factors like the cost of implementation in deciding

whether to adopt tougher standards.

Those textual differences are dispositive, because they carve out different roles for EPA

and the President. *See Ysleta Del Sur Pueblo*, 596 U.S. at 698. It is EPA's role to determine what

emissions reductions can be "achieved" by the industry and set standards accordingly. Once EPA

has set standards, the President has no authority to grant an exemption because he determines

that a standard is unachievable.

Second, the text of the exemption provision makes clear that it authorizes the President to

make determinations as to specific facilities, not as to the industry as a whole. The President may

grant an exemption to "any stationary source," which the Act defines to mean "any building,

structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C.

§§ 7411(a)(3), 7412(a)(3), (i)(4). Thus, unlike EPA's authority to set standards for an entire

"category" (i.e. industry-wide standards), *see* 42 U.S.C. § 7412(d)(1)–(3), (f)(2), the President is

required to make a determination of whether the requisite technology is unavailable at the

individual facility level. This is consistent with the broader structure of the Act, which specifically contemplates that at the time new standards are set, some facilities within the category will not have met the new standards. *See*, *e.g.*, *U.S. Sugar Corp.*, 830 F.3d at 612 (upholding standards even where "few or no units [within the category] have achieved those standards for all pollutants"). Accordingly, for a facility that does not already meet a standard, Section 7412(i)(4) authorizes an exemption if the President finds the requisite technology is unavailable to that facility, but that does not contemplate exempting the entire industry because the President does not believe the standards can be implemented at all.

Third, statutory structure and context further confirms the President lacks authority to second-guess the validity of a standard, as the Act provides an express reconsideration mechanism for correcting flawed standards. Specifically, the judicial review provisions mandate that adversely affected industries administratively petition EPA for reconsideration of the rule where there are errors in the rule that could not have been objected to during the rulemaking process. 42 U.S.C. § 7607(b)(1). However, the filing of a reconsideration petition "shall not postpone the effectiveness of [a] rule," and EPA may only stay the effectiveness of the rule "for a period not to exceed three months" upon initiating a reconsideration proceeding. 42 U.S.C. § 7607(b)(1), (d)(7). This provision represents "Congress's clear intent to specifically limit the agency's authority" to reconsider rules. *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *see id.* at 1063 (noting that "EPA previously interpreted that provision as establishing the CAA's <u>exclusive</u> mechanism for staying the effectiveness of a final rule pending reconsideration.").

If the President were permitted to exempt entire industries based on objections to the standards themselves, the Section 7412(i)(4) authority would operate as an end-run around those

limitations. Congress cannot have intended that "absurd" outcome, and the President's use of

Section 7412(i)(4) to effectuate such an end run is *ultra vires*. *Fed. Educ. Ass'n*, 2025 WL

2738626, at \*9.

> 2.    **The Proclamation grossly exceeds the limits and prohibitions in Section 7412(i)(4) in order to roll back the Coke Ovens Rule.**

On its face, the Proclamation's determinations are based on the President's view that the

standards in the Coke Ovens Rule are not achievable, which is *ultra vires*. The Proclamation

attacks the "premise[s]" underlying the Rule; concludes that the requisite "emissions-control

technologies [] <u>do not yet exist</u> in a commercially demonstrated or cost-effective form"; and

claims the standards "rely on technologies that…<u>cannot be implemented</u> safely or consistently

under real-world conditions," or are otherwise "unproven." 90 Fed. Reg. 54517 (emphases

added). Those findings are not about availability of a specific technology for a specific facility,

but simply dispute that the standards can be achieved or implemented at all.

To be sure, the Proclamation cursorily parrots the statutory standard, invoking the

language of availability. *See id.* But the Proclamation does not address the physical

unavailability of any particular technology needed to implement any particular standard at any

particular facility. Instead, the Proclamation makes clear that the President's true target is the

existence of the standards in the first place. In disregarding the specific and unambiguous

statutory limits, and seeking to overturn lawfully promulgated EPA standards, the President

grossly exceeds the clear and unambiguous limits on his authority.

As the head of the executive branch, if the President believes that EPA got a standard

wrong, he can order the agency to reconsider the standard and, can even direct the agency to stay

the standard for up to three months if the test for mandatory reconsideration under Section 7607

is met. 42 U.S.C. § 7607(d)(7). But Section 7412(i)(4) does not empower him to take those

powers into his own hands as an end-run around the substantive and procedural standards that apply.

Thus, the face of the Proclamation demonstrates that President has grossly exceeded his authority and thereby acted *ultra vires*.

### B.    The Proclamation's Findings Are Directly Contrary to the Executive's Own Findings Made Mere Weeks Earlier, Demonstrating Bad Faith.

The Proclamation's determinations irreconcilably conflict with EPA's recent findings to the contrary. When EPA published the Delay Rule on July 8, 2025, it voiced concerns similar to those reflected in the Proclamation, that the Coke Ovens Rule posed "compliance challenges" necessitating an extension of the compliance deadlines, for example because the compliance deadlines for certain standards were "infeasible for sources to adhere to." SUMF ¶ 19 (90 Fed. Reg. 30001). According to EPA, the Delay Rule was prompted by "serious concerns that, without the installation of additional controls that may be unavailable or infeasible, industry would be unable to comply" with certain aspects of the Coke Ovens Rule. *Id.* ¶ 19 (90 Fed. Reg. 56011).

Yet, EPA quickly realized those concerns were unfounded after it received and reviewed comments from both the coke oven industry and the public. *Id.* ¶ 25 (90 Fed. Reg. 56011). And after completing that additional due diligence, EPA determined by October 2025 that the compliance deadlines were feasible and that coke oven facilities would face no "immediate compliance difficulties with relevant deadlines," *id.* ¶ 24, and that this was true "regardless of whether facilities installed additional controls," *id.* ¶ 23. In other words, weeks before the President issued the Proclamation, his own EPA again reaffirmed that facilities not only could timely comply with the Coke Ovens Rule, but could do so <u>without</u> installing additional technology.

34

Despite EPA's finding to the contrary, the Proclamation nevertheless claims that the "technology to implement the Coke Oven[s] Rule is not available" as it "does not exist in a commercially viable form sufficient to allow implementation of and compliance with the Coke Oven[s] Rule by the compliance dates in the Coke Oven[s] Rule." 90 Fed. Reg. 54518. This divergence highlights the baselessness of the Proclamation claims. Indeed, EPA's own near-contemporaneous records establish that for most standards no technology is needed or that the technology is available. *See infra* III.C.2. The Proclamation is in bad faith and, therefore, *ultra vires.*

**C.      The Proclamation Exceeds the President's Authority Because It Evinces a Patent Misconstruction of Section 7412(i)(4) and Is Predicated on Bad Faith.**

The Proclamation's blanket exemption—covering nearly every one of the roughly two dozen new standards established in the Coke Ovens Rule at every operating coke oven—is plainly ultra vires because it represents a patent misconstruction of Section 7412(i)(4). The Proclamation foregoes individualized determinations and it does not even attempt to identify which technologies are needed to implement the standards it waives, let alone why such technologies are unavailable at any given facility. Nor could it: of the Coke Ovens Rule standards, 20 do not require any technology to implement; and for two other standards, the requisite technology is available and is either currently in use, was recently in use, or previously has been implemented. Thus, none of the standards are eligible for an exemption.

The Proclamation is so divorced from reality that its findings constitute bad faith. This is not just one rotten apple spoiling the barrel; virtually every apple is rotten to its core. Accordingly, the pervasiveness of the Proclamation's flaws demonstrate that it was made without consideration or application of the Section 7412(i)(4) standard, in blatant disregard of the narrow authority and limitations Congress imposed.

1. **The Proclamation's sweeping findings disregard the Act's plain requirements.**

To grant an exemption, the statute requires a determination that a particular facility cannot timely comply with a given standard at issue because the technology is not available to that facility. 42 U.S.C. § 7412(i)(4). Here, rather than making specific determinations as to the availability of technology to implement each standard at a specific facility to implement, the President exempted <u>all eleven coke facilities</u> from <u>all compliance deadlines</u>. Proclamation, 90 Fed. Reg. 54518 (emphasis added). And instead of determining which technology is unavailable for specific standards or facilities, the Proclamation simply makes sweeping, blanket conclusions about unspecified technologies untethered from any factual reality. *See id.* at 54517–18.

The Proclamation "disregards a specific and unambiguous statutory directive" to make facility specific findings. *Changji*, 40 F.4th at 722. Allowing sweeping, industry-wide exemptions would effectively nullify the statute's requirements—that the technology to implement a standard be unavailable at a facility—rendering an "absurd result." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (cleaned up).

2. **The Proclamation unlawfully exempts standards that are ineligible for an exemption because no technology is needed to implement them.**

The President exceeded his authority under 7412(i)(4) because the Proclamation exempted facilities from having to comply with 20 standards that do not require any technology to implement. In doing so, the Proclamation "disregards a specific and unambiguous statutory directive" in two, independent ways. *Changji*, 40 F.4th at 722.

First, for many of the standards—the 17 new MACT floors, visual monitoring at bypass stacks, and lower leak limits at byproduct ovens—EPA determined the standards did not require technology to implement; and that determination is conclusive, making the standards ineligible for 7412(i)(4) exemption as a matter of law. Text, structure, and context establish that this

36

provision constrains the President's authority to determining whether "the technology to implement such standard," as identified by EPA when setting Section 7412 standards, is not available. 42 U.S.C. § 7412(i)(4) (emphasis added); *see* supra III.A. EPA can and does set standards that are based on "processes" or "practices," rather than "control technologies." *E.g.,* 42 U.S.C. § 7412(d)(6). EPA considers both "air pollution control technology" and "non-technology pollution prevention techniques" such as training, material type, and equipment design. *Sierra Club,* 479 F.3d at 882–83 (discussing Section 7412(d)(3) MACT standard setting); *see also* 42 U.S.C. § 7412(d)(2) (enumerating different "measures" that EPA may consider in setting beyond-the-floor standards).

Thus, EPA can determine that technology is not needed to implement a standard, which limits the President's authority under Section 7412(i)(4). The President is prohibited from granting an exemption for a standard under Section 7412(i)(4) where EPA has determined the standard can be implemented without technology.

Second, even if EPA's determinations do not conclusively make the standards ineligible for an exemption, many of the standards facially do not require technology to implement, making them ineligible for a 7412(i)(4) exemption.

Either way, the President's exemption exceeded the statutory limits on his authority and was *ultra vires*. The Proclamation rests on a determination that technology is required to implement the standards, when, as a matter of law, the standards do not. 90 Fed. Reg. 54517 (The Rule's standards require "the application of emissions-control technologies that do not yet exist in a commercially demonstrated or cost-effective form" and the standards "rely on technologies that are . . . not demonstrated at the necessary scale, or cannot be implemented safely or consistently under real-world conditions." (emphases added)). Looking to the

individual standards and EPA's findings confirms that the President patently misconstrues Section 7412(i)(4) to apply to standards that do not require technology to be implemented.

### a.  MACT Floor Standards

The Proclamation unlawfully exempts every coke oven from the applicable 17 numerical MACT floor standards and one MACT floor work practice standard promulgated in the Coke Ovens Rule. SUMF ¶¶ 58–61; 40 C.F.R. §§ 63.7290(b)–(d), 63.7296(c)–(f), 63.7297(a)–(d), 63.7298(a)–(e), and at 40 C.F.R. § 63.7300(c)(4)).

However, EPA determined no technology is needed to implement these standards, finding "all sources can meet the MACT floor limits and would not have to install controls to meet the limits." SUMF ¶ 61 (89 Fed. Reg. 55720); *see also id.* ¶ 62 (EPA concluded in the MACT Memorandum that "all sources were shown to meet the MACT limits" with their existing control technologies). Accordingly, EPA determined that "there are no [air pollution control device] costs associated with compliance with the MACT limits." *Id.* ¶ 62; *see also id.* ¶ 64 (EPA calculated the compliance cost for MACT, with no cost for new technology). In addition, these MACT standards are based on the actual performance of several coke ovens, and are thus already achieved at these ovens without additional technology. *Id.* ¶ 63; *see also Sierra Club v. EPA*, 895 F.3d 1, 7–8 (D.C. Cir. 2018) (describing the MACT floor setting process).

Because no technology is necessary to implement this standard, the President exceeded the clear limits of 7412(i)(4) in exempting facilities from complying with the MACT floors.

### b.  MACT Work Practice Standard

The Proclamation also unlawfully exempts coke ovens from a MACT work practice standard of based on "good combustion practices" that does not require technology to implement. SUMF ¶ 60 (89 Fed. Reg. 55708); 40 C.F.R. § 63.7300(c)(4). Specifically, "good combustion practices" include, but are not limited to "[p]roper operating conditions," and

"[r]outine inspection and preventative maintenance." SUMF ¶ 60. The Rule describes

management and maintenance practices that do not rely on the installation or operation of

controls or technology. Indeed, EPA expressly concluded that sources "would not have to install

controls" to meet any finalized MACT standards. *Id*. ¶ 61. Accordingly, this standard does not

require technology and is ineligible from a 7412(i)(4) exemption.

### c.    Visual Monitoring – Bypass Stacks

The Proclamation exempts all non-recovery ovens from having to comply with visual

monitoring requirements for bypass/waste heat stack found at 40 C.F.R. § 63.7299, even though

EPA concluded technology was not needed to comply and the regulation on its face requires no

technology to implement. SUMF ¶¶ 82–92.

In establishing requirements for these stacks, EPA rejected potential standards that would

require technology. *Id.* ¶ 83 (EPA "did not finalize control devices for HNR B/W stacks at

facilities with no HRSG."). That alone makes the standard ineligible for an exemption.

Instead, the Coke Ovens Rule requires the use of Method 9 "observation" monitoring to

determine the opacity of the stack exhaust at non-recovery ovens that emit exhaust through a

bypass or waste heat stack for more than one hour per week. 40 C.F.R. § 63.7299; SUMF ¶¶ 85–

88. Under Method 9, a qualified observer uses their naked eye to determine the opacity of the

exhaust; there is no technology involved. 40 C.F.R. pt. 60, app. A-4. If the Method 9 observer

sees stack exhaust opacity above 20 percent, the facility must take corrective action[3] to reduce

---

[3] EPA has been clear that "[c]orrective action levels are not intended to function as conventional
emission limits." SUMF ¶ 89. Instead, a corrective action standard is "the design, operation and
maintenance changes that one takes consistent with good engineering practice to reduce or
eliminate the likelihood of the recurrence" of the event that leads to a violation. 40 C.F.R.
§ 63.301 (2025).

emissions, record the event, and report the exceedance in the quarterly report. 40 C.F.R.

§ 63.7299(a)–(c).

There is no interpretation of the Section 7412(i)(4) that allows the President to determine that naked-eye observations are a technology that can be unavailable. Tellingly, SunCoke, the owner of all ovens potentially subject to this regulation, did not request that EPA reconsider this requirement, despite requesting numerous other changes, and did not request a Section 7412(i)(4) exemption from this standard. SUMF ¶¶ 91, 92. The fact that SunCoke never claimed it would not be able to implement the standard further demonstrates the bad faith underlying the Proclamation.

### d.     Non-Recovery Oven Door Leaks

The Proclamation also exceeds the President's authority because it exempts coke ovens from having to comply with the door leak and visual monitoring requirements at 40 C.F.R. § 63.303(a)(1)(i), despite EPA determining technology was not needed to implement this standard. SUMF ¶¶ 93–96, 100. This regulation requires facilities to have 0.0 percent leaking coke oven doors shown through daily monitoring using EPA Method 303 or 303A, in which a certified observer uses their naked eye to determine whether any visible emissions are present. 40 C.F.R. § 63.303(a)(1)(i); 40 C.F.R. pt. 63, app. A (2025).

Visual observations do not require technology to implement. Accordingly, EPA determined that the only cost to comply with this requirement was the labor of the observer, not the implementation of any technology. SUMF ¶ 100. Further, this standard merely incorporates ovens' existing practice to respond to any noted door leaks. *See id.* ¶¶ 94–96.

### e.     Leak Limits for Doors, Lids, and Offtakes at Byproduct Ovens

The Proclamation also patently exceeds the President's authority as to new leak limits, which EPA determined required no new technology to implement. SUMF ¶¶ 49–56. The Coke

Ovens Rule lowered the allowable door, lid, and offtake leak limits for byproduct ovens. 40 C.F.R. § 63.302(a)(4); SUMF ¶ 51. The EPA found that coke oven "facilities will be able to comply with these limits without the need for any new controls." *Id.* ¶ 52 (89 Fed. Reg. 55696). In fact, EPA specifically set the leak limits "to ensure the limit is achievable by the affected facilities without the need for additional controls or costs." *Id.* ¶ 53. The regulated entities themselves have acknowledged that no technology-based controls are necessary to comply with this requirement, commenting in the rulemaking that "across the cokemaking industry leak control for doors, lids, and offtakes is achieved through operational and maintenance work practices, not through add-on pollution controls or other equipment." *Id.* ¶ 55. In addition, these coke ovens must perform daily visual operations using EPA Method 303 or 303A, which, again, does not require technology to implement. *Id.* ¶ 56.

### 3. The Proclamation unlawfully exempts standards where the technology needed to implement them is available.

The Proclamation exempted coke ovens from two Coke Ovens Rule standards that require technology: tunnel pressure monitoring for the five non-recovery ovens (40 C.F.R. § 63.303(a)(1)(ii)) and fenceline monitoring for the six byproduct ovens (40 C.F.R. § 63.314). SUMF ¶¶ 68, 93. However, the Proclamation put forth no specific finding that the technology to implement these two standards is unavailable. Nor could it. The requisite technology is readily available and is either already in use or has recently been installed and used.

First, common tunnel pressure monitoring technology for non-recovery ovens is available because is <u>already installed and in use</u> at <u>all</u> non-recovery ovens that received an exemption from the President. SUMF ¶ 98 (89 Fed. Reg. 55703) (explaining that, according to commenter SunCoke, "SunCoke's heat recovery facilities already monitor negative pressure in the common

tunnel electronically on a continuous basis"); *id.* ¶ 100. Therefore, the technology to monitor

pressure in the common tunnels is available and already implemented safely and used.

Second, the technology to conduct both types of fenceline monitoring prescribed by the

rule is readily available. The rule requires byproduct ovens to conduct Method 325A/B fenceline

monitoring using sorbent tubes, 40 C.F.R. § 63.314, a technology which is readily available and

has already been successfully implemented at many of the exempted coke ovens. Tellingly, four

of the six operating byproduct ovens conducted six months of Method 325A/B fenceline

monitoring using sorbent tubes in 2022 as part of EPA's Section 7414 Information Collection

request to develop the Coke Ovens Rule. SUMF ¶ 72 (88 Fed. Reg. 55885).

These sorbent tubes are readily available. Various vendors offer sorbent tubes for

purchase, with delivery options available as soon as the next day. *Id.* ¶¶ 74–77. At least twenty-

one laboratories have been listed as accredited for performing EPA Method 325. *Id.* ¶ 76. Indeed,

since 2018, the refinery sector has been subject to similar fenceline monitoring requirements,

requiring the use Method 325A/B and sorbent tubes. *Id.* ¶ 75.

Finally, the rule requires real-time sampling in specified circumstances, and the requisite

monitoring technology exists and is readily available for purchase or rental. *Id.* ¶¶ 77–81. At

least 14 refineries in California are currently using real-time sampling technologies to identify

causes of benzene exceedances, and other real-time technologies are used in California and

across the country. *Id.* ¶¶ 79–81. EPA recently cited to the same type of real-time sampling

technologies as a best practice for finding root causes of action level exceedances for refineries.

*Id.* ¶ 78.

In sum, the technology to implement these two standards is widely available and already in use. The Proclamation's sweeping and unsupported assertions, are plainly in bad faith and grossly exceed the President's authority, rendering these exemptions ultra vires.

## IV.  THE PROCLAMATION'S BAD FAITH OVERCOMES ANY PRESUMPTION OF REGULARITY

The President is likely to argue that the presumption of regularity prevents this Court from second-guessing his determinations, but nothing about the Proclamation is regular. Though the presumption of regularity may bar a court from "requir[ing] the President to explain the basis for [his] determinations," that bar does not apply when the presumption has been overcome. *Fed. Educ. Ass'n,* 2025 WL 2738626, at *8. Here, "clear evidence" demonstrates the President "did not discharge his [] official duties properly." *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 89 (D.D.C. 2025) (cleaned up).

The Proclamation exempts facilities from a standard for which industry has never asked for relief. SUMF ¶ 92. The Proclamation claims that technology is not available to implement a standard that only requires monitoring with the naked eye. *Id*. ¶¶ 56, 94. And the President's own EPA sought to achieve the very same ends based on the very same compliance concerns, but could not substantiate that such concerns were valid, mere weeks before the President issued the Proclamation. *Id*. ¶¶ 23, 25.

Indeed, this President's repeated use of the Section 7412(i)(4) exemption power is highly irregular. None of his predecessors ever invoked it. He has now done so seven times to exempt more than 180 facilities from various emission standards for hazardous air pollutants, relying on similarly unfounded determinations of availability that all simply parrot identical generic boilerplate about the commercial viability of compliance. SUMF ¶¶ 1–2.

## V.    THE PROCLAMATION SHOULD BE DECLARED UNLAWFUL AND EPA ENJOINED FROM IMPLEMENTING IT

The Court should declare the Proclamation unlawful and grant injunctive relief as to Administrator Zeldin and EPA to prevent them from relying on the Proclamation to allow exempted coke oven facilities to continue noncompliance with the duly issued Coke Ovens Rule. This relief is no broader than necessary to redress the harms to Plaintiffs' members and supporters and well within this Court's authority to grant.

This Court may enter a declaratory judgment as to the President declaring that the Proclamation is unlawful. *See Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that President's actions under Line Item Veto Act were invalid). Such declaratory relief is necessary to "clarif[y] the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)). The Court should exercise its "sound discretion," to enter such a judgment here to eliminate "uncertainty" about the lawfulness of the Proclamation for exempted facilities, subordinate officials, and EPA. *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980).

Further, this Court should grant injunctive relief against Administrator Zeldin as the subordinate officer who enforces the President's directive. *Reich*, 74 F.3d at 1328 ("Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality'" of the action and "'to compel subordinate executive officials to disobey illegal Presidential commands.'"). The injunction should prohibit the Agency Defendants from implementing or giving effect to the unlawful Proclamation, including through implementation of the Act's Title V operating permit program, and direct EPA to notify all exempted coke oven

facilities and relevant permitting authorities that the Proclamation is unlawful and that they may not rely on it.

## CONCLUSION

The Coke Ovens Proclamation allows the entire coke ovens industry to continue emitting toxic and carcinogenic pollutants unconstrained by the duly issued Coke Ovens Rule for an additional two years. It prolongs the harms to people who live in communities adjacent to exempted facilities in ways big (Mr. Jack Evans is "worried that one day [he] will get cancer or suffer from the pulmonary diseases that [his] mother and grandmother had" from exposure to pollutants emitted during the coking process) and small (Mr. Evans has "stopped planting a garden because [he is] afraid of what contaminants from ABC Coke are in the soil"). Ex. 13, Evans Decl. ¶ 4. The Proclamation is unlawful. It serves as the President impermissibly substituting his judgment to effectively reconsider EPA's achievability determinations of the technology necessary to comply with the Rule. It evinces an utterly unreasonable interpretation of "technology" being "unavailable." And it is squarely at odds with EPA's findings that facilities could comply with the Rule, made just weeks before the President issued the Proclamation. More is required for the President to invoke the narrow exemptions authority in Section 7412(i)(4) of the Act, and this Court should demand more of the President by exercising its equitable jurisdiction to strike down the Proclamation as *ultra vires*.

DATED: February 27, 2026

/s/ Tosh Sagar
Tosh Sagar (D.C. Bar No. 1562693)
Sage Lincoln (Pro Hac Vice, D.C. Bar No.
90042038)
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
Tel: (202) 793-2075
tsagar@earthjustice.org
slincoln@earthjustice.org

*Counsel for Citizens for Pennsylvania's Future,*
*Hoosier Environmental Council, Just*
*Transition Northwest Indiana, and Sierra Club*

/s/ Shampa Panda
Shampa Panda (D.C. Bar No. 90030605)
Sarah A. Buckley (D.C. Bar No. 90035401)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
Tel: (202) 836-9333
Tel: (202) 836-9555
spanda-bryant@nrdc.org
sbuckley@nrdc.org

*Counsel for Natural Resources Defense*
*Council*

/s/ Brian Lynk
Brian Lynk (D.C. Bar No. 459525)
Environmental Law & Policy Center
740 15th St. NW, Suite 700
Washington, D.C. 20005
Tel: 240-461-4241
blynk@elpc.org

*Counsel for Environmental Law & Policy*
*Center*

Respectfully submitted,

/s/ Jaclyn Brass (Pro Hac Vice)
Jaclyn Brass (Ala. Bar No. ASB-5340-B19L)
Christina Tidwell (Ala. Bar No ASB-9696-
D10R)
Southern Environmental Law Center
2829 2nd Avenue S, Suite 282
Birmingham, AL 35233
Tel: 205-745-3060
Jbrass@selc.org
Ctidwell@selcal.org

Keri N. Powell (D.C. Bar No. 477045)
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Tel: 678-433-6851
Kpowell@selc.org

*Counsel for Greater-Birmingham Alliance to*
*Stop Pollution*

/s/ Haley Lewis (Pro Hac Vice)
Haley Lewis (AL Bar No. ASB-1008-R66I)
888 17th Street, NW, Suite 810
Washington, DC 20006
Tel: (202) 263-4449
hlewis@environmentalintegrity.org

Abel Russ (D.C. Bar No. 1007020)
888 17th Street, NW, Suite 810
Washington, DC 20006
Tel: (802) 482-5379

aruss@environmentalintegrity.org

*Counsel for Greater-Birmingham Alliance to*
*Stop Pollution and Clean Air Council*