**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ) | |
| GREATER-BIRMINGHAM ALLIANCE TO ) | |
| STOP POLLUTION, et al., ) | |
| ) | |
| *Plaintiffs*, ) | Civil Action No. 1:25-cv-04469-CRC |
| ) | |
| v. ) | |
| ) | |
| DONALD TRUMP, President of the United ) | |
| States, in his official capacity, et al., ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

**PLAINTIFFS' ADDENDUM OF DECLARATIONS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

| Exh. | Declarations | Page No. |
|---|---|---|
| | **Organizational** | |
| 1 | Declaration of Paula Brooks | EXH001 |
| 2 | Declaration of Kevin Brubaker | EXH006 |
| 3 | Declaration of Huda Fashho | EXH008 |
| 4 | Declaration of Annie Fox | EXH011 |
| 5 | Declaration of Aaron Isherwood | EXH016 |
| 6 | Declaration of Patrick McDonnell | EXH023 |
| 7 | Declaration of Jilisa Milton | EXH028 |
| 8 | Declaration of Gina Trujillo | EXH031 |
| 9 | Declaration of Ashley Williams | EXH034 |
| | **Member** | |
| 10 | Declaration of Susan Adams | EXH039 |
| 11 | Declaration of Donna Ballinger | EXH042 |
| 12 | Declaration of Vicki Dobbins | EXH046 |
| 13 | Declaration of Jack Evans | EXH050 |
| 14 | Declaration of Amanda Franklin | EXH054 |
| 15 | Declaration of Allan Halline | EXH057 |
| 16 | Declaration of Melanie Meade | EXH063 |
| 17 | Declaration of Judy Mendoza | EXH069 |
| 18 | Declaration of Mary Lou Mills | EXH072 |
| 19 | Declaration of Robert Mulvihill | EXH077 |
| 20 | Declaration of Julie Peller | EXH080 |
| 21 | Declaration of Janet Roslund | EXH083 |
| 22 | Declaration of Betty Sullivan | EXH089 |
| | **Fact** | |
| 23 | Declaration of Lauren Fleer | EXH092 |
| 24 | Declaration of Robyn Winz | EXH096 |

# EXHIBIT 1

# Declaration of Paula Brooks

## DECLARATION OF PAULA BROOKS

I, Paula Brooks, declare as follows:

      1.      I serve as the Environmental Justice Director at Hoosier Environmental Council (HEC) and have worked at HEC since 2016.

      2.      I am submitting this declaration in support of HEC's legal challenge to the Presidential proclamation issued on November 21, 2025, "Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security," 90 Fed. Reg. 54517 (Nov. 26, 2025) ("Coke Ovens Proclamation").

      3.      Hoosier Environmental Council, founded in 1983, is one of Indiana's largest state-wide environmental advocacy organizations. Its mission is to make Indiana a better place to live, breathe, work, and play. HEC works to reduce environmental burdens, including by reducing exposure to toxic pollution. HEC has individual members across Indiana who make financial contributions to the organization.

      4.      I am a graduate of Howard University, where I received a bachelor's degree (BBA) in Finance and a master's (MA) degree in Development, Policy, and Planning. I have received Lean Six Sigma Yellow Belt training from Six Sigma Indy.

      5.      Currently, as Environmental Justice Director at HEC, I identify, prioritize,  and ultimately mitigate environmental health risks in low-income communities and in communities of color in Indiana. One of my main focus areas is building community capacity, so that communities burdened by environmental injustice can act as equal stakeholders in matters that impact them. In that role, I help communities to secure community benefit plan agreements to mitigate the health and environmental harms from industrial sources of pollution and to ensure that benefits flow to the communities where

EXH001

those industrial sources are located. In addition to grassroots organizing, I work with decision-makers and policy makers to educate them about the impacts of environmental injustice on Indiana communities. I have expertise in land use and zoning and how that influences siting decisions for industrial polluters.

6.      For my work, I received a Hoosier Environmental Hero Award from Indiana University's Environmental Resilience Institute in 2021.

7.      I am familiar with and knowledgeable about HEC's purpose and activities regarding prevention and reduction of exposure to toxic pollution. HEC is dedicated to protecting the health of people in Indiana, including HEC members, from industrial sources of pollution, and to protecting their ability to recreate in the outdoors. I have access to organizational information such as how many members we have, where they are located, and how many people receive our newsletters and attend our events.

8.      HEC uses education, advocacy, policy, and litigation to fulfill its mission. We educate members and the public on environmental health, environmental justice, sustainability, land conservation, and wetland protection through various means. We publish four monthly newsletters by email that any member of the public can sign up to receive: Improving Kids' Environment, HEC News, Agriculture, and Mounds Greenway. HEC's newsletters educate readers on recent developments in environmental issues in Indiana, the health impacts of air pollution, and relevant legal developments. The newsletters discuss new bills and laws and explain how to reach out to a district representative with concerns. HEC also educates the public regularly on environmental issues and our work through webinars, seminars, and social media. HEC runs educational stands at public health fairs, environmental fairs, and other events, where we distribute educational materials to members

EXH002

of the public.

9.      As part of our policy work, HEC supports or opposes various state and federal legislative proposals. HEC educates members on bills, their environmental implications, and how to contact representatives. In addition, HEC shares stories and lived experiences of Hoosiers impacted by pollution to policy makers and legislators.

10.      HEC provides technical assistance to our members to help them protect themselves and their communities from environmental harms.

11.      HEC submits comments in rulemakings to urge EPA to issue rules that are more protective of human health and the environment. For example, Hoosier Environmental Council filed comments on EPA's 2023 proposed rule to regulate coke ovens.

12.      When necessary, the organization engages in litigation to protect human health and the environment.

13.      Through my work with communities burdened by industrial pollution, I am aware that HEC members live, work, and recreate near coke ovens in Indiana, including the Burns Harbor and East Chicago plants. I am aware that members who live, work, and recreate near the above facilities are at risk of being exposed to toxic air emissions from these plants.

14.      I am aware that coke oven facilities in Burns Harbor and East Chicago are major sources of hazardous air pollutants and are subject to EPA's air toxics rule for coke ovens: pushing, quenching, and battery stacks, and coke oven batteries ("Coke Ovens Rule").

15.      I am aware that EPA published a revised Coke Ovens Rule on July 5, 2024, and that the Rule established new standards and tightened existing standards for coke ovens, protecting HEC members who live, work, recreate, or otherwise spend time near coke ovens.

EXH003

For example, the Rule established a fenceline monitoring and corrective action standard that will catch violations more quickly and ensure quicker compliance. Additionally, the Rule sets standards for previously unregulated hazardous air pollutants for the first time, preventing sources from increasing their emissions. 89 Fed. Reg. 55684 (July 5, 2024) ("2024 Coke Ovens Rule").

16.     Emissions information obtained through fenceline monitoring and electronic reporting, as required by the 2024 Coke Ovens Rule, would be helpful to HEC in educating its members about the risks posed by coke ovens and protecting members from coke ovens emissions. It would also help HEC and its members participate in regulatory and legislative processes relating to coke ovens.

17.     I am aware that, on July 3, 2025, EPA issued an interim final rule, which attempted to extend certain compliance deadlines in the Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 5, 2027. HEC sued the EPA asserting that the interim final rule was unlawful. On October 2, 2025, the EPA issued a final rule rescinding the challenged interim final rule. 90 Fed. Reg. 56010 (Dec. 5, 2025).

18.     I understand that on November 21, 2025, President Trump issued a Proclamation which extends certain compliance deadlines in the Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 7, 2027, and January 5, 2028. Requirements that would have taken effect on July 7 of this year include: fenceline monitoring and corrective action; leak limits for doors, lids and offtakes; and zero-leak limits at certain oven doors. The Rule's new emission limits for previously unregulated hazardous air pollutants would have taken effect on January 5, 2026.

19.     I am aware that the Proclamation will delay the protections established in the

4

Coke Ovens Rule, exposing HEC members to greater amounts of air pollution than would otherwise be allowed if coke ovens were required to start implementing the Rule's requirements on July 7, 2025, and January 5, 2026.

20.    By preventing the 2024 Coke Oven Rule's fenceline monitoring requirements from taking effect, the Proclamation prevents HEC from accessing emissions data that it would use to educate the public about coke oven emissions, protect its members from coke oven emissions, and participate in regulatory and legislative processes relating to coke ovens.

21.    If a court were to declare the Proclamation unlawful, the above harms would be remedied. The pollution control requirements in the 2024 Coke Ovens Rule would have effect and provide the protection they were promulgated to provide.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on February 23, 2026

*Paula Brooks*

Paula Brooks

5

EXH005

# EXHIBIT 2

# Declaration of Kevin Brubaker

## DECLARATION OF KEVIN BRUBAKER
## DEPUTY DIRECTOR, ENVIRONMENTAL LAW & POLICY CENTER

I, Kevin Brubaker, declare as follows:

1. I am the Deputy Director and Chief Operations Officer of the Environmental Law & Policy Center ("ELPC") and have been employed by the organization since 1996. My responsibilities include financial and operations oversight, as well as direct involvement in policy issues and ELPC's advocacy campaigns.

2. ELPC is a Midwest-based environmental and public health advocacy organization. ELPC's mission is to improve environmental quality and protect natural resources, particularly across the Midwest and Great Plains states. ELPC works to protect air quality and to ensure that air pollutants are properly regulated to ensure healthy, breathable air. ELPC's headquarters is in Chicago, Illinois, and ELPC also has offices in Washington, D.C. as well as Iowa, Ohio, and Michigan.

3. ELPC has been deeply involved in administrative proceedings related to U.S. Environmental Protection Agency's ("EPA") regulation of hazardous air pollutants from coke ovens. In 2024, ELPC submitted comments on EPA's proposal under section 112 of the Clean Air Act to: (1) revise the emission leak limits for coke oven doors, lids, and offtakes, (2) require fenceline monitoring for benzene along with establishment of an action level for benzene, (3) set new standards for 17 previously unregulated hazardous air pollutants, (4) remove exemptions for periods of startup, shutdown, and malfunction, and (5) add electronic reporting for performance tests results and compliance reports. EPA's proposal was later made final, as *National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review*, published at 89 Fed. Reg. 55684 (July 5, 2024).

1

4. ELPC signed a letter to Senators in March 2024 regarding the dangerous benzene concentrations measured at coke oven plants.

5. ELPC staff testified in EPA's public hearing on September 4, 2025, regarding the Interim Final Rule, *National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review*, published at 90 Fed. Reg. 29997 (July 8, 2025).

6. ELPC has also been specifically involved with the Cleveland-Cliffs Burns Harbor integrated steel mill ("Burns Harbor"). On May 28, 2024, ELPC submitted comments to the Indiana Department of Environmental Management ("IDEM") on the Draft Title V Operating Permit renewal for Burns Harbor (Part 70 Operating Permit Renewal No. T127-46984-00001).

7. ELPC has members who live near coke ovens that were exempted from the 2024 Coke Ovens Rule. At least two members live near one of these coke ovens, located at Burns Harbor in Northwest Indiana. Those members are directly affected by the pollution that coke oven generates. Two of these members have submitted declarations in this case.

8. The interests of ELPC and its members are threatened by the exemptions given to coke ovens from the 2024 Coke Ovens Rule.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: _12 / 18 / 2025_

_____
Kevin Brubaker

2

# EXHIBIT 3

# Declaration of Huda Fashho

# DECLARATION OF HUDA FASHHO

I, Huda Fashho, declare as follows:

1.      I am over 18 years of age, and I am competent to testify and I have personal knowledge of the matters set forth herein.

2.      I am the Senior Managing Director of Member Care for the Sierra Club. In my role, I manage all aspects of the Sierra Club's customer service functions related to members, including maintaining an accurate list of members and managing the organization's member database, which contains the addresses where our members live. I also regularly query the membership directory to identify members, including where they live. And I also review the membership reports— that identify the individual members and their place of residence—generated in response to queries run by other Sierra Club employees.

3.      Based on a query of the Sierra Club membership directory and using location information for coke ovens from EPA's ECHO website, Sierra Club has:

i.      139 members live within 10 km (6.2 miles) of the Drummond (ABC) coke oven battery in Birmingham, Alabama.

ii.      86 members live within 10 km (6.2 miles) of the Cleveland-Cliffs Burns Harbor coke oven battery in Burns Harbor, Indiana.

iii.      38 members live within 10 km (6.2 miles) of the Cleveland-Cliffs Monessen coke oven battery in Monessen, Pennsylvania.

1

EXH008

iv.      70 members live within 10 km (6.2 miles) of the Cleveland-Cliffs Warren coke oven battery in Warren, Ohio.

v.      184 members live within 10 km (6.2 miles) of the EES Coke coke oven battery in River Rouge, Michigan.

vi.      56 members live within 10 km (6.2 miles) of the Indiana Harbor Coke Company coke oven battery in East Chicago, Indiana.

vii.      2 member lives within 10 km (6.2 miles) of the Haverhill Coke Company coke oven battery in Franklin Furnace, Ohio.

viii.      34 members live within 10 km (6.2 miles) of the Gateway Energy coke oven battery in Granite City, Illinois.

ix.      66 members live within 10 km (6.2 miles) of the Middletown Coke (Suncoke) coke oven battery in Middletown, Ohio.

x.      4 members live within 10 km (6.2 miles) of the Jewell Coke coke oven battery in Vansant, Virginia.

xi.      132 members live within 10 km (6.2 miles) of the U.S. Steel Clairton Works coke oven battery in Clairton, Pennsylvania.

EXH009

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on February 19, 2026

_____
Huda Fashho

EXH010

# EXHIBIT 4

# Declaration of Annie Fox

# DECLARATION OF ANNIE FOX

I, Annie Fox, declare and state as follows:

1.      This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2.      I submit this declaration in support of Clean Air Council's ("the Council") challenge to President Trump's Proclamation to exempt United States Steel Corporation: Mon Valley Works, Clairton Coke Plant ("Clairton Coke Works" or "Clairton") and Cleveland Cliffs Monessen Coke LLC ("Monessen Coke") from requirements in the "National Emission Standards for Hazardous Air Pollutants: for Coke Oven Batteries ("COB") and the Pushing, Quenching and Battery Stacks ("PQBS") source categories" ("Coke Oven NESHAP 2024 revisions") for two years from the promulgated compliance dates. Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security, 90 Fed. Reg. 54517 (Nov.26, 2025) ("the Presidential Proclamation.")

3.      I am currently a staff attorney for the Council, where I have worked since January 2022. My duties include regularly meeting with our members and supporters from Pennsylvania's Monongahela Valley who suffer health and other injuries from air pollution; researching and drafting comments on proposed federal, state, and local regulations related to air quality, environmental health, and environmental justice; and supporting the Council's community advocacy, regulatory work, and litigation intended to improve Pennsylvania's air quality and the health of those in the region, including the Council's members. I also participated in the development of the Council's Strategic Plan. My duties have required me to be familiar with the organization's structure, function, purpose, and membership.

EXH011

4.     The Council is incorporated in Pennsylvania with headquarters in Philadelphia, Pennsylvania. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

5.     The Council has thousands of members throughout Pennsylvania and the Mid-Atlantic Region. The Council's members and supporters include people who suffer from health injuries from their proximity to Clairton Coke Works and Monessen Coke, many of whom are residents of communities that have long been overburdened with the cumulative effects of air pollution from these two coke plants and other major sources of air pollution. Many of the Council's members seek to protect themselves, their families, and their communities from health and economic harms caused by air pollution.

6.     The Council is dedicated to protecting and defending everyone's right to a healthy environment, including everyone's right to breathe clean air. The Council works through a broad array of sustainability and public health initiatives using public education, community action, government oversight, and enforcement of environmental laws.

7.     The Council's programmatic work, as described on the organization's website, includes using "a combination of public education, community advocacy, and legal action to reduce harmful industrial air pollution from highly-polluting steel-making facilities like the Clairton Coke Works."

8.     As part of its work, the Council educates and facilitates the participation of members of frontline communities in engaging in the Administrative Procedure Act's public notice and comment procedures concerning federal environmental regulations that will impact their health and well-being.

EXH012

9.     The purpose of my declaration is to provide organizational information regarding the Council's concern that the Presidential Proclamation delays long awaited improvements to the coke oven NESHAP. The Council has a long and extensive history of advocating for stronger local, state, and federal regulations to reduce air pollution in the form of PM2.5, ozone, nitrogen oxides ("NOx"), sulfur dioxide ("SO2"), volatile organic compounds ("VOCs"), mercury, and hazardous air pollutants ("HAPs"), including benzene. The Council has also regularly been a plaintiff or intervenor in litigation to challenge inadequate air pollution permits or to ensure that regulations sufficiently protect public health and air quality as required by the Clean Air Act. Additionally, the Council sued U.S. Steel for Title V permit violations when the company's maintenance failures caused a fire to damage sulfur dioxide ("SO2") control equipment at Clairton Coke Works', followed by months of uncontrolled and unreported SO2 emissions, and challenged the Interim Final Rule that would have extended the compliance deadlines in the Coke Oven NESHAP 2024 revisions. Thus, taking legal action to challenge the Presidential Proclamation's delay in implementation of those revisions, including fenceline monitoring requirements, is well within the Council's organizational mission and interests.

10.     The Council's support for the Coke Oven NESHAP 2024 revisions is firmly rooted in science. Benzene is a known carcinogen, and peer-reviewed studies indicate that there is no safe exposure level for benzene, lead, or mercury, which are among the toxic pollutants addressed by the important and long-awaited revisions.

11.     From October 2022 through April 2023, the average benzene concentration at Clairton Coke Works' fenceline was 33 $\mu g/m^3$, which is over ten times higher than the upper limit for chronic benzene exposure set by the California Environmental Protection Agency.

EXH013

12.     Among the harmful pollutants that the facility is permitted to emit are 1,228.40 tons per

year ("tpy") of fine particulate matter ("PM$_{2.5}$"), 570.36 tpy of volatile organic compounds

("VOCs"), and 62.12 tpy of benzene.

13.     Despite high emissions limits, Clairton Coke Works has had high priority violations of

the Clean Air Act ("CAA") in all 12 of the last 12 quarters.

14.     The Council submitted comments when the Coke Oven NESHAP 2024 revisions were

proposed, explaining the harm that emissions from toxic air pollutants, including benzene, harm

members of the surrounding communities and advocating for the final Coke Oven NESHAP to

contain provisions necessary to sufficiently protect public health. In addition to supporting the

fenceline monitoring, emission reductions, and other protections currently in the final rule, the

Council and others urged EPA to strengthen it. The Council and our members were relieved that

many of the protective requirements were scheduled to become effective this month, especially

the fenceline monitoring requirements.

15.     I believe that the Council's members and other residents near Clairton Coke Works and

Monessen Coke will be greatly disadvantaged by the President allowing these coke ovens to

delay beginning fenceline monitoring. This is because fenceline monitoring data would provide

vital data necessary to protect the health of our members living near the plant.

16.     The Council has many members with respiratory and cardiovascular conditions who face

increased risk of asthma attacks, heart attacks, cancer, hospitalizations, and missed work because

of the cumulative effect of air pollutants, including from Clairton Coke Works and Monessen

Coke. These members would benefit from possible emission reductions and more emission data

from fenceline monitoring reporting because of the 2024 Coke Oven NESHAP revisions. The

Council is concerned that its members will likely be exposed to and sickened by more pollution,

EXH014

and that they will be deprived of critical data, because of the President's decision to delay compliance through the Presidential Proclamation.

17.    A declaration that Presidential Proclamation is unlawful and invalid would remedy these harms by allowing the pollution control requirements in the Coke Oven NESHAP 2024 revisions to have effect and provide the protections they were promulgated to provide.

18.    The Council's members and supporters near Clairton Coke Works and Monessen Coke live in communities already overburdened by air pollution and suffer from the corresponding elevated health risks.

19.    Additionally, part of the Council's work is to encourage people to bicycle and walk more frequently, including by commuting to work and by enjoying hiking on nature trails. The toxic air pollution from Clairton Coke Works and Monessen Coke interferes not only with the ability of local residents to engage in such activities but contributes to frequent bad air quality days severe enough that the Allegheny County Health Department advises them to stay indoors with their windows shut.

20.    The Council's members and supporters have a strong interest in coke ovens complying with the deadlines established in the 2024 Coke Oven NESHAP revisions.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of February, 2026.

_Annie Fox_

_____
Annie Fox
1617 JFK Boulevard, Suite 1130
Philadelphia, PA 19103

EXH015

# EXHIBIT 5

# Declaration of Aaron Isherwood

# DECLARATION OF AARON ISHERWOOD

I, Aaron Isherwood, declare as follows:

1.      I am the Philip S. Berry Managing Attorney for the Environmental Law Program at the Sierra Club. In this role, I supervise the Sierra Club's litigation docket and help develop legal strategies to advance the Sierra Club's organizational priorities. I have worked as an attorney for the Sierra Club since 1999. The information in this declaration is based on my personal knowledge and experience.

2.      I am submitting this declaration in support of the Sierra Club's legal challenge to the Presidential proclamation purporting to exempt all eleven coke plants subject to the 2024 Coke Ovens Rule from those standards, "Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security," 90 Fed. Reg. 54517 (Nov. 26, 2025) ("Coke Ovens Proclamation").

3.      Through my role as Managing Attorney for the Sierra Club, I am familiar with the Sierra Club's structure, mission, activities, and membership.  I have expertise and knowledge concerning the Environmental Law Program and the Sierra Club's environmental litigation docket, in federal and state courts, for the entire United States. I am also highly familiar with the Clean Air Act's provisions for regulating hazardous air pollutants and EPA's regulations implementing those provisions. 42 U.S.C. § 7412; 40 C.F.R. Part 63.

4.      The Sierra Club is a 501(c)(4) non-profit organization organized and existing under the laws of the state of California, and headquartered at 2101 Webster Street, Suite 1300, Oakland, California. As a Managing Attorney, I work out of the Sierra Club's Oakland headquarters.

EXH016

5.      Founded in 1892, the Sierra Club is a national nonprofit organization that has dozens of chapters and over 614,000 members across all fifty states, the District of Columbia, and Puerto Rico.

6.      The Sierra Club's members pay dues that help to finance the programs and activities of the organization. Members also have voting rights to elect the Sierra Club's Board of Directors. Members can vote for leadership at the local and state level.

7.      The Sierra Club's mission is to preserve and protect the places where people live, work, and play. Our members are dedicated to exploring, enjoying, and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives nationwide.

8.      As part of this mission, the Sierra Club has dedicated itself to protecting public health and its members from toxic chemicals, including toxic air pollution. The Sierra Club works to protect the health of its members (and their children) and their ability to enjoy being outdoors and to engage in recreational activities and the use of public lands, parks, green spaces, and outdoor spaces without experiencing exposure to toxic chemicals. Among other things, the Sierra Club has dedicated itself to reducing air pollution and protecting public health, including that of its members, from major industrial sources of air pollution, including hazardous air pollutants.

9.      Since the passage of the Clean Air Act, the Sierra Club has worked to strengthen and fully implement our mission by providing essential services to our membership including education and dissemination of information, public representation, and litigation for full and effective implementation of the Clean Air Act's protections.

EXH017

10.     The Sierra Club works to fulfill its mission by regularly providing information and services to members to assist them in protecting their health and recreational interests. The Sierra Club works to educate our members and the public on the health and environmental impacts of hazardous air pollution. Among other things, we inform and educate members through web content on hazardous air pollution, which can be found on our webpage dedicated to the topic of clean air. We publish articles in *SIERRA* magazine, which has a print version only available to dues-paying members, and a free version which is available online to the public. Members rely on us to educate and inform them about air pollution and how they can help the Sierra Club take action to reduce it. We use a variety of social media, including Facebook, Twitter, and regularly updated blogs, to communicate with our members and supporters about air issues and provide notifications about local air quality, including to members who live, work, or recreate near sources of toxic air pollution. The Sierra Club also disseminates information it gathers to the Sierra Club's chapters and local Sierra Club groups to inform them of potential health and environmental problems stemming from air pollution in their communities. Sierra Club chapters and local groups, in turn, communicate with local members through meetings and events, their websites and blogs, and periodic newsletters to ensure individual members stay informed. Members can also receive online action alerts that provide breaking news on environmental and health issues and an opportunity for members to communicate with leaders and policy makers, for instance, by providing comments on EPA rulemakings.

11.     The Sierra Club and its state chapters have longstanding involvement in trying to reduce toxic air pollution from industrial sources across the country to protect our members' and local communities' health, aesthetic, recreational, and other interests. In particular, the Sierra Club has invested substantial resources in demonstrating the need for and working for EPA to

EXH018

timely and lawfully perform Clean Air Act Section 112(d) and Section 112(f)(2) rulemakings for existing hazardous air pollution emission standards. These efforts include filing public comments on proposed Section 112(d) and Section 112(f)(2) reviews and rules, educating members about such reviews and rules and the dangers posed by toxic air pollution, and litigating when necessary. Through litigation, the Sierra Club has successfully obtained deadlines for EPA to conduct numerous overdue Section 112(d) and Section 112(f)(2) rulemakings for dozens of source categories. The Sierra Club provides detailed legal and technical comments seeking strong emission standards in EPA rulemakings under Section 112, including those rulemakings where we have secured a court ordered deadline. And as a result of completing these statutory reviews, EPA has proposed or finalized improved standards, based on comments the Sierra Club has joined or submitted, for sources that emit hazardous air pollutants.

12.     The Sierra Club has been actively working to protect our members, the broader public, and the environment from coke ovens, which emit a mix of highly toxic air pollutants.

13.     Coke ovens that are major sources of hazardous air pollutants are subject to EPA's air toxics rule for coke ovens: pushing, quenching, and battery stacks, and coke oven batteries ("Coke Ovens Rule").

14.      Congress expressly designated the mix of pollutants emitted by coke ovens— "coke oven emissions"—as a distinct hazardous air pollutant under the Clean Air Act. 42 U.S.C. § 7412(b)(1). Coke oven emissions are made up of dozens of toxic constituents, including, among others, benzene, nonmercury metals (e.g., lead and arsenic), mercury, dioxin/furans, formaldehyde, and acid gases. 89 Fed. Reg. at 55,686. These pollutants cause and/or are associated with adverse health effects including cancer and premature death. Risk Assessment Document for Coke Oven MACT Residual Risk, EPA-HQ-OAR-2003-0051-0212 (March 31,

EXH019

2005) at 10-11. Chronic exposure to benzene is associated with blood disorders, including reduced red blood cell count and aplastic anemia, adverse reproductive effects in women, and adverse effects on the developing fetus. *Id.* EPA acknowledges that "Coke oven emissions are among the most toxic of all air pollutants." EPA, *Fact Sheet-Coke Oven NESHAP*, *available at* https://www.epa.gov/sites/default/files/2016-01/documents/cokefact.pdf (last visited Aug. 20, 2024). EPA estimated that the coke ovens regulated by the Coke Ovens Rule collectively emit nearly 2300 tons of hazardous air pollutants per year. Coke Ovens Risk and Technology Review: Data Summary, EPA-HQ-OAR-2002-0085-1595, at B-2 Tbl. B-1 (May 1, 2024).

15.     Because EPA failed to timely complete required rulemakings for both of the coke oven source categories, including the Coke Oven Batteries source category (40 C.F.R. Part 63 Subpart L) and the Pushing, Quenching, and Battery Stacks source category (40 C.F.R. Part 63 Subpart CCCCC), under Section 112 of the Clean Air Act, the Sierra Club sued EPA to compel the agency to complete these rulemakings. *Citizens for Pennsylvania's Future v. Wheeler*, 469 F. Supp. 3d 920 (N.D. Cal. 2020). That litigation resulted in a court-ordered deadline for EPA to complete mandatory Section 112 rulemakings for the coke ovens source categories.

16.     The Sierra Club actively engaged in and commented on EPA's rulemaking efforts, including by providing input on EPA's Section 114 Information Collection Request to coke oven operators and commenting on the proposed rule.

17.     These efforts were designed to protect Sierra Club members, and the broader public, from toxic coke oven emissions. Based on my experience and knowledge of air pollution control, emissions, and monitoring, these members are likely exposed to coke oven emissions due to their proximity to these facilities.

EXH020

18.     In part because of Sierra Club's litigation and participation in the rulemaking process, EPA revised its Coke Ovens Rule, setting new emissions limits for previously unregulated hazardous air pollutants; updating some work practices and existing emissions limits; and establishing new fenceline monitoring and corrective action requirements. 89 Fed. Reg. 55684 (July 5, 2024) ("2024 Coke Ovens Rule").

19.     The new requirements in the 2024 Coke Ovens Rule will protect Sierra Club members who live, work, recreate, or otherwise spend time near coke ovens. For example, the Rule now contains a fenceline monitoring and corrective action standard that will more quickly catch violations of standards and ensure compliance, thereby reducing exposure. Additionally, the Rule sets standards for previously unregulated hazardous air pollutants for the first time, preventing sources from increasing their emissions.

20.     Emissions information obtained through fenceline monitoring and electronic reporting would also be helpful to Sierra Club in educating its members about the risks posed by coke ovens, protecting its members from coke oven emissions, and participating in regulatory processes relating to coke ovens.

21.     I understand that on July 3, 2025, EPA issued an interim final rule, which extended certain compliance deadlines in the 2024 Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 5, 2027. The Sierra Club filed a lawsuit asserting that this interim final rule was unlawful, and on October 2, 2025, the EPA issued a final rule rescinding the challenged interim final rule and thereby re-establishing the original compliance deadlines. 90 Fed. Reg. 56010 (Dec. 5, 2025).

22.     I understand that on November 21, 2025, the President issued a Proclamation exempting all coke ovens from the Coke Ovens Rule for two years.

6

EXH021

23.    Many requirements would have taken effect on July 7, 2025, including fenceline monitoring and corrective action; leak limits for doors, lids and offtakes; visual monitoring, and zero-leak limits at certain oven doors. The 2024 Coke Ovens Rule's new emission limits for previously unregulated hazardous air pollutants would have taken effect on January 5, 2026. The Proclamation delayed these deadlines by two years.

24.    I am aware that the Proclamation will delay the new protections established in the 2024 Coke Ovens Rule, exposing Sierra Club members to greater amounts of air pollution than would otherwise be allowed if coke ovens were required to start implementing the Rule's requirements on July 7, 2025, and January 5, 2026.

25.    By preventing the 2024 Coke Oven Rule's fenceline monitoring and visual monitoring requirements from taking effect, the Proclamation prevents Sierra Club from accessing emissions data that it would use to educate the public about coke oven emissions, protect its members from coke oven emissions, and participate in regulatory proceedings relating to coke ovens.

26.    A ruling that the Proclamation is unlawful would remedy the above harms by ensuring compliance with the requirements of the 2024 Coke Ovens Rule, thereby providing the protection they were intended to have.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on February 18, 2026

_____
Aaron Isherwood

7

EXH022

# EXHIBIT 6

# Declaration of Patrick McDonnell

## DECLARATION OF PATRICK MCDONNELL

I, Patrick McDonnell, declare and state as follows:

1.      I am the President of Citizen's for Pennsylvania's Future ("PennFuture") and have worked at PennFuture since 2022. I am over 18 years old and the information in this declaration is based on my personal knowledge and experience.

2.      I am submitting this declaration in support of PennFuture's legal challenge to the Presidential proclamation purporting to exempt all eleven coke plants subject to the 2024 Coke Ovens Rule from those standards, "Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security," 90 Fed. Reg. 54517 (Nov. 26, 2025) ("Coke Ovens Proclamation").

3.      Through my work, I am familiar with PennFuture's purpose and mission, its activities related to coke ovens, and the nature and scope of its membership.

4.      PennFuture is a 501(c)(3) nonprofit environmental organization based in Pennsylvania, whose activities include advocating for legislative action on a state and federal level; providing education for the public; and engaging in legal actions to ensure environmental protections. PennFuture's mission is to lead the transition to a clean energy economy in Pennsylvania and beyond. PennFuture works to protect our air, land and water, and to empower citizens to build sustainable communities for future generations.

5.      PennFuture is a membership organization, and its programs and activities are financed, in part, by our members.

6.      Coke ovens have operated in Pennsylvania for decades, spewing toxic pollutants that make people sick and poison the community. Coke oven emissions are made up of dozens of toxic constituents, including, among others, benzene, nonmercury metals (e.g., lead and arsenic),

1

mercury, dioxin/furans, formaldehyde, and acid gases. 89 Fed. Reg. at 55,686. These pollutants cause and/or are associated with adverse health effects including cancer and premature death. Risk Assessment Document for Coke Oven MACT Residual Risk, EPA-HQ-OAR-2003-0051-0212 (March 31, 2005) at 10-11. Chronic exposure to benzene is associated with blood disorders, including reduced red blood cell count and aplastic anemia, adverse reproductive effects in women, and adverse effects on the developing fetus. *Id.* EPA acknowledges that "Coke oven emissions are among the most toxic of all air pollutants." EPA, Fact Sheet-Coke Oven NESHAP, available at https://www.epa.gov/sites/default/files/2016-01/documents/cokefact.pdf (last visited Aug. 20, 2024).

7. I am aware that PennFuture members live, work, and spend time near the coke ovens at Clairton Coke Works ("Clairton"), and are exposed to air pollution as a result.

8. I am aware that Clairton is subject to EPA's air toxics rule for coke ovens: pushing, quenching, and battery stacks, and coke oven batteries ("Coke Ovens Rule"). PennFuture currently has 11 members who live within 10 km of Clairton.

9. EPA estimated that the coke ovens in Pennsylvania emit nearly 65 tons of hazardous air pollutants per year, with Clairton alone estimated to emit roughly 57 tons. Coke Ovens Risk and Technology Review: Data Summary, EPA-HQ-OAR-2002-0085-1595, at B-2 Tbl. B-1 (May 1, 2024).

10. PennFuture seeks to protect its members from toxic pollution emitted from this coke oven pollution. For example, PennFuture has engaged in a campaign to raise awareness of the harmful emissions from coke ovens in western Pennsylvania. This campaign has included outreach to our members and communities burdened by coke oven emissions to provide education on health impacts, communications such as billboard and online ads highlighting the

EXH024

toxic nature of such facilities' emissions, and advocacy to elected officials regarding the need to protect Pennsylvanians' health.

11.     Congress expressly designated the mix of pollutants emitted by coke ovens—"coke oven emissions"—as a distinct hazardous air pollutant (HAP) under the Clean Air Act. 42 U.S.C. § 7412(b)(1). As a result, EPA is required to set standards to protect people and the environment from toxic coke oven emissions and to periodically update those standards. 42 U.S.C. § 7412(d), (f).

12.     I am aware that from 2005 to 2023 EPA failed to take action pursuant to 42 U.S.C. §§ 7412(d) or (f) to update emission standards for the source categories Coke Oven Batteries (COB) and Coke Ovens: Pushing, Quenching, and Battery Stacks (PQBS). PennFuture and other environmental and public health organizations successfully sued EPA in 2019 to compel EPA to fulfill its statutory obligations to update emission standards for these source categories.

13.     As a result of the above-mentioned deadline suit, EPA published proposed updated emission standards coke ovens. 88 Fed. Reg. 55,858 (August 16, 2023). PennFuture (among others) commented on the proposed rulemaking, commending certain proposed updates to the emission standards, while also advocating for more stringent measures that would create meaningful public health benefits. PennFuture also provided input on EPA's Section 114 Information Collection Request to coke oven operators, which generated data that EPA relied on in the proposed rulemaking.

14.     I am aware that EPA revised its Coke Ovens Rule on July 5, 2024, setting new emission limits for previously unregulated hazardous air pollutants; updating some work

EXH025

practices and existing emissions limits; and establishing new fenceline monitoring and corrective action requirements. 89 Fed. Reg. 55684 (July 5, 2024) ("2024 Coke Ovens Rule").

15.    These new requirements would protect PennFuture members who live, work, recreate, or otherwise spend time near coke ovens. For example, the Rule establishes a fenceline monitoring and corrective action standard that will catch violations more quickly and ensure quicker compliance. Additionally, the Rule sets standards for previously unregulated hazardous air pollutants for the first time, preventing sources from increasing their emissions.

16.    Emissions information obtained through fenceline monitoring and electronic reporting would also be helpful to PennFuture in educating its members about the risks posed by coke ovens and in its future efforts to protect members from coke ovens emissions.

17.    I understand that on July 3, 2025, EPA issued an interim final rule, which attempted to extend certain compliance deadlines in the Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 5, 2027. PennFuture and other organizations sued the EPA asserting that the interim final rule was unlawful. On October 2, 2025, the EPA issued a final rule rescinding the challenged interim final rule, thereby re-establishing the original compliance deadlines. 90 Fed. Reg. 56010 (Dec. 5, 2025).

18.    I understand that on November 21, 2025, President Trump issued a proclamation, which exempted all eleven coke oven facilities from all compliance deadlines established under the 2024 Coke Ovens Rule, and extended each relevant deadline by two years. Certain requirements that would have taken effect on July 7, 2025, are now exempt until July 7, 2027, including: fenceline monitoring and corrective action; leak limits for doors, lids and offtakes; and zero-leak limits at certain oven doors. The Rule's new emission limits for previously unregulated

4

EXH026

hazardous air pollutants would have taken effect on January 5, 2026, but now do not take effect until January 5, 2028.

19.     I am aware that the Coke Ovens Proclamation will delay the protections established in the Coke Ovens Rule, exposing PennFuture members to greater amounts of air pollution than would otherwise be allowed if coke ovens were required to start implementing the Rule's requirements on July 7, 2025, and January 5, 2026.

20.     By preventing the Coke Oven Rule's fenceline monitoring requirements from taking effect, the Coke Ovens Proclamation prevents PennFuture from accessing emissions data that it would use to educate the public about coke oven emissions, protect its members from coke oven emissions, and participate in regulatory proceedings relating to coke ovens.

21.     The relief requested in this lawsuit would remedy the above harms by ensuring compliance with the requirements of the 2024 Coke Ovens Rule, thereby providing the protection they were intended to have.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this on February 18, 2026.

Patrick McDonnell

5

EXH027

# EXHIBIT 7

# Declaration of Jilisa Milton

### DECLARATION OF JILISA MILTON

I, Jilisa Milton, declare and state as follows:

1.    I am the Executive Director of the Greater Birmingham Alliance to Stop Pollution ("GASP"). I began working at GASP in 2022. I am over 18 years old. The information in this declaration is based on my personal knowledge.

2.    I am submitting this declaration in support of GASP's legal challenge to challenge to President Trump's Proclamation to exempt Drummond Company d/b/a ABC Coke ("ABC Coke") from requirements in the National Emission Standards for Hazardous Air Pollutants: for Coke Oven Batteries ("COB") and the Pushing, Quenching and Battery Stacks ("PQBS") source categories" ("Coke Ovens Rule") for two years from the promulgated compliance dates. Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security, 90 Fed. Reg. 54517 (Nov.26, 2025) ("the Presidential Proclamation").

3.    Through my work, I am familiar with GASP's purpose and mission, its activities related to the steel sector, and the nature and scope of its membership, including members who live, work, and recreate near Drummond Company d/b/a ABC Coke ("ABC Coke").

4.    GASP is a 501(c)(3) nonprofit health advocacy organization with a mission to advance healthy air and environmental justice in Birmingham, Alabama. GASP strives to reduce air pollution and to educate the public on the health risks associated with poor air quality in order to secure the right of Alabamians to breathe clean air.

5.    GASP is a membership organization and GASP members pay annual dues that help to finance the programs and activities of the organization.

6.    Coke ovens have operated in Birmingham, Alabama, for decades, spewing toxic pollutants that make people sick and poison the community. Birmingham rose to prominence as a major steel production

EXH028

center and "company town" shaped by racialized planning and policies, which often neglected the health and safety of its Black residents.

7.    In 2024, EPA estimated that coke ovens in Birmingham collectively emitted at least 38 tons of hazardous air pollutants per year. Coke Ovens Risk and Technology Review: Data Summary, EPA-HQ-OAR-2002-0085-1595, at B-2 Tbl. B-1 (May 1, 2024). EPA estimates that ABC Coke, the one remaining coke oven facility currently in operation, emits 22 tons of hazardous air pollutants per year. *Id.*

8.    I am aware that GASP members live, work and spend time near the coke ovens at ABC Coke, and are exposed to coke oven emissions as a result.

9.    GASP has engaged its members and advocated on their behalf to reduce toxic air pollution from ABC Coke. For example, GASP staff attended a public hearing at the Jefferson County Dep't of Health ("JCDH") on February 24, 2026 related to the publicly-noticed renewal permit under Title V of the Clean Air Act, 42 U.S.C. § 7661 et seq., for the ABC Coke. GASP also submitted written comments that same day, which GASP has also done for the past two renewal permits. Due to the Environmental Protection Agency's ("EPA") failure to timely review and update emission standards for coke ovens, in 2019 GASP and other environmental and public health organizations successfully sued EPA to compel EPA to fulfill its statutory duties. In the subsequent rulemaking, GASP and other community groups provided input on EPA's Section 114 Information Collection Request to coke oven operators, which generated data that EPA relied on in the proposed rulemaking. GASP then commented on the proposed rulemaking, advocating for stringent measures that would create meaningful public health benefits.

10.    I am aware of the Coke Ovens Rule that set new emission limits for previously unregulated hazardous air pollutants; updated some work practices and existing emissions limits; and established new fenceline monitoring and corrective action requirements. These requirements would help GASP and its members. For example, emissions information obtained through fenceline monitoring and electronic reporting would also be helpful to GASP in educating its members about the risks posed by coke ovens

and in its future efforts to protect members from coke ovens emissions. Because Title V permits must be regularly renewed, accurate information about the amount of hazardous air pollutants emitted from coke ovens would help GASP and its members in the future in seeking that permits for coke ovens provide greater protection for members.

11.     I am aware that on November 21, 2025 that President Trump posted a proclamation exempting ABC Coke from compliance with Coke Ovens Rule and the Presidential Proclamation was published in the federal register five days later.

12.     The Presidential Proclamation delays the protections established in the Coke Ovens Rule, exposing GASP members to greater amounts of air pollution than would otherwise be allowed if coke ovens were required to start complying with the Rule's requirements on schedule. Also, by preventing the Coke Ovens Rule's fenceline monitoring requirements from taking effect, the interim final rule prevents GASP from accessing emissions data that it would use to educate the public about coke oven emissions, protect its members from coke oven emissions, and participate in regulatory proceedings concerning coke ovens in the community.

13.     A declaration that Presidential Proclamation is unlawful and invalid would remedy these harms by requiring ABC Coke to begin complying with the Coke Ovens Rule and provide the protections it was promulgated to provide.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on February 24, 2026.

*Jilisa Milton*

Jilisa Milton

# EXHIBIT 8

# Declaration of Gina Trujillo

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREATER-BIRMINGHAM ALLIANCE TO
STOP POLLUTION, *et al.*;

        *Plaintiffs,*

        v.

DONALD TRUMP, *et al.*

        *Defendants.*

**Case No. 25-4469**

### DECLARATION OF GINA TRUJILLO

I, Gina Trujillo, declare as follows:

1.     I am the Managing Director of Membership and Planned Giving at the Natural Resources Defense Council, Inc. (NRDC). I have been directing the membership department since January 1, 2015, and I have worked at NRDC in the membership department for more than 30 years.

2.     My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3.     NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. NRDC's headquarters are located at 40 West 20th Street, New York, NY 10011.

4.     NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." NRDC works to ensure the rights of all people to clean air, clean water, and healthy communities. NRDC's mission includes protecting the health and safety

EXH031

of NRDC's members by reducing and preventing exposure to toxic air pollution, including

benzene and the other hazardous air pollutants emitted by coke oven facilities regulated by the

2024 revisions to rules for Coke Oven Batteries (40 C.F.R. Part 63, Subpart L) and Pushing

Quenching Battery Stacks (40 C.F.R. Part 63, Subpart CCCCC) (together, the "Coke Ovens

Rule").

5.      NRDC is committed to ensuring that all communities have access to clean air.

NRDC has consistently advocated for enforcement of the Clean Air Act to significantly reduce

air pollutants, protect public health, promote environmental equity, and maintain the integrity of

statutory programs.

6.      Over many years, NRDC has called on EPA to effectively regulate air pollution

with more stringent emissions standards that reflect technological developments and which

adequately protect public health.[1] NRDC has also called on EPA and engaged in litigation to

close loopholes that allow industrial sources of pollution, including hazardous air pollutants, to

evade pollution controls.[2]

7.      When an individual becomes a member of NRDC, his or her current residential

address is recorded in NRDC's membership database. When a member renews his or her

---

[1] *See, e.g.*, Letter from Natural Resources Defense Council *et al.* to EPA Administrator Lee
Zeldin, Petition to Prohibit the Use of Hydrogen Fluoride in Domestic Oil Refining under
Section 21 and 6(A) of the Toxic Substances Control Act (Feb. 11, 2025); National Emission
Standards for Hazardous Air Pollutants: Plywood and Composite Wood Products, 69 Fed.Reg.
45,944 (July 30, 2004); and *Natural Resources Defense Council v. EPA*, 489 F.3d 1364 (D.C. Cir.
2007).

[2] *See, e.g.*, *California Communities Against Toxics, et al. v. EPA*, No. 20-1024 (DC Cir.) (Jan. 15,
2021); Letter from Earthjustice *et al*. to U.S. EPA Administrator Andrew Wheeler, Petition for
Reconsideration of "Reclassification of Major Sources as Area Sources Under Section 112 of the
Clean Air Act," 85 Fed. Reg. 73,854 (Nov. 19, 2020), Docket ID No. EPA-HQ-OAR-2019-0282
and for Withdrawal of Guidance Memorandum titled "Reclassification of Major Sources as Area
Sources Under Section 112 of the Clean Air Act" (January 25, 2018) (OAQPS2020-415) (Jan.
18, 2021); and *Natural Resources Defense Council v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007).

EXH032

membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

8.     NRDC currently has hundreds of thousands of members nationwide. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico. NRDC has members who live in places where coke oven facilities regulated by the Coke Ovens Rule are located and where they emit hazardous air pollutants.

9.     When an individual becomes a member of NRDC, they authorize NRDC to take legal action on their behalf to promote the member's environmental and public interests, including their interests in protecting the public from hazardous air pollution.

I declare under penalty of perjury that the foregoing is true and correct.


_Gina Trujillo_
Gina Trujillo

_2/20/26_
Date

EXH033

# EXHIBIT 9

# Declaration of Ashley Williams

## DECLARATION OF ASHLEY WILLIAMS

I, Ashley Williams, declare as follows:

1.      I am the Executive Director of Just Transition Northwest Indiana (JTNWI), an organization that I founded in 2020. My responsibilities include overseeing JTNWI's staff and operations, developing and implementing the organization's strategy and budgetary priorities, and managing the organization's philanthropic network.

2.      I am submitting this declaration in support of JTNWI's legal challenge to the Presidential proclamation issued on November 21, 2026, "Regulatory Relief for Certain Stationary Sources To Promote American Coke Oven Processing Security," 90 Fed. Reg. 54517 (Nov. 26, 2025) ("Coke Ovens Proclamation").

3.      JTNWI is a grassroots environmental justice organization that serves the historic Rust Belt steel region of Northwest Indiana, including Lake County and the cities of East Chicago, Hammond, Michigan City, and Whiting, Indiana. Our work focuses on securing a just transition from fossil fuels to renewable energy within Northwest Indiana.

4.      Through my experience as founder and executive director, I am familiar with and knowledgeable about JTNWI's mission and activities, including activities aimed at preventing and reducing the community's exposure to toxic air pollution. I have access to organizational information such as how many members we have, where they are located, and the nature and extent of their participation in the organization's activities.

5.      JTNWI advances our mission through a mix of advocacy, litigation, and community organizing, and we run several campaigns in order to protect the community from the adverse effects of fossil fuel production and use. As just one example, our No False Solutions campaign is focused on organizing to oppose the development of hydrogen

1

EXH034

production facilities that use fossil fuel gas and require the construction of dangerous pipelines in Northwest Indiana communities.

6.      JTNWI organizes, advocates, and litigates to prevent and reduce toxic air pollution from industrial facilities, including coke ovens. In doing so, JTNWI advocates for clean air protections before federal and state agencies in regulatory proceedings relating to industrial facilities that emit toxic air pollution, including administrative proceedings before: the US Environmental Protection Agency, the US Department of Energy, the Indiana Department of Environmental Management, the Indiana Department of Natural Resources, and the Indiana Utility Regulatory Commission. For example, JTNWI recently participated in Title V permitting under the federal Clean Air Act for coke oven facilities in Northwest Indiana, including by educating and empowering the organization's members to provide testimony and comments on proposed permits.

7.      JTNWI is a 501(c)(3) nonprofit organization currently headquartered in Michigan City, IN.

8.      JTNWI has a network of about 90 member donors. Individuals can become members by donating $5/month, $15/quarter or $60/year. For individuals who would like to become a member but cannot afford to, JTNWI offers membership on a case-by-case basis to those who make a one-time contribution, or the organization may offer a one-year grace period.

9.      Members are active participants in the organization, guiding our organizational priorities, activities, and goals. Members are invited to attend quarterly meetings to discuss the organization's strategic plan and direction. JTNWI follows a consensus-based framework in which leadership meaningfully incorporates membership input and feedback into decision

EXH035

making. Members can also participate in a leadership circle that meets monthly or bi-

monthly. Members of the leadership circle participate in programming and campaign work.

For example, leadership circle members might organize a rally or protest, engage in

canvassing, publish blogs and op-eds, and help with fundraising. JTNWI provides

mentorship to leadership circle members to help them take an active role in guiding the

organization.

10.     JTNWI is governed by a board of directors. Seventy-five percent of the board's

members live in the Northwest Indiana area. All of the board are also member donors.

11.     Through my work with communities in Northwest Indiana, I am aware that

JTNWI members live, work, and recreate near coke ovens in Indiana, including the Indiana

Harbor and Burns Harbor plants. I am aware that members who live, work, and recreate near

these facilities are at risk of being exposed to toxic air emissions from these plants.

12.     I am aware that the Indiana Harbor and Burns Harbor plants are major sources of

hazardous air pollutants and are subject to EPA's air toxics rule for coke ovens: pushing,

quenching, and battery stacks, and coke oven batteries ("Coke Ovens Rule").

13.     I am aware that EPA published a revised Coke Ovens Rule on July 5, 2024, and

that the 2024 Coke Ovens Rule established new standards and tightened existing standards

for coke ovens, protecting JTNWI members who live, work, recreate, or otherwise spend

time near coke ovens. The Rule sets standards for previously unregulated hazardous air

pollutants for the first time, preventing sources from increasing their emissions.

14.     Additionally, the 2024 Coke Ovens Rule established a fenceline monitoring and

corrective action standard that will catch violations more quickly and ensure quicker

compliance. Emissions information obtained through fenceline monitoring and electronic

3

EXH036

reporting would be helpful to JTNWI in educating its members about the risks posed by coke ovens, thereby enabling members to take steps to avoid coke ovens emissions. It would also help JTNWI and its members participate in regulatory processes relating to coke ovens, including permitting processes.

15.     JTNWI has consistently advocated for fenceline monitoring to keep track of emissions at industrial facilities, including coke ovens. In the absence of verified monitoring data from EPA, JTNWI has spent organizational funds to purchase Purple Air sensors to monitor emissions in Michigan City and is supporting the use of monitors in Lake County through the Northern Lake County Environmental Partnership Community Advisory Board. The Lake County sensors include the monitoring of emissions at the integrated steel operation in Indiana Harbor, which includes cokemaking facilities. Data collected from Purple Air sensors is often disregarded by EPA and other regulators because it is not collected in accordance with certain established monitoring methodologies.

16.     If the fenceline monitoring required by the 2024 Coke Ovens Rule goes into effect, JTNWI would use the emissions data to more effectively advocate for Northwest Indiana communities, including by seeking stronger health protections in regulatory proceedings, such as permitting processes.

17.     I understand that in July, 2025, EPA issued an interim final rule extending certain compliance deadlines in the Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 5, 2027. JTNWI and other organizations sued the EPA, asserting that the interim final rule was unlawful. On October 2, 2025, the EPA issued a final rule rescinding the challenged interim final rule and thus re-establishing the original compliance deadlines. 90 Fed. Reg. 56010 (Dec. 5, 2025).

EXH037

18.     I am aware that on November 21, 2026, President Trump issued the Coke Ovens
Proclamation, purporting to exempt all coke ovens subject to the 2024 Coke Ovens Rule
from those standards for two years. This extends certain compliance deadlines in the 2024
Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 7, 2027, and January 8,
2028, respectively. I know that these Rule requirements, including fenceline monitoring,
would have already taken effect if it were not for the proclamation.

19.     I am aware that this exemption will delay the protections established in the 2024
Coke Ovens Rule, exposing JTNWI members to greater amounts of air pollution than would
otherwise be allowed if coke ovens were required to start implementing the Rule's
requirements on July 7, 2025, and January 5, 2026.

20.     By preventing the 2024 Coke Oven Rule's fenceline monitoring requirements
from taking effect, the interim final rule prevents JTNWI from accessing emissions data that
it would use to educate the public about coke oven emissions, protect its members from coke
oven emissions, and participate in regulatory processes relating to coke ovens.

21.     If a court were to find this exemption unlawful, the pollution control requirements
in the 2024 Coke Ovens Rule could go into effect and provide the protection they were
promulgated to provide.


I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge.

Executed on February  19, 2026

_____
Ashley Williams

5

EXH038

# EXHIBIT 10

# Declaration of Susan Adams

# DECLARATION OF SUSAN ADAMS

I, Susan Adams, declare as follows:

1.      My name is Susan Adams. I am a citizen of the United States, am over 18 years of age, and am competent to give this declaration. All of the information provided is based on my own personal knowledge unless otherwise noted.

2.      I am a member of the Environmental Law & Policy Center ("ELPC") and have been involved with ELPC since approximately 2019.

3.      Prior to my retirement, I was a federal judicial clerk in Chicago for three years and a professor at Chicago Kent College of Law for twenty-one years.

4.      I currently live in Ogden Dunes, Indiana and have been in my current home since 2009. My property sits on approximately one acre on the north side of a dune. I am located approximately two blocks from Lake Michigan.

5.      I live approximately two miles from the Cleveland-Cliffs Burns Harbor facility.

6.      I have been engaged in environmental issues for many years. In addition to ELPC, I have been involved with multiple environmental advocacy groups since the 1970s, including the Ogden Dunes Environmental Advisory Board. My involvement with these groups has targeted issues such as water pollution in the Valparaiso, Indiana area and air quality in Ogden Dunes, Indiana.

7.      The proximity to heavy industry in Northwest Indiana has always been a concern of mine since I came to live in this area in approximately 1980. The first time I drove through Northwest Indiana was in 1967. I was on my way to Madison, Wisconsin from my prior home in Connecticut. I recall being distressed by the air quality even then.

1

EXH039

8.      Since I first moved to Ogden Dunes, I have found soot daily on my open porch. The soot is easy to spot because I have glass tabletops on my porch furniture. I have to clear it up on a daily basis, particularly in the summertime.

9.      I try to spend time outside near my home on a daily basis. I walk often and enjoy being on the beach. Most of my outdoor time is devoted to gardening both in the town vegetable garden and on my own property.

10.     The air pollution from the Burns Harbor facility impacts my time outside. Publicly available air quality information is important to me. If the odors coming from Burns Harbor are strong or if the air quality in my area is very poor, I remain indoors because I am concerned about the impacts that continued air pollution has had and will continue to have on my health. This pollution prevents me from safely enjoying my property, my community, and my recreational activities.

11.     I understand that compliance with the 2024 Coke Oven Rule would require the Burns Harbor coke oven, along with other coke ovens across the country, to limit their releases of pollutants including mercury, formaldehyde, dioxins, and soot, and to monitor on a quarterly basis for benzene at the fence line of the facility. I also understand that the exemption from compliance with the 2024 Coke Oven Rule could result in an increase in emissions of these pollutants and a lack of air quality monitoring information.

12.     I am aware that the air pollution that is subject to the 2024 Coke Oven Rule could increase the risk of respiratory issues and cancer. Given how close I live to Burns Harbor, I am concerned about the impacts that continued coke oven air pollution will have on my health, my property, and my community.

EXH040

13.     If **Burns Harbor** conducted periodic air monitoring and made the results publicly **available, I would check** those results to improve my understanding of how much benzene I am **exposed to. An absence** of benzene emissions data would prevent me from being informed of the **health risks** that I am subject to.

14.     If the Burns Harbor facility's exemption from the 2024 Coke Oven Rule is allowed to stand, my health, property, recreational, and personal interests will be at risk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  _December 15, 2025_

_Susan Adams_
_____
Susan Adams

EXH041

# EXHIBIT 11

# Declaration of Donna Ballinger

## DECLARATION OF DONNA BALLINGER

1. My name is Donna Ballinger, and I am over 21 years old.

2. I am a member of Sierra Club and have been a member since 2017.

3. I have lived in Middletown, Ohio for my entire life and have been living at my current address for twelve years. I live with my partner of thirty-five years, my daughter, and two of my grandchildren, aged fifteen and eight.

4. I live less than 1 mile from SunCoke Middletown Coke Company ("SunCoke Middletown").

5. I am aware that SunCoke Middletown is subject to EPA's air toxics rule for coke ovens: pushing, quenching, and battery stacks, and coke oven batteries that are major sources of hazardous air pollutants ("Coke Ovens Rule").

6. I am aware that, in 2024, the Environmental Protection Agency ("EPA") revised its Coke Ovens Rule, which sets new emissions limits for previously unregulated hazardous air pollutants; and updates some work practices and existing emissions limits.

7. I am aware that SunCoke Middletown emits toxic air pollutants, including lead, arsenic, and benzene. This concerns me deeply because I know that toxic air pollutants are harmful to human health and that I am exposed to these pollutants because I live so close to the plant.

8. I smell the strong odors and see fallout from SunCoke Middletown every single day. Pollution in the air burns my eyes, makes my throat itchy, and causes me to cough. The odors are unbearable, and they are constant. I see black powdery substances and black grease on surfaces on and around my home. My car is often covered with black soot and grease.

1

EXH042

9. I have chronic obstructive pulmonary disease (COPD) and experience frequent sinus and respiratory infections. My family members also experience sinus and respiratory infections. I worry that breathing in pollution from SunCoke Middletown contributes to our sinus and respiratory infections.

10. To protect myself and my family and to avoid the toxic air polluted by the coke ovens, my family and I do not engage in any outdoor activities around my home because of the emissions from SunCoke Middletown. My family does not go outside to play, have family gatherings, go for walks, or do any outdoor recreation near our home. I do not open any windows in my home. When I want to spend time outside or take my family outside for recreation, I drive to different parks between five and twenty miles away from my home, such as Smith Park, Sebald MetroPark, and Heuston Woods State Park. If the air were cleaner and safe to breathe, I would go outside and recreate more near my home; I'd be able to just breathe without worrying about the effects on my health.

11. My granddaughter goes to school less than a mile away from SunCoke Middletown on the same road as the facility. I take her to school, and I can see SunCoke Middletown from where I drop her off. Because the school is so close to the facility, I am worried that my granddaughter breathes in emissions from the coke ovens while she is at school.

12. It greatly concerns me that the toxic air pollutants emitted from the coke ovens accumulate in the soil and water around the ovens. My family and I do not drink the municipal water in Middletown because it has a bad, metallic taste. We have no other option but to shower and cook with it, but we only drink bottled water. If not for my concerns about pollutants in the tap water, we would drink tap water.

EXH043

13. Many members of my community have experienced declines in their health and many people have died from cancer or have been put on oxygen tanks. I believe that the toxic pollutants, which have negative effects on human health, emitted from SunCoke Middletown contribute to the decline in community health.

14. I am aware that EPA issued a new rule that sought to delay the compliance deadlines that EPA had created in the new 2024 Coke Ovens Rule. I know that Sierra Club and other organizations challenged this rule, and that EPA ultimately withdrew it

15. I am aware that in November 2025, the President issued a Proclamation that exempted SunCoke Middletown and other coke ovens from the 2024 Coke Ovens Rule for two years. This means that the protections from the new Rule that were supposed to have already gone into effect are delayed. It concerns me that the strengthened limits applicable to SunCoke Middletown have had their compliance dates pushed back, and that my exposure to toxic emissions will be prolonged and increased. I am worried that my breathing issues may continue and worsen without these protections.

16. I am highly concerned that the health of my community and quality of life will further deteriorate if the protections do not go into effect. People in my community, including myself, feel stuck in this area because we cannot afford to move away to protect ourselves from these toxic air pollutants. SunCoke Middletown is in an economically distressed area with many families who lack the resources to get away from air pollution. We were relying on EPA to protect us with strengthened pollution limits.

17. It is important to me that the strengthened emission limits for coke ovens are not delayed so that my community, the surrounding environment, and I are protected from further

3

harmful effects from these toxic air pollutants. I would feel safer if the strengthened limits in the 2024 Coke Ovens Rule were complied with on schedule.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 20, 2026.

Donna Ballinger

EXH045

# EXHIBIT 12

# Declaration of Vicki Dobbins

## DECLARATION OF VICKI DOBBINS

I, Vicki Dobbins, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements below are based on my personal knowledge.

2. I am a member of Sierra Club, and have been since 2015. I am a member because the Sierra Club addresses environmental issues that I care about, including clean air in my community.

3. As a child, I lived on Campbell Street in River Rouge with my family. I moved back to my childhood home on Campbell Street in River Rouge in 1999 and it is my current residence.

4. I am aware that EES Coke LLC operates a coke oven battery ("Plant") on Zug Island in River Rouge, Michigan, less than two miles from my home. I have observed the coke oven gas flares operating at the Plant.

5. I have routinely expressed my concerns about air quality and its public health impact in interviews with journalists, including in a New York Times article. I also regularly attend a variety of public hearings, community meetings and events to express my concerns regarding local air quality and its public health impact and to advocate for me and my community.

6. Through my extensive work to improve air quality in the metropolitan-Detroit and Wayne County area, I am aware that air pollution can harm the respiratory system and make breathing difficult. I am also aware that fine particulate pollution can cause a range of respiratory and cardiovascular health problems.

EXH046

7. I am aware that EES Coke emits a mix of toxic air pollutants, including lead, arsenic, and benzene. It also emits sulfur dioxide, fine particulate matter, and other air pollutants.

8. I am aware that EES Coke is subject to EPA's air toxics rule for coke ovens pushing, quenching, and battery stacks, and coke oven batteries that are major sources of hazardous air pollutants ("Coke Ovens Rule").

9. I am aware that the Environmental Protection Agency ("EPA") recently revised its Coke Ovens Rule, which sets new emissions limits for previously unregulated hazardous air pollutants and updates some work practices and existing emissions limits. I also understand that the rule would require fenceline benzene monitoring, which would allow the facility, EPA, Sierra Club, and the community to better understand how much benzene we in the community are exposed to.

10. I understand that on November 21, 2025, the President issued a proclamation, which exempted all eleven coke plants subject to the Coke Ovens Rule for a period of two years. This extends certain compliance deadlines in the Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 7, 2027, and January 5, 2028. These Rule requirements would have already gone into effect if it were not for this exemption.

11. Soon after moving to River Rouge as an adult. I was diagnosed with asthma. I use an inhaler to treat my asthma symptoms. I believe air pollution aggravates my asthma. I believe the emissions from the Coke Oven Battery are a significant contributor to the air pollution that triggers my asthma symptoms. I also believe that some of the emissions from EES Coke have been associated with high rates of cancer, asthma, bronchitis, and emphysema. Because of this, I am concerned about the impact the Plant's emissions have had and will have on my health.

12. I enjoy spending time outdoors, including biking. Due to air pollution in my neighborhood and the threat of asthma attacks, I generally travel to areas outside of my community to ride my bike.

13. I have made a number of improvements to my home to reduce indoor air pollution, including installing new windows and using air conditioner rather than opening windows during periods of warm weather.

14. Delaying coke ovens' obligations to comply with the Coke Ovens Rule will prolong and increase the harm to me and my community by exposing us to greater amounts of air pollution than would otherwise be allowed if coke ovens were required to start implementing the Rule's requirements starting July 7, 2025, and January 5, 2026.

15. In particular, I am concerned about the delay to the fenceline monitoring requirements of the rule. Previously, we had an air quality monitor at New Mt. Hermon Church, which is near the EES Coke. I, along with my neighbors, consulted the monitoring data that was produced by this monitor to better understand how our health was being impacted and to inform our advocacy. If air quality monitors were installed and operating at the fenceline of EES Coke, I would use that data, particularly to support my advocacy in the community and on behalf of myself and my neighbors.

16. A declaration that the Proclamation is unlawful will remedy these harm by allowing the pollution control requirements in the Coke Ovens Rule to go into effect, providing the protection and information they were promulgated to provide to communities near coke ovens, like mine.

17. If the Rule is implemented, I will have greater assurance that EES Coke will be obligated to keep its emissions hazardous air pollutants at or below their current level.

EXH048

18. If there was less pollution in my neighborhood, I would ride my bike in my neighborhood and leave my windows open.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 25, 2026.

*Vicki Dobbins*

VICKI DOBBINS

EXH049

# EXHIBIT 13

# Declaration of Jack Evans

## DECLARATION OF JACK EVANS

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, Jack Evans states as follows:

1.      I live at 1500 East Lake Blvd, Tarrant, AL 35217. This has been my permanent address my entire life. My house is located less than a mile (4,198 feet) from ABC Coke and downwind from the coke oven batteries.

2.      I was introduced to GASP at a community outreach and education event held at the Tarrant Recreation Center in May of 2024. My concerns align with the views of GASP, because I am concerned about hazardous pollution from ABC coke and its impact on the air quality where I live. Having taken "Environmental Law" in law school, I am generally aware of the Clean Air Act and other legal requirements to reduce air pollution from coke ovens like ABC Coke. I ran for Mayor of Tarrant this year and one of my goals was to get more action from the U.S. Environmental Protection Agency (EPA) in Tarrant to address the ongoing air pollution and legacy soil pollution from ABC Coke.

3.      I am aware that coke plants like ABC Coke emit large amounts of toxic air pollutants, like benzene, and other pollutants that cause cancer and other harmful effects on health when people inhale and are otherwise exposed to these pollutants. I believe that the air pollution from ABC Coke contributed to my mother's untimely death in July of 2025 from interstitial pulmonary disease. My mother never smoked a day in her life and I believe that living in Tarrant this close to ABC Coke, breathing in the toxic emissions inside and outside of her home her whole life caused her health issues. In 2017, My grandmother with whom my mother and I lived also died from pulmonary disease when her lungs stopped functioning. I also believe the toxic

EXH050

pollution emitted from ABC Coke contributed to my grandmother's pulmonary disease and death.

4.    The toxic air pollution from ABC Coke also affects my daily life. I stopped planting a garden because I'm afraid of what contaminants from ABC Coke are in the soil and I would be afraid to eat any food that I grow. When I am at home, I stay indoors and rarely go outdoors. If I could afford it, I would buy indoor air purifiers to be able to reduce my exposure to air pollution from ABC Coke. I started driving for Uber, in part, because I want to be away from my home and the air pollution from ABC Coke as much as possible. Because I know that air pollution from ABC Coke, especially benzene, causes cancer, I am worried that one day I will get cancer or suffer from the pulmonary diseases that my mother and grandmother had.

5.    I believe the toxic air pollution is causing me health issues. I get headaches very often: at least weekly. I feel like I am always on the verge of getting a headache when I don't actively have a headache. I feel better when I am working and away from my home near ABC Coke.

6.    I appreciate the EPA's revisions to the National Emission Standards for Hazardous Air Pollutants  for coke ovens ("coke oven NESHAP"). I was grateful that EPA finalized new emission limits, standards for leaking parts of coke ovens and fenceline monitoring requirements which were intended to protect public health. I was especially looking forward to ABC Coke publishing results from their fenceline monitoring and that I'd be able to go online and check those results. It was valuable and important to me to be able to have better information about benzene concentrations from ABC Coke at the fenceline of their facility so that I could understand better the amount of benzene I could be exposed to less than a mile away. I was looking forward to being able to go online and read the results of ABC Coke's fenceline monitoring. I planned to use that information to determine whether I should spend more time

EXH051

away from home or budget my income to be able to purchase an air purifier to reduce my exposure to harmful pollutants like benzene. I planned to educate my neighbors about the information I learned from the fenceline monitoring so that they could also reduce their exposure to the air pollution from ABC Coke.

7.      I am aware that industry—through its trade associations—challenged the coke oven NESHAP. I'm also aware that EPA delayed all of the coke ovens', including ABC Coke, compliance deadlines in an interim final rule and that EPA withdrew that interim final rule in December of 2025.

8.      I am also aware that all coke ovens, including ABC Coke, requested two-year compliance extensions with the coke oven NESHAP. I am also aware that on November 21, 2025, President Trump granted all coke ovens, including ABC Coke, a two-year exemption from compliance with requirements in the coke oven NESHAP. I understand that President Trump granted these requests by referring to the exemption requests saying that many of the items and technology required by fenceline testing and monitoring requirements rely on technologies that are not practically available.

9.      I know that ABC Coke performed fenceline monitoring for six months in 2022, at the request of EPA. I read the results of this monitoring and am aware that the actual, measured fenceline concentrations of benzene at ABC Coke are much greater than what ABC Coke reported those emissions to be. Because ABC Coke already bought the air monitors and conducted this air monitoring in 2022, I do not believe that the monitoring technology needed to perform fenceline monitoring is not practically available.

EXH052

10.     I am concerned that President Trump exempting ABC Coke from compliance with the coke oven NESHAP for two more years will allow ABC Coke to emit larger amounts of toxic air pollution, including benzene, than otherwise would be permitted under these revisions. I am concerned that this will expose me and my neighbors and the environment to higher levels of toxic pollution. This would increase the likelihood that we will experience adverse health effects that are associated with increased exposure. Increased pollution could also further devalue our properties and affect our ability to enjoy our homes.

11.     Requiring ABC Coke to meet the compliance deadlines in the coke oven NESHAP will help address my concerns above.

Executed on this 15th day of December, 2025.

Jack Evans

# EXHIBIT 14

# Declaration of Amanda Franklin

## DECLARATION OF AMANDA FRANKLIN

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, Amanda Franklin states as follows:

1.      I live at 1009 Overton Ave, Birmingham, AL 35217. I've lived at this address for twenty-five years (since 2000). My house is located less than a mile (2,795 feet) from ABC Coke and downwind from the coke oven batteries.

2.      I have been a member of GASP since 2025. I joined GASP because I am concerned about the pollution from ABC coke and its impact on the air quality where I live. I am generally aware of legal requirements that are supposed to reduce air pollution from coke ovens like ABC Coke. My husband and I joined GASP because we are concerned about air pollution from ABC Coke and want to be involved in ways to reduce our exposure to the pollution.

3.      I am aware that coke plants like ABC Coke emit large amounts of toxic air pollutants, like benzene, and other pollutants that cause cancer and other harmful effects on health when people inhale and are otherwise exposed to these pollutants. I believe that the air pollution from ABC Coke contributed to my and my husband's health issues. I was diagnosed with asthma in 2015. My husband also has asthma and has developed hypertension in recent years. I have severe headaches at least once a week.

4.      The toxic air pollution from ABC Coke also affects my daily life. I want to plant a garden, but I'm afraid of what contaminants from ABC Coke are in the soil and I would be afraid to eat any food that I grow. I occasionally wear a mask if I'm outside because I am concerned about the air pollution at my home that is downwind from ABC Coke. There is always soot on my home; even when I clean it off, I know it will be back within a day or two. I am even more

concerned about my health because I do not work outside of the home and am in my home many hours a day and night.

5.    I appreciate the EPA's revisions to the National Emission Standards for Hazardous Air Pollutants for coke ovens ("coke oven NESHAP"). I was grateful that EPA finalized new emission limits, standards for leaking parts of coke ovens and fenceline monitoring requirements which were intended to protect public health. I was excited that the EPA was going to require ABC Coke to publish results from their fenceline monitoring and that I or my husband would be able to go online and check those results. I wanted to learn more about benzene concentrations from ABC Coke at the fenceline of their facility so that I could understand better the amount of benzene I may be exposed to less than a mile away. I planned to use ABC Coke's monitoring information that would be posted online to reduce my and my husband's exposure to harmful pollutants like benzene.

6.    I am aware that industry—through its trade associations—challenged the coke oven NESHAP. I'm also aware that EPA delayed all of the coke ovens', including ABC Coke, compliance deadlines in an interim final rule and that EPA withdrew that interim final rule in December of 2025.

7.    I am also aware that all coke ovens, including ABC Coke, requested two-year compliance extensions with the coke oven NESHAP. I am also aware that on November 21, 2025, President Trump granted all coke ovens, including ABC Coke, a two-year exemption from compliance with requirements in the coke oven NESHAP. I understand that President Trump granted these requests by saying that many of the testing and monitoring requirements rely on technologies that are not practically available.

8.      I know EPA had ABC Coke perform fenceline monitoring for six months in 2022. I read the results of this monitoring and am aware that the actual, measured fenceline concentrations of benzene at ABC Coke are much greater than what ABC Coke reported. Because ABC Coke already bought the air monitors and conducted this air monitoring in 2022, I do not believe that the monitoring technology needed to perform fenceline monitoring is not practically available.

9.      I am concerned that President Trump exempted ABC Coke from compliance with the coke oven NESHAP for two more years. I worry that ABC Coke could pollute the air near my home more. I am concerned that this will expose me and my neighbors and the environment to higher levels of toxic pollution. I'm worried that even more pollution can make me and my husband sicker and could devalue our property.

10.     Requiring ABC Coke to meet the compliance deadlines in the coke oven NESHAP will help address my concerns above.


Executed on this 11th day of December, 2025.


Amanda Franklin

# EXHIBIT 15

# Declaration of Allan Halline

**DECLARATION OF ALLAN HALLINE**

I, Allan Halline, declare as follows:

1.      My name is Allan Halline. I am a United States citizen, am over the age of 18, and am competent to give this declaration. All information provided is based on my own personal knowledge unless otherwise noted.

2.      I currently live in Ogden Dunes, Indiana, within Porter County. My wife and I bought our current home in 2013 and moved there in 2020 after we retired. Our home is located on Lake Michigan on the west end of Ogden Dunes. We live approximately 2 to 2.5 miles from the Cleveland-Cliffs Burns Harbor facility ("Burns Harbor") to our east.

3.      Prior to my retirement, I was an academic gastroenterologist and practiced at the University of Illinois at Chicago and Jesse Brown VA Hospitals for my 30-year career. I received my MD at the University of Illinois College of Medicine in 1981 and was certified by the American Board of Internal Medicine in both Internal Medicine and Gastroenterology. My area of expertise was in diagnosing, managing, and treating patients with various gastrointestinal malignancies including cancers of the esophagus, stomach, pancreas, liver, and colon.

4.      I first became a member of the Environmental Law & Policy Center ("ELPC") in 2019. I have been aware of the tremendous work done by ELPC for several years, especially regarding the pollution coming from our neighboring steel mills, including an August 2019 discharge by Cleveland-Cliffs Burns Harbor of cyanide and ammonia that killed more than 3,000 fish and required closure of nearby beaches. ELPC has also provided legal assistance related to my work with Gary Advocates for Responsible Development ("GARD") of which I am also a member.

1

EXH057

5.      I began my community advocacy in approximately 2024 when I was accepted into a training program sponsored by Industrious Labs. I was thrilled to join this group of 18 like-minded individuals from Northwest Indiana, to learn about the steelmaking process, the pollution coming from antiquated steelmaking operations, and the exciting prospect of how air pollution could be reduced by as much as 95% by switching to green steel production and direct reduction.

6.      Approximately two years ago, I joined GARD and have been serving as medical advisor helping to develop a position paper and speaking out against the pollution from our steel mills. I am on the Green Steel Committee, and we meet monthly to discuss strategy in advocating for transition to direct reduced iron.

7.      I also have been working with Professor Ellen Wells at Purdue University and serve as a Community Ambassador helping to recruit Gary residents into Northern Lake County Environmental Partnership, an NIH-sponsored research project. This project studies the presence of various pollutants at the homes of participants in their soil, water, dust, and air as well as obtaining biologic samples and demographic and other health data to explore possible links between certain pollutants in the environment to health effects.

8.      When I became involved with local environmental groups, I learned about the vast literature emerging that links air pollution, primarily PM2.5, with many cancers of the GI tract as well as throughout the body. I wrote a paper for GARD based on my literature review, illuminating how many other disease categories are also linked to air pollution, including cardiovascular, neurologic, autoimmune, and maternal-fetal health disorders.

9.      For the past two years, I have become concerned about air pollution in Porter County and Lake County, Indiana, much of which comes from our three steel mills. As a health professional, I have spoken to several local groups about growing concerns of the adverse health

2

effects of air pollution and particulate matter (PM2.5) specifically. I have given public testimony to IDEM as well as the EPA in response to multiple rules and regulations related to steel mills and coke ovens in our area, and my concerns have been ignored. In addition to formal testimony, I regularly write my elected officials to push for changes in our steel industry, and I am planning to submit an op-ed piece to the Chicago Tribune based on a recent letter I sent to Senator Todd Young of Indiana.

10.     When I drive east from Ogden Dunes on Route 12, I can see billowing gray or white smoke from Burns Harbor every day along with frequent hazy skies and the strong stench of sulfur and other noxious odors coming from the steel mill. These smells occur most often when there is limited to no breeze. I sometimes experience the smells on my own property. The smells are even more noticeable at the homes of our friends who live on the eastern edge of the community, closer to Burns Harbor. I feel compelled to speak out and try to do something to change this.

11.     My wife and I retired to this area, in part, because of the close proximity to nature and the wonderful hiking trails in our nearby National and State Parks. Some of our favorite hikes in the National Park are in West Beach on the Dunes Succession Trail, Miller Beach, and the Cowles Bog Trails. We also like to hike in Indiana Dunes State Park. Over the past few years, we have both enjoyed birdwatching in our community and on our hikes and feel very lucky to be so close to a major bird migration flyway. I also enjoy biking. I have been a member of the Calumet Astronomical Society and enjoy astronomy and stargazing. Recently, I have developed a keen interest in deep space astrophotography and have invested in equipment to photograph deep space galaxies and nebulae, which fascinate me. This requires spending many hours outside late at night hoping for clear skies unobscured by clouds and/or pollution. Additionally, I sailed for many years on Lake Michigan with my father and later with my family. I very much enjoy looking out at the

3

EXH059

wondrous expanse of Lake Michigan and feel deeply saddened when there is a brown haze on the horizon coming from Burns Harbor and other nearby industrial operations.

12.    The pollution in our area impacts how we live our lives. Every day we see a new film on the windshield of our car that is parked in our driveway and wonder what that film is and how much of that we are breathing in daily. We follow the Air Quality Index (AQI) more closely on our weather apps and alerts and avoid hiking when it gets too high. On days when we smell fumes or unusual smells outside, we have to hike elsewhere instead of our local hiking trails. When the AQI is in the hazardous range, we must avoid hiking altogether.

13.    Obtaining accurate air quality information is important to me. In addition to monitoring my weather app and alerts, I installed a PurpleAir monitor on my property approximately six months ago to track the PM2.5 AQI as well as volatile organic compounds more closely. I have been surprised how both these measurements can oscillate up and down, sometimes spiking to very high levels. I look at this data most days, particularly when the air is hazy or smelly. I use this information to determine where or if I might hike or bike.

14.    I now know a lot more about the pollutants coming from our steel mills, including PM2.5, nitrogen and sulfur oxides, heavy metals such as mercury and arsenic, volatile organic compounds like benzene and toluene, as well as the large category of air toxics, many of which are carcinogenic. I am also aware through reading the medical literature how many of these chemicals can readily enter the bloodstream through the lungs and spread throughout the body causing inflammation, tissue injury, and even mutations in DNA, one of the known mechanisms of carcinogenesis. I also know that the carcinogenic process is a multistep process that can take many years to manifest. My wife and I are 70 years old and hopefully will never develop cancer, but I worry about our children and especially our new grandson visiting us for any length of time

4

EXH060

with this pollution present, knowing what harms it can do. I am aware of several health issues of Ogden Dunes residents that are too excessive or numerous to ignore.

15.     I have mild exercise-induced asthma and rarely use my inhaler. My wife has noticed that I get shorter of breath when we hike, prompting me to get a full cardiac evaluation including exercise stress test, EKG, and echocardiogram that were all negative. I wonder if my lungs have been adversely affected by air pollution.

16.     Over the past two years, I have had difficulties with my balance and have seen neurologists at the University of Chicago. I have undergone MRI's of my head and neck along with several tests of my vestibular system. My care team has concluded that I have vestibular dysfunction of unknown etiology. I have also learned that air pollutants can cause neurologic damage and increase the risk for dementia and strokes. Both my wife and I worry about declining mental acuity. I wonder if my imbalance is related to living near the steel mills.

17.     My wife was diagnosed with autoimmune hepatitis three years ago and has been treated with immunosuppressants. I was surprised to learn that many autoimmune disorders are also linked to air pollution as well. Current medical literature suggests that autoimmune diseases are due to genetic predisposition but become manifest with environmental triggers. Air pollution is one such environmental trigger that is now recognized. When PM2.5 enters the body, it can trigger a cascade of inflammatory processes and is now linked to increased risk for several autoimmune disorders including autoimmune hepatitis.

18.     I understand that the 2024 Coke Oven Rule would require coke ovens, including Burns Harbor, to limit their releases of pollutants such as mercury, formaldehyde, dioxins, and soot, and monitor for and publish their fenceline benzene levels on a quarterly basis. I would have appreciated pollution limitations and additional information about benzene. If Burns Harbor

EXH061

conducted air monitoring and made its quarterly results publicly available, I would use that data to improve my understanding of the amount of benzene I am exposed to from that facility.

19.    I understand that an exemption from compliance with the 2024 Coke Oven Rule could result in increased emissions of these pollutants from Burns Harbor and a lack of air quality monitoring data. Exempting the Burns Harbor coke oven from compliance with the 2024 Coke Oven Rule will jeopardize my health, my family's health, and my personal, recreational, and property interests, including my interest in improved information about local air quality and the levels of pollution that my wife, visiting family and I are being exposed to because of the air pollutant emissions from Burns Harbor

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: _December 18, 2025_

_____
Allan Halline

EXH062

# EXHIBIT 16

# Declaration of Melanie Meade

**DECLARATION OF MELANIE MEADE**

I, Melanie Meade, hereby declare and state:

1.      This declaration is based on my personal knowledge and belief.

2.      I am over the age of eighteen (18) and suffer no legal incapacity.

3.      I am a current member of Clean Air Council (the "Council"), and the Council has helped me learn about air pollution and advocate for clean air in my community since 2013.

4.      I currently reside in Clairton, Pennsylvania, approximately 2,900 feet from U.S. Steel's Clairton Coke Works facility. I have lived in Clairton for most of my life and have firsthand experience of the harms that its pollution has caused to my health and my community.

5.      My family has lived in Clairton for generations, and my grandfather once owned the land around the facility.

6.      I am aware that Clairton Coke Works, which produces over 10,000 tons of coke per day, emits large amounts of toxic pollutants into the air which I, my family, and my community breathe. Among other harmful pollutants, the facility is permitted to emit 1,228.40 tons per year ("tpy") of fine particulate matter ("$PM_{2.5}$"), 570.36 tpy of volatile organic compounds ("VOCs"), and 62.12 tpy of benzene.

7.      I am aware that Clairton Coke Works has had high priority violations of the Clean Air Act in all 12 of the last 12 quarters.

8.      I am also aware that benzene is a known carcinogen, and that from October 2022 to April 2023, the average benzene concentration at Clairton Coke Works' fenceline was approximately 33 $\mu g/m^3$, which is over ten times higher than the upper limit for chronic benzene exposure set by the California Environmental Protection Agency.

EXH063

9.      Almost my entire family has died from conditions associated with the types of toxic air pollution emitted from Clairton Coke Works. My father died from heart failure and severe coronary artery disease, and my mother died from kidney and heart failure. One of my brothers had bad asthma as a child when he lived near the facility, and I believe this contributed to his death from COVID-19-associated blood clots in his lungs when he was only 41. My sister died from cancer when she was 55. My eldest brother died from heart failure when he was only 45.

10.     One friend who was a neighbor died from a stroke at 45. Several community friends have died from heart failure or strokes in their forties and fifties. Multiple neighbors, including my cousin, around that age suffer from chronic kidney failure. People in the community surrounding the facility consider it normal for people in their forties to suffer from such illnesses.

11.     I was diagnosed with epilepsy in 2008, and the symptoms completely disappear when I am away from Clairton for an extended period of time. In 2008 I was living in Washington D.C. and working at American University. When I visited friends in Clairton, we went to a bar located across a parking lot from Clairton Coke Works. I did not drink any alcoholic beverages. I woke up in the hospital because I had my first seizure. Tests for seizure activity were negative when I returned to Washington D.C. However, tests conducted while I am living in Clairton show multiple seizures per day — these are sometimes "absent" seizures that show in my brain activity, as opposed to the seizures that cause shaking. I was tested again during my year living in North Carolina, and there was no seizure activity. However, the seizures returned when I moved back to Clairton in 2013. I most recently had the seizure activity confirmed in tests conducted by UPMC Presbyterian in Pittsburgh in 2025.

12.     In 2025, I had a seizure while driving and totaled my car. I was lucky to survive and have not been able to drive since.

EXH064

13.     When I am at home, being around the stench of the pollution from Clairton Coke Works causes me to stop being able to smell anything, including the food that I cook. However, when I am away from home for a period of time, when I return I can smell again for a little while.

14.     My 16-year-old child has had chronic nasal congestion throughout the year since we returned from North Carolina where we lived briefly until my father died in 2013. Congestion was never a problem while they lived in North Carolina.

15.     My grandson has football practice at the baseball field adjacent to Clairton Coke Works. Because of the poor air quality at the location, I never attend his practices.

16.     I also seldom watch my grandson's football games that take place at Clairton Park, about a half a mile from the facility. On the rare occasions that I do attend, being that close to the facility tends to cause headaches, brain fog, and a "pinching" feeling around my heart. I am deprived of bonding with my grandson by cheering for him when he plays and by being unable to engage in other outdoor relationship-building activities that I could otherwise do with him if not for the air pollution from Clairton Coke Works and other industrial facilities.

17.     From my home I regularly hear what sounds like explosions at Clairton Coke Works and see plumes of thick smoke and unexplained flames that I understand are most likely caused by flaring. Since the August 2025 explosion, I have noticed an increase in dark brown emissions from areas of the facility that did not previously have emissions that looked like that.

18.     I am concerned about the air pollutants emitted by the facility, including benzene. I want to know fenceline benzene levels, particularly when there are explosions, excessive dark smoke, or flaring at Clairton Coke Works. U.S. Steel would be required to monitor those emissions if it had to comply with the Coke Ovens Rule.

EXH065

19.     To protect myself to the best of my ability from the air pollution emitted by Clairton

Coke Works, I do not spend time outside in the vicinity of my home, nor do I open my windows.

If I have to go out for any length of time, I try to choose a destination that is at least ten miles

away. I also maintain one air filter and three air purifiers in my house.

20.     Because of the suffering in my family and my community, I advocate for clean air and to

raise community awareness about air pollution from the U.S. Steel facilities. I have regularly

worked with Clean Air Council to connect with other local groups and individuals concerned

about the health injuries from the air pollution those facilities emit.

21.     I am aware that EPA finalized updated the Coke Ovens Rule for coke oven facilities like

Clairton Coke Works in 2024. I supported the provisions for fenceline monitoring requirements

for benzene and new standards for several hazardous air pollutants ("HAP").

22.     I am also aware that EPA issued an Interim Final Rule ("IFR") that delayed when coke

ovens like Clairton Coke Works would have had to comply with the long overdue NESHAP

revisions in the 2024 Coke Oven Rule. I was relieved when the EPA repealed the IFR. The relief

was short-lived, however, because in November 2025, President Trump exempted coke oven

facilities, including Clairton Coke Works, from the compliance deadlines in the Coke Ovens

Rule.

23.     Clairton Coke Works is one of the largest sources of HAP in the region. Residents of

Clairton and other nearby communities have experienced elevated rates of asthma, chronic

obstructive pulmonary disease, cancer, heart disease, kidney disease, strokes, and other health

injuries as a result of prolonged exposure to emissions from the facility. For example, the age-

adjusted death rate due to cancer in Clairton is 17% higher than the county average, and heart

disease rates are 63% higher. Children in Clairton have asthma rates nearly three times the

EXH066

national average, and many of these children are unable to have their symptoms controlled by medication. The community's overall health has been significantly compromised by pollution, and delay in implementing the NESHAP rules only increases the suffering from these conditions and causes more premature deaths.

24.     I am concerned that the President's proclamation delays much-anticipated possible reductions in emissions from coke ovens. As someone who already suffers from epilepsy and lives in close proximity to the pollution source, I believe that I am at high risk of experiencing further harm. The President's decision to delay Clairton Coke Works' compliance with the Coke Ovens Rule could increase levels of particulate matter, benzene, sulfur oxides, and other hazardous air pollutants, which would not only worsen my condition but also endanger the health of my remaining family and neighbors, especially members of vulnerable populations like children and the elderly.

25.     Given the established links between air pollution and serious health conditions such as cancer, respiratory diseases, and cardiovascular issues, I am concerned that this delay in compliance will have devastating effects on the community.

26.     I am especially concerned that the President is delaying compliance with the fenceline monitoring requirements. I and other members of our community would have kept track of the data reported. We also would have used that data to inform ourselves and our neighbors about any possible exceedances of benzene. We would have used this data in determining how much time to spend outdoors and to inform our doctors about our potential exposure levels.

27.     I have lost family, friends, and community members who have died from cancers and other health injuries associated with exposure to air pollutants emitted from Clairton Coke Works and other local industrial facilities. I try to channel my grief and fear into action, which

EXH067

includes educating community members about the air pollution from these facilities so that they can advocate for improved emission controls, such as those required by the Coke Ovens Rule. I am concerned that the President has delayed the important progress my community made in advocating for this Rule.

28.     Invalidating President Trump's proclamation that exempted coke oven facilities from the compliance deadlines in the Coke Ovens Rule and ordering those facilities, including Clairton Coke Works, to promptly comply with the standards in the Rule would remedy these harms by implementing the pollution control requirements in the Coke Ovens Rule and providing the protections that they were promulgated to provide.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 23rd day of February, 2026.


/s/ Melanie Meade

Melanie Meade
Declarant

EXH068

# EXHIBIT 17

# Declaration of Judy Mendoza

## DECLARATION OF JUDY MENDOZA

1.  My name is Judy Mendoza, and I live in Hammond, Indiana.

2.  I am a member of Just Transition Northwest Indiana and have been a member since October 2024.

3.  I have lived in Hammond for about thirty-three years.

4.  My home is about 4.5 miles from the Indiana Harbor cokemaking plant in East Chicago, Indiana, operated by SunCoke, Inc. ("SunCoke Indiana Harbor").

5.  I am aware that SunCoke Indiana Harbor is subject to EPA's air toxics rule for coke ovens: pushing, quenching, and battery stacks, and coke oven batteries that are major sources of hazardous air pollutants ("Coke Ovens Rule").

6.  I am aware that the Environmental Protection Agency ("EPA") recently revised its Coke Ovens Rule, to set stronger standards that would cover the SunCoke plant.

7.  I understand that on November 21, 2025, the President issued a proclamation, which exempted all eleven coke plants subject to the Coke Ovens Rule for a period of two years. The Rule's requirements would have already gone into effect if it were not for this exemption.

8.  I am aware that SunCoke Indiana Harbor emits toxic air pollutants, including lead, arsenic, and benzene. This concerns me deeply because I know that toxic air pollutants are harmful to me and people living in my community.

9.  Living in Whiting can be very scary, knowing the health risks associated with toxic pollution from SunCoke Indiana Harbor and recently learning that the President is delaying stricter pollution regulations for that facility. The air pollution around Hammond gives the area an awful, rancid smell. My niece raised her children just across the street from me and her son developed asthma at a very young age, which he has to this day.

EXH069

I've had bouts of bronchitis and even pneumonia. As a result, I had an MRI done that showed some deposits in my lungs, which makes me concerned about my health.

10. As a result, I worry about the threat air pollution poses to me and so I have an air purifier in my home and a monitoring app on my phone that I check often.

11. Air pollution is particularly concerning to me because I love to garden and I spend about nine months out of the year gardening. I know that some of the toxic pollutants emitted by coke ovens, like lead, can deposit in my garden and potentially contaminate what I grow. I am planning to have testing of my garden soil done this year.

12. On days that I know the air quality is particularly bad, I leave the neighborhood entirely, typically to stay with family in Michigan or Illinois, or I go stay indoors and avoid opening windows.

13. Delaying coke ovens' obligations to comply with the Coke Ovens Rule will prolong and increase the harm to me and my community by exposing us to greater amounts of air pollution than would otherwise be allowed if coke ovens were required to start implementing the Rule's requirements.

14. A declaration that the Proclamation is unlawful will remedy this harm by requiring the pollution control requirements in the Coke Ovens Rule to have effect and provide the protection they were promulgated to provide. It's very important to me that the SunCoke plant be subject to basic, common sense regulations like those in the Coke Ovens Rule. They need to be a good neighbor and limit their pollution.

15. If the Rule is implemented, I will have greater assurance that my health is being protected and I will get more enjoyment from doing things like gardening and just being able to live my life in my community as a normal person and homeowner .

EXH070

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed on February 23 , 2026.


_Judy Mendoza_
_____

Judy Mendoza

# EXHIBIT 18

# Declaration of Mary Lou Mills

## DECLARATION OF MARY LOU MILLS

I, Mary Lou Mills, hereby declare and state:

1.      This declaration is based on my personal knowledge and belief.

2.      I am over the age of eighteen (18) and suffer no legal incapacity.

3.      I am a current member of Clean Air Council (the "Council"), and I joined the Council to support its efforts to reduce air pollution in my region and beyond.

4.      I currently reside in Monongahela, Pennsylvania, approximately four miles northwest of Cleveland Cliffs' Monessen Coke, which is typically downwind of the facility. My spouse and I have lived in this house for about ten years.

5.      I am aware that Monessen Coke emits large amounts of toxic pollutants into the air which I, my family, and my community breathe. Among other harmful pollutants, the facility is permitted to emit 92 tons per year ("tpy") of volatile organic compounds ("VOCs"), 537 tpy of sulfur oxides ("SOx"), 773 tpy of nitrogen oxides ("NOx"), 22 tpy of total hazardous air pollutants ("HAP"), and 7.4 tpy of benzene.

6.      I am aware that Monessen Coke has had high priority violations of the Clean Air Act in all 12 of the last 12 quarters.

7.      I am also aware that benzene is a known carcinogen, and that independent testing of benzene concentrations around coking facilities has often exceeded reported levels.

8.      The air in my neighborhood smells foul at least two or three times each week, and we are typically downwind of Monessen Coke. I am concerned about the potential health effects of breathing the chronically polluted air.

9.      I am aware that EPA finalized updated National Emission Standards for Hazardous Air Pollutants ("NESHAP") for coke oven facilities like Monessen Coke Works ("Coke Ovens

EXH072

Rule") in 2024. I supported the provisions for fenceline monitoring requirements for benzene, measures to reduce leaks from coke oven doors, and new standards for several hazardous air pollutants ("HAP").

10.    I am also aware that EPA issued an Interim Final Rule ("IFR") that delayed when coke facilities like Monessen Coke Works would have had to comply with the long overdue NESHAP revisions in the Coke Ovens Rule. I was relieved when the EPA repealed the IFR. The relief was short-lived, however, because in November 2025, President Trump exempted coke oven facilities, including Monessen Coke, from the compliance deadlines in the Coke Ovens Rule.

11.    My spouse and I have volunteered with environmental health organizations to help measure the air pollution levels in my area. In 2022 and 2023, the Environmental Integrity Project set up a benzene monitor at our house, and I understand that it was the same type of monitor that coke facilities are required to set up at their fencelines by the Coke Ovens Rule.

12.    As a member of Clean Air Council, I learned that one of the requirements for a facility to receive a presidential exemption from rules like the Coke Ovens Rule is that it would not be feasible to satisfy the requirements. I saw how simple it was to maintain the benzene monitors. Although it requires special training for someone to collect the tubes in the monitors and to properly maintain the chain of custody, a community volunteer was able to be trained to handle it. Also, with all the money Cleveland Cliffs makes from steel facilities, it seems ridiculous to me if the company claims that it cannot afford the types of monitors that a comparatively small nonprofit organization could purchase.

13.    We also are volunteering with a local group called Reducing Outdoor Contaminants in Indoor Spaces ("ROCIS"). They work on helping people reduce indoor air contamination. They have set up expensive air quality monitors in our home that we run side-by-side with more

EXH073

affordable monitors to compare the readings and test the reliability of the less expensive monitors that more people could afford.

14.     I am concerned about the air pollutants emitted by the Monessen Coke, including benzene. I want to know the fenceline levels of benzene, particularly when there is excessive dark smoke or flaring. Cleveland Cliffs would be required to monitor those emissions if it had to comply with the Coke Ovens Rule. Cleveland Cliffs would also need to find and address the cause of excessive benzene levels, which mean more rapid discovery of any leaks or malfunctions, potentially avoiding excessive emissions of other air pollutants as well.

15.     I am 69 years old and have diabetes and high blood pressure. I also developed asthma about four or five years ago. I had a frightening incident approximately two years ago when difficulty breathing made me go to an urgent care facility. They sent me home with Albuterol, but I still felt like I could not breathe. So, I went to the hospital, where they found that my oxygen saturation was only 85%. I needed to use supplemental oxygen for several days, and I was prescribed a BREO ELLIPTA inhaler which I have used daily since then. I do not know if my health issues were caused by air pollution, but I believe that the breathing difficulties in particular make me more susceptible to health injuries from Monessen's emissions.

16.     To protect myself to the best of my ability from the air pollution emitted by Monessen Coke, I do not spend time outside in the vicinity of my home, nor do I open my windows unless I absolutely have to for a short time in the summer because I do not have central air conditioning.

17.     We have a high quality air filter in our house, and my spouse and I have also constructed simple filters using box fans attached to HVAC filters. We use the latter in most rooms of our house. When we must open a window, we set up one of those to filter the air as it enters our house. They get black surprisingly quickly. Maintaining the air filters around our house is costly,

and I know many people in the Mon Valley area cannot afford to employ similar protective measures.

18.     About three or four times per week, I need to either pass through Monessen or go to a store there. When passing through, I keep the car windows up and the car air recirculating to minimize my exposure to the often foul-smelling air. When deciding where to shop on a given day, my spouse and I check the available information on air quality in the area and try to avoid any areas with particularly high pollution levels or numerous reports of toxic smells. However, the main grocery store in the area is about two miles closer to Monessen Coke and the wind comes right from the facility. Particularly during the frequent temperature inversions that make the air quality worse, I am concerned about the impact to my health from needing to go there regularly.

19.     I believe that the air pollution also lowers our property value, and that the community is hurt economically because younger people and new businesses do not want to come to an area with poor air quality.

20.     I also value the wildlife in the area, and I am concerned about the pollution harming the health of the animals, and particularly the birds because they have small lungs.

21.     Residents of communities like mine along the Monongahela River have experienced elevated rates of asthma, chronic obstructive pulmonary disease, cancer, heart disease, kidney disease, strokes, and other health injuries as a result of prolonged exposure to air pollution. Any delay in implementing the Coke Ovens Rule only increases the suffering from these conditions and causes more premature deaths.

22.     I am concerned that the President's proclamation delays much-anticipated possible reductions in emissions from coke ovens. As someone who already needs to use an inhaler, I

believe that I am at substantial risk of experiencing further harm. The President's decision to delay Monessen Coke's compliance with the 2024 Coke Ovens Rule could increase levels of particulate matter, benzene, sulfur oxides, and other hazardous air pollutants, which could not only worsen my condition but also endanger the health of my family and neighbors, especially members of vulnerable populations like children and the elderly.

23.     Given the established links between air pollution and serious health conditions such as cancer, respiratory diseases, and cardiovascular issues, I am concerned that this delay in compliance will have devastating effects on the community.

24.     I am especially concerned that the President is delaying compliance with the fenceline monitoring requirements. My spouse and I would have kept track of the data reported. We also would have used that data to inform ourselves and our neighbors about any possible exceedances of benzene. We would have used this data in determining how much time to spend outdoors and to inform our doctors about our potential exposure levels.

25.     Invalidating President Trump's proclamation that exempted coke oven facilities from the compliance deadlines in the 2024 Coke Ovens Rule and ordering those facilities, including Monessen Coke, to promptly comply with the standards in the Rule would remedy these harms by implementing the pollution control requirements in the 2024 Coke Ovens Rule and providing the protections that they were promulgated to provide.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 24th day of February, 2026.

/s/ Mary Lou Mills

Mary Lou Mills

EXH076

# EXHIBIT 19

# Declaration of Robert Mulvihill

## DECLARATION OF ROBERT MULVIHILL

1. My name is Robert Mulvihill and I live in Pleasant Hills, Pennsylvania.

2. I am 67 years of age and work as an ornithologist (a biologist who specializes in the study of birds).

3. I joined PennFuture in 2024.

4. I have lived at my residence in Pleasant Hills for 14 years. I currently live there with my spouse, along with our three dogs and a cat.

5. My home is less than 5 miles from the U.S. Steel Clairton Coke Works facility in Clairton, PA.

6. I am aware that the Clairton Coke Works facility is subject to EPA's air toxics rules for coke ovens ("Coke Ovens Rule") and that coke ovens are major sources of toxic air pollution.

7. I am aware that Clairton Coke Works emits toxic air pollution, including lead, arsenic, and benzene. As a biologist, this concerns me deeply, because I know that toxic air pollutants are potentially harmful to me, my wife, other people living in my community, and the environment.

8. Given how close I live to the plant, emissions from the Clairton Coke Works facility have always concerned me. I have a chronic heart condition, symptoms of which include shortness of breath. Having this condition makes me even more concerned about the long-term effects of harmful air pollution from the Clairton Coke Works facility.

9. I have a family member who lived less than six miles from the facility who contracted and died from lung cancer, despite the fact that she was not a smoker. I frankly believe emissions from the Clairton Coke Works facility likely contributed to her illness.

EXH077

10. Sometimes, there is a noticeable odor in the air that I attribute to emissions from the Clairton Coke Works facility. When there is a noticeable odor in the air, my wife and I close the windows in order to avoid undue exposure to us and our pets from any toxic air pollution.

11. Unpleasant odor is what initially prompted my concern about emissions from the facility. Because of this concern, I agreed in 2019 to have a Purple Air monitor installed at my home so that my wife and I could directly monitor air quality and detect and document episodes of higher emissions.

12. Currently, we are part of a cohort for the **ROCIS (Reducing Outdoor Contaminants in Indoor Spaces;** rocis.org) study, which involves continually monitoring air quality inside and outside our home.

13. I am aware that the Environmental Protection Agency ("EPA") recently revised and strengthened its Coke Ovens Rule. I am aware that the new 2024 Coke Ovens Rule requires some facilities, including Clairton Coke Works, to monitor benzene at the fenceline and take corrective action if emissions exceed a certain limit. These facilities must report their fenceline monitoring data to EPA, and EPA must publish that data to a publicly available website.

14. I understand that on November 21, 2025, the President issued a proclamation, which extends certain compliance deadlines in the 2024 Coke Ovens Rule from July 7, 2025, and January 5, 2026, to July 7, 2027, and January 5, 2028.

15. Delaying coke ovens' obligations to comply with the 2024 Coke Ovens Rule will prolong and increase the harm to me and my community by exposing us to greater amounts of air pollution than would otherwise be allowed.

16. If Clairton Coke Works were complying with the 2024 Coke Ovens Rule's fenceline monitoring requirements, I would consult the publicly available monitoring data on EPA's website. I would feel safer and more comfortable engaging in outdoor activities if I were able to access this data and know that Clairton Coke Works was complying with the Rule's limits for benzene emissions.

17. If the 2024 Coke Ovens Rule was implemented, I would have greater assurance that Clairton Coke Works is keeping its coke oven emissions at or below their current levels.

18. I want the court to strike down the proclamation so that the strengthened requirements in the 2024 Coke Ovens Rule have effect and provide the protections they were promulgated for.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 24, 2026

Robert S. Mulvihill

EXH079

# EXHIBIT 20

# Declaration of Julie Peller

**DECLARATION OF JULIE PELLER**

I, Julie Peller, declare as follows:

1. My name is Julie Peller and I live in Chesterton, Indiana.

2. I am a member of Hoosier Environmental Council (HEC). I also served as a member of HEC's Board of Directors for over ten years until I very recently stepped down.

3. I am a professor of chemistry at Valparaiso University, and I received my PhD in chemistry from the University of Notre Dame. My research focuses on environmental pollution, particularly water pollution. I am currently a member of the Northern Lake County Environmental Partnership, a collaboration between researchers, students, and local community members to comprehensively study pollution in the area, including air pollution.

4. As a result of my education and work, I have knowledge of the pollution caused by the coke ovens at Cleveland-Cliffs Burns Harbor, in Burns Harbor, Indiana ("Burns Harbor Coke Plant") and the associated effects of such pollution.

5. My home is roughly 3.5 miles from the Burns Harbor Coke Plant. I have lived at my current home for over 7 years. Given my proximity to the plant, I am concerned about my exposure from emissions of these toxic pollutants. On days when the wind blows from the plant towards my home, I can smell the pollution from the coke plant. On days when I smell pollution from the plant, I close my windows and avoid spending time outside.

6. I frequently visit Indiana Dunes National Park, parts of which are only a few miles from the Burns Harbor facility. I can see plumes rising from the plant while I am at the park, which diminishes my enjoyment of my time in the park. I am concerned about the air, water and soil/sand that receive the emitted pollutants.

1

EXH080

7. I am aware that Burns Harbor Coke Plant is subject to the Environmental Protection Agency's ("EPA") air toxics rule for coke ovens ("Coke Ovens Rule").

8. I am aware that in 2024 EPA strengthened its Coke Ovens Rule, setting new emissions limits for previously unregulated hazardous air pollutants and updating some work practices and existing emissions limits.

9. I am aware that the 2024 Coke Ovens Rule requires some facilities, including the Burns Harbor Coke Plant, to monitor for benzene at the fenceline and take corrective action if emissions exceed a certain limit. Facilities must report their monitoring data to EPA, which EPA would publish to its publicly available website. That information would be helpful to me, my colleagues, and the graduate students I supervise in the Northern Lake County Environmental Partnership, and to the greater community. We seek to better understand sources of pollution in the area and data about the benzene emissions from the Burns Harbor Coke Plant would be valuable to our research efforts and our efforts to arm partners and leaders in the community with information about pollution.

10. I understand that the President recently issued an exemption to all coke oven facilities, which delays certain compliance deadlines in the 2024 Coke Ovens Rule by two years, including the requirements for fenceline monitoring which originally had a compliance deadline of July 7, 2025 and now has a deadline of July 7, 2027.

11. Delaying coke ovens' obligations to comply with the Coke Ovens Rule will prolong and increase harms to me and my community and denies me information that would benefit the research efforts I engage in. I would like these requirements to go into effect so that the Burns Harbor Coke Plant complies with them on the original schedule.

EXH081

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 19, 2026

_Julie Peller_
Signature

Dr. Julie Peller

EXH082

# EXHIBIT 21

# Declaration of Janet Roslund

## DECLARATION OF JANET ROSLUND

I, Janet Roslund, hereby declare and state:

1.      This declaration is based on my personal knowledge and belief.

2.      I am over the age of eighteen (18) and suffer no legal incapacity.

3.      I am a current member of Clean Air Council (the "Council"), and I joined the Council to support its efforts to reduce air pollution in my region and beyond.

4.      I currently reside in Monongahela, Pennsylvania, approximately four miles northwest of Cleveland Cliffs' Monessen Coke, which is typically downwind of the facility. My spouse and I have lived in this house for about ten years.

5.      I am aware that Monessen Coke emits large amounts of toxic pollutants into the air which I, my family, and my community breathe. Among other harmful pollutants, the facility is permitted to emit 92 tons per year ("tpy") of volatile organic compounds ("VOCs"), 537 tpy of sulfur oxides ("SOx"), 773 tpy of nitrogen oxides ("NOx"), 22 tpy of total hazardous air pollutants ("HAP"), and 7.4 tpy of benzene.

6.      I am aware that Monessen Coke has had high priority violations of the Clean Air Act in all 12 of the last 12 quarters.

7.      I am also aware that benzene is a known carcinogen, and that independent testing of benzene concentrations around coking facilities has often exceeded reported levels.

8.      The air in my neighborhood smells foul at least two or three times each week, and we are typically downwind of Monessen Coke. I am concerned about the potential health effects of breathing the chronically polluted air.

EXH083

9.      I am aware that EPA finalized updated National Emission Standards for Hazardous Air Pollutants ("NESHAP") for coke oven facilities like Monessen Coke Works (the "Coke Ovens Rule") in 2024. I supported the provisions for fenceline monitoring requirements for benzene, measures to reduce leaks from coke oven doors, and new standards for several hazardous air pollutants ("HAP").

10.     I am also aware that EPA issued an Interim Final Rule ("IFR") that delayed when coke facilities like Monessen Coke would have had to comply with the long overdue NESHAP revisions in the 2024 Coke Oven Rule. I was relieved when the EPA repealed the IFR. The relief was short-lived, however, because in November 2025, President Trump exempted coke oven facilities, including Monessen Coke, from the compliance deadlines in the Coke Ovens Rule.

11.     My spouse and I have volunteered with environmental health organizations to help measure the air pollution levels in my area. In 2022 and 2023, the Environmental Integrity Project set up a benzene monitor at our house, and it is my understanding that it was the same or similar type of monitor that coke facilities are required to set up at their fencelines by the 2024 Coke Ovens Rule.

12.     As a member of Clean Air Council, I learned that one of the requirements for a facility to receive a presidential exemption from rules like the Coke Ovens Rule is that it would not be feasible to satisfy the requirements. I saw how simple it was to maintain the benzene monitors. Although it requires special training for someone to collect the tubes in the monitors and to properly maintain the chain of custody, a community volunteer was able to be trained to handle it. Also, Cleveland Cliffs should be able to easily afford the types of monitors that a comparatively small nonprofit organization could purchase.

2

EXH084

13.     We also are volunteering with a local group called Reducing Outdoor Contaminants in Indoor Spaces ("ROCIS"). They work on helping people reduce indoor air contamination. They have set up expensive air quality monitors in our home that we run side-by-side with more affordable monitors to compare the readings and test the reliability of the less expensive monitors that more people could afford.

14.     I am concerned about the air pollutants emitted by the Monessen Coke, including benzene. I want to know the fenceline levels of benzene, particularly when there is excessive dark smoke or flaring. Cleveland Cliffs would be required to monitor those emissions if it had to comply with the Coke Ovens Rule. Cleveland Cliffs would also need to find and address the cause of excessive benzene levels, which mean more rapid discovery of any leaks or malfunctions, potentially avoiding excessive emissions of other air pollutants as well.

15.     I am 78 years old and have high blood pressure. These factors likely make me more susceptible to health injuries from Monessen Coke's emissions.

16.     My spouse has asthma and had an incident a couple years ago in which she had to be hospitalized because of trouble breathing and low oxygen saturation. She has had to use an inhaler on a daily basis since then. I am concerned about how the air pollution impacts  her health.

17.     To protect ourselves from the air pollution emitted by Monessen Coke, we do not open our windows unless we must in the summer because we do not have central air conditioning.

18.     I love to spend time outdoors, working in the yard and walking with or without our dogs. However, multiple times per week the air smells bad enough that I need to go back inside to limit my exposure to the air pollution.

3

19.     We have a high quality air filter in our house, and my spouse and I have also constructed simple filters using box fans attached to HVAC filters. We use the latter in most rooms of our house. When we must open a window, we set up one of those to filter the air as it enters our house. They get black surprisingly quickly. Maintaining the air filters around our house is costly, and I know many people in the Mon Valley area cannot afford to employ similar protective measures.

20.     About three or four times per week, I visit or drive through Monessen. When driving through, I keep the car windows up and the car air recirculating to minimize my exposure to the often foul-smelling air. When deciding where to shop, my spouse and I check the available air quality information in the area and try to avoid any areas with particularly high pollution levels or numerous reports of toxic smells. However, the main grocery store is about two miles closer to Monessen Coke and the wind comes right from the facility. Particularly during the frequent temperature inversions that make the air quality worse, I am concerned about the impact to my health from needing to go there regularly.

21.     I volunteer for Monongahela Main Street Program, a group that tries to attract businesses to our community. I believe the air pollution causes economic harm because younger people and new businesses do not want to come to an area with poor air quality. I also believe that the air pollution lowers our property value.

22.     Residents of communities like mine along the Monongahela River have experienced elevated rates of asthma, chronic obstructive pulmonary disease, cancer, heart disease, kidney disease, strokes, and other health injuries as a result of prolonged exposure to air pollution. Any delay in implementing the Coke Ovens Rule only increases the suffering from these conditions and causes more premature deaths.

4

23.    I am concerned that the President's proclamation delays much-anticipated possible reductions in emissions from coke ovens. As someone who already needs to use an inhaler, I believe that I am at substantial risk of experiencing further harm. The President's decision to delay Monessen Coke's compliance with the Coke Ovens Rule could increase levels of particulate matter, benzene, sulfur oxides, and other hazardous air pollutants, which could not only worsen my condition but also endanger the health of my family and neighbors, especially members of vulnerable populations like children and the elderly.

24.    Given the established links between air pollution and serious health conditions such as cancer, respiratory diseases, and cardiovascular issues, I am concerned that this delay in compliance will have devastating effects on the community.

25.    I am especially concerned that the President is delaying compliance with the fenceline monitoring requirements. My spouse and I would have kept track of the data reported. We also would have used that data to inform ourselves and our neighbors about any possible exceedances of benzene. We would have used this data in determining how much time to spend outdoors and to inform our doctors about our potential exposure levels.

26.    Invalidating President Trump's proclamation that exempted coke oven facilities from the compliance deadlines in the Coke Ovens Rule and ordering those facilities, including Monessen Coke, to promptly comply with the standards in the Rule would remedy these harms by implementing the pollution control requirements in the Coke Ovens Rule and providing the protections that they were promulgated to provide.

5

EXH087

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed on this 24th day of February, 2026.


/s/ Janet Roslund

Janet Roslund
Declarant

6

EXH088

# EXHIBIT 22

# Declaration of Betty Sullivan

## DECLARATION OF BETTY SULLIVAN

I, BETTY SULLIVAN, do hereby affirm and state:

1.   I am a member of the Natural Resources Defense Council. I joined NRDC in 2023 because I care about clean air and clean water. I want my family to have access to clean air and water so that we can live healthy lives.

2.   I live in Belle Vernon, PA, and I have lived here for over fifty years. My children and grandchildren also live nearby.

3.   Belle Vernon is a small, rural town along the Monongahela River that is a part of the Pittsburgh metropolitan area. The town is surrounded by many industrial operations, including coke oven facilities, the county landfill and waste management facility, and several chemical manufacturing plants along the Monongahela River.

4.   I live near two coke oven facilities—the Cleveland-Cliffs Monessen Coke plant and the U.S. Steel Mon Valley Works, Clairton Coke plant—that are subject to EPA's NESHAP for coke ovens (the "Coke Ovens Rule") and were exempted from compliance with updated standards by President Trump's November 21, 2025, Proclamation, "Regulatory Relief for Certain Stationary Sources to Promote American Coke Oven Processing Security."

5.   I live 2.5 miles from the Cleveland-Cliffs Monessen Coke plant ("Monessen Coke plant"). My family and I often drive by this plant to get takeout and to go to the only bakery in the area, and I often drive by the plant because it is near my hospital. I sometimes smell a pungent smell coming from this plant. I try to avoid going to Monessen, PA as much as I can because of the bad air quality. In the 1980s, I spent about 6 years working at a liquor store right near the Monessen Coke plant, and I recall often feeling black soot settle onto my hands if I put my hand out in the air.

EXH089

6. I also live approximately 12 miles from the U.S. Steel Mon Valley Works, Clairton Coke plant ("Clairton Coke plant"). I drive by the Clairton Coke plant approximately every two weeks when I pick up my groceries at Sam's Club and go shopping at Kohl's. My grandchildren and I also frequently go to Kennywood, a local amusement park, which is less than 6 miles from the Clairton Coke plant. There is also a waterpark in the area that my daughter and grandchildren often visit.

7. I am aware that coke oven facilities like the Monessen Coke plant and Clairton Coke plant emit a range of hazardous air pollutants, including cancer-causing pollutants like benzene and toxic metals like mercury.

8. I am very concerned about the health risks from exposure to hazardous air pollution from these facilities. I recently underwent my second heart surgery, and I may have to get a pacemaker inserted soon. In 2013, I had melanoma cancer which has since been removed by surgery. I also suffer from a range of other medical conditions, including fibromyalgia, shortness of breath, celiac disease, and a precancerous condition called Barrett's esophagus. Because of these preexisting conditions, I am predisposed to cancer and other negative health implications resulting from continued exposure to hazardous air pollutants like benzene. I have spent so much of my life near these coke oven plants, and I wonder how hazardous air pollution from these plants may have caused or contributed to my current health issues. I also worry about the health of my children and grandchildren who spend more time outside than I do.

9. Due to my air pollution-related concerns, I frequently wear masks and spend very little time outside. I also sometimes get air pollution alerts through the TV or the weather app on my cell phone. For example, a recent explosion at the U.S. Steel Clairton plant was a

major news event. If it is a high pollutant day, I do not go outside. I fear that my grandchildren will face health complications like asthma or cancer from long-term exposure to these pollutants because they can't always avoid going outside like I do. While I try to avoid going to Monessen, my family and I cannot avoid driving by the Clairton Coke plant because it is right by U.S. Route 51, which is the major highway in the area.

10. I would greatly benefit from access to fenceline monitoring data for benzene emissions at these coke oven facilities. I would know what days to limit my time outdoors, and I would share this information with my friends and family via Facebook so they too can limit their exposure. I am aware that both the Monessen Coke plant and Clairton Coke plant are exempted from fenceline monitoring requirements under the presidential exemption.

11. I believe it is very important to regulate carcinogenic and neurotoxic pollutants from coke oven facilities because I fear that continued, ongoing exposure to hazardous air pollution will harm my health and my family's health.

12. I fully support NRDC's litigation challenging the Proclamation exempting coke oven facilities from hazardous air pollutant regulations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Dated: 12/19/2025

Betty J. Sullivan

EXH091

# EXHIBIT 23

# Declaration of Lauren Fleer

## DECLARATION OF LAUREN FLEER

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, Lauren Fleer states as follows:

1. My name is Lauren Fleer. I am a licensed Professional Engineer in the State of Illinois. I completed a Bachelor of Science in Civil Engineering in 2008 at the University of Illinois-Chicago, followed by a Master of Science in Environmental Engineering and Science in 2012 at Northwestern University.

2. I have worked as an Environmental Engineer at the Environmental Integrity Project (EIP) since June 2021. I have helped to administer EIP's Center for Applied Environmental Science (CAES), which is a program that seeks to advance environmental justice by providing communities and environmental advocates access to high-quality science and engineering expertise. In my role with EIP and CAES, I have accepted requests for technical assistance from communities impacted by air and water pollution and have endeavored to satisfy those requests through my own effort and by recruiting the expertise of colleagues and consultants.

3. In my capacity as an Environmental Engineer at EIP and CAES, I have designed and implemented several projects to measure the concentration of pollutants in the ambient air and near known sources of industrial air pollution. In the projects I have personally executed, I have collected air samples using summa canisters and sorbent tubes and I have contracted with accredited analytical laboratories to analyze the samples. I have deployed Federal Equivalent Method air monitors and other sensors to continuously monitor changes in the concentrations of certain air pollutants. I have provided training to members of communities impacted by industrial odors and air pollution on ambient air sample collection using summa canisters and sorbent tubes. I have also analyzed air quality data collected by state and federal agencies as well as other nonprofit organizations.

4. Previously, I worked for the U.S. Army Corps of Engineers (2009-2018) as an Environmental Engineer. During this time, I executed a project to evaluate potential vapor intrusion into homes built on land historically impacted by a LNAPL groundwater plume. I collected time-integrated air samples in the crawlspaces of homes using summa canisters, shipped them to an analytical laboratory for analysis, and interpreted the results.

5. I have conducted air monitoring following EPA Method 325, *Volatile Organic Compounds from Fugitive and Area Sources*. EPA Method 325 was created for monitoring benzene concentrations at refinery fencelines and includes two sub-part methods: 325A for sample deployment and collection and 325B for preparation and analysis of the sample. Samples are collected using a 3.5-inch-long stainless-steel tube packed with a carbon-based sorbent. During the two-week sampling period, one end of the sorbent tube is exposed to the ambient air and the gaseous VOC compounds diffuse into the tube and adsorb onto the sorbent. At the conclusion of each two-week sampling period, the field personnel cap the open end of each sorbent tube and ship them to a laboratory for analysis. At the lab, the VOCs are extracted from the tube and are

EXH092

separated and analyzed by Gas Chromatography/Flame Ionization Detection or Gas Chromatography/Mass Spectrometry.

6. In 2023, I conducted an air monitoring project in Harvey, Louisiana in partnership with a local community group called Jefferson, Orleans, and Irish Channel Neighbors (JOIN) for Clean Air. We conducted ten weeks of biweekly sampling for benzene, toluene, ethylbenzene, and xylene (BTEX) at three locations using EPA Method 325A/B. I contracted with Enthalpy Analytical in Durham, North Carolina for sorbent tube preparation and rental and analysis of the collected samples. The costs were 22 dollars per sample for tube rental and preparation, and 93 dollars per sample for the analysis.

7. It also would have been as easy and affordable to purchase the sorbent tubes, since they are available for purchase online for approximately $150 each.[1] However, for our project design, renting from the laboratory was more expedient and economical.

8. In my experience, it was easy and affordable to obtain and deploy the sorbent tubes and have them analyzed. Enthalpy Analytical shipped us a package of prepared sorbent tubes in time for our initial and subsequent biweekly sampling events. At the conclusion of each two-week sampling period, our field sampling team shipped the collected samples back to Enthalpy's Durham lab via FedEx. The lab confirmed receipt of each package via email and posted the results of the analysis to their file sharing website within the standard turnaround time of 10 business days.

9. Many laboratories provide these services, as refineries have been conducting fenceline monitoring following EPA Method 325A/B since January 2018. The National Environmental Laboratory Accreditation Management System identifies 21 laboratories in the United States that are accredited for EPA Method 325.[2] The Coke Ovens Rule requires fenceline monitoring utilizing the same methods as required by the 2015 Refinery Rule: EPA Methods 325A and 325B.[3]

10. Technology for continuous monitoring and real-time reporting of benzene concentrations is also available. California refineries shown in Table 1 measure benzene and other pollutants continuously at their fencelines using open path gas analyzers. Open path analyzers include Ultraviolet Differential Optical Absorption Spectroscopy (UV-DOAS), Fourier Transform Infrared (FTIR), and tunable diode laser (TDL) technologies. Open-path analyzers measure absorbance of airborne compounds between a light source and a detector. UV-DOAS open path spectroscopy is the ideal technique to measure air toxics such as benzene, toluene, ethylbenzene, and xylenes. FTIR is a more generally applicable

---

[1] SKC, Passive Thermal Desorption Tube for Benzene 3.5 x 0.25in OD deactivated stainless steel tubes filled with pre-conditioned Carbopack X, diffusion caps, brass Swagelok screw caps w/PTFE ferrules, 10Pk. https://skcinc.com/passive-thermal-desorption-tube-for-benzene-10pk-226-520

[2] "Home Page - TNI LAMS - National Environmental Laboratory Accreditation Management System," accessed February 23, 2026, https://lams.nelac-institute.org/.

[3] Petroleum Refinery Sector Risk and Technology Review and New Source Performance Standards, December 1, 2015. 80 Fed. Reg. at 75,196.

technique that can also measure benzene but is best suited for detecting methane, ethane, and ammonia.

**Table 1. California refineries measuring benzene continuously at the fenceline**

| Refinery Name | Refinery air monitoring website |
|---|---|
| Chevron (Richmond) | https://www.richmondairmonitoring.org/measurements.html |
| Shell (Martinez) | https://www.fenceline.org/martinez/ |
| Phillips 66 (Rodeo) | https://www.rodeofencelinemonitoring.com/ |
| Marathon Petroleum (Martinez) | https://www.marathonmartinez.com/ |
| Valero (Benicia) | https://beniciarefineryairmonitors.org/ |
| Marathon Petroleum (Carson) | https://marathonlosangelesrefineryfencelinemonitoring.com/ |
| Marathon Petroleum (Wilmington) | https://marathonlosangelesrefineryfencelinemonitoring.com/ |
| Chevron (El Segundo) | https://www.elsegundo1180.com/data.html |
| PBF Energy (Torrance) | https://torc.data.spectrumenvsoln.com/data |
| Valero (Wilmington) | https://wilmingtonrefinerymonitoring.org/ |
| Phillips 66 (Wilmington) | https://p66losangeles1180.com/about.html |
| Phillips 66 (Carson) | https://p66losangeles1180.com/about.html |
| Kern Oil & Refining Co. (Bakersfield) | https://www.kern4460.com/ |
| San Joaquin Refining Co. (Bakersfield) | https://sjr.argos-scientific.com/ |

11. Several California refineries also use automated gas chromatographs (AutoGCs) to measure concentrations of benzene and other compounds in the communities adjacent to their facilities. Ten fully-equipped community air monitoring stations within the South Coast Air Quality Management District measure benzene, among other air toxics, using an AutoGC instrument manufactured by the Tricorntech Corporation.[4] The District publishes hourly average benzene concentration measurements, among other data, in real time at their Rule 1180 Data Dashboard.[5]

12. The nationwide Photochemical Assessment Monitoring Stations (PAMS) network was first established in the 1990s to measure ozone precursors, as required by Section 182(c)(1) of the Clean Air Act (CAA). Updates to the PAMS requirements in 2015 now require that the 43 required PAMS sites measure hourly average concentrations of benzene and other volatile organic compounds using AutoGCs.[6] Data from these PAMS AutoGC sites are available at EPA's PAMS Dashboard and AirData websites.[7]

---

[4] Olga Pikelnaya et al., *South Coast Air Quality Management District QAPP for Rule 1180 Community Air Monitoring Program Rev. No.: 0.1 Date: December 2023 Page 2 of 108*, no. 0 (n.d.).

[5] "Rule 1180 Community Air Monitoring," accessed February 23, 2026, https://xappprod.aqmd.gov/Rule1180CommunityAirMonitoring/.

[6] "Extension of Start Date for Revised Photochemical Assessment Monitoring Stations," Federal Register, January 8, 2020, https://www.federalregister.gov/documents/2020/01/08/2019-28219/extension-of-start-date-for-revised-photochemical-assessment-monitoring-stations.

[7] OAR US EPA, "Air Data Basic Information," Data and Tools, August 30, 2016, https://www.epa.gov/outdoor-air-quality-data/air-data-basic-information; "PAMS Dashboard," accessed February 23, 2026, https://rstudio-connect.sonomatechdata.com/pams_dashboard/.

13. Environmental agencies in some U.S. states use automated gas chromatographs (AutoGCs) to measure hourly average concentrations of benzene and other air toxics. The Texas Commission on Environmental Quality, for example, measures benzene continuously at dozens of sites across the state.[8]

Executed on this 24th day of February, 2026.

Lauren Fleer

---

[8] Texas Commission on Environmental Quality. Volatile Organic Compound Data. https://www.tceq.texas.gov/airquality/monops/agc/auto-gc

EXH095

# EXHIBIT 24

# Declaration of Robyn Winz

## DECLARATION OF ROBYN WINZ

I, Robyn Winz, declare as follows:

1.    I am a Senior Research and Policy Analyst with Earthjustice. I hold an M.S. in

Environmental Metrology and Policy from Georgetown University, a degree focused on

the measurement of environmental pollutants and human health risk assessment.

Throughout my nearly four years as a Senior Research and Policy Analyst at Earthjustice,

I have reviewed technical documentation supporting numerous Risk and Technology

Reviews to understand the impact of such regulations on public health and the

environment.

2.    Based on my examination of statements submitted by SunCoke in litigation and historical

stack test data provided by SunCoke to EPA in the administrative record of the Coke

Ovens Rule, EPA-HQ-OAR-2003-0051, I found that SunCoke facilities have regularly

emitted levels of hazardous air pollution that exceed Maximum Achievable Control

Technology ("MACT") limits for existing facilities set in the 2024 Coke Ovens Rule. The

exceedances are documented in the chart below.

Table 1 – Exceedances of 2024 Rule MACT Limits in SunCoke's Past Stack Emission Tests

| Test Date | Facility Name | Unit Tested | Pollutant | 2024 Rule MACT limit (gr/dscf)[1] | Test Result (gr/dscf) |
|-----------|---------------|-------------|-----------|-----------------------------------|------------------------|
| Mar. 2022[2] | Haverhill | Main Stack | Particulate matter | 0.0049 | 0.0053 |
| Oct. 2021[3] | Haverhill or East Chicago[4] | Bypass vent stack | Particulate matter | 0.032 | 0.047 |

---

[1] Grains per dry standard cubic foot.
[2] *See infra* ¶ 3.a.
[3] *See infra* ¶ 3.b.
[4] The Quanci declaration does not make clear at which facility this test result occurred; *see infra* ¶ 3.b.

EXH096

| Nov. 2020[5] | East Chicago | Bypass vent stack | Particulate matter | 0.032 | 0.065 |
| May 3-12, 2017[6] | Gateway | Vent stack | Particulate matter | 0.032 | 0.033 |
| Apr. 16-19, 2012[7] | Middletown | Main baghouse stack | Mercury | 3.00E-06 | 3.40E-06 |
| Aug. 25, 2011[8] | Gateway | Main stack (EPA 29) | Particulate matter | 0.0049 | 0.0051 |
| | | Main stack (EPA 5) | Particulate matter | 0.0049 | |
| July 13-15, 2010[9] | Gateway | Main stack baghouse | Mercury | 3.00E-06 | 3.12E-06 |
| May 18-22, 2010[10] | Gateway | Waste heat stack #6 | Particulate matter | 0.032 | 0.046 |
| Apr. 28, 2006[11] | Haverhill | HRSG bypass vent stack | Particulate matter | 0.032 | 0.034 |
| Jan. 2006[12] | Haverhill | Main stack | Mercury | 3.00E-06 | 4.77E-06 |

3.  I identified four occasions on which SunCoke facilities exceeded the 2024 Rule's MACT limits from a declaration by SunCoke Vice President and Chief Technology Officer John Quanci, which SunCoke filed in support of its motion for stay in D.D.C. No. 24-1287. *See* Declaration of John Quanci in Support of Motion for Stay Pending Review Filed by Suncoke Energy, Inc., *American Coke and Coal Chemicals Institute et al., v. Environmental Protection Agency*, No. 24-1287 (D.D.C. Sept. 30, 2024) ("Quanci Decl.").

    a.  Quanci attested that in March 2022, testing at the main stack of Haverhill in Franklin Furnace, Ohio, yielded a result of "5.26E-03, which is 107% of the Final

---

[5] *See infra* ¶ 3.c.
[6] *See infra* ¶ 5.
[7] *See infra* ¶ 6.
[8] *See infra* ¶ 7.
[9] *See infra* ¶ 8.
[10] *See infra* ¶ 9.
[11] *See infra* ¶ 10.
[12] *See infra* ¶ 3.d.

Rule's MACT floor" of 4.90E-03 gr/dscf for particulate matter, "[s]o if the Final

Rule were in effect in 2022, [Haverhill] would have exceeded the PM limit for its

main stack," Quanci Decl. ¶ 22a.

b.  Quanci attested that in October 2021, testing at the bypass vent stack of a

SunCoke facility yielded a result of "4.72E-02 gr/dscf, which is 147% of the Final

Rule's MACT floor" for particulate matter, "[s]o if the Final Rule were in effect

in 2021, [the facility] would have exceeded the PM limit for its bypass vent

stacks." Quanci Decl. ¶ 49b. It is not clear to which facility Quanci is referring

here, as paragraph 49b references HH1 (Haverhill) and IHO (East Chicago) for

the same stack test, *see* ¶ 5 for facility shorthand used in the Quanci declaration.

Regardless, a violation clearly occurred at one of these facilities in October 2021.

c.  Quanci attested that in November 2020, testing at the bypass vent stack of the

East Chicago, Indiana, SunCoke facility yielded a result of "6.52E-02, which is

204% of the Final Rule's MACT floor limit" of 3.20E-02 gr/dscf for particulate

matter, "[s]o if the Final Rule were in effect in 2020, [the East Chicago, Indiana,

SunCoke facility] would have exceeded the particulate matter limit for its bypass

vent stacks." Quanci Decl. ¶ 49a.

d.  Quanci attested that in January 2006, testing at the main stack of Haverhill in

Franklin Furnace, Ohio, yielded a result of "4.77E-06, which is 159% of the

MACT floor limit" of 3.00E-06 gr/dscf for mercury, "[s]o if the Final Rule were

in effect in 2006, [Haverhill] would have failed." Quanci Decl. ¶ 22b.

4.  I identified six occasions on which SunCoke facilities exceeded the 2024 Rule's MACT

limits from test reports that SunCoke submitted to EPA. For each exceedance event, I

converted the test results from each test run to gr/dscf and corrected for 10% O2 (done by question), then calculated the average from those results. Summaries of my calculations from each test report appear below, *see* Tables 2-7.

5.    After reviewing the SunCoke stack emissions tests posted to the rulemaking docket, I identified 17 reports that contained tests for the three MACT limits where exceedances were also found: the particulate matter limit for existing facility Heat and Nonrecovery Heat Recovery Steam Generator Main Stacks (0.0049 gr/dscf at 10% O2); the particulate matter limit for existing facility Heat and Nonrecovery Bypass/Waste Heat Stacks (0.032 gr/dscf at 10% O2); and the mercury limit for existing facility Heat and Nonrecovery Heat Recovery Steam Generator Main Stacks (3.0E-06 gr/dscf at 10% O2).

6.    I found one exceedance (tested via two methods) of the particulate matter limit at Heat and Nonrecovery Heat Recovery Steam Generator Main Stacks at existing facilities, and seven tests without exceedances, meaning one-eighth of tests on the docket for this limit showed an exceedance, or 12.5 percent. I found three exceedances of the particulate matter limit at Heat and Nonrecovery Bypass/Waste Heat Stacks at existing facilities, and four tests without exceedances, meaning three-sevenths of tests on the docket for this limit showed an exceedance, or 43 percent. I found two exceedances of the mercury limit at Heat and Nonrecovery Heat Recovery Steam Generator Main Stacks at existing facilities, and three tests without exceedances, meaning two-fifths of tests on the docket for this limit showed an exceedance, or 40 percent.

7.    SunCoke performed testing for emissions of particulate matter from the bypass vent stack 5 of its Gateway facility in Granite City, Illinois, from May 3-12, 2017. The test report was submitted by SunCoke to EPA and can be found at

https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0979. *See* tbl. 4-12 "Gateway Bypass Vent Stack 5 Test Results for Filterable and Condensable PM, Opacity, and Metals" (PDF pp. 41-42). Over three runs, after I converted to gr/dscf and corrected for 10% O2, Total PM averaged 0.033 gr/dscf, which exceeds the MACT limit for Heat and Nonrecovery Bypass/Waste Heat Stack of 0.032 gr/dscf.

Table 2 – Gateway 2017 Test for Particulate Matter, HNR B/W Stack

|  | Run 1 | Run 2 | Run 3 |
|---|---|---|---|
| Measured Emissions (mg/dscm)[13] | 56.74 | 84.80 | 47.13 |
| O2 (%) | 11.7 | 11.7 | 11.8 |
| Measured Emissions converted to gr/dscf and corrected to 10% O2 | 0.029 | 0.044 | 0.025 |
| Average (gr/dscf @ 10% O2) | 0.033 | | |

8.  SunCoke performed testing for emissions of mercury from the main baghouse stack at its Middletown facility in Middletown, Ohio, from April 16-19, 2012. The test report was submitted by SunCoke to EPA and can be found at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0811. *See* tbl.2-2 "Main Baghouse Stack Compliance Test Results" (PDF p.10). Over three runs, after I converted to gr/dscf and corrected for 10% O2, mercury emission rate averaged 3.40E-06 gr/dscf, which exceeds the MACT limit for Heat and Nonrecovery Heat Recovery Steam Generator Main Stack of 3.00E-06 gr/dscf.

Table 3 – Middletown 2012 Test for Mercury, HNR HRSG Main Stack

|  | Run 1 | Run 2 | Run 3 |
|---|---|---|---|
| Measured Emissions (lb/hr) | 0.0084 | 0.0081 | 0.0089 |
| DSCFM | 196,878 | 201,589 | 200,843 |
| O2 (%) | 5.5 | 4.8 | 4.8 |
| Measured Emissions converted to gr/dscf and corrected to 10% O2 | 3.52E-06 | 3.20E-06 | 3.50E-06 |

---

[13] Milligrams per dry standard cubic meter.

| Average (gr/dscf @ 10% O2) | 3.40E-06 |
|---|---|

9.      SunCoke performed testing for emissions of particulate matter from the main stack at its

Gateway facility in Granite City, Illinois, on August 25, 2011. The test report was

submitted by SunCoke to EPA and can be found at

https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0820. *See* tbl.2-1

"GECC Method 201A/202 Test Results" (PDF p.9). Over three runs, which were reported

in gr/dscf, and after I corrected for 10% O2, Total PM averaged 0.0051 gr/dscf, which

exceeds the MACT limit for Heat and Nonrecovery Heat Recovery Steam Generator

Main Stack of 0.0049 gr/dscf. SunCoke also tested the same unit using a different method

and found the same results. *See* tbl.2-2 "GECC Method 5 Particulate Test Results" (PDF

p.9). Over three runs, reported in gr/dscf and after I corrected for 10% O2, Total PM

averaged 0.0051 gr/dscf, which exceeds the MACT limit for Heat and Nonrecovery Heat

Recovery Steam Generator Main Stack of 0.0049 gr/dscf.

Table 4 – Gateway 2011 Tests for Particulate Matter, HNR HRSG Main Stack

| *Method 201A/202* | Run 1 | Run 2 | Run 3 |
|---|---|---|---|
| Measured Emissions (gr/dscf) | 0.0065 | 0.0083 | 0.0084 |
| O2 (%) | 3.6 | 4.8 | 4.5 |
| Measured Emissions corrected to 10% O2 | 0.0041 | 0.0056 | 0.0056 |
| Average (gr/dscf @ 10% O2) | 0.0051 | | |
| | | | |
| *Method 5* | Run 1 | Run 2 | Run 3 |
| Measured Emissions (gr/dscf) | 0.0062 | 0.0081 | 0.0081 |
| O2 (%) | 3.6 | 4.8 | 4.5 |
| Measured Emissions corrected to 10% O2 | 0.0041 | 0.0057 | 0.0056 |
| | 0.0051 | | |

10.     SunCoke performed testing for emissions of mercury from the main stack at its Gateway

facility in Granite City, Illinois, from July 13-15, 2010. The test report was submitted by

SunCoke to EPA and can be found at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0822.  *See* tbl.2-1 "Main Stack Compliance Test Results" (PDF p.10). Over three runs, after I converted to gr/dscf and corrected for 10% O2, mercury emission rate averaged 3.12E-06 gr/dscf, which exceeds the MACT limit for Heat and Nonrecovery Heat Recovery Steam Generator Main Stack of 3.00E-06 gr/dscf.

Table 5 – Gateway 2010 Test for Mercury, HNR HRSG Main Stack

|  | Run 1 | Run 2 | Run 3 |
|---|---|---|---|
| Measured Emissions (lb/hr) | 0.0084 | 0.0076 | 0.0106 |
| DSCFM | 261,244 | 250,942 | 259,642 |
| O2 (%) | 7.1 | 6.6 | 6.9 |
| Measured Emissions converted to gr/dscf and corrected to 10% O2 | 2.96E-06 | 2.70E-06 | 3.70E-06 |
| Average (gr/dscf @ 10% O2) | 3.12E-06 | | |

11.      SunCoke performed testing for emissions of particulate matter from waste heat stack #6 at its Gateway facility in Granite City, Illinois, from May 18-22, 2010. The test report was submitted by SunCoke to EPA and can be found at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0821. *See* tbl.2-3 "Waste Heat Stack #6 Compliance Test Results" (PDF p.14). Over three runs, which were reported in gr/dscf and which I corrected for 10% O2, Total PM averaged 0.046 gr/dscf, which exceeds the MACT limit for Heat and Nonrecovery Bypass/Waste Heat Stack of 0.032 gr/dscf.

Table 6 – Gateway 2010 Test for Particulate Matter, HNR B/W Stack

|  | Run 1 | Run 2 | Run 3 |
|---|---|---|---|
| Measured Emissions (gr/dscf) | 0.044 | 0.041 | 0.069 |
| O2 (%) | 8.8 | 8.5 | 9.2 |
| Measured Emissions corrected to 10% O2 | 0.039 | 0.036 | 0.064 |
| Average (gr/dscf @ 10% O2) | 0.046 | | |

12.    SunCoke performed testing for emissions of particulate matter from the Heat Recovery

Steam Generator bypass vent stack at its Haverhill facility in Franklin Furnace, Ohio on

April 28, 2006. The test report was submitted by SunCoke to EPA and can be found at

https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0967. *See* tbl.2-3

"HRSG By-Pass Vent Stack Test Results" (PDF p.8). Over two runs, which were

reported in gr/dscf and I corrected for 10% O2, Total PM averaged 0.034 gr/dscf, which

exceeds the MACT limit for Heat and Nonrecovery Bypass/Waste Heat Stack of 0.032

gr/dscf. (As noted in the test report, "Run 3 for PM/PM10…was not completed due to

critical sampling equipment failure," n.1 to tbl.2-3.).

Table 7 – Haverhill 2006 Test for Particulate Matter, HRSG B/W Stack

|  | Run 1 | Run 2 | Run 3 |
|---|---|---|---|
| Measured Emissions (gr/dscf) | 0.0607 | 0.0291 | -- |
| O2 (%) | 6.50 | 6.62 | 6.65 |
| Measured Emissions converted to gr/dscf and corrected to 10% O2 | 0.046 | 0.022 | -- |
| Average (gr/dscf @ 10% O2) | 0.034 | | |

13.    On April 21, 2025, Earthjustice submitted a FOIA request on behalf of a number of

groups, requesting records related to requests by coke oven companies, among others, for

a Presidential exemption from new Section 112 standards. A true and correct copy is

attached as Attachment 1. A true and correct copy of excerpts of the responsive records

provided by EPA are attached as Attachment 2.

14.    I declare that the foregoing is true and correct to the best of my knowledge.


Dated February 27, 2026                    Signed:


EXH103



EXH104

# ATTACHMENT 1

EXH105

April 21, 2025

National Freedom of Information Officer
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW (2822T)
Washington, DC 20460
(202) 566-1667

**SUBMITTED ELECTRONICALLY**

>   **Re:    Freedom of Information Act Request for Records Associated with
>           Compliance Exemptions Under Clean Air Act Section 112(i)(3) and 112(i)4)**

Dear Freedom of Information Officer:

Earthjustice submits this request under the Freedom of Information Act (FOIA) on behalf of itself, Sierra Club, and California Communities Against Toxics ("Requesting Organizations"). As detailed below, Requesting Organizations respectfully request records in EPA's possession, custody, or control, as that term is defined at 5 U.S.C. § 552(f)(2) of the Freedom of Information Act ("FOIA"),[1] of U.S. Environmental Protection Agency ("EPA") activities and communications referencing Clean Air Act section 112(i)(4) to provide a potential compliance exemption to any stationary source from one or more National Emission Standards for Hazardous Air Pollutants (NESHAPs) promulgated under Clean Air Act section 112.[2]

---

[1] The term "records" means all materials in whatever form (handwritten, typed, electronic or otherwise produced, reproduced, or stored) including, but not limited to, letters, memoranda, correspondence, communications (including emails and text messages or messages on messaging platforms such as Signal, Slack, GChat or Google Hangouts, Lync, Skype, X direct messages, Facebook messages, WhatsApp, Telegram, or Parler, along with any chats or transcripts of MS Teams, Zoom, or other similar audio or video messaging platforms), notes, applications, completed forms, studies, reports, reviews, guidance documents, policies, notes of telephone conversations, telefaxes, e-mails, text messages, internet chat logs, documents, databases, drawings, graphs, charts, photographs, meeting minutes, electronic and magnetic recordings of meetings, and any other compilation of data from which information can be obtained. Without limitation, "records" includes records relating to the topics described in this request at any stage of development, whether proposed, draft, pending, interim, final, embargoed, or otherwise. All of the foregoing are included in this request if they are in the possession of or otherwise under the control of the EPA or any of its offices nationwide, including responsive records in or on the personal computers, cellphones, or other devices, or personal email accounts used by any federal employee or official if used for any governmental purpose. "Records" includes materials that have been deleted but remain recoverable in any way.
[2] *See* 42 U.S.C. § 7412§7412(i)(4) (allowing the President to exempt a source from compliance for up to two years upon a finding that "the technology to implement such standard is not available and that it is in the national security interests of the United States to do so.").

This request relates to actions taken by EPA on March 12, 2025, in which the agency announced its decision to reconsider "multiple National Emission Standards for Hazardous Air Pollutants (NESHAPs) affecting a broad range of American industrial sectors,"[3] and on March 24, 2025, in which the agency published a webpage and process by which sources or facilities could request an exemption under Clean Air Act section 112(i)(4), instructing them to "submit a request for a Presidential Exemption to this email address: airaction@epa.gov by March 31, 2025," with "'Presidential Exemption: [Name of Regulation]: [Facility(ies) Name]' as the subject of the request," and directing other information the source or facility should provide in the email.[4]

EPA has specifically invited applications for exemptions for nine NESHAPs that regulate and reduce toxic air pollution from coal, oil, chemical, manufacturing, and other industrial sectors:

- National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing, 89 Fed. Reg. 16,408 (March 6, 2024);
- National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23,294 (April 3, 2024);
- National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review, 89 Fed. Reg. 24,090 (April 5, 2024) ("Sterilizer Rule");
- National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024) ("MATS Rule");
- National Emission Standards for Hazardous Air Pollutants: Primary Copper Smelting Residual Risk and Technology Review and Primary Copper Smelting Area Source Technology Review, 89 Fed. Reg. 41,648 (May 13, 2024);
- New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins, 89 Fed. Reg. 42,932 (May 16, 2024) ("HON Rule");
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed. Reg. 55,684 (July 5, 2024);

---

[3] EPA, Press Release: Trump EPA Announces Reconsideration of Air Rules Regulating American Energy, Manufacturing, Chemical Sectors (NESHAPs) (March 12, 2025), https://www.epa.gov/newsreleases/trump-epa-announces-reconsideration-air-rules-regulating-american-energy-manufacturing (last visited April 6, 2025); EPA, *Fact Sheet: National Emissions Standards for Hazardous Air Pollutants (NESHAP)* (March 12, 2025), *available at* https://www.epa.gov/system/files/documents/2025-03/neshap_powering_the_great-american-comeback_fact-sheet_2.pdf.

[4] *See* EPA, Clean Air Act Section 112 Presidential Exemption Information, https://www.epa.gov/stationary-sources-air-pollution/clean-air-act-section-112-presidential-exemption-information (last visited April 21, 2025).

- National Emission Standards for Hazardous Air Pollutants: Lime Manufacturing Plants Technology Review, 89 Fed. Reg. 57,738 (July 16, 2024); and
- National Emission Standards for Hazardous Air Pollutants: Rubber Tire Manufacturing, 89 Fed. Reg. 94,886 (Nov. 29, 2024).

## REQUESTED RECORDS

Requesting Organizations specifically seek the following records:

1. Records relating to EPA's action, reasoning, or rationale for deciding to reconsider one or more of the above nine NESHAPs, including correspondence with any non-EPA entities regarding such reconsideration;
2. Records relating to EPA's action, reasoning, or rationale for instituting an EPA process to seek requests for compliance exemptions and to inform the consideration of compliance exemptions under Clean Air Act section 112(i)(4), including correspondence with non-EPA entities about the development of, and institution of, this process;
3. Records of decisions by EPA or any federal or state entity to grant, deny, or take other action on a compliance exemption pursuant to Clean Air Act section 112(i)(4);
4. Records of the rationale or reasoning for the decisions on the exemptions;
5. All correspondence with outside entities relating to Clean Air Act section 112(i)(4) exemptions, including any requests for exemptions and any information or materials in support of a request for such an exemption;[5]
6. All correspondence to and from the following electronic mailbox: airaction@epa.gov;
7. All correspondence with "Presidential Exemption" in the subject line or Re: line;
8. Records referencing the availability of technology to implement the air toxics standards under the above-listed nine NESHAP rules, including any correspondence with outside parties regarding the availability of technology to implement any such standards; and
9. Any correspondence with outside parties regarding any potential NESHAP compliance exemptions and any potential impacts on the "national security interests of the United States."

These requests include communications that are or were on any system or device, computer, phone, smartphone, tablet, email account, cloud, server, or other communication system either personal or business that is or was owned or operated by EPA or other governmental personnel. These requests include all emails, text messages, or other communications from any personal account operated by EPA or other governmental personnel that have been forwarded into an EPA or other governmental email account. Correspondence

---

[5] Correspondence shall include correspondence to or from the White House (or any person affiliated with the White House), any member or committee of Congress (or any person affiliated with such member or committee), or any law firm, lobbying firm, trade association, or company (or any person affiliated with any such entities).

EXH108

includes hard-copy and electronic correspondence including, but not limited to, emails, voicemails, text messages, chats or audio or video conference transcripts, and correspondence transmitted through any other electronic platform, as summarized in footnote 1. Requesting Organizations also request all files attached to the emails or other correspondence records that are identified in the records search detailed above, as well as copies of any files obtained via downloadable links within the body of such emails or other correspondence.

Requesting Organizations seek records produced, modified, or transmitted since January 20, 2025, and that exist as of the date that EPA begins searching for records responsive to this request. Requesting Organizations request that documents be produced in a readily accessible electronic format.

If any of the records sought in this request are deemed by the Agency to be properly withheld under a FOIA exemption, 5 U.S.C. § 552(b), please respond with an explanation sufficient to identify the record and the particular exemption(s) claimed for each such record or portion thereof.

## A.    Record Delivery Format and Method

We appreciate a prompt determination on the requested records, and within 20 working days as required by 5 U.S.C. § 552(a)(6)(A)(i) and 40 C.F.R. § 2.104(a)(1). Failure to comply within the statutory timeframe may result in our filing an action before the relevant U.S. District Court to ensure timely receipt of the requested materials.

Under FOIA, you are obligated to provide records in the format requested if the record is readily reproducible by the agency in that format. *See, e.g.*, 5 U.S.C. § 552(a)(3)(B). We request that you send the records in **individual documents in native, searchable, and analyzable electronic format wherever possible, with metadata included**.

Please email copies of all requested records as soon as they become available to you, on a rolling basis, to akron@earthjustice.org.

If you are unable to deliver any documents through electronic means, please deliver the documents to:

Adam Kron
Earthjustice
1001 G Street NW
Suite 1000
Washington, DC 20001

At no point should the search for or deliberation concerning certain records delay the production of others that the agency has already retrieved and elected to produce.

Please do not include any records that are already publicly available. If EPA concludes that any of the records requested here are publicly available, please email us an index of those

EXH109

documents, including each document's full ID number and a specific full web link to each document.

### B.    Withheld Information or Exempt Records

If EPA withholds any requested information pursuant to 5 U.S.C. § 552(a)(8)(A), we ask for the following information:

1. An index or log of withheld documents containing a description about each withheld document (including type, originator/sender and recipient, date, length, general subject matter, and location); and

2. Explanations and justifications for denial, including the identification of the category within the governing statutory provision under which the document (or portion thereof) was withheld and a full explanation of how each exemption fits the withheld material.

If EPA determines that portions of the records requested are exempt from disclosure, it must provide specific information about the exempt portion of a record, including "[t]he amount of information deleted, and the exemption under which the deletion is made." *Id.* § 552(b). EPA must provide any "reasonably segregable portion" of a record after redacting portions that EPA claims are exempt and deliver the non-exempt portions of such records. *Id.*

### C.    Request for Expedited Processing

Requesting Organization respectfully request expedited processing pursuant to 40 C.F.R. § 2.104(g)(1), which applies to "an urgency to inform the public about an actual or alleged Federal government activity, if the information is requested by a person primarily engaged in disseminating information to the public."

This request seeks information on federal governmental activity: specifically, grants of compliance period extensions and exemption to stationary sources of hazardous air pollution by EPA and the President of the United States. EPA has actively invited hundreds of industrial sources to apply for exemptions to their compliance deadlines for air toxics standards under the Clean Air Act, which require sources to limit their emissions of highly toxic hazardous air pollutants such as ethylene oxide, chloroprene, mercury, lead, and arsenic.[6]

Informing the public about EPA's and the President's actions and decisions is "urgen[t]" because such actions immediately threaten the agency's ability to  protect public health and safety, especially for children. 40 C.F.R. § 2.104(g)(1). This request concerns a matter of current exigency to the American public. As noted above, the deadline of March 31, 2025, for applications indicates that such exemptions will be issued very soon. In fact, exemptions have

---

[6] *See* EPA, Clean Air Act Section 112 Presidential Exemption Information, https://www.epa.gov/stationary-sources-air-pollution/clean-air-act-section-112-presidential-exemption-information (last visited April 21, 2025).

5

already been issued to 47 facilities subject to the MATS Rule. It is urgent and critical that the public be informed about any sources of air pollution that might be given additional time to comply with air toxics standards or exempted from complying with pollution standards and that thus will present a greater health risk to the public than the public is currently anticipating.

Responsive records will be vital to inform the public about which stationary sources of air pollution may be polluting more than is expected due to compliance exemptions or extensions. They will also inform the public about the basis for EPA's recommendation to exempt industrial sources from the Clean Air Act's requirements to control hazardous air pollution and allow for greater transparency on whether these exemptions are consistent with the agency's statutory mandate to protect public health and the environment.

Although dissemination of information is not Requesting Organizations' sole occupation, educating the public is a "primary" activity of each of the organizations. 40 C.F.R. § 2.104(g)(3)(i). For example, as provided in Sierra Club's mission statement, one of the three elements of Sierra Club's mission is to "*educate* and enlist humanity to protect and restore the quality of the natural and human environment."[7] Sierra Club disseminates the information it receives through FOIA requests in a variety of ways, including: analysis and distribution to the media, distribution through publication and mailing, posting on its website, emailing and list serve distribution to our members across the United States, and via public meetings and events. Every year the Sierra Club website receives over 15 million page views by 5,492,373 users; on average, the site gets 39,000 visits per day. *Sierra* is a magazine with a printed circulation of approximately 440,000 copies. An additional 50,000 Sierra Club members receive a "tree-free" digital replica edition. *Sierra* publishes online daily at www.sierramagazine.org and reaches about 125,000 readers a month, most of whom are not Sierra Club members or supporters. *Sierra Club Insider*, an electronic newsletter, is sent to over 2.2 million people twice a month.

In previous FOIA requests submitted by the Sierra Club, EPA has found that the Sierra Club is primarily engaged in dissemination of information to the public and accordingly granted Sierra Club's expedited processing requests.[8]

Requesting Organizations certify that this statement is true and correct to the best of their knowledge and belief. *See* 40 C.F.R. § 2.104(g)(3).

### D.    Duty to Preserve Records

EPA must preserve all records requested herein while this FOIA is pending or under appeal. *See* 40 C.F.R. § 2.106; *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1004 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under FOIA or the Privacy Act."). Accordingly, please

---

[7] Sierra Club, Mission Statement, https://www.sierraclub.org/about-sierra-club (last April 6, 2025) (emphasis added).

[8] *See, e.g.*, Letter from EPA Office of General Counsel Re: Freedom of Information Act Request – 2025-EPA-04584 Expedited Processing Determination at 3 (Apr. 7, 2025) (granting Sierra Club's expedited processing request).

EXH111

immediately advise custodians of potentially responsive records that the above records have been requested under FOIA and therefore may not be destroyed.

**FEE WAIVER REQUEST**

We respectfully request that you waive all fees in connection with this request, as provided by 5 U.S.C. § 552(a)(4)(A)(iii) and 40 C.F.R. § 2.107(n). As explained below, this FOIA request satisfies the requirements for fee waiver under the FOIA statute and EPA's implementing regulations. EPA must grant a fee waiver if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see* 40 C.F.R. § 2.107(n)(4).

To determine whether disclosure of requested information is "[l]ikely to contribute significantly to public understanding of the operations or activities of the government," 40 C.F.R. § 2.107(n)(4)(i), EPA considers four factors: (1) "[w]hether the subject of the requested records concerns … identifiable operations or activities of the Federal government, with a connection that is direct and clear, not remote"; (2) the "informative value of the information to be disclosed"; (3) whether disclosure of the requested records would "contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester"; and (4) the "significance of the contribution to public understanding," *id.* § 2.107(n)(5). Additionally, to determine whether the request "is not primarily in the commercial interest of the requester," *id.* § 2.107(n)(4)(ii), EPA considers two factors: (1) the "existence and magnitude of a commercial interest," and (2) the "primary interest in disclosure," *id.* § 2.107(n)(6).

**A.    The subject of the request concerns "the operations or activities of the government." 40 C.F.R. § 2.107(n)(5)(i).**

The requested records concern EPA's and the Office of the President's decision-making process in seeking, determining, and granting or denying compliance period extensions and exemptions to stationary sources of hazardous air pollution under sections 112(i)(3)(B) and 112(i)(4). By their very definition, the documents concern "identifiable operations or activities of the government." 40 C.F.R. § 2.107(n)(5)(i).

**B.    Disclosure of the requested records will be "meaningfully informative" and "'likely to contribute' to an increased public understanding" of government operations or activities. 40 C.F.R. § 2.107(n)(5)(ii).**

Disclosure of the requested records will allow Requesting Organizations to convey information to their members, clients, partners, and the public about the impact of this administration's efforts to cut EPA's workforce and reorganize the agency. Once the requested records are made available, Requesting Organizations will analyze them and present their findings to its members and the general public in a manner that will meaningfully enhance the public's understanding of EPA's actions. The documents requested will thus be "meaningfully

7

informative" and "likely to contribute" to an understanding of EPA's operations and the implications for a multitude of projects around the country. 40 C.F.R. § 2.107(n)(5)(ii).

The requested records are not otherwise in the public domain and are not accessible other than through a FOIA request. *See id.* EPA has not provided any detail to the public as to the specific positions that are vacant as a result of staffing changes and the hiring freeze or how exactly it will reorganize the agency.

**C.      Disclosure of the requested records would "contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester." 40 C.F.R. § 2.107(n)(5)(iii).**

Requesting Organizations have the requisite "expertise in the subject area and [the] ability and intention to effectively convey information to the public," and to do so in a manner that contributes to the understanding of a "reasonably broad audience of persons interested in the subject." 40 C.F.R. § 2.107(n)(5)(iii). For example, Sierra Club has longstanding experience tracking EPA activities and engaging with its program and Regional Offices to advocate for cleaner air, water, and land. As a result, Sierra Club has special insight into the implications of the disclosures sought by this request as to the exemptions offered by EPA to sources with respect to their air toxics standards under section 112, the sources' applications for those exemptions, and EPA's and the President's decisions on those applications.

Further, Requesting Organizations have mechanisms in place to share information obtained from records requests with the general public and other interested organizations. Requesting Organizations disseminate the information received through FOIA requests in a variety of ways, including: analysis and distribution information to the media; publication and mailing; website posts; emails; and public meetings and events.

For example, the Sierra Club website receives over 15 million page views by 5,492,373 users; on average, the site gets 39,000 visits per day. *Sierra* is a magazine with a printed circulation of approximately 440,000 copies. An additional 50,000 Sierra Club members receive a "tree-free" digital replica edition. *Sierra* publishes online daily at www.sierramagazine.org and reaches about 125,000 readers a month, most of whom are not Sierra Club members or supporters. *Sierra Club Insider*, an electronic newsletter, is sent to over 2.2 million people twice a month. In addition, Sierra Club disseminates information obtained by FOIA requests through comments to administrative agencies, and where necessary, through the judicial system.

Additionally, Earthjustice is a non-profit environmental organization dedicated to protecting the health of people and the environment and dedicated to communicating information about these activities. It regularly disseminates information about the risks associated with toxic air pollution. Earthjustice disseminates this information via media outlets, in-person and virtual meetings, email communication, its website, and social media posts. Earthjustice's website receives hundreds of thousands of page views per month, and it publishes a widely read quarterly print magazine and has more than 200,000 followers on its social media accounts.

EXH113

**D.      Disclosure of the requested records would enhance the "public's understanding of the subject in question … to a significant extent." 40 C.F.R. § 2.107(n)(5)(iv).**

The records requested would allow Requesting Organizations to disclose and explain to the public the facts and implications of about which stationary sources of air pollution have applied for and may receive exemptions or extensions and therefore may emit greater amounts of air toxics than expected. The records will also inform the public about the basis for EPA's recommendation to exempt industrial sources from the Clean Air Act's requirements to control hazardous air pollution and allow for greater transparency on whether these exemptions are consistent with the agency's statutory mandate to protect public health and the environment

Accordingly, the records requested will significantly contribute to the public understanding of governmental operations, and activities. Because the requested information is not currently available to the public, disclosure will "enhance[]" the "public's understanding of the subject in question, as compared to the level of public understanding existing prior to the disclosure." *Id.* § 2.107(n)(5)(iii); *see Fed. CURE v. Lappin*, 602 F. Supp. 2d 197, 205 (D.D.C. 2009).

**E.      Disclosure of the records is not in Requesting Organizations' commercial interest as defined in 40 C.F.R. § 2.107(n)(6).**

Requesting Organizations have no commercial interest in the requested records. Requesting Organizations are nonprofit organizations under sections 501(c)(3) and/or 501(c)(4) of the Internal Revenue Code. The requested records would be used for the furtherance of the organizations' work to inform the public on matters of vital importance to the environment and public health. FOIA "is to be liberally construed in favor of waivers for noncommercial requesters." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 106 (D.D.C. 2006) (quoting *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)).

For the foregoing reasons, Requesting Organizations respectfully request that EPA waive processing and copying fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). If EPA denies a fee waiver, please contact us immediately via telephone or email and send a written explanation for the denial. Please do not incur expenses beyond $250 without first contacting our office for explicit authorization.

EXH114

Thank you for your assistance in this matter. Please do not hesitate to contact us to clarify the request or for any other reason.

Respectfully submitted,

/s/ Adam Kron
Adam Kron
Earthjustice
1001 G St NW
Suite 1000
Washington, DC 20001
(202) 794-8039
akron@earthjustice.org

*On behalf of Earthjustice, Sierra Club, and California Communities Against Toxics*

EXH115

# ATTACHMENT 2

EXH116

Message

| From: | AirAction [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FA78B98923384078995E04A73D258D83-AIRACTION] |
| Sent: | 4/1/2025 4:11:43 PM |
| To: | Tamukong, Walter [Walter.Tamukong@clevelandcliffs.com] |
| CC: | Forrester, Traci L [Traci.Forrester@clevelandcliffs.com] |
| Subject: | RE: Presidential Exemption: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, |
| | Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, & Periodic |
| | Technology Review (89 FR 55684; July 5, 2 |

Thank you for emailing the AirAction mailbox to request a Presidential Exemption under section 112(i)(4) of the Clean Air Act and for engaging with EPA in advancing President Trump's Executive Orders and Powering the Great American Comeback. We have received your email and will be in contact soon. If you have Confidential Business Information (CBI) that you'd like to submit, please submit it in electronic version to the CBI@epa.gov inbox or in hardcopy to:

USEPA, OAQPS
CORE CBI Office
4930 Old Page Road
Durham, NC 27703

**From:** Tamukong, Walter <Walter.Tamukong@clevelandcliffs.com>
**Sent:** Monday, March 31, 2025 5:26 PM
**To:** AirAction <AirAction@epa.gov>
**Cc:** Tsirigotis, Peter <Tsirigotis.Peter@epa.gov>; Lassiter, Penny <Lassiter.Penny@epa.gov>; Forrester, Traci L <Traci.Forrester@clevelandcliffs.com>
**Subject:** Presidential Exemption: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, & Periodic Technology Review (89 FR 55684; July 5, 2024)

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Dear Administrator, Hon. Lee M. Zeldin:

On behalf of Cleveland-Cliffs Inc., Please see attached request for **Presidential Exemption: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (89 FR 55684; July 5, 2024) (Coke Ovens Rule)**

Cleveland-Cliffs Inc. hereby requests a two-year Presidential exemption in accordance with CAA § 112(i)(4) for Cleveland-Cliffs Burns Harbor LLC; Cleveland-Cliffs Cleveland Works LLC, Warren Location; and Cleveland-Cliffs Monessen Coke LLC from compliance with the standards and limitations in the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed. Reg. 55684 (July 5, 2024) (collectively, the "Coke Ovens Rule").

Granting the extension will not result in any unacceptable risks to the public or the environment because EPA has determined that the source category presents an acceptable risk to human health with an ample margin of safety with the present controls, requirements, and limits already in effect.

Also attached are three referenced documents (**Congressional letters**) to support the request for **Presidential exemption of steel manufacturers and related supply chains from:**

EXH117

ED_018388_00005550-00001

- National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review (89 FR 23294; April 3, 2024)
- National Emission Standards for Hazardous Air Pollutants: Lime Manufacturing Plants Technology Review, EPA Docket No. OAR-2017-0015, RIN 2060-AV59, 89 Fed. Reg. 57,738
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (89 FR 55684; July 5, 2024) (Coke Ovens Rule)
- National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing, EPA Docket No. OAR-, RIN, 89 Fed. Reg. 16408 (March 6, 2024)

If you have questions or need additional information, please contact Walter Tamukong at 216-694-4862 or at walter.tamukong@clevelandcliffs.com

Sincerely

Walter Tamukong



walter.tamukong@clevelandcliffs.com

**CLEVELAND-CLIFFS INC.**

200 Public Square, 3300

Cleveland, OH 44114

P: (216) 694-5700  www.clevelandcliffs.com

This electronic message and any attachments included with this message are for the exclusive use of the individual or entity to which it is intended to be addressed. This message may contain information that is privileged or confidential and thereby exempt and protected from unauthorized disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is not authorized and is strictly prohibited. If you have received this communication and are not the intended recipient, please notify the sender immediately and permanently delete

EXH118

ED_018388_00005550-00002

the original message from your e-mail system.

EXH119

ED_018388_00005550-00003

Message

| | |
|---|---|
| **From:** | AirAction [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FA78B98923384078995E04A73D258D83-AIRACTION] |
| **Sent:** | 4/2/2025 11:56:02 AM |
| **To:** | Tamukong, Walter [Walter.Tamukong@clevelandcliffs.com] |
| **CC:** | Forrester, Traci L [Traci.Forrester@clevelandcliffs.com] |
| **Subject:** | CORRECTION: Updated email address for CBI related to the Presidential Exemption |

In the previous email, an incorrect email address was provided for the submission of electronic Confidential Business Information (CBI). The email address should be:

OAQPS_CBI@epa.gov

Thank you.

**From:** AirAction
**Sent:** Tuesday, April 1, 2025 12:12 PM
**To:** Tamukong, Walter <Walter.Tamukong@clevelandcliffs.com>
**Cc:** Forrester, Traci L <Traci.Forrester@clevelandcliffs.com>
**Subject:** RE: Presidential Exemption: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, & Periodic Technology Review (89 FR 55684; July 5, 2

Thank you for emailing the AirAction mailbox to request a Presidential Exemption under section 112(i)(4) of the Clean Air Act and for engaging with EPA in advancing President Trump's Executive Orders and Powering the Great American Comeback. We have received your email and will be in contact soon. If you have Confidential Business Information (CBI) that you'd like to submit, please submit it in electronic version to the CBI@epa.gov inbox or in hardcopy to:

USEPA, OAQPS
CORE CBI Office
4930 Old Page Road
Durham, NC 27703

**From:** Tamukong, Walter <Walter.Tamukong@clevelandcliffs.com>
**Sent:** Monday, March 31, 2025 5:26 PM
**To:** AirAction <AirAction@epa.gov>
**Cc:** Tsirigotis, Peter <Tsirigotis.Peter@epa.gov>; Lassiter, Penny <Lassiter.Penny@epa.gov>; Forrester, Traci L <Traci.Forrester@clevelandcliffs.com>
**Subject:** Presidential Exemption: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, & Periodic Technology Review (89 FR 55684; July 5, 2024)

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Dear Administrator, Hon. Lee M. Zeldin:

On behalf of Cleveland-Cliffs Inc., Please see attached request for **Presidential Exemption: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (89 FR 55684; July 5, 2024) (Coke Ovens Rule)**

EXH120

ED_018388_00005748-00001

Cleveland-Cliffs Inc. hereby requests a two-year Presidential exemption in accordance with CAA § 112(i)(4) for Cleveland-Cliffs Burns Harbor LLC; Cleveland-Cliffs Cleveland Works LLC, Warren Location; and Cleveland-Cliffs Monessen Coke LLC from compliance with the standards and limitations in the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed. Reg. 55684 (July 5, 2024) (collectively, the "Coke Ovens Rule").

Granting the extension will not result in any unacceptable risks to the public or the environment because EPA has determined that the source category presents an acceptable risk to human health with an ample margin of safety with the present controls, requirements, and limits already in effect.

Also attached are three referenced documents (**Congressional letters**) to support the request for **Presidential exemption of steel manufacturers and related supply chains from:**
- National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review (89 FR 23294; April 3, 2024)
- National Emission Standards for Hazardous Air Pollutants: Lime Manufacturing Plants Technology Review, EPA Docket No. OAR-2017-0015, RIN 2060-AV59, 89 Fed. Reg. 57,738
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (89 FR 55684; July 5, 2024) (Coke Ovens Rule)
- National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing, EPA Docket No. OAR-, RIN, 89 Fed. Reg. 16408 (March 6, 2024)

If you have questions or need additional information, please contact Walter Tamukong at 216-694-4862 or at walter.tamukong@clevelandcliffs.com

Sincerely

Walter Tamukong

**CLIFFS**



walter.tamukong@clevelandcliffs.com

**CLEVELAND-CLIFFS INC.**

200 Public Square, 3300

Cleveland, OH 44114

P: (216) 694-5700  www.clevelandcliffs.com

This electronic message and any attachments included with this message are for the exclusive use of the individual or entity to which it is intended to be addressed. This message may contain information that is privileged or confidential and thereby exempt and protected from unauthorized disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is not authorized and is strictly prohibited. If you have received this communication and are not the intended recipient, please notify the sender immediately and permanently delete the original message from your e-mail system.

# SunCoke Energy®

March 31, 2025

**VIA ELECTRONIC MAIL: AIRACTION@EPA.GOV**

President Donald J. Trump
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Administrator Lee Zeldin
U.S. Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Re: Presidential Exemption: "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55684 (July 5, 2024) (Coke Ovens Rule): Facilities' Names: Middletown Coke Company, LLC, Jewell Coke Company, L.P., Haverhill Coke Company LLC, Gateway Energy & Coke Company LLC, and Indiana Harbor Coke Company LP.

Dear Mr. President and Administrator Zeldin:

In accordance with Section 112(i)(4) of the Clean Air Act (CAA), SunCoke Energy, Inc. (SunCoke) is writing to request a two-year exemption from all compliance obligations under the Coke Ovens Rule for its metallurgical coke plants located in Granite City, Illinois ("Granite City"); East Chicago, Indiana ("Indiana Harbor"); Franklin Furnace, Ohio ("Haverhill I" and "Haverhill II"); Middletown, Ohio ("Middletown"); and Vansant, Virginia ("Jewell"), on the basis that: 1) the technology to implement the standards is not available, and 2) it is in the national security interest of the United States (U.S.) to provide the exemption.

    1.  Background on SunCoke's Facilities

SunCoke is the largest independent producer of blast furnace coke in the U.S., with a total domestic coking capacity of 4.2 million tons, and more than 50 years of experience producing coke. Coke is a principal raw material in the blast furnace steelmaking process. Coke is produced by heating metallurgical coal in a refractory oven, which releases volatile components from coal,

thus transforming the coal into coke. SunCoke's facilities manufacture metallurgical grade coke using efficient, modern technology designed and operated under negative pressure to combust the coal's volatile components and, at all but one of the facilities, use the resulting waste heat to create steam or electricity.[1] SunCoke owns U.S. coke plants located in Granite City, Illinois, East Chicago, Indiana, Franklin Furnace, Ohio, Middletown, Ohio, and Vansant, Virginia. Our five U.S. plants supply nearly 40 percent of the entire domestic coke supply for the American steel industry. SunCoke uses nearly all American coal to produce our coke, which is then used to produce automobiles, military gear and equipment, weapons, pipelines, infrastructure, construction materials, municipal/water infrastructure, and more. SunCoke is also one of only two foundry coke producers in the U.S., which is used to produce iron castings for a wide range of applications including auto parts, railroads, infrastructure, and military gear and vehicles.

On July 5, 2024, the U.S. Environmental Protection Agency (EPA) finalized changes to two Clean Air Act rules (NESHAP Subparts CCCCC and L), regulating the production of both blast furnace and foundry coke in the U.S. 89 Fed. Reg. 55684 (July 5, 2024) (Coke Ovens Rule). Existing facilities must comply with the new MACT floor emission limits and related reporting and recordkeeping requirements for existing sources by January 5, 2026, 18 months after the effective date of the Coke Ovens Rule. Existing facilities must also comply with the related testing requirements by July 4, 2026. Importantly, in the Coke Ovens Rule, EPA determined that risks due to emissions of hazardous air pollutants (HAPs) from coke production are acceptable and that the current NESHAP standards provide an ample margin of safety to protect public health. Notwithstanding its conclusions, EPA then established 17 new, lower, "MACT floor" emission limits. *Id.* at 55689.

## 2. The Technology to Implement the Coke Ovens Rule is not Available.

In the Coke Ovens Rule, EPA projected that regulated facilities would be able to comply with the new MACT floor emission limits "without the need for any new controls or operating costs." 89 Fed. Reg. at 55696. This is incorrect. EPA reached its conclusion by using a methodology to set the new limits that is inaccurate with the dataset employed by EPA. The methodology is only accurate with a much larger data set. In addition, EPA failed to consider all available test data, and failed to account for variability of chlorine and mercury in coal and its impact on emissions. These and other errors resulted in EPA setting limits for pushing, main

---

[1] SunCoke operates four heat recovery facilities and one non-recovery facility, all of which are referred to as heat and/or nonrecovery (HNR) facilities. SunCoke's heat recovery facilities use heat recovery steam generators (HRSGs) to recover waste heat, and the coal volatiles are combusted within the ovens. SunCoke's nonrecovery facility does not recover waste heat but coal volatiles are still combusted in the ovens. This innovative process is different from the traditional coking process, known as byproduct cokemaking, in which the coal volatiles and combustion products are recovered downstream of the oven chamber and refined to produce chemicals such as light oil, tar, and ammonia, as well as coke oven gas for use in oven underfiring and in other areas of the facility. None of these elements are present at SunCoke's HNR facilities. Additionally, in contrast to byproduct coke ovens that operate under positive pressure, HNR coke ovens operate under negative pressure and combust the coal volatiles, thereby virtually eliminating leaks from coke ovens to the atmosphere and minimizing emissions of volatile organic compounds and HAPs.

EXH124

ED_018388_00000084-00002

stacks, and bypass vent stacks that cannot be met with existing controls and the technology to implement the new limits is not available.[2]

*a.   Pushing limits at 40 C.F.R. § 63.7290(b) (e):*

For pushing, EPA promulgated numeric MACT floor emission limits for acid gases (AG), hydrogen cyanide (HCN), mercury (Hg), and polycyclic aromatic hydrocarbons (PAH).[3] The technology to implement these new pushing limits is not available.

Pushing emissions at byproduct (ByP) facilities are controlled using stationary devices (baghouses). In contrast, SunCoke's facilities use flat push hot cars, which have roofs and multicyclones (also referred to as multiclones) that capture pushing emissions.[4] The flat push hot cars cannot be equipped with additional controls needed to meet the new limits because flat push hot cars are mobile, subject to significant vibration, and have very limited space or structural capacity for additional equipment.[5]

Moreover, unlike ByP facilities, SunCoke's HNR facilities' configuration does not allow for controls, like a traveling hood with a fixed baghouse, on flat push hot cars.[6] SunCoke's ovens are horizontal and their batteries and tunnels are longer, whereas ovens at byproduct coke facilities are vertical and their batteries and tunnels are shorter. Because of the unique configuration of SunCoke's ovens and batteries, SunCoke would not be able to pull sufficient draft to run a traveling hood fixed to a baghouse, and if SunCoke were unable to pull sufficient draft, that could create positive pressure that increases the likelihood of emissions of pollutants into the environment. SunCoke's negative pressure technology requires a specific configuration that uses negative pressure and draft to pull pollutants through environmental treatment technology. SunCoke's technology requires this configuration, and SunCoke cannot reconfigure its equipment at existing HNR facilities to install controls.

For the reasons described above, SunCoke requests a two-year exemption from compliance with the new MACT floor emission limits established in the Coke Ovens Rule for pushing (40 C.F.R. § 63.7290(b) (e)). SunCoke also requests a two-year exemption from compliance with the following obligations associated with the new MACT floor emission limits: initial performance tests to demonstrate compliance with the new emission limits (§ 63.7320(a)); subsequent performance tests (§ 63.7321); compliance report requirements specific to the new MACT floor

---

[2] SunCoke submitted extensive comments in response to EPA's proposed revisions to NESHAP Subparts CCCCC and L, as well as a petition for reconsideration of the final Coke Ovens Rule. SunCoke Comment, Docket ID EPA-HQ-OAR-2002-0085-0968 (Oct. 2, 2023) [attached at Tab A, without attachments]; SunCoke Petition for Reconsideration to M. Regan, former EPA Administrator (Sept. 3, 2024) [attached at Tab B]. In the comment letter and petition for reconsideration, SunCoke extensively addressed its inability to meet new MACT floor emission limits with existing controls and the technological infeasibility of installing new controls. *See* SunCoke Comment; SunCoke Petition for Reconsideration.

[3] 89 Fed. Reg. at 55708; 40 C.F.R. § 63.7290(b) (e).

[4] *See* SunCoke Comment at 9.

[5] *See id.* at 30.

[6] *Id.*

3

EXH125

ED_018388_00000084-00003

emission limits (§ 63.7341(c)); and recordkeeping requirements specific to the new MACT floor emission limits (§ 63.7342(a)).

    *b.  Main Stack limits at 40 C.F.R. § 63.7297(a) (d):*

For main stacks, EPA promulgated numeric MACT floor emission limits for AG, Hg, PAH, and particulate matter (PM).[7] The technology to implement the new main stack limits is not available. To meet the new main stack limits, SunCoke would have to install multiple layers of controls in order to control individual HAPs; this new technology configuration does not exist, has never been done before, and would be prohibitively expensive.

First, installing controls to control a HAP on the main stacks will necessarily impact emissions of other HAPs and process combinations regulated by the Coke Ovens Rule due to pollutant interactions. Thus, installing controls for one HAP has the potential to increase other HAP emissions, requiring the addition of unknown layers of controls. Multiple integrated technologies have never been tested for, or applied at, a coke plant. SunCoke, therefore, cannot ensure that the multiple integrated technologies that could be required to meet the new MACT floor emission limits for main stacks are technologically achievable at its facilities.

Second, even if multiple integrated technologies were available and feasible to install at SunCoke's facilities, they would be cost prohibitive. To comply with the main stack MACT floor emission limits for only *two* HAPs (PM and Hg) at *one* of SunCoke's facilities (Haverhill I), SunCoke would need to spend a minimum of $61–99 million on testing, designing, engineering, procuring, and installing the new controls (an estimated $54 million to control PM emissions and $4 million to control Hg emissions).[8] If more expensive equipment is needed to control the Hg emissions, then SunCoke's costs could balloon up to more than $99 million.[9] This cost estimate does not account for controls that may be needed due to impacts from the Hg and PM controls on other pollutants, nor does the cost include the controls that would be needed at SunCoke's four other facilities. Adding in these additional controls could lead to an astronomical and prohibitive cost.

Third, the new MACT floor emission limits for main stacks do not account for the significant variability of chlorine and mercury in coal.[10] Coal is formed from organic materials. The levels of chlorine in a coal seam will generally depend on a geological formation's proximity to ancient seas. Mercury levels will generally depend on the coal seam's overlay materials and how the coal was formed from those materials. Not only will levels of these substances vary greatly from mine to mine, but they could also vary within the same coal seam at a particular mine. SunCoke cannot ensure that it can meet the new MACT floor emission limits with existing controls without adjustments to the limits to account for the range of chlorine and mercury in different coal sources, which EPA failed to consider when it established the limits.

---

[7] 89 Fed. Reg. at 55709; 40 C.F.R. § 63.7297(a)–(d).
[8] *See* Declaration of J. Quanci at 14–16, *American Coke and Coal Chemicals Institute, et al. v. EPA*, Case No. 24-1287 (Sept. 30, 2024) [attached at Tab C, without exhibits].
[9] *See id.* at 15–16.
[10] *See* SunCoke Petition for Reconsideration at 11–12.

EXH126

ED_018388_00000084-00004

For these reasons, SunCoke requests a two-year exemption from compliance with the new MACT floor emission limits established in the Coke Ovens Rule for main stacks (§ 63.7297(a)–(d)). SunCoke also requests a two-year exemption from compliance with the following associated obligations associated with the MACT floor emission limits: initial performance tests to demonstrate compliance with the new emission limits (§ 63.7320(a)); subsequent performance tests (§ 63.7321); compliance report requirements specific to the new MACT floor emission limits (§ 63.7341(c)); and recordkeeping requirements specific to the new MACT floor emission limits (§ 63.7342(a)).

    *c.   Bypass Vent Stack limits at 40 C.F.R. § 63.7298(a)–(c):*

For bypass vent stacks, EPA promulgated numeric MACT floor emission limits for AG, formaldehyde, Hg, PAH, and PM.[11] The technology to implement the new bypass vent stack limits is not available.

Bypass vent stacks are a passive safety device. They maintain negative pressure on SunCoke's ovens in the event of a power failure or other malfunction. During normal operations, bypass vent stacks are held closed by powered pistons, and negative pressure on the ovens is maintained by other means. When a power failure occurs, the pistons cease operating, and the bypass vent stacks automatically open (without any power source), creating negative pressure. The negative pressure keeps the volatile organic compounds (VOCs) inside the oven and protects nearby personnel from fire and chemical exposure. The negative pressure continues to draw in air to fully combust the VOCs, protects the environment from the release of HAPs, and protects the downstream equipment from potential gas build up to explosive concentration levels. Operating an HNR facility without bypass vent stacks would be a serious safety hazard because there would be no way to maintain negative pressure in the event of a power failure or other malfunction.[12] And applying any pollution controls to the bypass vent stacks would be infeasible because these controls would require power to run. Thus, there is no technologically feasible control equipment that can be implemented for SunCoke's bypass vent stacks.[13]

For these reasons, SunCoke requests a two-year exemption from compliance with the new MACT floor emission limits established in the Coke Ovens Rule for bypass stacks (§ 63.7298(a)–(c)). SunCoke also requests a two-year exemption from compliance with the following additional obligations associated with the new MACT floor emission limits: initial performance tests to demonstrate compliance with the new emission limits (§ 63.7320(a)); subsequent performance tests (§ 63.7321); compliance report requirements specific to the new MACT floor emission limits

---

[11] 89 Fed. Reg. at 55709; 40 C.F.R. § 63.7298(a)–(c).

[12] *See* SunCoke Petition for Reconsideration at 12–13; *see also* SunCoke Comment Letter at 34.

[13] SunCoke provided EPA with data showing that it could not meet some of the MACT floor limits on its bypass vent stacks. *See* Declaration of J. Quanci at 19–20, *American Coke and Coal Chemicals Institute, et al. v. EPA*, Case No. 24-1287 (Sept. 30, 2024). For example, in 2020, the bypass vent stacks of SunCoke's Indiana Harbor facility in East Chicago, Illinois emitted particulate matter at 204 percent of the Coke Ovens Rule's MACT floor. In 2021, SunCoke's Haverhill 1 facility located in Franklin Furnace, Ohio emitted particulate matter at 147 percent of the Coke Ovens Rule's MACT floor. EPA did not address these emission limit failures because the Agency's limited data analysis led it to conclude that SunCoke's bypass vent stacks tested below the new MACT floor emissions limits.

EXH127

ED_018388_00000084-00005

(§ 63.7341(c)); and recordkeeping requirements specific to the new MACT floor emission limits (§ 63.7342(a)).

> ### d.   *Zero percent leaking door standard at 40 C.F.R. § 63.303(a)(1)(i):*

To monitor for emissions from coke oven doors, EPA required that HNR facilities either (1) meet the 0.0 percent leaking requirement, as determined using EPA Method 303A, or (2) conduct daily pressure monitoring in each oven or in each common battery tunnel to ensure that the ovens are operated under negative pressure. Under the Coke Ovens Rule, EPA now requires HNR facilities to do both. 40 C.F.R. § 63.303(a)(1).

SunCoke already employs daily pressure monitoring, in compliance with the requirements at § 63.303(a)(1)(i), to monitor for coke oven door leaks. The existing monitoring system already accurately monitors for pressure and allows personnel to take action in a timely and safe manner when necessary to stop leaks. However, to guarantee 0.0 percent leaking from coke oven doors a technical impossibility. For this reason, SunCoke requests a two-year exemption from compliance with the new requirement to comply with the 0.0 percent leaking door requirement in the Coke Ovens Rule (§ 63.303(a)(1)(i)) and the associated recordkeeping requirement (§ 63.311(f)(1)(iv)).

> ### 3.   It is in the National Security Interests of the U.S. to Provide the Exemption.

Granting a two-year exemption from the Coke Ovens Rule's compliance obligations as described above for SunCoke's metallurgical coke plants is in the national security interests of the U.S. Maintaining a strong domestic steel industry supplied by a domestic supply of coal and coke is critical to national defense, to the health of the nation's infrastructure, and to many manufacturing industries essential to a strong economy.[14]

> ### a.   *Jeopardizing SunCoke's supply of coke to the domestic steel industry due to new MACT floor emissions limits would be harmful to the national security interests of the U.S.*

SunCoke's blast furnace and foundry coke are essential for the American manufacture of automobiles, military gear and equipment, weapons, pipelines, railroads, municipal/water infrastructure (e.g., piping, fire hydrants and manhole covers), and critical infrastructure, all of which are critically important to our national security.[15] SunCoke's coke likely could not be replaced by any other domestic supplier, which would directly impact domestic steel production and harm our national security. Further, nearly all of the coal that SunCoke uses to produce its coke is American coal. So, SunCoke's coke production not only supports the domestic steel industry, but also the domestic metallurgical coal industry.

Despite U.S. strategic defense and trade interests in maintaining an independent and robust domestic steel industry, there are only two remaining blast furnace steelmakers in the U.S.,

---

[14] During the shutdown caused by the COVID-19 pandemic, all companies in the coke and steel industry continued operations as critical members of the manufacturing sector that are crucial to the economic prosperity and continuity of the U.S. *See* https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/critical-manufacturing-sector.

[15] *See id.* (identifying steel mills as a core of the "Critical Manufacturing Sector).

EXH128

ED_018388_00000084-00006

Cleveland-Cliffs, Inc. and United States Steel Corporation, both of whom rely heavily on the coke industry to provide them millions of tons of coke annually. As the supplier of nearly 40 percent of the entire domestic coke supply for the American industry, SunCoke's coke is vitally important to that industry.

Due to its reliable supply of high-quality coke, SunCoke has long-term, take or pay contracts with these two remaining blast furnace steelmakers. Should the new Coke Ovens Rule be implemented, it could jeopardize the ability of domestic cokemakers to supply the quantities of coke necessary to fuel the domestic steel industry. Given the limited number of cokemaking facilities remaining in the U.S. and the importance of the domestic steel industry to this administration's priorities, the possibility of curtailing operations at even one coke plant would have substantial downstream impacts on the U.S. economy and this country's national security.

> b. *SunCoke's supply of coke to domestic steel producers and manufacturers is critical to national security as it reduces reliance on foreign imports.*

Over time, multiple administrations have recognized that a strong domestic steel industry is vital to national and economic security, critical infrastructure, and the competitiveness of many domestic manufacturing industries. [16] Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust steel imports which threaten to impair the national security. "National security" for purposes of Section 232 includes the "general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements, which are critical to minimum operations of the economy and government."

In a 2018 proclamation, President Trump determined pursuant to his authority under section 232 that foreign steel imports "threaten to impair the national security of the United States." 83 Fed. Reg. 11625, 11626 (Mar. 15, 2018). Using that authority thereby imposed a tariff on steel imports from all countries except Canada and Mexico to "reduce our Nation's need to rely on foreign producers for steel and ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense." *Id.* On February 18, 2025, President Trump again reiterated the connection between domestic steel production to national security in a proclamation titled "Adjusting Imports of Steel into the United States." 90 Fed. Reg. 9187 (Feb.

---

[16] In 2018, the U.S. Department of Commerce issued a report assessing the effect of imports of steel mill products on the national security of the U.S. That report reiterated the importance of domestic steel production to our national security. *See* U.S. Department of Commerce, Bureau of Industry and Security, Office of Technology Evaluation, The Effect of Imports of Steel on the National Security (Jan. 11, 2018), https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf ("Domestic steel production is essential for national security. Congress, in Section 232(d) [of the Trade Expansion Act of 1962, as amended], directed the Secretary of Commerce and the President to consider domestic production and the economic welfare of the U.S. in determining whether imports threaten to impair national security. The history of U.S. Government actions to ensure the continued viability of the U.S. steel industry demonstrates that, across decades and administrations, there has been consensus that domestic steel production is vital to national security.").

18. 2025). In that proclamation, President Trump again exercised his authority under section 232 to "adjust imports of steel and aluminum to protect our national security."[17]

A thriving domestic coke industry is necessary to ensure that domestic steel is produced for critical industries. As noted above, SunCoke can meet those needs as the supplier of close to 40 percent of the current coke production for the steel industry. The MACT floor emission limits in the Coke Ovens Rule, however, could jeopardize the domestic coke industry's ability to supply the amount of coke needed for domestic steel production. As this will be detrimental to the national security interests of the U.S., the administration should grant the two-year exemption to these limits as requested above.

4. Conclusion

We appreciate this administration's strong commitment to domestic steel production and recognition of its importance for national security. Requiring SunCoke to comply with the new MACT floor emission limits and related obligations in the Coke Ovens Rule when the technology to do so is not available will harm domestic coke production and increase America's reliance on foreign imports, thus impairing our national security. For these reasons and as set forth above, we therefore urge you under Clean Air Act Section 112(i)(4) to issue a two-year exemption for SunCoke from all compliance obligations under the Coke Ovens Rule for its metallurgical coke plants.

Sincerely,

Sarah Albert

cc:    Katie Batten, Director of Environmental and Sustainability, SunCoke Energy

---

[17] *See* Fact Sheet, https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-restores-section-232-tariffs/. Vice President Vance has equally drawn the connection between domestic steel production and national security. In 2023, in his role as Senator of Ohio, Vice President Vance led a congressional letter recognizing that foreign acquisition of domestic steel assets would "threaten[] to impair the national security of the United States." Letter from Sen. Vance to President Biden (May 9, 2024) (quoting 50 U.S.C. § 4565(d)(1)), available at https://www.hawley.senate.gov/wp-content/uploads/files/2024-05/Hawley-Letter-to-Biden-re-Nippon-Steel-Takeover.pdf. The Vice President also penned an op-ed in which he noted that "preservation of the domestic steel industry remains vital to our national security." Sen. J.D. Vance, *America cannot afford to auction off its industrial base*, WASHINGTON POST (Sept. 5, 2023), https://www.washingtonpost.com/opinions/2023/09/05/jd-vance-america-auction-industrial-base/.

EXH130

ED_018388_00000084-00008

# SunCoke Energy®

March 31, 2025

**VIA ELECTRONIC MAIL: AIRACTION@EPA.GOV**

President Donald J. Trump
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Administrator Lee Zeldin
U.S. Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Re:  Presidential Exemption: "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55684 (July 5, 2024) (Coke Ovens Rule): Facilities' Names: Middletown Coke Company, LLC, Jewell Coke Company, L.P., Haverhill Coke Company LLC, Gateway Energy & Coke Company LLC, and Indiana Harbor Coke Company LP.

Dear Mr. President and Administrator Zeldin:

In accordance with Section 112(i)(4) of the Clean Air Act (CAA), SunCoke Energy, Inc. (SunCoke) is writing to request a two-year exemption from all compliance obligations under the Coke Ovens Rule for its metallurgical coke plants located in Granite City, Illinois ("Granite City"); East Chicago, Indiana ("Indiana Harbor"); Franklin Furnace, Ohio ("Haverhill I" and "Haverhill II"); Middletown, Ohio ("Middletown"); and Vansant, Virginia ("Jewell"), on the basis that: 1) the technology to implement the standards is not available, and 2) it is in the national security interest of the United States (U.S.) to provide the exemption.

    1.  Background on SunCoke's Facilities

SunCoke is the largest independent producer of blast furnace coke in the U.S., with a total domestic coking capacity of 4.2 million tons, and more than 50 years of experience producing coke. Coke is a principal raw material in the blast furnace steelmaking process. Coke is produced by heating metallurgical coal in a refractory oven, which releases volatile components from coal,

thus transforming the coal into coke. SunCoke's facilities manufacture metallurgical grade coke using efficient, modern technology designed and operated under negative pressure to combust the coal's volatile components and, at all but one of the facilities, use the resulting waste heat to create steam or electricity.[1] SunCoke owns U.S. coke plants located in Granite City, Illinois, East Chicago, Indiana, Franklin Furnace, Ohio, Middletown, Ohio, and Vansant, Virginia. Our five U.S. plants supply nearly 40 percent of the entire domestic coke supply for the American steel industry. SunCoke uses nearly all American coal to produce our coke, which is then used to produce automobiles, military gear and equipment, weapons, pipelines, infrastructure, construction materials, municipal/water infrastructure, and more. SunCoke is also one of only two foundry coke producers in the U.S., which is used to produce iron castings for a wide range of applications including auto parts, railroads, infrastructure, and military gear and vehicles.

On July 5, 2024, the U.S. Environmental Protection Agency (EPA) finalized changes to two Clean Air Act rules (NESHAP Subparts CCCCC and L), regulating the production of both blast furnace and foundry coke in the U.S. 89 Fed. Reg. 55684 (July 5, 2024) (Coke Ovens Rule). Existing facilities must comply with the new MACT floor emission limits and related reporting and recordkeeping requirements for existing sources by January 5, 2026, 18 months after the effective date of the Coke Ovens Rule. Existing facilities must also comply with the related testing requirements by July 4, 2026. Importantly, in the Coke Ovens Rule, EPA determined that risks due to emissions of hazardous air pollutants (HAPs) from coke production are acceptable and that the current NESHAP standards provide an ample margin of safety to protect public health. Notwithstanding its conclusions, EPA then established 17 new, lower, "MACT floor" emission limits. *Id.* at 55689.

### 2. The Technology to Implement the Coke Ovens Rule is not Available.

In the Coke Ovens Rule, EPA projected that regulated facilities would be able to comply with the new MACT floor emission limits "without the need for any new controls or operating costs." 89 Fed. Reg. at 55696. This is incorrect. EPA reached its conclusion by using a methodology to set the new limits that is inaccurate with the dataset employed by EPA. The methodology is only accurate with a much larger data set. In addition, EPA failed to consider all available test data, and failed to account for variability of chlorine and mercury in coal and its impact on emissions. These and other errors resulted in EPA setting limits for pushing, main

---

[1] SunCoke operates four heat recovery facilities and one non-recovery facility, all of which are referred to as heat and/or nonrecovery (HNR) facilities. SunCoke's heat recovery facilities use heat recovery steam generators (HRSGs) to recover waste heat, and the coal volatiles are combusted within the ovens. SunCoke's nonrecovery facility does not recover waste heat but coal volatiles are still combusted in the ovens. This innovative process is different from the traditional coking process, known as byproduct cokemaking, in which the coal volatiles and combustion products are recovered downstream of the oven chamber and refined to produce chemicals such as light oil, tar, and ammonia, as well as coke oven gas for use in oven underfiring and in other areas of the facility. None of these elements are present at SunCoke's HNR facilities. Additionally, in contrast to byproduct coke ovens that operate under positive pressure, HNR coke ovens operate under negative pressure and combust the coal volatiles, thereby virtually eliminating leaks from coke ovens to the atmosphere and minimizing emissions of volatile organic compounds and HAPs.

EXH132

ED_018388_00000108-00002

stacks, and bypass vent stacks that cannot be met with existing controls and the technology to implement the new limits is not available.[2]

### a.   Pushing limits at 40 C.F.R. § 63.7290(b) (e):

For pushing, EPA promulgated numeric MACT floor emission limits for acid gases (AG), hydrogen cyanide (HCN), mercury (Hg), and polycyclic aromatic hydrocarbons (PAH).[3] The technology to implement these new pushing limits is not available.

Pushing emissions at byproduct (ByP) facilities are controlled using stationary devices (baghouses). In contrast, SunCoke's facilities use flat push hot cars, which have roofs and multicyclones (also referred to as multiclones) that capture pushing emissions.[4] The flat push hot cars cannot be equipped with additional controls needed to meet the new limits because flat push hot cars are mobile, subject to significant vibration, and have very limited space or structural capacity for additional equipment.[5]

Moreover, unlike ByP facilities, SunCoke's HNR facilities' configuration does not allow for controls, like a traveling hood with a fixed baghouse, on flat push hot cars.[6] SunCoke's ovens are horizontal and their batteries and tunnels are longer, whereas ovens at byproduct coke facilities are vertical and their batteries and tunnels are shorter. Because of the unique configuration of SunCoke's ovens and batteries, SunCoke would not be able to pull sufficient draft to run a traveling hood fixed to a baghouse, and if SunCoke were unable to pull sufficient draft, that could create positive pressure that increases the likelihood of emissions of pollutants into the environment. SunCoke's negative pressure technology requires a specific configuration that uses negative pressure and draft to pull pollutants through environmental treatment technology. SunCoke's technology requires this configuration, and SunCoke cannot reconfigure its equipment at existing HNR facilities to install controls.

For the reasons described above, SunCoke requests a two-year exemption from compliance with the new MACT floor emission limits established in the Coke Ovens Rule for pushing (40 C.F.R. § 63.7290(b) (e)). SunCoke also requests a two-year exemption from compliance with the following obligations associated with the new MACT floor emission limits: initial performance tests to demonstrate compliance with the new emission limits (§ 63.7320(a)); subsequent performance tests (§ 63.7321); compliance report requirements specific to the new MACT floor

---

[2] SunCoke submitted extensive comments in response to EPA's proposed revisions to NESHAP Subparts CCCCC and L, as well as a petition for reconsideration of the final Coke Ovens Rule. SunCoke Comment, Docket ID EPA-HQ-OAR-2002-0085-0968 (Oct. 2, 2023) [attached at Tab A, without attachments]; SunCoke Petition for Reconsideration to M. Regan, former EPA Administrator (Sept. 3, 2024) [attached at Tab B]. In the comment letter and petition for reconsideration, SunCoke extensively addressed its inability to meet new MACT floor emission limits with existing controls and the technological infeasibility of installing new controls. See SunCoke Comment; SunCoke Petition for Reconsideration.
[3] 89 Fed. Reg. at 55708; 40 C.F.R. § 63.7290(b) (e).
[4] See SunCoke Comment at 9.
[5] See id. at 30.
[6] Id.

EXH133

ED_018388_00000108-00003

emission limits (§ 63.7341(c)); and recordkeeping requirements specific to the new MACT floor emission limits (§ 63.7342(a)).

      *b.  Main Stack limits at 40 C.F.R. § 63.7297(a)–(d):*

      For main stacks, EPA promulgated numeric MACT floor emission limits for AG, Hg, PAH, and particulate matter (PM).[7] The technology to implement the new main stack limits is not available. To meet the new main stack limits, SunCoke would have to install multiple layers of controls in order to control individual HAPs; this new technology configuration does not exist, has never been done before, and would be prohibitively expensive.

      First, installing controls to control a HAP on the main stacks will necessarily impact emissions of other HAPs and process combinations regulated by the Coke Ovens Rule due to pollutant interactions. Thus, installing controls for one HAP has the potential to increase other HAP emissions, requiring the addition of unknown layers of controls. Multiple integrated technologies have never been tested for, or applied at, a coke plant. SunCoke, therefore, cannot ensure that the multiple integrated technologies that could be required to meet the new MACT floor emission limits for main stacks are technologically achievable at its facilities.

      Second, even if multiple integrated technologies were available and feasible to install at SunCoke's facilities, they would be cost prohibitive. To comply with the main stack MACT floor emission limits for only *two* HAPs (PM and Hg) at *one* of SunCoke's facilities (Haverhill I), SunCoke would need to spend a minimum of $61–99 million on testing, designing, engineering, procuring, and installing the new controls (an estimated $54 million to control PM emissions and $4 million to control Hg emissions).[8] If more expensive equipment is needed to control the Hg emissions, then SunCoke's costs could balloon up to more than $99 million.[9] This cost estimate does not account for controls that may be needed due to impacts from the Hg and PM controls on other pollutants, nor does the cost include the controls that would be needed at SunCoke's four other facilities. Adding in these additional controls could lead to an astronomical and prohibitive cost.

      Third, the new MACT floor emission limits for main stacks do not account for the significant variability of chlorine and mercury in coal.[10] Coal is formed from organic materials. The levels of chlorine in a coal seam will generally depend on a geological formation's proximity to ancient seas. Mercury levels will generally depend on the coal seam's overlay materials and how the coal was formed from those materials. Not only will levels of these substances vary greatly from mine to mine, but they could also vary within the same coal seam at a particular mine. SunCoke cannot ensure that it can meet the new MACT floor emission limits with existing controls without adjustments to the limits to account for the range of chlorine and mercury in different coal sources, which EPA failed to consider when it established the limits.

---

[7] 89 Fed. Reg. at 55709; 40 C.F.R. § 63.7297(a)–(d).
[8] *See* Declaration of J. Quanci at 14–16, *American Coke and Coal Chemicals Institute, et al. v. EPA*, Case No. 24-1287 (Sept. 30, 2024) [attached at Tab C, without exhibits].
[9] *See id.* at 15–16.
[10] *See* SunCoke Petition for Reconsideration at 11–12.

EXH134

ED_018388_00000108-0004

For these reasons, SunCoke requests a two-year exemption from compliance with the new MACT floor emission limits established in the Coke Ovens Rule for main stacks (§ 63.7297(a)–(d)). SunCoke also requests a two-year exemption from compliance with the following associated obligations associated with the MACT floor emission limits: initial performance tests to demonstrate compliance with the new emission limits (§ 63.7320(a)); subsequent performance tests (§ 63.7321); compliance report requirements specific to the new MACT floor emission limits (§ 63.7341(c)); and recordkeeping requirements specific to the new MACT floor emission limits (§ 63.7342(a)).

    *c.  Bypass Vent Stack limits at 40 C.F.R. § 63.7298(a) – (c):*

For bypass vent stacks, EPA promulgated numeric MACT floor emission limits for AG, formaldehyde, Hg, PAH, and PM.[11] The technology to implement the new bypass vent stack limits is not available.

Bypass vent stacks are a passive safety device. They maintain negative pressure on SunCoke's ovens in the event of a power failure or other malfunction. During normal operations, bypass vent stacks are held closed by powered pistons, and negative pressure on the ovens is maintained by other means. When a power failure occurs, the pistons cease operating, and the bypass vent stacks automatically open (without any power source), creating negative pressure. The negative pressure keeps the volatile organic compounds (VOCs) inside the oven and protects nearby personnel from fire and chemical exposure. The negative pressure continues to draw in air to fully combust the VOCs, protects the environment from the release of HAPs, and protects the downstream equipment from potential gas build up to explosive concentration levels. Operating an HNR facility without bypass vent stacks would be a serious safety hazard because there would be no way to maintain negative pressure in the event of a power failure or other malfunction.[12] And applying any pollution controls to the bypass vent stacks would be infeasible because these controls would require power to run. Thus, there is no technologically feasible control equipment that can be implemented for SunCoke's bypass vent stacks.[13]

For these reasons, SunCoke requests a two-year exemption from compliance with the new MACT floor emission limits established in the Coke Ovens Rule for bypass stacks (§ 63.7298(a)–(c)). SunCoke also requests a two-year exemption from compliance with the following additional obligations associated with the new MACT floor emission limits: initial performance tests to demonstrate compliance with the new emission limits (§ 63.7320(a)); subsequent performance tests (§ 63.7321); compliance report requirements specific to the new MACT floor emission limits

---

[11] 89 Fed. Reg. at 55709; 40 C.F.R. § 63.7298(a)–(c).

[12] *See* SunCoke Petition for Reconsideration at 12–13; *see also* SunCoke Comment Letter at 34.

[13] SunCoke provided EPA with data showing that it could not meet some of the MACT floor limits on its bypass vent stacks. *See* Declaration of J. Quanci at 19–20, *American Coke and Coal Chemicals Institute, et al. v. EPA*, Case No. 24-1287 (Sept. 30, 2024). For example, in 2020, the bypass vent stacks of SunCoke's Indiana Harbor facility in East Chicago, Illinois emitted particulate matter at 204 percent of the Coke Ovens Rule's MACT floor. In 2021, SunCoke's Haverhill 1 facility located in Franklin Furnace, Ohio emitted particulate matter at 147 percent of the Coke Ovens Rule's MACT floor. EPA did not address these emission limit failures because the Agency's limited data analysis led it to conclude that SunCoke's bypass vent stacks tested below the new MACT floor emissions limits.

EXH135

ED_018388_00000108-00005

(§ 63.7341(c)); and recordkeeping requirements specific to the new MACT floor emission limits (§ 63.7342(a)).

### d.  Zero percent leaking door standard at 40 C.F.R. § 63.303(a)(1)(i):

To monitor for emissions from coke oven doors, EPA required that HNR facilities either (1) meet the 0.0 percent leaking requirement, as determined using EPA Method 303A, or (2) conduct daily pressure monitoring in each oven or in each common battery tunnel to ensure that the ovens are operated under negative pressure. Under the Coke Ovens Rule, EPA now requires HNR facilities to do both. 40 C.F.R. § 63.303(a)(1).

SunCoke already employs daily pressure monitoring, in compliance with the requirements at § 63.303(a)(1)(i), to monitor for coke oven door leaks. The existing monitoring system already accurately monitors for pressure and allows personnel to take action in a timely and safe manner when necessary to stop leaks. However, to guarantee 0.0 percent leaking from coke oven doors a technical impossibility. For this reason, SunCoke requests a two-year exemption from compliance with the new requirement to comply with the 0.0 percent leaking door requirement in the Coke Ovens Rule (§ 63.303(a)(1)(i)) and the associated recordkeeping requirement (§ 63.311(f)(1)(iv)).

### 3.  It is in the National Security Interests of the U.S. to Provide the Exemption.

Granting a two-year exemption from the Coke Ovens Rule's compliance obligations as described above for SunCoke's metallurgical coke plants is in the national security interests of the U.S. Maintaining a strong domestic steel industry supplied by a domestic supply of coal and coke is critical to national defense, to the health of the nation's infrastructure, and to many manufacturing industries essential to a strong economy.[14]

### a.  Jeopardizing SunCoke's supply of coke to the domestic steel industry due to new MACT floor emissions limits would be harmful to the national security interests of the U.S.

SunCoke's blast furnace and foundry coke are essential for the American manufacture of automobiles, military gear and equipment, weapons, pipelines, railroads, municipal/water infrastructure (e.g., piping, fire hydrants and manhole covers), and critical infrastructure, all of which are critically important to our national security.[15] SunCoke's coke likely could not be replaced by any other domestic supplier, which would directly impact domestic steel production and harm our national security. Further, nearly all of the coal that SunCoke uses to produce its coke is American coal. So, SunCoke's coke production not only supports the domestic steel industry, but also the domestic metallurgical coal industry.

Despite U.S. strategic defense and trade interests in maintaining an independent and robust domestic steel industry, there are only two remaining blast furnace steelmakers in the U.S.,

---

[14] During the shutdown caused by the COVID-19 pandemic, all companies in the coke and steel industry continued operations as critical members of the manufacturing sector that are crucial to the economic prosperity and continuity of the U.S. *See* https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/critical-manufacturing-sector.

[15] *See id.* (identifying steel mills as a core of the "Critical Manufacturing Sector).

EXH136

ED_018388_00000108-00006

Cleveland-Cliffs, Inc. and United States Steel Corporation, both of whom rely heavily on the coke industry to provide them millions of tons of coke annually. As the supplier of nearly 40 percent of the entire domestic coke supply for the American industry, SunCoke's coke is vitally important to that industry.

Due to its reliable supply of high-quality coke, SunCoke has long-term, take or pay contracts with these two remaining blast furnace steelmakers. Should the new Coke Ovens Rule be implemented, it could jeopardize the ability of domestic cokemakers to supply the quantities of coke necessary to fuel the domestic steel industry. Given the limited number of cokemaking facilities remaining in the U.S. and the importance of the domestic steel industry to this administration's priorities, the possibility of curtailing operations at even one coke plant would have substantial downstream impacts on the U.S. economy and this country's national security.

>    b.    *SunCoke's supply of coke to domestic steel producers and manufacturers is*
>         *critical to national security as it reduces reliance on foreign imports.*

Over time, multiple administrations have recognized that a strong domestic steel industry is vital to national and economic security, critical infrastructure, and the competitiveness of many domestic manufacturing industries. [16] Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust steel imports which threaten to impair the national security. "National security" for purposes of Section 232 includes the "general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements, which are critical to minimum operations of the economy and government."

In a 2018 proclamation, President Trump determined pursuant to his authority under section 232 that foreign steel imports "threaten to impair the national security of the United States." 83 Fed. Reg. 11625, 11626 (Mar. 15, 2018). Using that authority thereby imposed a tariff on steel imports from all countries except Canada and Mexico to "reduce our Nation's need to rely on foreign producers for steel and ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense." *Id.* On February 18, 2025, President Trump again reiterated the connection between domestic steel production to national security in a proclamation titled "Adjusting Imports of Steel into the United States." 90 Fed. Reg. 9187 (Feb.

---

[16] In 2018, the U.S. Department of Commerce issued a report assessing the effect of imports of steel mill products on the national security of the U.S. That report reiterated the importance of domestic steel production to our national security. *See* U.S. Department of Commerce, Bureau of Industry and Security, Office of Technology Evaluation, The Effect of Imports of Steel on the National Security (Jan. 11, 2018), https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf ("Domestic steel production is essential for national security. Congress, in Section 232(d) [of the Trade Expansion Act of 1962, as amended], directed the Secretary of Commerce and the President to consider domestic production and the economic welfare of the U.S. in determining whether imports threaten to impair national security. The history of U.S. Government actions to ensure the continued viability of the U.S. steel industry demonstrates that, across decades and administrations, there has been consensus that domestic steel production is vital to national security.").

EXH137

ED_018388_00000108-00007

18. 2025). In that proclamation, President Trump again exercised his authority under section 232 to "adjust imports of steel and aluminum to protect our national security."[17]

A thriving domestic coke industry is necessary to ensure that domestic steel is produced for critical industries. As noted above, SunCoke can meet those needs as the supplier of close to 40 percent of the current coke production for the steel industry. The MACT floor emission limits in the Coke Ovens Rule, however, could jeopardize the domestic coke industry's ability to supply the amount of coke needed for domestic steel production. As this will be detrimental to the national security interests of the U.S., the administration should grant the two-year exemption to these limits as requested above.

### 4.  Conclusion

We appreciate this administration's strong commitment to domestic steel production and recognition of its importance for national security. Requiring SunCoke to comply with the new MACT floor emission limits and related obligations in the Coke Ovens Rule when the technology to do so is not available will harm domestic coke production and increase America's reliance on foreign imports, thus impairing our national security. For these reasons and as set forth above, we therefore urge you under Clean Air Act Section 112(i)(4) to issue a two-year exemption for SunCoke from all compliance obligations under the Coke Ovens Rule for its metallurgical coke plants.

Sincerely,

Sarah Albert

cc:    Katie Batten, Director of Environmental and Sustainability, SunCoke Energy

---

[17] *See* Fact Sheet, https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-restores-section-232-tariffs/. Vice President Vance has equally drawn the connection between domestic steel production and national security. In 2023, in his role as Senator of Ohio, Vice President Vance led a congressional letter recognizing that foreign acquisition of domestic steel assets would "threaten[] to impair the national security of the United States." Letter from Sen. Vance to President Biden (May 9, 2024) (quoting 50 U.S.C. § 4565(d)(1)), available at https://www.hawley.senate.gov/wp-content/uploads/files/2024-05/Hawley-Letter-to-Biden-re-Nippon-Steel-Takeover.pdf. The Vice President also penned an op-ed in which he noted that "preservation of the domestic steel industry remains vital to our national security." Sen. J.D. Vance, *America cannot afford to auction off its industrial base*, WASHINGTON POST (Sept. 5, 2023), https://www.washingtonpost.com/opinions/2023/09/05/jd-vance-america-auction-industrial-base/.

EXH138

ED_018388_00000108-00008

# TAB A

EXH139

ED_018388_00000109-00001

# Beveridge
# & Diamond

Heidi C Knight
155 Federal Street, Suite 1600
Boston, MA 02110
+1.617.419.2365
HKnight@bdlaw.com

October 2, 2023

***Submitted via*** https://www.regulations.gov

U.S. Environmental Protection Agency
EPA Docket Center
Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, DC 20460

Re:  **Comments on Proposed Rule, National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries, Docket ID Nos. EPA–HQ–OAR–2002–0085 and EPA–HQ–OAR–2003–0051**

To Whom It May Concern:

On behalf of SunCoke Energy, Inc. ("SunCoke"), Beveridge & Diamond, P.C., respectfully submits these comments to the U.S. Environmental Protection Agency ("EPA" or "the Agency") on the Agency's *Proposed Rule: National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries*, as published in 88 Fed. Reg. 55858 (Aug. 16, 2023) (the "Proposed Rule").

SunCoke believes that the Proposed Rule would impose numerous, onerous new limits and requirements that are unnecessary for environmental protection and are technically and economically infeasible, despite the Agency's findings of acceptable risk and lack of developments in practices, processes, or control technologies.[1]  In fact, EPA's proposed requirements could cause irreparable harm to SunCoke. The 45-day comment period was woefully inadequate, as SunCoke explained in its request for an extension (Attachment A), which EPA denied without any explanation (Attachment B).  In the limited time provided, SunCoke spent considerable effort evaluating the proposed amendments and the technical memoranda and other new information that was only recently made available to SunCoke and other affected parties; however, there was a

---

[1] *See, e.g.,* 88 Fed. Reg. 55858, 55858 (Aug. 16, 2023); *see also infra* Section II (describing Agency's RTR findings and its analysis of HNR cokemaking process and emissions in prior rulemakings).

substantial amount of review, testing, monitoring, and analysis that SunCoke could not complete in the too short, 45-day, comment period. *See infra* Section V. The fact that EPA was under a court-ordered deadline to issue the Proposed Rule does not excuse the Agency's obligation under 42 U.S.C. § 7607(h) to provide a reasonable period of time for review.

SunCoke is the largest independent producer of coke in the United States, with a total U.S. cokemaking capacity of 4.2 million tons of coke per year and more than 50 years of experience producing coke. SunCoke owns or has interests in U.S. coke plants located in Granite City, Illinois ("Granite City"), East Chicago, Indiana ("Indiana Harbor"), Franklin Furnace, Ohio ("Haverhill"), Middletown, Ohio ("Middletown"), and Vansant, Virginia ("Jewell"). SunCoke provides a total of 887 well-paying jobs in the United States, many in rural, economically distressed areas. Forty (40) percent of SunCoke's workforce are union (United Steelworkers).

Coke is an essential ingredient in the blast furnace production of steel. The blast furnace steelmakers use SunCoke's coke in the process of making lightweight, strong steel for automobiles (including for electric automobiles), pipelines, infrastructure construction, and more. The high quality and strength of SunCoke's coke results in less overall use of coke in the blast furnace process, resulting in lower GHG emissions from the blast furnace.

SunCoke's facilities manufacture metallurgical-grade coke using innovative, superior technology that sets the standard for environmental performance in cokemaking. EPA has declared that SunCoke's process is the most environmentally friendly way to make coke.[2] SunCoke's coke ovens are designed and operated under negative pressure to combust the coal's volatile components, and, at all but one of its facilities (Jewell), use the resulting waste heat to create steam or electricity, with no net new Greenhouse Gas ("GHG") emissions. SunCoke also operates in substantial compliance with its environmental permits.

Yet far from taking the differences in cokemaking technologies into account, the Proposed Rule ignores them, indiscriminately saddling SunCoke with requirements that make sense only for a different type of facility. Several of the new limits and requirements are "one size fits all," even though byproduct recovery ("ByP") coke plants operate and emit in ways that are entirely different from SunCoke's heat and/or nonrecovery ("HNR") coke plants. *See infra* Section III.A.1.

The significant impact of the additional costs of complying with the Proposed Rule greatly outweighs the potential benefits. *See infra* Sections VIII–XIII. The Proposed Rule's impacts on SunCoke's Jewell coke plant would be particularly severe; if it were even feasible to install these controls, the costs would ***exceed $474.9 million (not $7.4 million)*** in capital investments and ***$66 million (not $4.7 million)*** in annual costs, based on SunCoke's detailed engineering estimates and experience having installed similar controls at other SunCoke facilities but without Jewell's unique siting considerations. *See infra* Section VIII.B. Moreover, the retrofitting required to comply with

---

[2] *See, e.g.*, 66 Fed. Reg. 35326, 35328–29 (Jul. 3, 2001); 42 U.S.C. § 7412(d)(8)(A) (directing the Agency to establish emission standards for coke oven batteries, and, in establishing such standards, to evaluate "(ii) as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, *the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies,* and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke") (emphasis added).

EXH141

ED_018388_00000109-00003

the proposed amendments would increase GHG emissions by more than 46,000 tons annually and hazardous dust disposal by at least 4,360 tons per year. *Contra* 88 Fed. Reg. 55858, 55894 (Aug. 16, 2023).

SunCoke believes that the Proposed Rule is deficient in several ways. SunCoke offers comment on several elements of the Proposed Rule, and specific recommendations for improving the proposed amendments. The following identifies key elements of SunCoke's comments:

- Imposition of the amendments, as proposed, could impair the domestic steel and foundry industries, disrupt the U.S. transition to a lower carbon economy, and cause job loss in economically distressed areas (see Section I).

- The court-ordered deadline is causing EPA to scramble to interpret substantial information and publish a rule that, as proposed, will be deficient and unworkable (see Section II).

- EPA's mischaracterization of SunCoke's heat and nonrecovery cokemaking processes and its confusion of SunCoke's processes with that of byproduct coke manufacturing results in inaccuracies in EPA's development of the proposed emissions limits, proposed benzene fenceline monitoring work practices, and other portions of the Proposed Rule (see Section III).

- EPA should continue to regulate SunCoke's heat and nonrecovery cokemaking operations differently from byproduct coke manufacturing (see Section IV).

- Due to the highly technical nature of this rulemaking and the large volume of information in the docket, EPA is violating the CAA and the APA by limiting the notice and comment period to a mere 45 days (see Section V).

- EPA further violated the APA by failing to publish revised rule text in the *Federal Register*; the redline provided in the docket is not an adequate substitute, especially in light of the number of changes that are included in the redline but not explained or discussed in the *Federal Register* notice (see Section VI).

- SunCoke's facilities constitute "existing sources" under the CAA, despite EPA's failure to revise the definition of "new source" as part of this rulemaking; interpreting otherwise would result in coke oven batteries that are almost 20 years old being considered "new" (see Section VII).

- The proposed beyond-the-floor limits for SunCoke's Jewell facility are unwarranted under the applicable legal standard and based on flawed assumptions, inaccurate data, and the legally erroneous use of a cost-effectiveness threshold from an unrelated industry (see Section VIII).

- The proposed MACT limits for the HNR facilities' pushing operations are not "necessary," are based on limited and/or unreliable data, and are not "achievable," and for the facilities' main stacks and bypass/waste heat stacks, are also based on limited and/or unreliable data and are not "achievable" (see Section IX).

- The performance testing requirements for pushing emissions are not feasible, including the minimum sample volume for the Hg and PAHs test methods (see Section X).

3

EXH142

ED_018388_00000109-00004

- EPA's technology review does not support requiring fenceline monitoring at HNR facilities under Section 112(D)(6); the Agency lacks authority to require fenceline monitoring at the HNR facilities because there is no evidence that these requirement are "necessary," and EPA's proposed approach has several flaws with the proposed action level, the corrective action process, and the timeline and approach for monitoring (see Section XI).

- Implementing the proposed more rigorous oven pressure monitoring *and* Method 303A monitoring is not "necessary" to achieve emissions standards (see Section XII).

- EPA's technology review does not support the proposed new opacity limit and daily observation requirements (see Section XIII).

- EPA's proposal to allow the use of ASTM D7520-16 as an alternative to the long-standing EPA Reference Method 9 to measure opacity is unreasonable because the proposed method is experimental and has not consistently been accurately demonstrated for use at the type of source being regulated (i.e., a source of fugitive emissions) (see Section XIV).

- EPA's elimination of the startup, shutdown, and malfunction exemption must be replaced with alternative limits (see Section XV).

- The redline versions of the Agency's proposed amendments to the current Subpart L and Subpart CCCCC include new and revised terms and definitions, several of which are inaccurate and should be revised as indicated herein (see Section XVI).

## I.    IF THE RULE IS PUBLISHED AS PROPOSED, EPA COULD IMPAIR THE DOMESTIC STEEL AND FOUNDRY INDUSTRIES, DISRUPT THE U.S. TRANSITION TO A LOWER CARBON ECONOMY, AND CAUSE JOB LOSS IN ECONOMICALLY DISTRESSED AREAS

Coke is an essential ingredient in blast furnace production of steel, which steelmakers use to make lightweight, strong steel for automobiles (including electric vehicles, which are required to be made from blast furnace steel), pipelines, infrastructure construction, solar panels, geothermal plants, and more. Despite U.S. strategic defense and trade interests in maintaining an independent and robust steel industry, there are only two remaining blast furnace steelmakers in the U.S., Cleveland-Cliffs, Inc. and United States Steel Corporation, both of whom rely heavily on the coke industry to provide them millions of tons of coke annually. Due to its reliable supply of high-quality coke, SunCoke has long-term, take or pay contracts with these two remaining blast furnace steelmakers. Should SunCoke be forced to curtail or cease coke production to meet the new, overly stringent limits as required by the EPA rulemaking, SunCoke may be unable to meet its contractual obligations and be unable to supply steelmakers with the quantities of coke necessary to fuel the domestic steel industry.

A strong domestic steel industry is vital to national and economic security, the U.S. clean energy transition and decarbonization strategy, critical infrastructure, and the competitiveness of many domestic manufacturing industries.[3] The domestic steel industry is the cleanest and most energy-efficient in the world; steel production in the United States has the lowest GHG emissions

---

[3] Indeed, all of SunCoke's coke plants remained operational during the COVID-19 pandemic government shutdowns because they were deemed "critical infrastructure" as suppliers to steelmakers and energy generators.

EXH143

ED_018388_00000109-00005

intensity of the nine largest steel producing countries and the EU-27.[4]  The curtailment of domestic steel production due to a coke supply shortage would make the U.S. dependent on imports of steel from countries where GHG emissions from steel production are substantially higher, not to mention the environmental emissions associated with shipping millions of tons of coke across the world.  Domestic steel is a critical material for U.S. transition to a low-carbon economy.



Source: Adapted from McKinsey & Company, "The raw-materials challenge: How the metals and mining sector will be at the core of enabling the energy transition" 2021.

SunCoke produces 37% of the entire domestic metallurgical coke supply used by the domestic steel industry.  SunCoke's patented heat recovery cokemaking process was recognized by EPA as the MACT and the most environmentally friendly method to make coke.[5]  SunCoke's unique cokemaking process creates higher quality, higher strength coke that results in steelmakers using *less* coke in their blast furnaces and thereby lowering their GHG emissions; in this way, SunCoke supports steelmakers in achieving their GHG-reduction goals.[6]  SunCoke invests in maintaining and improving its cokemaking plants to ensure they are performing optimally and in compliance for decades to come.  With its environmentally superior technology and younger cokemaking assets,[7] SunCoke is well positioned to be a leader in producing coke for the domestic steel market for many years to come.

SunCoke's Jewell facility also began producing foundry coke in 2021 after making a $50 million investment to refurbish its coking facility in Vansant, Virginia.  Foundry coke is distinct

---

[4] Adapted from Hasanbeigi, "Steel Climate Impact: An International Benchmarking of Energy and CO2 Intensities," Global Efficiency Intelligence, 2022.

[5] *See* n.1.

[6] In addition to its environmental signature, SunCoke's innovative process generates enough electricity to power 60,000 homes.

[7] The majority of SunCoke's coke plants were built after 2005, with the exception of Jewell and Indiana Harbor, which have undergone extensive refurbishments.

EXH144

ED_018388_00000109-00006

in size and drop strength from blast furnace coke and is not interchangeable with blast furnace coke. There are only two remaining foundry coke producers in the U.S., one of which is SunCoke's Jewell coke plant and the other being ABC Coke. Iron foundries use coke to melt scrap metal to produce cast iron shapes that are used in a wide variety of industries, including automotive parts (in particular for electric vehicles), construction, agriculture, defense, energy, and municipal water. SunCoke produces approximately 31% (approximately 170,000 tons per year) of the entire domestic foundry coke supply. The U.S. Department of Commerce has prohibited imports of foundry coke from China since 2003, after concluding that China's foundry coke imports violated antidumping laws and were being sold for less than fair market value in the U.S.[8] For these reasons, SunCoke's production of foundry coke is critical to the U.S. economy and should not be curtailed.

SunCoke is also a significant employer; it employs a substantial union workforce and provides jobs in economically challenged areas of the country. In total, SunCoke provides 887 well-paying jobs to its employees, with 40% of its workforce being members of the United Steelworkers union. With respect to SunCoke's coke plants, Jewell (VA) plant provides 116 jobs; Granite City (IL) provides 102 jobs; Haverhill (OH) provides 173 jobs; Indiana Harbor (IN) provides 163 jobs; and Middletown (OH) provides 91 jobs. SunCoke is a stable employer, with the average length of tenure for its employees being 11 years. In addition to SunCoke's own employees, it provides numerous jobs for long-term, on-site contractors. SunCoke's coke plants provide a positive impact to the local economies far beyond SunCoke jobs. SunCoke employs a wide variety of local businesses as contractors and supports local communities through donations and participation in community-building events.

Numerous coke plants have closed over the past decade due to aging assets and the high costs necessary to maintain these facilities to meet existing environmental requirements.[9] Because EPA's proposed changes are uneconomical and impractical, additional coke plant closures or curtailments will result, leading to a decline in domestic steel and cast iron production. Regulations rendering domestic cokemaking infeasible would further cripple the domestic steel and iron foundry industries, increase the necessity to import these products, hinder the U.S. transition to a low-carbon economy, and cause job loss in economically distressed areas. The end result of the amendments as proposed would be to harm rather than protect the environment, and they should be modified.

---

[8] *See, e.g.*, *Final Results of Antidumping Administrative Review: Foundry Coke from the People's Republic of China*, 69 Fed. Reg. 4,108, 4,108 (Dep't Commerce Jan. 28, 2004) ("AR 2001–2002 Final Results").
[9] Closures since 2014: DTE Shenango (300Kt); USS Granite City (500Kt); USS Gary Works (1,200Kt); Tonawanda (150Kt); Erie Works (150Kt); Bluestone (300Kt); Middletown (Wilputte) (400Kt); Mountain State Carbon (700Kt); and Clairton (Partial) (700Kt).

EXH145

ED_018388_00000109-00007

## II.    EPA WAS RUSHED TO PUBLISH PROPOSED AMENDMENTS TO LONG-ESTABLISHED COKE OVEN MACT STANDARDS

EPA is proposing to amend two existing rules at the same time: the NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks (40 CFR Part 63, Subpart CCCCC) and the NESHAP for Coke Oven Batteries (40 CFR Part 63, Subpart L).

EPA promulgated Subpart L in 1993. 57 Fed. Reg. 57534, 57536 (Dec. 4, 1992); 58 Fed. Reg. 57898, 57898 (Oct. 27, 1993). For HNRs, Subpart L addresses leaks of coke oven emissions (COE)[10] from oven doors and charging emissions. According to EPA, the controls and work practice requirements included in the rule provide "concurrent control of many air toxics and hazardous pollutants included in the coke oven emissions from batteries or bypass/bleeder stacks." 58 Fed. Reg. at 57906. EPA made minor corrections to the standards in 1994. 59 Fed. Reg. 1992-C (Jan. 13, 1994). EPA amended Subpart L in 2005 after an RTR review in order to address health risks remaining after implementation of the 1993 standards and new calculations based on revised cancer guidelines. 69 Fed. Reg. 48338 (Aug. 9, 2004); 70 Fed. Reg. 19992 (Apr. 15, 2005). In the 2005 rule, EPA used particulate matter as "a surrogate for particulate HAP in [COE]," 70 Fed. Reg. at 19994, and considered in the risk assessment a group of PAH and lead." *Id.* at 20002. EPA noted that it "continue[s] to consider the MIR [maximum individual risk] due to emissions at the limits in the 1993 national emission standards to be an acceptable level of risk." 70 Fed. Reg. at 19993.

EPA promulgated Subpart CCCCC in 2003. 66 Fed. Reg. 35326 (Jul. 3, 2001); 68 Fed. Reg. 18008 (Apr. 14, 2003). Subpart CCCCC established MACT standards that included PM limits as a surrogate for HAP metals[11] for pushing, opacity limits for PM/HAP metals from battery stacks of oven combustion air, and a work practice standard to limit PM and volatile HAP emissions for quenching.[12] EPA made corrections to these standards in 2003. 68 Fed. Reg. 19885-C (Apr. 22, 2003). EPA issued a direct final rule amending these standards in 2004, but withdrew a part of that direct final rule in 2005. 69 Fed. Reg. 60813 (Oct. 13, 2004); 70 Fed. Reg. 1670

---

[10] "COE are a separately-listed hazardous air pollutant (HAP) emitted from most subpart L sources that is thought to consist of more than approximately 71 chemicals, including volatile and semi-volatile organic HAP and particulate matter (PM) HAP." EPA-HQ-OAR-2002-0085-0873, EPA, Memorandum, *Technology Review for NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks (40 CFR part 63, subpart CCCCC), and NESHAP for Coke Oven Batteries (40 CFR part 63, subpart L)* (May 1, 2023).

[11] The HAP metals are antimony, arsenic, beryllium, cadmium, chromium, cobalt, lead, manganese, nickel, and selenium.

[12] EPA noted in a response to comments that regulation of PM through the use of control devices directly reduces individual HAP emissions, stating:

> We agree with the comment that baffles reduce PM emissions. In addition, we believe that baffles also reduce the emission of HAP metal compounds contained in the particles of grit released, as well as semivolatile and VOC such as polycyclic aromatic hydrocarbons (PAH) and benzene, when green coke is quenched. Semivolatile organic compounds evolve from green coke and condense to form fine PM or condense on other particles during the quenching process. Consequently, baffles reduce emissions of both metal and organic HAP.

71 Fed. Reg. at 18018. EPA also defended the continued use of opacity as a surrogate, citing the correlation between opacity and HAP: "Higher opacities mean a higher concentration of particles and therefore higher concentrations of HAP." 71 Fed. Reg. at 18020.

7

(Jan. 10, 2005). EPA finalized the withdrawn provisions in 2005. 70 Fed. Reg. 44285 (Aug. 2, 2005).

SunCoke's heat-recovery coke oven technology set an example and served as the basis for establishing the MACT, as it is designed to limit emissions of HAPs. 66 Fed. Reg. at 35328-29. All of SunCoke's heat-recovery cokemaking facilities built in the U.S. since 1998 have either met or exceeded the applicable BACT or LAER standards set forth for cokemaking facilities.

For the RTR for Subpart CCCCC and the technology review for Subpart L, EPA issued CAA section 114 information collection requests ("ICRs") to SunCoke and certain other affected sources in April 2016, June 2022, and July 2022. These requests included lengthy questionnaires and source test requests. SunCoke and other affected sources provided a significant amount of data and information to EPA in response to these ICRs. SunCoke conducted extensive stack testing of various sources including bypass vent stacks, main stacks, hot car stacks, and pusher/charger machine stacks for over 75 constituents, including HAPs and other target pollutants. SunCoke alone spent around $1.5–1.6 million to perform the stack testing and multitude of other types of tests required under EPA's ICRs.

EPA is proposing amendments to the NESHAPs for the Coke Ovens: Pushing, Quenching, and Battery Stacks ("PQBS") source category and the Coke Oven Batteries ("COB") source category, after conducting its RTR for the PQBS source category and its periodic technology review for the COB source category. There is no dispute that EPA was rushed to publish the Proposed Rule. EPA was sued by environmental groups in the Northern District of California for failing to undertake the statutorily-required residual risk and technology reviews for the two coke oven source categories. *Citizens for Pennsylvania's Future v. Wheeler*, 469 F. Supp. 3d 920, 934 (N.D. Cal. 2020). The court ordered EPA to take final action by December 26, 2022, and then extended the deadline to May 23, 2024, causing EPA to scramble to gather information, conduct an analysis, and publish the Proposed Rule that is the subject of these comments. In its haste to respond to the court order, EPA has proposed a rule that does not provide feasible solutions or enough time for stakeholders to meaningfully comment.

## III. EPA'S MISCHARACTERIZATION OF SUNCOKE'S HEAT/NONRECOVERY COKEMAKING PROCESS, DISTINCT FROM BYPRODUCT COKEMAKING, RESULTS IN A FLAWED PROPOSED RULE

### A. EPA Mischaracterizes SunCoke's Cokemaking Process and Facilities

In its haste to get the Proposed Rule published, EPA made a number of factually incorrect assumptions and statements about SunCoke's process that could lead to irrevocably prejudicial and damaging results for SunCoke.[13] HNR ovens operate under negative pressure, adding air from the outside to oxidize volatile matter and release the heat of combustion within the coke oven system. Coal is charged into an HNR oven at the beginning of the coking cycle, using a mobile pushing/charging machine ("PCM") to create a coal bed in the oven. The mobile PCM charges coal into one side of the oven. Each PCM is equipped with a traveling hood/baghouse system that controls charging emissions.

---

[13] *See, e.g.*, 88 Fed. Reg. at 55863-65 (describing processes of HNR and ByP facilities).

8

The coking cycle is typically 48 hours (about 2 days) for blast coke and 72 hours (about 3 days) for foundry coke. During the coking cycle, coal molecules are pyrolyzed and polymerized to create larger coke carbon crystalline structures. Pyrolysis products are released from the coal bed as volatile matter ("VM"). The VM is partially burned in the headspace, i.e., crown, of the oven above the coal bed. Partially combusted gases then pass into a sole flue system beneath the oven floor where essentially all of the combustion is completed. The flue gases then pass into a common tunnel where any remaining uncombusted volatile organics are oxidized and fully combusted.

In SunCoke's sole non-recovery plant (Jewell), the fully combusted flue gas is exhausted to the atmosphere through waste heat stacks on top of each battery of ovens. The waste heat stacks provide the natural draft to draw the VM and combustion air through the system. In SunCoke's heat recovery plants (Haverhill, Granite City, Middletown, and Indiana Harbor), the common tunnel system routes the flue gases from the coking process to heat recovery steam generators ("HRSGs") to recover heat for steam generation, which can be used as process steam or electricity that off-sets the use of fossil fuels. The HRSGs also cool the flue gases that go to downstream pollution control devices. Particulate matter ("PM"), sulfur dioxide ("$SO_2$"), mercury ("Hg"), acid gases, and other compounds are removed from the flue gases in a flue gas desulfurization ("FGD") system that consists of a spray dryer absorber ("SDA") with activated carbon injection, followed by a baghouse. Scrubbed flue gases are then emitted via induced draft fans through the main stack. The induced draft fans provide the draft that draws the gas through the entire system.

At the end of the coking cycle, after the coal has been converted to coke, the coke is pushed into a mobile hot car. At SunCoke's Jewell and Indiana Harbor plants, the hot car is a conventional open top design. At the remainder of SunCoke's plants (Haverhill, Granite City, and Middletown), the hot car is a flat push hot car design. The open top hot cars operate under a cokeside shed that captures pushing emissions. The flat push hot cars are equipped with a roof and multicyclone (also referred to as a multiclone) that captures pushing emissions. The cokeside sheds and multicyclones control HAP metals that are in the form of PM.[14]

The hot car travels on rails to convey the coke to the quench station. The open top hot cars are quenched directly inside the quench tower while a stationary quench ram transfers the coke loaf from the flat push hot cars to a quench car. Quenching is performed in a specially designed quench tower with baffles to control PM. Quenching emissions are also controlled by using water with total dissolved solids ("TDS") levels no greater than 1,100 milligrams per liter ("mg/L"). Acceptable quench makeup water is used (e.g., river water and retained stormwater runoff) to maintain the TDS level in the quench water at or below 1,100 mg/L. SunCoke's coke plants are a net user of water and do not discharge process waste waters.

Bypass vent stacks are normally closed. To safely maintain negative pressure in the coke ovens during an emergency (such as a severe storm with a major power outage) or during HRSG maintenance (typically 8 days per year) or FGD maintenance (typically 5 days per year), natural

---

[14] EPA-HQ-OAR-2002-0085-0873, EPA, Memorandum, *Technology Review for NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks (40 CFR part 63, subpart CCCCC), and NESHAP for Coke Oven Batteries (40 CFR part 63, subpart L)*, at 5 (May 1, 2023).

9

draft bypass vent stacks can be used to vent the *fully combusted* flue gases to the atmosphere. These stacks are typically open for established limited periods during the year such that the lids are closed the majority of the time.

### 1.    HNR Coke Ovens and ByP Coke Ovens are Fundamentally Different

The design and operation of SunCoke's cokemaking process is so fundamental and unique that SunCoke's facilities should not be compared to ByPs. EPA nevertheless appears to confuse SunCoke's cokemaking process with that of byproduct coke manufacturing. This leads to several inaccuracies in EPA's development of the proposed emissions limits, proposed benzene fenceline monitoring work practices, and other portions of the Proposed Rule.

For example, in the Proposed Rule, EPA makes the following mischaracterizations of the coking process at both types of coke oven facilities:

> The process begins when a batch of coal is discharged from the coal bunker into a larry car (i.e., charging vehicle that moves along the top of the battery). The larry car is positioned over the empty, hot oven; the lids on the charging ports are removed; and the coal is discharged from the hoppers of the larry car into the oven. . . . This process takes place at two types of facilities: (1) by-product recovery (ByP) facilities, where chemical byproducts are recovered from coke oven emissions (COE) in a co-located coke byproduct chemical recovery plant (CBRP); or (2) heat and nonrecovery, or only nonrecovery with no heat recovery (HNR) facilities, where chemicals are not recovered but heat may be recovered from the exhaust from coke ovens in a heat recovery steam generator (HRSG).

88 Fed. Reg. 55858, 55863 (Aug. 16, 2023). These statements are false for several reasons, including: HNR cokemaking does not use a larry car; does not have a car of any kind on top of the battery; transfers coal via conveyor belts instead of cars; and has a different coking cycle timeframe than that described by EPA. The two cokemaking processes are fundamentally different and must be evaluated as such in this rulemaking.



EXH149

ED_018388_00000109-00011

One of the primary differences between HNR facilities and ByP facilities is that byproduct ovens operate under positive pressure, such that small openings or cracks in byproduct ovens allow raw coke oven gas and HAPs to leak into the atmosphere. The volatiles and combustion products are collected downstream of the oven chamber and refined in a chemical plant to produce coke oven gas and other products such as tar, ammonia, and light oils.

SunCoke's HNR ovens operate under negative pressure, using induced draft fans that pull air from the outside to oxidize volatile matter and release the heat of combustion within the oven system.[15] Operating the coke ovens under negative pressure virtually eliminates the risk of leakage of coke oven emissions through doors or other potential leakage points. Openings or cracks in the ovens simply allow additional air to be drawn into the oven as part of the carbonization process. Coal volatiles are combusted within the HNR oven system, unlike at ByP facilities, where the byproducts are recovered in a downstream chemical plant. This combustion generates heat, which is used to complete the coking cycle and, at heat recovery facilities, the remaining heat is recovered in HRSGs and used to produce electricity or process stream,

SunCoke's ovens are not sources of leaking coke oven emissions, with the exception of limited door leaks, which EPA recognized "are so infrequent and of such short duration that the annual emissions are orders of magnitude below those from door leaks on by-product batteries, which occur on a continuous basis."[16] EPA further stated that it did not "anticipate any adverse public health or environmental impacts due to emissions from charging and coke oven doors at non-recovery batteries." 69 Fed. Reg. 48337, 48344 (Aug. 9, 2004).

The equipment used by the two types of facilities is also different because of the difference in the design and operation of the ovens. SunCoke charges its HNR ovens from the side using a PCM, whereas ByP ovens charge from the top using a larry car. At an HNR facility, coke is pushed out of the ovens into a hot car, controlled by either a multiclone or a shed enclosure, whereas ByP facilities use hot cars controlled by baghouses or other devices. EPA accounted for the difference in these control types in the original MACT standard. *See* 58 Fed. Reg. 57898, 57899 (Oct. 27, 1993). Byproduct ovens, as EPA notes, are smaller in width than heat recovery ovens. 88 Fed. Reg. at 55863. The difference in pushing control technologies is due to the size and layout of the coke oven batteries, as further described in Section IV.

The differences in operations mean differences in emissions and, while EPA accounted for these differences in the original MACT standard, it ignored them in the Proposed Rule. One of the more egregious examples was failing to account for the fact that the annual emissions from HNR facilities (in EPA's own words) "are orders of magnitude below those from door leaks on by-product batteries, which occur on a continuous basis." *See, e.g.*, Sections XI.A.1, XII. The below chart further illustrates differences in emissions (here, benzene and PAH) between heat

---

[15] While Jewell does not have induced draft fans, it uses natural draft to pull air from the outside to oxidize and fully combust volatile matter and release the heat of combustion within the oven system. Similar to SunCoke's heat recovery plants, Jewell also operates under negative pressure; openings or cracks in the ovens simply allow additional air to be drawn into the oven system.

[16] EPA, *National Emissions Standards for Coke Oven Batteries: Background Information for Final Amendments,* at 21 (Mar. 31, 2005).

EXH150

ED_018388_00000109-00012

recovery and byproduct plants. EPA ignored these differences (and the Fenceline Monitoring data) when it determined, for example, that it was "necessary" to require Fenceline Monitoring for both.



## 2.    SunCoke's Facilities Do *Not* Emit COE Directly to the Atmosphere

SunCoke does not emit coke oven emissions ("COE") directly to the atmosphere through its bypass or waste heat stacks. EPA makes significant mischaracterizations of SunCoke's venting process in the *Federal Register* notice and in its analysis of SunCoke's emissions:

> The one facility without HRSGs *sends COE directly to the atmosphere* via waste heat stacks, 24 hours per day, 7 days a week. At the current heat recovery facilities, each HRSG can be bypassed ranging from 192 to 1,139 hours per year, depending on the facilities' permits, *sending COE directly into the atmosphere.*

88 Fed. Reg. 55858, 55864 (Aug. 16, 2023) (emphasis added); *see also id.* 55877. The volatiles in the coke oven emissions are already fully combusted when vented out of the waste heat and bypass vent stacks and therefore, no COE is vented directly to the atmosphere. *See* Section III.A. Instead fully combusted oven flue gases (primarily $CO_2$, $H_2O$, and excess oxygen and nitrogen) are vented to the atmosphere. This is because, as described in Section III.A above, SunCoke's ovens operate under negative pressure such that the volatiles in the coal are combusted within the oven system, which means they are not vented to the atmosphere like ByP coke ovens.

SunCoke performs quarterly industrial hygiene monitoring for COEs at all of its facilities pursuant to OSHA's Coke Oven Emissions Standard, 29 CFR § 1910.1029. As part of this monitoring, SunCoke monitors employees' potential exposure to COEs by collecting personal air samples during normal operations from several categories of workers, including burners, hot car operators, door machine operators, and PCM operators, among others. This monitoring has consistently demonstrated that air samples taken from employees working in close proximity to operational coke ovens shows that the potential exposure to the relevant PAHs (phenanthrene,

12

EXH151

ED_018388_00000109-00013

anthracene, pyrene, chrysene, and benzo(α)pyrene) is below the analytical limit of quantification. This long-time monitoring further demonstrates that SunCoke does not emit COE directly to the atmosphere.

## IV.     EPA SHOULD TREAT HNR AND BYP AS SEPARATE SUBCATEGORIES

HNR and ByP facilities operate in fundamentally different ways and lead to different pathways for emissions. *See, e.g.*, 66 Fed. Reg. 35326, 35336 (Jul. 3, 2001) ("Non-recovery coke oven batteries differ from by-product coke oven batteries both physically and operationally."). EPA should use its discretion to regulate these facility types differently, as it has done in the past for this and countless other source categories. The CAA provides EPA with authority to regulate different types of sources differently for purposes of NESHAP regulations. Section 112(d)(1) provides, in establishing emission standards, "The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source . . . ." 42 U.S.C. § 7412(d)(1).

EPA has acknowledged that regulating sources differently is appropriate if "differences in emissions characteristics, processes, [air pollution control device] viability, or opportunities for pollution prevention exist within the source category." 67 Fed. Reg. 47894, 47907 (July 22, 2002); *see also* 64 Fed. Reg. 63025, 63028 (Nov. 18, 1999). Courts have confirmed EPA's discretion to categorize based on a number of different parameters. *See, e.g.*, *Sierra Club v. EPA*, 895 F.3d 1 (D.C. Cir. 2018) (upholding EPA's approach to subcategorize based on size of brick kilns); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 656–57 (D.C. Cir. 2016) (upholding EPA's discretion to subcategorize based on the type of fuel a boiler burns because the type of fuel "affect[s] boiler emissions and the feasibility of emission controls"); *Sierra Club v. Costle*, 657 F.2d 298, 318–19 (D.C. Cir. 1981) (holding that the text of 42 U.S.C. § 7411, which allows EPA to "distinguish among classes, types and sizes," permits distinctions based on variations in the sulfur content of coal used by utility plants). In *U.S. Sugar Corp.*, the D.C. Circuit noted that the statute "implicitly acknowledges that the EPA may need to set different emission standards within a category of major sources based on what is achievable for a subset of those sources." 830 F.3d at 657.

Differences in the design and operation of heat and non-recovery and byproduct technology and their pollution control equipment result in differences in emissions, such that EPA should treat these distinct facility types as separate subcategories. *See, e.g.*, 66 Fed. Reg. at 35334 (establishing separate subcategories for short and tall batteries after recognizing "the greater height of fall of the coke from a tall oven can result in more visible emissions," and establishing a subcategory for batteries with horizontal flues because of unique physical and operational differences from vertical flue batteries).

For example, byproduct coke plants control pushing emissions using stationary devices (baghouses) whereas three HNR sources (Granite City, Haverhill, Middletown) control pushing emissions using a mobile multiclone (on the flat push hot car) and two HNR sources (Indiana Harbor, Jewell) control pushing emissions using cokeside sheds, one of which has a baghouse system ( Indiana Harbor). Differences in the design and operation of these types of coke plants and their pollution control equipment result in differences in emissions between HNR and ByP facilities. Installing additional controls on an HNR's flat push hot car for controlling any of these

13

pollutants is technically infeasible because the hot car is mobile, subject to significant vibration, and has very limited space or weight capacity for additional equipment. Despite the differences between these sources, EPA developed the proposed pushing limits using data from both byproduct and HNR sources. *See* 88 Fed. Reg. 55858, 55861 (Aug. 16, 2023). For these reasons, it is inappropriate, arbitrary, and capricious to use data from byproduct coke plants to establish limits for the HNR facilities. The HNRs' limits must be based solely on HNR facilities' data. *See* Section IX.C.3.

## V.    THE PROPOSED RULE VIOLATES THE APA BECAUSE EPA PROVIDED INADEQUATE TIME FOR REVIEW

Due to the highly technical nature of this rulemaking and the large volume of information in the docket, EPA is violating the CAA and the Administrative Procedure Act ("APA") by limiting the notice and comment period to 45 days. EPA's failure to provide a reasonable period for responding to the proposed amendments violates the CAA. Section 107(h) of the CAA requires EPA to provide a "reasonable period" for public participation in responding to a proposed rule: "It is the intent of Congress that . . . the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a *reasonable period* for public participation of at least 30 days . . . ." 42 USC § 7607(h) (emphasis added). This comment process is a "crucial" rulemaking requirement to "ensure that agency regulations are tested via exposure to diverse public comment . . . to ensure fairness to affected parties, and . . . to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013); *see also Miami-Dade Cty. v. EPA*, 529 F.3d 1049, 1058 (11th Cir. 2008). Moreover, the fact that EPA has a court ordered deadline of May 23, 2024 to complete this rulemaking does not excuse the agency from complying with Section 107(h). The CAA is clear that EPA is required to provide a "reasonable period" for public participation even when a rulemaking is "subject to a deadline." 42 USC § 7607(h).

Further, EPA's failure to provide a meaningful opportunity for SunCoke and other affected sources to review and comment on the proposed amendments violates the APA. The APA requires agencies to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). Agencies must provide the public with a "meaningful opportunity" to comment on a proposed rule. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). The length of a comment period is an important factor used to determine whether an agency provided a "meaningful" opportunity to comment. *See, e.g., N.C. Growers' Ass'n v. UFW*, 702 F.3d 755, 770 (4th Cir. 2012) ("Our conclusion that the Department did not provide a meaningful opportunity for comment further is supported by the exceedingly short duration of the comment period."); *see also Est. of Smith v. Bowen*, 656 F. Supp. 1093, 1099 (D. Colo. 1987) ("The comment period of 60 days was inadequate. The Secretary's failure to extend that period pursuant to the numerous requests to do so was arbitrary and capricious").

As further described in SunCoke's request for an extension, attached as Attachment A, EPA is proposing *major* changes to *two* different standards, 40 CFR Part 63, Subparts L and CCCCC, in a single rulemaking. The amendments are highly technical, and over 450 supporting documents — including substantial volumes of technical memoranda, analyses, and important

EXH153

ED_018388_00000109-00015

data   providing the basis for this rulemaking were not publicly available until the Proposed Rule was published on August 16, 2023.[17]   For example, EPA's MACT Standard Calculations, Cost Impacts, and Beyond-the-Floor Cost Impacts for Coke Ovens Facilities consists of 114 pages each plus nine separate excel sheets filled with technical data that necessitate detailed review and analysis.  It took EPA 10 years to develop the Proposed Rule, yet SunCoke and the other affected sources were given less than 2 months to evaluate and provide thoughtful comments on it.

Providing a full and comprehensive evaluation of the expected costs, feasibility, and other implications of the proposed amendments and preparing timely and thoughtful comments was virtually impossible for SunCoke (and undoubtedly other affected sources) to accomplish within the comment period provided.  For example, SunCoke was unable to:

- Fully evaluate EPA's calculations and proposed emission limits;
- Perform modeling, including an analysis of the implications of the fenceline monitoring provisions;
- Conduct risk modeling on site-specific profiles;
- Fully analyze energy consumption requirements associated with installing, operating, and maintaining the additional pollution control equipment required by the Proposed Rule; or
- Fully analyze the cost and benefit estimates for the proposed requirements specifically described herein.

SunCoke also was unable to comment on many of the topics EPA specifically requested comment on, including:

- The merits of a 1-hour opacity standard (88 Fed. Reg. at 55861);
- The validity of the assumption of two for an acute factor for all sources at coke facilities (*Id.* at 55871);
- Alternative approaches to establishing emissions standards for HRSG main stacks and bypass stacks (*Id.* at 55879);
- The feasibility of capturing and controlling soaking COE (*Id.* at 55884);
- Alternative methods to reduce leaks from doors, lids, and offtakes, and from charging at coke oven batteries (*Id.* at 55884);
- The suitability of selecting benzene or other HAP, including naphthalene and other PAH, as the indicator to be monitored by fenceline samplers (*Id.* at 55887);
- The revised equation to estimate coke oven door leaks (*Id.* at 55889);
- Whether any situations exist where separate standards, such as work practices, would be more appropriate during periods of startup and shutdown (*Id.* at 55890);
- The content, layout, and overall design of the quarterly and semiannual compliance reports templates (*Id.* at 55892);
- The use of 1 BP and any potential emissions of 1 BP from this source category (*Id.* at 55892);
- Additional data that may improve the risk assessments and other analyses (*Id.* at 55899);
- Cost and benefit estimates for the proposed action (*Id.* at 55899);

---

[17] In contrast, the preamble to the Proposed Rule indicates that EPA began collecting and analyzing relevant data as part of this rulemaking as early as 2016.  88 Fed. Reg. at 55,866.

15

EXH154

ED_018388_00000109-00016

- The accuracy of revenue and employment data included in the EIA (*Id.* at 55899); and
- The impact of other ongoing rulemaking efforts (*Id.* at 55899).

Additional time is required for SunCoke and other affected sources to have a meaningful opportunity to review. Forty-five (45) days is not reasonable. As such, SunCoke renews its request to extend the comment period another 45 days.

## VI.  EPA VIOLATED THE APA BY FAILING TO PUBLISH PROPOSED RULE CHANGES IN THE *FEDERAL REGISTER*

EPA did not publish any proposed rule language in the *Federal Register* notice for the Proposed Rule. EPA instead included redline versions of its proposed amendments to the current Subpart L and Subpart CCCCC in the dockets.[18] These redline documents are not a valid substitute for publishing the actual proposed rule language in the *Federal Register*. EPA's failure to publish the Proposed Rule language in the *Federal Register* is particularly troubling because its redline versions of its proposed amendments include several changes that are not explained, nor in some instances even discussed, in the *Federal Register* notice. For example, the redlined version of EPA's proposed amendments to Subpart L proposes amending 40 C.F.R. § 63.305 to allow use of ASTM D7520-16 as an alternative to Method 9 to measure the opacity of emissions from coke oven doors equipped with sheds (see proposed addition of (iii)(A)-(E) to section 63.305(c)(3). This proposed amendment is not identified in the *Federal Register* notice. SunCoke is very concerned with these discrepancies, particularly since the short comment period did not allow sufficient time for SunCoke to analyze EPA's proposed changes to the redline versions, or sufficient time to compare those proposed changes to the *Federal Register* notice. As EPA is well aware, even minor changes to a rule can have significant impacts on an affected source.

For these reasons, EPA must re-publish the rule, including a description of all proposed rule changes, and allow additional time for public notice and comment.

## VII.  SUNCOKE'S EXISTING FACILITIES CONSTITUTE "EXISTING SOURCES" UNDER THE CAA

It appears that EPA may be mistakenly treating SunCoke's existing plants as "new sources" in the Proposed Rule, which, if so, would be contrary to the CAA's definition of "new source," contrary to EPA's past practice, and prejudicial to SunCoke. SunCoke's facilities have existed since well before EPA proposed amendments to this rule on August 16, 2023. SunCoke's newest facility, Middletown, OH, was brought online in 2011, and SunCoke's oldest facility, Jewell has been online since the 1960s. Because SunCoke's facilities predate EPA's Proposed Rule, the facilities must be considered "existing sources" for purposes of the rule. SunCoke's existing facilities should not be held to the same standard as new sources.

---

[18] EPA-HQ-OAR-2003-0051, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC* (Jul. 1, 2023); EPA-HQ-OAR-2003-0051-0753, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart L* (Jul. 1, 2023).

EXH155

ED_018388_00000109-00017

## A.    It is Ambiguous Whether the Proposed Rule Applies to Existing or New Sources

Although the plain language of the CAA, applicable case law, and EPA's long-standing history of applying the "new source" definition all dictate that the existing SunCoke facilities must be considered existing sources, ambiguity exists within EPA's proposed amendments as written. The redline version of the proposed amendments — which EPA did not incorporate into the *Federal Register* notice—suggests that EPA is not updating the cut-off date for what is considered a "new" or "existing" coke oven battery under these amendments, and that EPA intends to consider coke oven batteries that are almost 20 years old to be "new."[19]  EPA's technical analysis, however, correctly assumes that each of SunCoke's existing facilities will be considered "existing" sources under the proposed amendments and that only those coke oven batteries that are actually new after issuance of the rule would be subject to the proposed emission limits for "new" coke oven batteries, as explained in SunCoke's request for an extension. *See* Attachment A at 2 and n.2. As a regulated company, SunCoke has the right to understand exactly which standards are being applied to it in a proposed rulemaking, and the lack of clarity on this point is prejudicial to SunCoke and all other regulated entities.

## B.    The CAA and EPA's History of Interpretations Supports Designating All SunCoke Facilities as "Existing Sources"

The plain language of the CAA and EPA's own interpretations support the regulation of all SunCoke facilities as existing sources.  Whether a source is considered "new" or "existing" is determined by whether the source's construction or reconstruction was commenced before or after proposal of the particular standards in question.  The CAA defines a "new source" as "a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source."  42 U.S.C. § 7412(a)(4).  The Act also defines an "existing source," which is "any stationary source other than a new source."  *Id.* § 7412(a)(10).

EPA has a history of applying the CAA's "new source" definition in accordance with this understanding that a "new source" is that for which construction or reconstruction begins after the date of proposal for rule amendments.  In doing so, EPA has interpreted "first proposed" to mean that the "new source" designation applies to sources constructed or reconstructed *after* each subsequent rulemaking.  In fact, EPA applied this same understanding to its 2005 amendments to the Coke Oven Batteries NESHAP:

> [EPA] concluded that it was not appropriate to increase the stringency of the current NESHAP for already-operating non-recovery batteries. This limit is appropriate for new sources, *which are those constructed after the date of proposal of these final rule amendments*, because it allows the new requirements to be incorporated into the considerations of design and operation of the new source.

---

[19] *See, e.g.*, EPA-HQ-OAR-2003-0051, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC*, at 3 (Jul. 1, 2023) ("An affected source at your coke plant is existing if you commenced construction or reconstruction of the affected source before July 3, 2001.")

EXH156

ED_018388_00000109-00018

70 Fed. Reg. 19992, 20009 10 (Apr. 15, 2005) (emphasis added). EPA's reasoning was clear; this "allows the new requirements to be incorporated into the considerations of design and operation of the new source." *Id.* at 20010. The same logic also must be applied to the current Proposed Rule.

The Portland cement manufacturing rule from 2000 provides another example of EPA's practice of treating only facilities built *after* a new rule is proposed as "new sources." EPA originally promulgated new emissions standards in 2000, but the D.C. Circuit Court remanded because EPA failed to set standards for certain HAPs. *See generally Nat'l Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000). Following the remand, EPA promulgated revised standards in 2006: *National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry, Final Rule*, 71 Fed. Reg. 76518 (Dec. 20, 2006). EPA applied the revised standards only to those sources constructed after 2005. In doing so, EPA expressly rejected comments seeking to apply the revised standards to sources constructed after 1999, when the original, remanded standards were proposed. 71 Fed. Reg. at 76518.[20]

In defending its interpretation, EPA reasoned:

> The whole premise of new source standards being potentially more strict than for existing sources . . . is that *these sources are being newly constructed and hence can immediately install the best pollution controls without incurring the time or expense of retrofitting.* Put another way, *new sources know from the beginning of the construction effort what controls will be required,* and do not have to incur the higher costs and the time-consuming disruptions normally associated with control retrofits. If we were to require 'new sources' that commenced construction prior to [2005] to retroactively install controls because we have changed rule requirements, then these particular sources would have to bear retrofit costs that we do not believe were intended by the CAA.

71 Fed. Reg. at 76541 (emphasis added). EPA further defended its refusal to retroactively apply the standards to sources constructed as early as 2000 by stating, "This reading makes no sense in the context of a court action which essentially required EPA to reexamine the entire issue, and re-determine what the standard should be. Under such circumstances, *the only reasonable date for determining new source applicability for a resulting standard would be the date EPA proposes it.*" *Id.* (emphasis added).

The only reasonable date for determining new source applicability, therefore, is the date EPA proposes the new amendments. A logical reading of the CAA and EPA's own history of practices and enforcement support the conclusion that all SunCoke facilities must be considered "existing sources."

---

[20] *See also National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry, Proposed Rule*, 70 Fed. Reg. 72330, 72336 (Dec. 2, 2005) ("The underlying principle for having new sources meet stricter standards . . . is that such sources are essentially starting from scratch and, therefore, can most efficiently utilize the best means of pollution control. They will not need to retrofit. Sources classified as new under the [original standard] are not in this position. They have already commenced construction (and most likely started operating) and so are not in the position of a source starting de novo.").

EXH157

ED_018388_00000109-00019

### C.    Case Law Further Supports Designating All SunCoke Facilities as "Existing Sources"

Pertinent case law analyzing the distinction between a new source and an existing source in this context is limited, likely due to the commonsense nature of EPA's previous rulemakings. The limited case law that does discuss this distinction confirms that new sources are those whose construction is commenced after promulgation of a new rule. Therefore, all previously existing SunCoke facilities must be considered "existing sources" according to the CAA.

The D.C. Circuit supports this understanding. In *U.S. Sugar Corporation v. EPA*, the D.C. Circuit confirmed, "new sources" were "those built after promulgation of a HAPs limit." 830 F.3d 579, 594 (D.C. Cir. 2016). Further, "'new' sources are those 'on which construction begins after EPA publishes emission standards' . . . most of the others are 'existing' sources, see 42 U.S.C. § 7412(a)(10)." *Id.* (citing *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 858 (D.C. Cir. 2001)).

Sixth Circuit jurisprudence has long supported this same understanding. In *United States v. City of Painesville, Ohio*, the Sixth Circuit held, "The statute [CAA] plainly provides that new sources are those whose construction is commenced after the publication of *the particular standards of performance in question* . . . ." 644 F.2d 1186, 1191 (6th Cir. 1981) (emphasis added). The Sixth Circuit makes clear that whether a source is considered "new" or "existing" is determined by whether the source's construction began before or after publication of the particular standards in question. Like the D.C. Circuit, the Sixth Circuit's holding in *City of Painesville* supports the argument that the determinative date for whether a source is "new" or "existing" is analyzed based on the proposal date of the standard or revision itself. Only sources whose construction begins after publication of a particular revision are considered "new sources" for purposes of applying that revision's standards for new sources. Accordingly, only the standards for existing sources under the current revision should apply to existing SunCoke facilities.

## VIII.   THE PROPOSED BTF LIMITS FOR SUNCOKE'S JEWELL FACILITY ARE BASED ON FLAWED ASSUMPTIONS, INACCURATE DATA, AND THE LEGALLY ERRONEOUS USE OF A COST-EFFECTIVENESS THRESHOLD FROM A DIFFERENT INDUSTRY

EPA's proposed beyond-the-floor ("BTF") measures for SunCoke's Jewell facility are unwarranted under the applicable legal standard and are based on faulty data and assumptions regarding both the costs of the measures and their expected emissions benefits. The CAA requires that proposed emission controls be "achievable"; this has not been demonstrated here. EPA has not justified   nor could it justify   its decision to require BTF measures that SunCoke expects are far from technically, physically, and economically achievable. Ironically, even if these measures were technically, physically, and economically feasible, these measures would have significant energy requirements and non-air quality health and environmental impacts that EPA insufficiently considered, including an estimated increase of over 46,000 ton annually in $CO_2$ emissions from the extra electricity needed to operate the system. Additionally, EPA's determination that the BTF measures were "cost-effective" was based on erroneous data concerning not only the costs of such measures, but also their effectiveness at reducing mercury and other HAP emissions. EPA's determination also improperly relied on a dollar threshold used in an entirely different regulatory

19

proceeding for a different industry. Under its own announced criteria, EPA's proposed measures are arbitrary and capricious.

### A.    BTF Measures Must be "Achievable" After Taking into Consideration their "Cost . . . and Any Non-air Quality Health and Environmental Impacts and Energy Requirements"

The first phase of EPA's standard setting process under CAA Section 112 consists of two parts: the Agency first sets the MACT standards as a minimum control level or "floor" for emissions reduction, then considers control options that are more stringent than ("beyond") this floor:

> Step one requires EPA to establish what has come to be known as the MACT floor—the minimum level of reduction required by statute. . . . Once EPA has set the MACT floor, it may then impose stricter standards—so-called "beyond-the-floor" limits   if the Administrator determines them to be achievable after "taking into consideration the cost . . . and any non-air quality health and environmental impacts and energy requirements."

*Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004) (citing 42 U.S.C. § 7412(d)(2)). When considering whether to implement BTF measures, EPA "must" take into consideration the cost of achieving such emission reduction. *Id.* at 988 (citing 42 U.S.C. § 7412(d)(2)). Costs are clearly an important component of achievability. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 640 (D.C. Cir.), *on reh'g en banc*, 671 F. App'x 822 (D.C. Cir. 2016), *and on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016) (upholding decision not to adopt BTF measures that would cost certain facilities $230,000 per ton of emissions where "[n]othing in section 7429(a)(2) requires the Agency to impose a cost so disproportionate to the expected emissions gains"); *Sierra Club v. EPA*, 167 F.3d 658, 666 (D.C. Cir. 1999) ("In the absence of any type of quantification of benefits or costs, the Administrator had no basis for finding that, 'taking into account the cost,' emissions reductions from pollution prevention programs were 'achievable' as the statute uses the word.").

EPA's discussion of this second step in the preamble for the Proposed Rule acknowledges that BTF standards are considered only if they "might be cost-effective," and proposed only if they are technically feasible and have "reasonable cost impacts":

> *If EPA determines that there are potential BTF standards that might be cost-effective*, the EPA typically develops and evaluates those BTF control options. After evaluating the BTF options, the EPA typically proposes such BTF options *if EPA determines those BTF options under consideration are technically feasible, costs impacts are reasonable*, and that the BTF standard would achieve meaningful reductions and not result in significant *non-air impacts* such as impacts to other media or excessive energy use.

88 Fed. Reg. 55858, 55862 (Aug. 16, 2023) (emphasis added). For this rulemaking, EPA has not demonstrated that the proposed BTF limits are achievable, nor did it accurately consider costs for achieving those limits.

EXH159

ED_018388_00000109-00021

**B.    EPA Relied on Erroneous Assumptions to Compute Costs of Implementing the Proposed BTF Measures at Jewell**

Under the approach adopted by EPA, only one category of facilities (HNR facilities that do not have HRSGs)—which has only one facility (SunCoke's Jewell plant at Vansant, VA)— would be required to implement the proposed BTF measures. 88 Fed. Reg. at 55893. The Jewell plant has a unique configuration that is a product of its topography, as EPA recognized when estimating the amount of time needed for Jewell to complete the work necessary to comply with the proposed new BTF PM limit:

> The facility that is affected by the new BTF PM limit is located between three rivers, a state road, and a railroad track. Therefore, due to the unique configuration of the facility, the resulting lack of space available to construct control devices and ductwork to reduce arsenic emissions from bypass stacks creates an impediment to a typical construction schedule.

88 Fed. Reg. at 55882, n.30. These same unique features are the reasons that SunCoke expects the changes that would be required under EPA's proposal to be exponentially more costly at Jewell— if they are technically or physically achievable at all. The plant's location in a river valley with rivers, a state road, railroad tracks, and extremely steep gradients on both sides does not provide sufficient space for baghouses of sufficient size to accommodate the exhaust flows from the exhaust coke oven batteries. *See* Attachment C for Jewell facility description and pictures.



EXH160

ED_018388_00000109-00022



The likelihood of significant costs and technical and physical infeasibility is especially true when considering that the oven exhaust must be cooled from 1,600°F or more to a minimum of 400°F for high temperature bag material to even function. And an air quench, as opposed to a water quench, would be required because the enormous water volumes otherwise required would far exceed the limitations of Dismal Creek, the source of plant cooling water. The air quench would result in a constant steam cloud within the valley. These two factors alone make a baghouse and an activated carbon injection ("ACI") system technically infeasible for this site.

In the limited time SunCoke has had to comment on the Proposed Rule, it has determined that EPA's cost calculation underestimates SunCoke's costs in at least the following ten respects:

- EPA's estimates did not include cooling before subjecting the 1,600° Fahrenheit exhaust from the B/W stacks to emissions controls, as would be necessary for the baghouse to function.

- The ductwork costs assume only a nominal length of unlined, galvanized steel duct between the battery stacks and the air emission controls. No provision for refractory lining, and ductwork foundations, structural support, access platforms, and underground routing of the duct were considered.

- The assumed height of the exhaust stack was too low. Given the valley location of the Jewell facility, an exhaust stack of significant height should have been considered.

- A shaker baghouse—notably the lowest capital cost baghouse type—was assumed. Shaker baghouses are old technology no longer used in industry because of high maintenance

22

EXH161

ED_018388_00000109-00023

requirements, challenges with operation, and degradation of removal efficiency over time. A compartmentalized, pulse jet baghouse is the industry standard for this application.

- EPA failed to consider the characteristics of the exhaust gases and the requisite materials of construction.

- EPA incorrectly assumed the volume of flue gas that would need to be treated based on arbitrary data from a single stack at a different plant.

- EPA failed to consider the unique retrofit requirements that would be necessary given the age, configuration, layout, and underground utilities existing at the Jewell facility.

- EPA significantly underestimated the amount of electricity usage and hazardous waste that would be generated.

- EPA used an incorrect algorithm to calculate the total capital investment for ACI (Sargent & Lundy 2011).

- EPA used an incorrect methodology to calculate the activated carbon injection rates. Based on the methodology included in a later study by the same authors (Sargent & Lundy 2017), the rate should be 699 lbs/hr rather than 50 lbs/hr, as EPA assumed.

*See* Attachment D (TRC, Technical Memorandum, Response to Proposed RTR, Oct. 2, 2023 ("TRC Technical Memo")). As a result of these errors, EPA's estimated costs to impose these controls at Jewell are low by orders of magnitude; a more realistic estimate is ***$474.9 million*** (not ***$7.4 million***) in capital investments and ***$66 million*** (not ***$4.7 million***) in annual costs.[21] Though this cost estimate is a high-level engineering estimate that does not account for the unique construction characteristics associated with the Jewell site and fails to consider the fact that this type of construction is infeasible at best.

## C.    EPA Erroneously Calculated the Emissions Reductions the Proposed BTF Measures Would Achieve at Jewell

EPA wrongly assumed the feasible addition of a baghouse with 99.9 percent reduction of metals and an ACI system with 90 percent reduction for mercury. *See* 88 Fed. Reg. 55858, 55879 (Aug. 16, 2023); *see also id.* at 55894 (assuming BTF measures would reduce air emissions by 4.0 tpy nonmercury HAP metals and 144 pounds per year mercury). According to SunCoke's analysis, 99.9 percent removal on a long-term basis is unlikely; a more realistic assumption is 99 percent removal. In addition, an outlet concentration, usually expressed as grain loading, is a better, more appropriate measure of baghouse performance, and the best performing baghouses can achieve an outlet concentration of 0.000437 grains per dry standard cubic foot.[22] Similarly, for mercury, a baghouse with ACI combination can only reasonably provide 80 percent mercury removal on a long-term basis.[23]

---

[21] *Compare* Tab. 6 with Attachment D (TRC Technical Memo) at 5.
[22] *See* Attachment D (TRC Technical Memo) at 3.
[23] *Id.*

23

EXH162

ED_018388_00000109-0024

The Agency erroneously calculated the cost-effectiveness by not including a baghouse for mercury control. When the cost and efficacy calculations are corrected, the cost-effectiveness for non-mercury HAP metals is *$24.7 million* per ton, not *$756,000* per ton, and the cost-effectiveness for mercury is *$713,000* per ton, not *$32,000* per ton.[24]

### D.    EPA Relied on Erroneous Data to Calculate Energy Required to Implement the Proposed BTF Measures at Jewell

EPA wrongly calculated that the increased energy to meet these proposed requirements would be *15.1 million* kilowatt-hours of increased electricity use. 88 Fed. Reg. at 55858, 55894 (Aug. 16, 2023). SunCoke has not been able to locate any analysis by EPA that supports these estimates, thereby depriving SunCoke of the opportunity to analyze the "connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). SunCoke's calculation shows that the true increase in energy would be *93.18 million* kilowatt hours (more than six times EPA's estimate).

### E.    EPA Did Not Consider Non-air Quality Health and Environmental Impacts of the Proposed BTF Measures

Related to its grossly inadequate estimate of the energy requirements for its proposed controls, EPA did not sufficiently consider the infrastructure upgrades that would be needed to serve the controls. At a minimum, the following electrical infrastructure upgrades would likely be required to address the incremental power demand of 10.5 MW:

- An upgraded Appalachian Power Company substation for an additional 69 kV load;

- Roughly 4,000 feet of 69 kV transmission line;

- A new substation at the Jewell site to receive 69 kV and step down to 4160V for further distribution across the plant;

- 4160V switchgear and motor control centers for multiple induced draft fans; and

- 4160V stepdown to 480V, switch gear, and motor control centers for ancillary gear serving the baghouse and ACI systems.

Moreover, in light of Jewell's topography, installing the infrastructure could require surfaces to be levelled and forested areas to be cleared. These electrical upgrades would likely impact wetlands, visual resources, soils, and/or vegetation and wildlife species in the affected areas, which EPA does not appear to have considered. This is especially true given the forested surroundings for the plant and the fact that the entirety of the facility lies in a floodplain; for this reason, federal law requires EPA, before requiring changes that would impact floodplains, to "consider alternatives to avoid adverse effects and incompatible development in the floodplains."[25]    In addition, the increased 10.5 MW demand would increase $CO_2$ emissions by more than an estimated 46,000 tons annually just to produce the electricity needed to run such a system. EPA further underestimated

---

[24] *Compare* Tab. 6 with Attachment D (TRC Technical Memo) at 5.
[25] Exec. Order 11988—Floodplain Management, § 2(a)(2).

24

EXH163

ED_018388_00000109-00025

the tons of hazardous dust disposal at 761 tons per year.[26] The correct number would be closer to 4,360 tons per year.[27]

### F.    EPA Erroneously Relied on Dollar Threshold Taken from Rulemaking for A Different Industry to Find the Proposed BTF Measures were Cost-effective

The preamble to the Proposed Rule states that because EPA found $1.3 million/ton of HAP metals to be cost effective in another rulemaking about a different (unrelated) industrial process (lead smelters), any measures that cost less than that amount are per se "cost effective." 88 Fed. Reg. 55858, 55879 (Aug. 16, 2023).    As discussed above, when the correct assumptions are incorporated into the cost and efficacy calculations, the actual number (*$24.7 million* per ton for non-mercury HAP metals) far exceeds the selected benchmark. *See supra* Section VIII.C.  But even if EPA's numbers did not grossly overestimate cost-effectiveness, the use of a cost-effectiveness threshold from another rulemaking as a benchmark is erroneous as a matter of law absent any showing that the economics of the two processes are the same; what is "cost effective" cannot be viewed in isolation but must be determined based on the context of the affected industry. As stated by the D.C. Circuit, EPA cannot use a one-size-fits-all number to determine cost-effectiveness in different regulatory contexts:

> This court has adopted an 'every tub on its own bottom' approach to EPA's setting of standards pursuant to the CAA, under which the adequacy of the underlying justification offered by the agency is the pertinent factor—not what the agency did on a different record concerning a different industry.

*Sierra Club v. EPA,* 353 F.3d 976, 986 (D.C. Cir. 2004); *see also Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 389 (D.C. Cir. 1973) ("The essential question is whether the mandated standards can be met by a particular industry for which they are set, and this can typically be decided on the basis of information concerning that industry alone"); *Kennecott v. EPA,* 780 F.2d 445, 456 (4th Cir. 1985) ("This court does not have before it the records of the rulemakings for the five other industries; we are, therefore, reluctant to launch comparisons of model technologies established for one industry with those established for another."). The Proposed Rule's indiscriminate use of a threshold for "cost-effectiveness" from another industry, despite no reason to believe it is cost-effective for this industry (coke manufacturing), let alone this unique facility (Jewell), is arbitrary.

### IX.    THE PROPOSED MACT LIMITS FOR SUNCOKE'S HNR FACILITIES ARE UNNECESSARY, BASED ON LIMITED AND/OR UNRELIABLE DATA, AND NOT "ACHIEVABLE"

EPA's proposed MACT limits for SunCoke's HNR facilities are unnecessary and are based on limited and, in some circumstances, unreliable data, among other data issues, and are therefore not "achievable." The proposed amendments are inconsistent with EPA's Risk and Technology Review ("RTR") findings for the PQBS source category. EPA found through its RTR that risks due to the HAP emissions from coke ovens' PQBS are "acceptable"; that the existing PQBS rule "provides an ample margin of safety to protect public health"; and that there "are no developments in practices, processes or control technologies that necessitate revision of standards for this source

---

[26] Attachment D (TRC Technical Memo, Workbook, "Utility Cost Summary").

[27] Attachment D (TRC Technical Memo).

EXH164

ED_018388_00000109-00026

category. 88 Fed. Reg. 55858, 55858 (Aug. 16, 2023). Yet EPA nonetheless proposes new MACT limits under CAA Sections 112(d)(2) and 112(d)(3) for the stated purpose of complying with its interpretation of *LEAN v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020). 88 Fed. Reg. at 55863 ("The EPA is required to address regulatory gaps, such as missing MACT standards for listed air toxics known to be emitted from the source category. *Louisiana Environmental Action Network (LEAN) v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020)."); *id.* at 55876 n.25 (citing to *LEAN* as support for its proposal of MACT standards).

EPA's approach for evaluating and including the data it reviewed, and translating that data into proposed emission limits, is flawed for the following reasons described herein. These data issues result in MACT limits that do not approximate the limits "achieved" by the best-performing five sources, and therefore do not comply with the CAA. EPA should reevaluate and revise these proposed MACT limits, including addressing the issues described in this section.

## A.    The CAA Does Not Require EPA to Impose the Proposed MACT Limits on SunCoke's HNR Facilities

The CAA requires each source category's emission standard to address the recognized hazardous pollutants that the source category is known to emit. *See LEAN v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000). EPA's overly expansive interpretation of this requirement leads the Agency to impose unnecessary and ill-informed MACT floor limits on an industry (heat/non-recovery cokemaking) that EPA recognizes adequately controls HAP emissions.

CAA Section 112(f) directs EPA to evaluate whether the risk remaining after application of MACT standards is "acceptable" and, if it is not acceptable, directs EPA to take additional steps to address that risk as necessary "to provide an ample margin of safety to protect public health." 42 USC § 7412(f)(2). "[A]s a general matter, EPA has stated that where we determine that existing standards are adequate to protect public health with an ample margin of safety and prevent adverse effects, it is unlikely that EPA would revise MACT standards merely to reflect advances in air pollution control technology." 72 Fed. Reg. 5510, 5532 33 (Feb. 6, 2007).

CAA Section 112(d)(6) directs EPA to periodically "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section." 42 USC § 7412(d)(6); *see also infra* Section XI. "Necessary" is modified and must be interpreted by the parenthetical that follows it, i.e., "taking into account developments in practices, processes and control technologies." *See, e.g., Nat'l Assoc. for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015) (stating that EPA must conduct a "technology review" to determine "whether standards [for an industry] should be tightened in view of developments in technologies and practices since the standard's promulgation or last revision").

EPA found through its RTR that risks due to the HAP emissions from coke ovens' PQBS are "acceptable"; that the existing PQBS rule "provides an ample margin of safety to protect public health"; and that there "are no developments in practices, processes or control technologies that necessitate revision of standards for this source category." 88 Fed. Reg. 55858, 55858 (Aug. 16, 2023).

EXH165

ED_018388_00000109-00027

EPA's sole reason for proposing the new MACT limits is to comply with its interpretation of *LEAN v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020). While *LEAN* requires that EPA "address" all HAPs known to be emitted by a source category, it does not mandate that EPA set numerical MACT floors for every HAP, particularly those that are already controlled to an adequate margin of safety. *LEAN v. EPA*, 955 F.3d 1088, 1097 (D.C. Cir. 2020) ("an emission standard includes *as many limits as needed* to control all the emitted air toxics of a particular source category") (emphasis added). The unachievable numerical limits proposed by EPA purportedly regulate previously "unregulated"  but already adequately controlled  HAPs. *Cf.* Section II (describing EPA's analysis of HAP emissions in prior coke oven source category rulemakings). EPA should conclude, consistent with the CAA, and the *LEAN* decision, that it is not "necessary" to amend the MACT standard to include these limits.

**B.    EPA Should Have Included All Available Emissions Data When Setting the MACT Standards for Sources**

EPA ignored relevant data when establishing the MACT floor limits. When establishing a "MACT floor," EPA must reflect the emission limits "achieved" by the "best performing" sources. *See, e.g.*, *Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004). Where, as here, there are fewer than 30 sources in a category or subcategory, the MACT floor for existing sources must be at least as stringent as "the average emission limitation *achieved* by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information)." 42 USC § 7412(d)(3)(B) (emphasis added).[28] In determining the "average," EPA must consider variability and set the standard at a level that the source can meet "every day and under all operating conditions." *Mossville Env't Action Now v. EPA*, 370 F.3d 1232, 1232 (D.C. Cir. 2004).

For this rulemaking, EPA calculated the MACT floor limits for the "previously unregulated HAP emissions" by ranking data and determining the top five (5) sources with emissions information, as per CAA sections 112(d)(2) and (3) for existing sources, then calculating the upper predictive limit ("UPL").[29] 88 Fed. Reg. 55858, 55876 (Aug. 16, 2023). The UPL calculation relies upon estimating the true average and true variance. While the estimation of the average can be confidently done with a small number of samples, the estimation of the variance requires a substantially larger number of samples and in particular samples that cover the range of varying factors. EPA's methodology results in proposed MACT limits that do not approximate the limits "achieved" by the best-performing five sources, and therefore do not comply with the CAA. In fact, the five best performing sources cannot reliably meet EPA's proposed limits based on their own testing data, which EPA did not consider in its evaluation of the MACT floor. EPA should reevaluate these proposed MACT floor limits, ensuring that it considers the full range of historic

---

[28] For *new* sources in a category or subcategory, the MACT standard may not be less stringent than the emission control that EPA determines is achieved in practice by the best controlled similar source. 42 U.S.C. § 7412(d)(3). SunCoke's comments focus on EPA's establishment of MACT standards for *existing* sources, since all SunCoke HNR coke plants constitute "existing sources." *See supra* Section VII. To the extent EPA believes any of SunCoke's HNR coke plants constitute a "new source" for purposes of the proposed amendments, SunCoke makes similar arguments with respect to EPA's development of the MACT standards, and notes that EPA is required to set limits based on worst foreseeable circumstances for best performing sources. *Sierra Club v. EPA*, 167 F.3d 658 (D.C. Cir. 1999).

[29] A UPL is a statistical tool that EPA uses to account for the variability inherent to emissions and emissions testing.

27

EXH166

ED_018388_00000109-00028

test data available, but only data that is from analogous, non-defunct facilities, using scientifically and statistically reliable collection methods.

### C.    EPA Should Not Impose MACT Floor Limits on HNR Pushing Operations

#### 1.    HNR Pushing Emissions are Too Minuscule to Necessitate A Limit

SunCoke's emissions from its pushing operations are *de minimis* and do not warrant any additional regulation or testing. In fact, additional testing would yield unreliable and potentially false results because the proposed limit and potential emission amounts are so low. For this reason, EPA should not require additional emissions standards associated with pushing.

Pushing is an intermittent emissions source. Emissions occur only during production, and only intermittently during production when the coke bed is pushed and travels to the quench tower. As such, pushing typically results in less than three (3) hours of actual emissions activity each day. Data presented in EPA's memo on HAP emissions from Coke Oven Facilities shows that estimated Total HAPs from Pushing at HNR facilities are typically less than 1 tpy.[30] Estimated emissions of individual HAPs, as presented in the same memo, are less than the reporting thresholds (for health risk analysis) established by many state agencies.[31] Thus, pushing HAPs are insignificant and any potential HAP emissions are already minimized by maintaining compliance with the existing PM limits on pushing.

Considering the intermittent nature of pushing emissions and the insignificant levels of HAP emissions, any new emission limits and testing requirements for pushing are unnecessary and burdensome. As noted by the D.C. Circuit, the *de minimis* doctrine serves "to alleviate 'severe' administrative and economic burdens by lifting requirements on 'minuscule' emission increases." *New York v. EPA*, 443 F.3d 880, 888 (D.C. Cir. 2006). Further, "the literal meaning of a statute need not be followed where the precise terms lead to absurd or futile results, or where failure to allow a de minimis exception is contrary to the primary legislative goal." *State of Ohio v. EPA*, 997 F.2d 1520, 1535 (D.C. Cir. 1993). It is within EPA's authority to set aside trivial applications of a regulation, particularly in this instance, where testing would do nothing more than yield unreliable results and frustrate the purposes of the regulation. *Alabama Power Co. v. Costle*, 636 F.2d 323, 361 (D.C. Cir. 1979) ("The 'de minimis' doctrine that was developed to prevent trivial items from draining the time of the courts has room for sound application to administration by the Government of its regulatory programs . . . .") (citing *District of Columbia v. Orleans*, 406 F.2d 957, 959 (1968)). Because the proposed limit and potential emission amounts are so low, EPA should not impose additional emission standards on the HNR facilities' pushing operations.

#### 2.    Mercury Emissions from Pushing Are Too Low for Establishing A Practical Emission Limit

Mercury emissions from SunCoke's pushing operations are also too low to permit scientific measurement of whether they comply with the proposed limits. A review of the individual sample

---

[30] EPA-HQ-OAR-2003-0051-0763, EPA, Memorandum, *HAP Emissions from Coke Oven Facilities*, May 1, 2023.
[31] https://www.phila.gov/media/20220218095051/AMR-VI-Risk-Assessment-Technical-Support-Document-09-14-2021.pdf; https://nj.gov/dep/airtoxics/Technical%20Support%20Document.pdf.

EXH167

ED_018388_00000109-00029

fractions in each test run of the SunCoke Middletown ICR Method 29 test show that the measured values in each sample fraction were either below the Method Detection Limit ("MDL") or barely above the MDL (1x to 2x MDL). Using such noise-level data to establish emission limits is unreasonable. Normal variability in measurement error on future stack test programs will make it difficult, if not impossible, to stay compliant with such low limits. The proposed MACT limit is so low that it allows for significant sampling error.

### 3. HNR Pushing Emissions are Different from ByP Pushing Emissions

EPA improperly used data collected from ByP pushing control devices to develop emission limits for SunCoke's unique pushing control devices; the data collected from ByP coke plants is not representative of SunCoke's HNR operating conditions. EPA's proposal to impose the same pushing emission limits on coke oven batteries in 40 C.F.R. § 63.7290(b-c)—regardless of the type of coking technology—diverges from Subpart CCCCC's long-standing practice of distinguishing between HNR and ByP facilities for emission limits and work practice standards.

Pushing emissions at ByP facilities are controlled using stationary devices (baghouses), whereas HNR facilities use a cokeside shed or mobile multiclone (on the hot car) to control pushing emissions. The current rule on pushing emissions distinguishes between HNR and ByP facilities by setting separate limits; it is clear from the plain language of the rule and its descriptions of the distinct capture systems and control devices which of the rule's limits apply to HNR or ByP coke facilities.[32] The proposed amendments would impose the same emission limits regardless of the type of coking process or the type of capture and control device used, which is neither appropriate nor reasonable since the design and operation of SunCoke's cokemaking process is fundamentally different than ByPs, resulting in differences in emissions. While EPA properly accounted for these differences in the original MACT standard, it ignored them in the Proposed Rule.[33] EPA should establish separate limits for HNR and ByP facilities, consistent with EPA's long-standing practice of differentiating between the technologies.

EPA's use of ByP data to establish the proposed pushing limits applicable to HNR facilities is improper and arbitrary. EPA's technical memorandum (MACT memo) indicates that it used testing data from both HNR *and* ByP facilities to establish the proposed pushing limits.[34] It was unreasonable for EPA to use data from ByP facilities to establish limits for the HNR facilities. Differences in the design and operation of HNR and ByP facilities result in differences in their

---

[32] The current rule on pushing emissions, 40 C.F.R. § 63.7290, limits PM emissions from pushing. The current rule's PM limits differ in form and numerical value depending on the type of capture system used and whether the control device is stationary or mobile. While the capture and control devices in use primarily control PM emissions, they also help reduce HAP emissions, as EPA acknowledged in the 2003 final rule. *See* 68 Fed. Reg. at 18015. EPA should have therefore followed the same approach (as setting PM limits) when it proposed limits on HAPs from pushing.

[33] For example, the proposed new paragraph (b) in the redline version of the Proposed Rule would impose a mercury emissions limit of 3.4E-07 lb/ton coke on "a control device applied to pushing emissions from a new coke oven battery" or 8.9E-07 lb/ton coke from an "existing coke oven battery." The proposed new limits would therefore apply to any type of control device applied to pushing emissions on any type of coking process. This is neither appropriate nor reasonable.

[34] EPA-HQ-OAR-2003-0051-0785, EPA, Memorandum, *Maximum Achievable Control Technology Standard Calculations, Cost Impacts, and Beyond-the-Floor Cost Impacts for Coke Oven Facilities under 40 CFR part 63, subpart CCCCC*, at B-6 and Tables B-1 through B-4 (May 1, 2023).

EXH168

ED_018388_00000109-00030

respective emissions. Flat car pushing, which is used at HNR facilities, is much different than conventional pushing which occurs at ByP facilities. With conventional pushing at ByP facilities, the coke bed falls into a hot car where it breaks apart and produces the traditional large hot pushing plume. The plume may be collected by either a mobile shed or by a large stationary coke side shed. With flat car pushing at HNR facilities, the coke bed is pushed onto a flat car with a hood that encloses the bed on the sides and top. Air from this hood is ducted to an air pollution control device, fan, and stack on a mobile car. These significant differences in the pushing process and the capture/control equipment warrant separating pushing emissions by process type and control type, as EPA has done in the past.

It also was unreasonable for EPA to use test data from closed ByP facilities to establish the new proposed pushing emission limits. EPA used testing data from the ByP facility in Middletown, Ohio (formerly, AK Steel Middletown), to develop the proposed limits,[35] even though Cleveland-Cliffs, which now owns the facility, idled these coke ovens in 2021. The CAA requires EPA to average emissions achieved by the "best performing" five (5) sources; a source that has shuttered its doors obviously is not "performing" at all. 42 USC § 7412(d)(3). Historically, only operating sources are included in the MACT floor analysis. EPA did not consider test data from other closed ByP facilities in its MACT floor calculations. EPA's MACT memo notes, for example, that while the Erie Coke facility conducted testing per the Section 114 request in 2016, the Agency did not include its emissions data in the MACT floor calculations because "the Erie Coke facility was shut down in late 2019."[36] Consistent with its approach with Erie Coke's data, EPA should also have excluded data from AK Steel Middletown from the MACT floor calculations for pushing.

### 4.    Installing Additional Controls on Hot Car is Technically Infeasible

Installing additional controls on an HNR flat push hot car for controlling any of these pollutants is technically infeasible because the hot car is mobile, is subject to significant vibration, and has very limited space or structural capacity for additional equipment. HNR facilities' configuration does not allow for baghouses on the flat push hot car; SunCoke ovens are horizontal and their batteries and tunnels are longer, whereas ByP ovens are vertical and their batteries and tunnels are shorter. SunCoke would not be able to pull sufficient draft to run a baghouse, thus creating the potential for positive pressure. SunCoke's technology requires this configuration, and it would be unreasonable to require SunCoke to reconfigure its equipment at existing HNR facilities, particularly given the facilities' current use of other more suitable control devices (e.g., cokeside shed, mobile multiclone).

### 5.    EPA Considered Data Collected Using Unreliable and "Abandoned" Test Method

EPA incorrectly established the proposed pushing limits for hydrogen cyanide (HCN) emissions using test data from an obsolete method. These proposed limits were established using

---

[35] EPA-HQ-OAR-2003-0051-0785, EPA, *Memorandum, Maximum Achievable Control Technology Standard Calculations, Cost Impacts, and Beyond-the-Floor Cost Impacts for Coke Oven Facilities under 40 CFR part 63, subpart CCCCC)*, at 4 and Table 1 (May 1, 2023).
[36] *Id.*

EXH169

ED_018388_00000109-00031

2016 ICR test data (from the SunCoke Middletown facility) that was collected using the Zinc Acetate method.[37] EPA acknowledges in its *Summary of Coke Ovens Risk and Technology Review: Data Summary* that "EPA abandoned the zinc acetate approach in mid-2017 due to its limited dynamic range of measurement, i.e., poor and inconsistent sample recovery."[38] Proposing limits using data collected from a test method that EPA has abandoned due to poor and inconsistent performance is arbitrary.

     **D.**     **EPA's Methodology for Establishing the Proposed MACT Floor Limits for HNR HRSG Main Stacks was Flawed[39]**

          **1.**     **EPA Arbitrarily Limited Its Analysis to a Small Subset of Available Test Data, and Failed to Control for Differing Oxygen Levels in the Data it Sampled**

EPA incorrectly established the proposed HNR HRSG main stack emission limits using only a limited subset of the available data, thus the data set is incomplete and not representative of SunCoke's HNR operating conditions. EPA included test data from the 2016 ICR and the 2022 ICR in its MACT floor calculations. The 2016 ICR and 2022 ICR data are very limited data set. A much larger dataset that more accurately represents trial-to-trial and plant-to-plant variations is available from compliance tests conducted on these sources in prior years. EPA provides no explanation for why it excluded this larger body of stack test data from its MACT floor calculations.

EPA used a statistical tool known as the UPL to seek to account for expected variability and uncertainty in emissions data to establish MACT floor standards.[40] *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 598 (D.C. Cir.), *on reh'g en banc*, 671 F. App'x 822 (D.C. Cir. 2016), *and on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016). EPA's use of the limited data set and its UPL approach did not reasonably account for variability. There are too few data points for a statistically valid analysis and limit. The UPL calculation relies upon estimating the true average and true variance. While the estimation of the average can be confidently done with a small number of samples, the estimation of the variance requires a substantially larger number of samples and in particular samples that cover the range of varying factors.

EPA's decision to base the Proposed Rule requirements on limited data is arbitrary and capricious. EPA gave no explanation for its decision to ignore relevant information provided by

---

[37] TEST REPORT FOR ICR TESTING AT SUNCOKE ENERGY, INC. FACILITIES REV. 1, Nov. 2017, AECOM Technical Services, Inc. The 2016 ICR test data that EPA used included data from SunCoke MTO. SunCoke's test plan and test report for the 2016 ICR testing shows that it used the Zinc Acetate method for HCN.

[38] EPA-HQ-OAR-2003-0051-0778, EPA, Memorandum, *Coke Ovens Risk and Technology Review: Data Summary*, at 30, Table 13 (May 1, 2023).

[39] Although EPA defines "HNR" to include "heat and nonrecovery, *or only nonrecovery, no heat,*" and identifies Jewell as an HNR facility, SunCoke reminds the Agency that Jewell does not have a main stack or a HRSG, and therefore Jewell would not be subject to the proposed HRSG main stack limits. 88 Fed. Reg. at 55860, 55864, 55877. *Contra* EPA-HQ-OAR-2003-0051, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC* (Jul. 1, 2023) (proposing amendments to 40 C.F.R. § 63.7297).

[40] EPA-HQ-OAR-2003-0051-0664, EPA, Memorandum, *Approach for Applying the Upper Prediction Limit to Limited Datasets* (May 1, 2023).

EXH170

ED_018388_00000109-00032

the very types of facilities to which the proposed limits would apply. Agencies "must *examine the relevant data* and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also* EPA, *Guidelines for MACT Determinations under Section 112(j) Requirements* (Feb. 2002) ("It is not necessary for the MACT floor to be determined based on emissions information from every existing source in the source category or subcategory if such information is not available. The permitting authority, however, should check with EPA Regional Offices and EPA Headquarters for *any available information* that could be used in determining the MACT floor.") (emphasis added).

In addition, the proposed HNR HRSG main stack emission limits are expressed purely on a concentration basis (gr/dscf) without normalization to a reference $O_2$ level. Concentration-based emission limits that are not corrected to a reference oxygen level will simply allow dilution of the stack gas with excess air as a means of complying with the emission limits. Similarly, the test data used in the MACT floor analysis to develop the concentration-based emission limits were uncorrected data. The individual data points used in the calculations are associated with varying oxygen levels in the stack. These data points should be corrected to a consistent reference oxygen level before being used in the calculations.

EPA must recalculate the HNR HRSG main stack limits using all available stack test data from 2006 through 2022 from SunCoke HNR HRSG main stacks at Haverhill, Middletown, and Granite City, and the Cokenergy HRSG main stack at Indiana Harbor, corrected to a consistent reference oxygen level. The 45-day comment period did not provide sufficient time for SunCoke to fully evaluate and propose more appropriate and accurate revised limits. Nonetheless, SunCoke's preliminary estimates correcting these two errors — i.e., the arbitrarily confined dataset used and the failure to correct for oxygen levels to enable separately collected datapoints to be meaningfully compared — demonstrate that the UPL used must be revised significantly.

## 2.    The Proposed Compliance Date is Insufficient and Unreasonable

The Proposed Rule specifies that sources must be in compliance with the proposed HNR HRSG main stack limits within one (1) year of publication of the final rule. 88 Fed Reg. 55858, 55893 (Aug. 16, 2023). Yet the Proposed Rule would, for the first time, impose emission limits for HRSG main stacks (and HRSG bypass/waste heat stacks), among other major changes to Subparts L and CCCCC. One year is not sufficient to establish new controls necessary for compliance with these new limits. Haverhill's P901 HRSG main stack source will likely require SunCoke to install an Activated Carbon Injection (ACI) system to control mercury emissions from the HRSG main stack and meet any "proposed or revised" mercury limit. SunCoke expects installation of the ACI system to cost approximately $3 million — not including annual operating costs or costs for the activated carbon. The mercury control efficiency will vary widely depending on the inlet mercury loading and the actual control efficiency of the system; however, SunCoke estimates that it would cost at a minimum $6 million per ton of mercury removed.

EXH171

ED_018388_00000109-00033

SunCoke estimates that it would need at least three (3) years to develop and install the system. This extra time would be necessary due to long lead equipment items exacerbated by continued supply chain challenges, retrofit challenges for installing these controls on an existing system that is currently operating, and extensive startup and shakedown testing (for determining operational readiness) that is expected to take an extended period of time based on SunCoke's prior experience operating these systems at other facilities. It could take even longer than three (3) years to develop and install the system if Haverhill is required to minimize emissions during construction. SunCoke has not had sufficient time to fully evaluate the placement and process for installing the ACI system at Haverhill P901.

To the extent that the Proposed Rule is finalized in a manner that requires SunCoke to comply with these requirements, SunCoke requests EPA to change the compliance date to three (3) years after publication of the final rule, given the extensive nature of the proposed amendments. EPA has the discretion under 42 U.S.C. §7412(a)(3) to establish a compliance date of three (3) years after the effective date of any emissions standard, limitation, or regulation promulgated under that section. EPA has provided additional time in other rulemakings to, for example, provide time for installing or retrofitting controls when necessary. *See, e.g., National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing*, 70 Fed. Reg. 73098, 73100 (Dec. 8, 2005) ("Congress provided us discretion to set a compliance date for existing sources of up to 3 years in order to provide time for retrofitting of controls where necessary.").

### E. EPA's Methodology for Establishing the Proposed MACT Floor Limits for HRSG Bypass/Waste Heat Stacks was Flawed[41]

#### 1. EPA Arbitrarily Limited Its Analysis to a Small Subset of Available Test Data, and Failed to Control for Differing Oxygen Levels in the Data it Sampled

EPA incorrectly established the proposed HNR HRSG bypass/waste heat stack emission limits using only a limited selection of the available data, similar to EPA's approach for establishing the HNR HRSG main stack emission limits, thus the data set is incomplete and not representative of SunCoke's HNR operating conditions. *See supra* Section IX.D.1. EPA similarly used only test data from the 2016 ICR and the 2022 ICR in the MACT floor calculations, ignoring

---

[41] Although EPA defines "HNR" to include "heat and nonrecovery, *or only nonrecovery, no heat*," and identifies Jewell as an HNR facility, SunCoke reminds the Agency that Jewell does not have a HRSG, and therefore the proposed amendment's reference to *HRSG* bypass/waste heat stacks is confusing and should be revised. 88 Fed. Reg. at 55860, 55864, 55877. *Contra* EPA-HQ-OAR-2003-0051, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC* (Jul. 1, 2023) (proposing amendments to 40 C.F.R. § 63.7298).

Additionally, SunCoke respectfully requests that the test period identified in the redlined version of the proposed changes to 40 C.F.R. § 63.7321(b)—"once every five years"—be changed to "once during each Title V operating permit term," which is consistent with other MACT performance test requirements. This change ensures that bypass vent stack testing meets the proposed test schedule since it can only be tested during periods of FGD maintenance and also allows testing to be conducted at the same time as other tests already required under Subparts L and CCCCC.

EXH172

ED_018388_00000109-00034

a larger and more representative dataset that better accounted for test-to-test and plant-to-plant variations. EPA's use of the limited data set and its UPL approach was arbitrary. *See id.*

In addition, similar to EPA's approach for establishing the HNR HRSG main stack emission limits, the proposed HNR HRSG bypass/waste heat stack emission data were improperly analyzed without first correcting the data points to a consistent reference oxygen level, making it impossible to compare them. For the same reason, the proposed limits (which are expressed purely on a concentration basis (gr/dscf) without normalization to a reference $O_2$ level), would be ineffective because the limits can be met simply by diluting the stack gas with excess air as a means of complying with the emission limits. *See supra* Section IX.D.1.

EPA must recalculate the HNR HRSG bypass/waste heat stack limits using all available stack test data from 2006 through 2022 from SunCoke HNR HRSG bypass/waste heat stacks at Haverhill, Middletown and Granite City, and Indiana Harbor, corrected to a consistent reference oxygen level. The 45-day comment period did not provide sufficient time for SunCoke to fully evaluate and propose more appropriate and accurate revised limits. Nonetheless, as with the proposed HNR HRSG Main Stack limits, SunCoke's preliminary estimates correcting these two errors — i.e., the arbitrarily confined dataset used and the failure to correct for oxygen levels to enable separately collected datapoints to be meaningfully compared — demonstrate that the UPL used must be revised significantly.

### 2. The Proposed Limits are Not "Achievable" Under Section 112(d)(2) Because No Technically Feasible Controls Exist that Would Meet Them

EPA's analysis indicates that the proposed emission limits on the bypass vent stacks can be achieved at SunCoke's plants (with the exception of the Jewell Coke plant) with no additional controls. However, as described in great detail above, the emission limits are based on a very limited data set. Additional controls may be required to meet the proposed bypass vent limits at some or all of SunCoke's heat recovery facilities.[42] The waste gases exiting the bypass vent stacks are typically in the 1300°F to 2000°F temperature range. To install any kind of additional pollution control equipment on the bypass vent stacks would first require cooling the high temperature waste gases significantly, using HRSGs or similar equipment, to a level that is appropriate for the specific control equipment. The current layout of the plants and the limited space available in and around the bypass vent stacks make it extremely challenging to design and install additional HRSGs, route additional ductwork and install any additional control equipment for the bypass vent stacks. Even if this could be engineered, the cost effectiveness ($/ton removed) would be extremely high considering the fact that the bypass vent stacks are used and open for venting only a fraction of the time on an annual basis. Even then, any time that bypass venting was required for any reason, the source would not be able to meet the proposed limits because it is not technically feasible to install controls directly on waste heat stacks.

---

[42] Controls needed for Jewell are discussed separately in Section VIII and Attachment D.

34

## X.    PROPOSED PERFORMANCE TESTING REQUIREMENTS FOR PUSHING ARE NOT FEASIBLE

The Proposed Rule proposes using either Method 320 or ASTM D6348 as the compliance test method for HCN emissions from pushing.[43] Both test methods use Fourier Transform Infrared ("FTIR") analyzer equipment. There are several challenges with setting up and collecting reliable test data using FTIR equipment on a mobile hot car during production. The hot cars ride on steel rails with limited suspension and are subject to high vibration and strong jolts. The FTIR analyzer has moving mirrors inside and alignment errors caused by jostling of the equipment and excessive vibrations adversely impact the measurements and the reliability of the results. Space on the mobile hot car is very limited; there is no available space for an instrument rack with FTIR equipment and calibration gas cylinders on the hot car.

### A.    Minimum Sample Volume for Mercury and PAHs Test Methods Are Too High

EPA's proposed minimum sample volume for Method 29 (Mercury) and Method 23 (PAHs) are unnecessarily high given the low levels of mercury and PAHs expected in the sample gas (based on SunCoke's previous test data). Pushing is a brief and intermittent activity that includes pushing coke from inside of an oven to the hot car and transport of the coke loaf to the quench tower. This pushing process lasts between two and four minutes for each oven. In order to measure emissions during this intermittent process, sampling is conducted during the push of each oven on as many ovens as is necessary to achieve the specified sample volume. In order to collect the Agency's proposed minimum sample volume of 105 dry standard cubic feet ("dscf") for Method 29 (Mercury) and 140 dscf for Method 23 (PAHs), testing would need to occur over a month to safely perform isokinetic testing (i.e., one run at a time) on one hot car.

For example, at a 100 coke oven facility (such as the two units at Haverhill and the one unit at Middletown), only 50 ovens are pushed per day. Sampling of pushing could only occur 100 to 200 minutes per day, or 1.7 to 3.3 hours per day. Consequently, it could take 2 to 3 days to collect a single run (and ultimately one month to collect all necessary runs). Conducting testing for such an extended period not only raises personnel safety concerns, but also serves to disrupt critical aspects of production and maintenance. Any issues that arise during testing would extend the test period and disrupt the production schedule; pushing and charging ovens on a set schedule is key to consistently producing high quality coke for the steel industry. The proposed test method would therefore require testing under non-representative conditions due to the method's impacts on the production cycle. The daily production schedule is designed to maintain stable oven temperatures necessary for coking and oven health, minimize the need to add in other carbon-based fuels like diesel or natural gas to increase oven temperature, and to preserve the daily window for conducting maintenance on production related equipment by starting and ending production on time.

---

[43] EPA-HQ-OAR-2003-0051, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC* (Jul. 1, 2023) (proposing amendments to 40 C.F.R. § 63.7322(e)).

EXH174

ED_018388_00000109-00036

SunCoke implores EPA to establish minimum sample volumes of 70 dscf to allow one isokinetic test run to be safely completed in one day. However, as previously discussed, the intermittent nature of pushing emissions and the insignificant levels of Mercury and PAH emissions, make any new emission limits and related testing and sample collection requirements unnecessary and burdensome.

## XI.    EPA'S TECHNOLOGY REVIEW DOES NOT SUPPORT REQUIRING BENZENE FENCELINE MONITORING AT HNR FACILITIES UNDER SECTION 112(D)(6)

EPA lacks authority to impose fenceline monitoring at HNR facilities because there is no evidence that the monitoring requirements are "necessary" under Section 112, taking into account developments in practices, processes, and control technologies. Monitoring data shows virtually no fugitive emissions from HNR facilities because they operate under negative pressure. EPA has not provided any reason why fenceline monitoring at HNR facilities is "necessary." It appears that EPA's motivation is not driven by emissions reductions. Instead, the Agency suggests that the reasons for this requirement relate to environmental justice and a desire to "provide fenceline communities with greater access to information." 88 Fed. Reg. at 55903. If EPA moves forward with the proposed monitoring requirements as applied to SunCoke, the Agency will exceed its statutory authority by regulating ambient air under a provision of the CAA that authorizes only its regulation of "sources" of HAP emissions and by usurping the legislative function to achieve policy goals unrelated to its statutory authority. In addition, the proposal does not include a sunset provision, like that proposed in the NESHAP for integrated iron and steel plants, which would allow HNR facilities an escape from the unceasing obligation to survey and monitor for benzene based on what the surveys reveal and what degree of compliance they achieve. *See, e.g.,* 88 Fed. Reg. 49402, 49419 (Jul. 31, 2023).

Section 112(d)(6) requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section." 42 USC § 7412(d)(6). Under this process, EPA assesses whether existing standards for regulated toxics "should be tightened in view of developments in technologies and practices since the standard's promulgation or last revision, and, in particular, the cost and feasibility of developments and corresponding emissions savings." *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015). As used in the statute, "[n]ecessary" is modified and must be interpreted by the parenthetical that follows it, i.e., "taking into account developments in practices, processes and control technologies." *Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1084 (D.C. Cir. 2008) (describing EPA's finding of no "significant developments in practices, processes and control technologies," as "the *core requirement* of subsection 112(d)(6)") (emphasis added).[44]

EPA's RTR "did *not* identify any developments in practices, processes or control technologies" relevant to coke oven doors or benzene fenceline monitoring. 88 Fed Reg. 55858, 55883 (Aug. 16, 2023) (emphasis added). Despite finding no facts that would support the statute's

---

[44] The D.C. Circuit held in *Louisiana Envt'l Actin Network v. EPA* that, at least for previously unregulated toxic substances, the three listed factors are not exhaustive. 955 F.3d 1088. But requirements proposed as part of the technology review must nonetheless be "necessary" to achieve an existing emissions standard or other requirement of the CAA.

EXH175

ED_018388_00000109-00037

prerequisite for regulating, EPA proposed a benzene fenceline monitoring requirement, a benzene action level (as a COE surrogate), and a root cause analysis and corrective action requirement if the action level is exceeded (collectively, "Fenceline Monitoring Requirements"), ostensibly "[t]o further address fugitive emissions at the Coke Oven Batteries facilities."[45]

The statute clearly requires EPA to "tak[e] into account developments in practices, processes, and control technologies" and to determine whether it is "necessary" to revise the standards. EPA "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Because there was no necessity with respect to these changes proposed by EPA, the Proposed Rule ignored this mandate and EPA may not legally adopt its proposed Fenceline Monitoring Requirements.

### A.    Fenceline Monitoring is Unnecessary and May Not Legally Be Adopted

Having concluded that there have been no developments in practice, processes, and control technologies necessitating additional controls, EPA may not legally adopt new control requirements.[46]  With respect to SunCoke's HNR facilities, in particular, the Agency offers no basis for requiring Fenceline Monitoring, having concluded that there are no fugitive emissions because the ovens operate under negative pressure.  As set forth in greater detail below, because HNR facilities use this unique technology, they must be excluded from any requirements for Fenceline Monitoring that may be adopted.

### 1.    Even If It Were "Necessary" for EPA to Require Fenceline Monitoring at ByP Facilities, The Requirement Should Not Apply to HNR Facilities

---

[45] By contrast, in the Refinery MACT, EPA "determined that there *are* developments in practices, processes and control technologies that warrant revisions to the MACT standards for this [Refinery MACT 1] source category" and finalized a "fenceline monitoring work practice standard to improve the management of fugitive emissions." 80 Fed. Reg. 75,182-83 (Dec. 1, 2015).

[46] The proposed Fenceline Monitoring Requirements are not appropriate work practice standards for HNR facilities. EPA reached that conclusion earlier this year in the Lead Acid Battery RTR and should have similarly done so here. *See* Lead Acid Battery RTR, 88 Fed. Reg. 11,556, 11,566 (Feb. 23, 2023). It explained:

> We received three comments regarding the proposed fugitive dust minimization work practice standard. Environmental groups generally supported the proposal, but they commented that the EPA must require the use of fenceline monitoring and corrective action tied to that monitoring as well as full enclosure negative pressure requirements. We disagree that the use of fenceline monitoring and corrective action tied to that monitoring is an appropriate work practice standard for this source category.

In that rulemaking, EPA stated that it "did not find that fenceline monitoring in the lead acid battery manufacturing source category is a new trend in facility procedures or is generally in use at these facilities." EPA, New Source Performance Standards for Lead Acid Battery Manufacturing Plants And National Emission Standards for Hazardous Air Pollutants for Lead Acid Battery Manufacturing Area Sources, Summary of Public Comments and Responses on Proposed Rules, 87 Fed. Reg. 10134 (Feb. 23, 2022) (Response 4.7). Coupled with the significant economic impacts, EPA made clear that "it was not identified as a development or advancement in emissions reduction control technology or control methods." *Id.* The same is true here: fenceline monitoring is not a new trend in facility procedures or generally in use at HNR facilities.

EXH176

ED_018388_00000109-00038

The potential for fugitive emissions from ByP and HNR facilities are entirely different due to important design and operational differences between their respective facilities and operations. *See supra* Section III.A. As EPA acknowledges, the fact that HNRs operate under negative pressure makes a material difference in HNRs' potential for fugitive emissions:

> Ovens at ByP facilities operate under positive pressure and, consequently, leak COE, a HAP, that includes both gases and particulate matter (PM), via oven door jams ("doors"), charging port lids ("lids"), offtake ducts ("offtakes"), and during charging. Ovens at HNR facilities are designed to operate under negative pressure to reduce or eliminate leaks but require maintenance and monitoring to ensure constant operation at negative pressure.

88 Fed. Reg. 55858, 55863 (Aug. 16, 2023). While EPA briefly acknowledges some of the differences, including differences related to fugitive emissions, it nevertheless ignores those differences in its Proposed Rule.

Because byproduct ovens operate under positive pressure, small openings or cracks in byproduct ovens allow raw coke oven gas and HAPs to leak into the atmosphere. In contrast, SunCoke's HNR ovens operate under negative pressure and release the heat of combustion within the oven system. EPA previously acknowledged that operating the coke ovens under negative pressure virtually eliminates the risk of leakage of coke oven emissions through doors or other potential leakage points:

> [T]hese leaks are so infrequent and of such short duration that the annual emissions are orders of magnitude below those from door leaks on by-product batteries, which occur on a continuous basis.

EPA, "National Emissions Standards for Coke Oven Batteries: Background Information for Final Amendments," at 21 (Mar. 31, 2005). Indeed, EPA initially only planned to request fenceline monitoring data from ByP plants; HNR plants were an afterthought because of their minimal fugitive emissions.[47] EPA described multiple reasons to gather benzene fugitive emissions data from ByP plants, but said nothing about fugitives from HNR facilities.[48] As described in greater detail in Section XI.A.4 below, fugitive HAP emissions monitoring conducted at one of SunCoke's plants for ten years demonstrates that there is no impact on ambient HAP levels, and that any emissions are below risk-based screening levels; the state agency agreed with this determination. *See* Attachment E (Letter from Ohio EPA to Haverhill Coke Company, July 14, 2014).

Yet, in determining whether to adopt Fenceline Monitoring requirements in the current rulemaking, EPA selected five coke facilities—four ByP facilities and one heat recovery facility (Haverhill)—to "improve [the Agency's] understanding of fugitive emissions and to potentially address fugitive emissions sources at coke facilities". 88 Fed. Reg. 55858, 55885 (Aug. 16, 2023). Despite recognizing the very significant differences in the potential for fugitive emissions, the

---

[47] *See* Declaration of Penny Lassiter, EPA's Director of Sector Policies and Programs Division in the Office of Air Quality Planning and Standards within the Office of Air and Radiation, May 5, 2022.
[48] *Id.* at Paragraphs 11 and 15.

EXH177

ED_018388_00000109-00039

Agency inexplicably lumped the sources together in concluding that Fenceline Monitoring is appropriate. *See infra* Section XI.A. It is impossible to reconcile EPA's current proposal to require Fenceline Monitoring of ByP and HNR with EPA's long-standing recognition that the differences in fugitive emissions between the two are so materially different.

An agency's decision is arbitrary and capricious if "the agency has [] offered an explanation for its decision that runs counter to the evidence before the agency." EPA does not offer any meaningful basis for its decision to require HNR plants to conduct Fenceline Monitoring and its data makes clear that there is no credible basis for doing so. *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4ᵗʰ Cir. 2018) (quoting *State Farm*, 463 U.S. at 43). EPA's conclusion suggests that it would have required Fenceline Monitoring regardless of the outcome of its analysis.

### 2. EPA's Reasons for Proposing Fenceline Monitoring Appear to be Unrelated to its Technology Review

EPA is proposing that coke oven batteries "conduct fenceline monitoring for benzene and report these data electronically to the EPA so that it can be made public and provide fenceline communities with greater access to information about potential emissions impacts." 88 Fed. Reg. at 55903. In other words, EPA is using the Technology Review as a vehicle to implement Executive Order Number 12898, "Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations." 59 Fed. Reg. 7629 (February 16, 1994). But EO 12,898 does not augment EPA's authority under the CAA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952) ("The Constitution did not subject this law-making power of Congress to presidential or military supervision or control."). Rather, the Order directs EPA to adopt EJ requirements when "permitted by law," which the Agency is not in this case for the reasons described above.

In addition to being unlawful, providing Fenceline Monitoring data to fenceline communities, as EPA has proposed, tells the public nothing useful about the potential emissions impacts from the facilities because the Proposed Rule "does not correlate to any particular metric related to risk," and because benzene is ubiquitous and the Proposed Rule does not ensure that emissions from offsite sources and non-source category emissions are excluded. 88 Fed. Reg. at 55886. The fugitive HAP emissions monitoring data collected at SunCoke's Haverhill facility is publicly available on EPA's web site and provides more useful information concerning risk to fenceline communities than the proposed fenceline monitoring, demonstrating there is no impact on ambient HAP levels and that emissions are below risk-based screening levels.[49]

### 3. The Proposed Rule Exceeds EPA's Authority Under CAA Section 112 Because It Does Not Ensure That Emissions From Offsite Sources Are Excluded

Section 112 of the CAA does not authorize EPA to regulate ambient air. *See W. Virginia v. EPA*, 142 S. Ct. 2587, 2600 (2022) ("EPA, though, does not choose which sources must reduce

---

[49] *See* https://www.epa.gov/outdoor-air-quality-data; *see also* Attachment E (Letter from Ohio EPA to Haverhill Coke Company, July 14, 2014).

EXH178

ED_018388_00000109-00040

their pollution and by how much to meet the ambient pollution target"). CAA Section 112 only authorizes EPA to regulate emissions "sources." 42 U.S.C. § 7412(d)(1). Yet in print and in practice, EPA is proposing to regulate ambient air with this rulemaking. EPA proposes that benzene be measured at the fenceline of each coke oven facility using EPA Methods 325A/B. 88 Fed. Reg. at 55885. According to EPA, the facility would then determine a "delta c" in order to subtract out the estimated contribution from background emissions that do not originate from the facility. *Id.* The rolling annual average "delta c" would be compared against the benzene action level and owners and operators would be required to conduct root cause analysis and corrective action upon exceeding the action level. *Id.*

As EPA acknowledges, fenceline monitors measure ambient air concentrations, not facility-specific emissions. *See, e.g., id.* at 55887. While the Proposed Rule contemplates excluding sample results attributable to offsite sources as outliers, *id.* at 55887, in practice, EPA does not allow it. For example, EPA's Petroleum Refinery Sector Rule ("Refinery MACT"), the Agency claimed that the benzene fenceline monitoring program is not an ambient air standard. 80 Fed. Reg. 75178, 75192 (Dec. 1, 2015). The Agency explained that the benzene fenceline monitors must be placed "on the facility fenceline to measure emissions from the facility, i.e., on the property of the refiner." *Id.* The placement, according to EPA, is necessary to establish that the monitors are not monitoring ambient air. *Id.* In addition, the Agency explained that Method 325A sets out procedures to exclude outliers. *Id.*

Despite these assurances in the Refinery MACT, EPA has rejected quarterly reports in which regulated entities have done just that—used Method 325A to exclude benzene fenceline concentrations from offsite sources as "outliers." As a result, refineries are required to report benzene emissions from offsite sources in their quarterly reports, conduct root cause analyses and perform corrective action based on ambient air emissions, including offsite sources, and are not eligible for reduced monitoring if emissions from offsite sources cause the refinery's emissions to be above the benzene action level, all of which violate CAA Section 112.

The Proposed Rule contains the same flaws. The proposed amendments to Subpart L's reporting and recordkeeping requirements refers to Section 9.2 of Method 325A with respect to outliers.[50] In Method 325A, Section 9.2, a potential outlier is defined as "a result for which one or more PS tubes does not agree with the trend in results shown by neighboring PS tubes particularly when data from those locations have been more consistent during previous sampling periods." Method 325A, Section 9.2 also states that "if the anomalous result is not repeated for that monitoring location, the episode can be ascribed to transient contamination and the data in question must be flagged for potential elimination from the dataset." Yet, in practice, EPA has taken the position that "Method 325A does not account for off-site sample contamination" and that the data impacted by an off-site emissions event should not be discarded/eliminated from the delta c calculation as an outlier. This determination is based on precedence established in the Agency's review of similar cases brought to it by refineries when off-site emissions events impacted their benzene fenceline monitors. For these reasons, the Proposed Rule must be revised to clarify that "outliers" necessarily include sample contamination from off-site sources.

---

[50] EPA-HQ-OAR-2003-0051-0753, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR Part 63, Subpart L*, at 45 (Jul 1, 2023) (40 C.F.R. § 63.311(j)(7)).

EXH179

ED_018388_00000109-00041

The Proposed Rule must make clear that any emissions from outside the facility, or from non-source category emissions from within the facility, must be excluded from the quarterly reports. Otherwise, root cause investigations and corrective action obligations will be triggered based on benzene concentrations in the ambient air and on emissions the Agency lacks authority to regulate. While the Proposed Rule contains narrow exceptions allowing the owner or operator to collect one or more samples if the owner or operator believes that an offsite upwind source has influenced the sampler measurements, provided the regulated entity secures from EPA a site-specific monitoring plan, this exception does not go far enough. 88 Fed. Reg. at 55887. The exclusion must include all offsite sources, not just those that are "upwind," and all non-source category emissions, because EPA has no legal authority to regulate either.

Although EPA claims to "allow the subtraction of off-site interfering sources (because they are not within the control of the owner or operators of coke ovens facilities) through site-specific monitoring plans," the Proposed Rule language does not go this far, i.e., it is limited to offsite, "upwind" sources. 88 Fed. Reg. at 55887. More fundamentally, EPA admits that it is "not providing this option for on-site, non-source category emissions," *id.* at 55887, meaning that EPA intends to violate the law. The action levels are based on facility-wide emissions, which includes non-source category emissions, which EPA may not legally regulate through its Technology Review for COB. Nothing in CAA Section 112 allows EPA to compel monitoring and to trigger work practices requirements based on sources and HAP emissions that EPA may not legally regulate. Yet, 99% of EPA's modeling data was from non-category sources.

If EPA nevertheless adopts a Fenceline Monitoring program, even though it has no legal authority to do so, it must ensure that its flawed implementation of the Refinery MACT, which also is evident in the Proposed Rule, is not repeated:

- Regulated entities should only be required to report source category emissions that originate from source category emissions from their facilities, and there must be clear mechanisms in the regulations to exclude emissions "that do not originate from the facility." *Id.* at 55885.

- Regulated entities should not be required to perform either a root cause or corrective action analysis for emissions that "do not originate from the facility." *Id.* EPA must amend the definition of root cause to make clear that the analysis is limited to source category emissions that originate from the facility. The root cause analysis is an assessment conducted through a process of investigation to determine the primary underlying cause and all other contributing causes to an exceedance of an action level set forth in this rule.

- Coke manufacturers must be eligible for exemptions from reporting or reduced monitoring based on low emissions compared to the action level based on emissions that originate *from the facility*, not offsite sources. Regulatory obligations under a benzene fenceline monitoring program that are triggered by ambient air concentrations, emissions from offsite sources, and emissions from non-source categories violate Section 112 of the CAA.

As written, the Proposed Rule regulates ambient air and is illegal.

EXH180

ED_018388_00000109-00042

### 4.    EPA's Action Level Is Technically Flawed and, Therefore, Arbitrary

If the Proposed Rule was adopted in its current form, regulated entities would be required to conduct root cause analysis and corrective action upon exceeding an entirely arbitrary annual average concentration "action level" for benzene of 3ug/m$^3$. As EPA explains, the action level does not correlate to any particular metric related to risk. 88 Fed. Reg. at 55886. Rather, the action level is based on modeling fenceline benzene concentrations using benzene emissions inventories in the facility wide risk assessment, and assuming that the reported emissions represented full compliance with all standards, adjusted for additional proposed control requirements. *Id.* at 55885. For purposes of its modeling analysis, EPA assumed that the nearest *off-site* polar grid receptor was the best representation of each facility's fenceline concentration, unless there was a census block centroid nearer to the fenceline than the nearest off-site polar grid receptor, or an actual receptor was identified from review of the site map. *Id.* at 55887.

In other words, the action level was derived based on modeled offsite concentrations of benzene rather than the benzene concentrations actually detected at the facility fenceline. *Id.* Only receptors that were estimated to be outside the facility fenceline were considered in determining the maximum benzene level for each facility, which also corresponded with the maximum benzene concentration modeled at the fenceline. And, although EPA acknowledged that "[d]ue to differences in short-term meteorological conditions, short-term (i.e., 2-week average) concentrations at the fenceline can vary greatly," EPA did not adjust the action level to account for this "great" variability. *Id.* EPA, without any support, assumed that a 2-week measurement period would take care of the "great" variability. *Id.*

More importantly, EPA's "modeling exercise" appears to entirely ignore the actual sampling data which showed that the "[a]verage benzene Δc concentrations ranged from 0.1 to 40 ug/m3 . . . at the fenceline."[51] As a result, some facilities would have to perform root cause investigations and take corrective actions as soon as the rule goes into effect, even though EPA concluded that monitoring is unnecessary based on the technology review.

| Method | Coke Facilities | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fenceline Concentration, µg/m3* | | | | | | | | | |
| | DTE/EES | | USS Clairton | | ABC | | SunCoke-Haverhill | | CC Burns Harbor | |
| | Naphthalene | Benzene | Naphthalene | Benzene | Naphthalene | Benzene | Naphthalene | Benzene | Naphthalene | Benzene |
| 325A&B | | 2 | | 40 | | 15 | | 0.1 | | 3 |
| 325A (six months) | | 3 | | 33 | | 16 | | | | 3 |
| TO-15A | 0.4 | 1 | 9 | 28 | | 8 | 0.00 | 0.2 | 1.1 | 1 |
| TO-13A | 0.6 | | 12 | | | | | 0.01 | 0.4 | |
| | Interior Concentration, µg/m3** | | | | | | | | | |
| TO-15A | 25 | 25 | 78 | 339 | 3 | 34 | NA | | 142 | 196 |
| TO-13A | 12 | | 67 | | 4 | | | | 50 | |

*Difference between measured value and background concentration ("delta C").
** Average across all time periods

Notably, the lowest benzene emissions were from SunCoke's Haverhill facility, an HNR facility, at 0.1 ug/m3. In contrast, the benzene emissions detected at ByP facilities were 90 to *4,000%* higher than the levels detected at SunCoke's Haverhill facility. Yet EPA did not remark upon this discrepancy nor attempt to distinguish between ByP and HNR facilities in determining the need for monitoring.

---

[51] EPA–HQ–OAR–2003–0051, EPA, *Memorandum, Fugitive Monitoring at Coke Oven Facilities*, at 11 (Jul. 1, 2023).

EXH181

ED_018388_00000109-00043

The absence of any necessity for Fenceline Monitoring at HNR facilities was demonstrated by the company's Haverhill facility, which performed almost 10 years of monitoring for PAH and VOCs as required by the facility's Title V Operating permit. The permit called for sampling at three ambient monitoring locations near the plant (one upwind, one downwind, and one adjacent to the entry gate to the plant). The sampling was initiated when the plant was being built in late 2004, continued as the plant became operational in mid-2005, and continued until Ohio EPA terminated the requirements for monitoring (in 2013 for PAH and in 2014 for VOC) because the HAP monitoring data demonstrated that Haverhill had no impact on ambient HAP levels and emissions were below risk-based screening levels. *See* Attachment E (Letter from Ohio EPA to Haverhill Coke Company, July 14, 2014).

5.    **Requiring HNR Facilities to Implement Fenceline Monitoring Would Necessitate Significant Capital Investment and Operational Expense with No Environmental or Public Health Benefit**

Because HNR facilities emit minimal fugitive benzene emissions, the costs associated with SunCoke's compliance with the proposed Fenceline Monitoring Requirements would also outweigh any potential benefits. In any event, EPA's cost estimate overlooks key considerations. EPA states that Fenceline Monitoring is expected to cost about $120K/year per plant. 88 Fed. Reg. at 55894. First, even if this cost estimate were reasonable today, which it is not, EPA fails to adjust its estimates in light of its proposed implementation schedule, and the Agency fails to take into account the upfront costs for establishing on-site meteorological monitoring (or upgrading to the EPA stated standard) in facilities where it is not already in place.

Second, EPA neglects to consider that costs will be higher for certain facilities, such as the company's Jewell plant, due to terrain and siting considerations, area maintenance such as mowing to maintain safe access to the monitoring locations, and the cost of running utilities, where electricity is needed.

6.    **EPA's Proposed Monitoring Approach is Flawed Because the Obligation Survives Even if Tests Data Confirms that it is Not "Necessary"**

Fenceline Monitoring is "unnecessary" as a matter of law. If EPA intends to impose Fenceline Monitoring Requirements on HNR facilities, the rule should include a sunset provision as proposed in the NESHAP for integrated iron and steel plants, *see, e.g.,* 88 Fed. Reg. 49402, 49419 (July 31, 2023), except SunCoke's HNR facilities should be eligible for a shorter time period considering SunCoke's prior monitoring results. If facilities remain below the action level for one (1) full year, they can terminate the fenceline monitoring as long as they continue to comply with all other rule requirements. The Proposed Rule should provide for a cessation of fenceline monitoring if this requirement is met, not merely a reduction in frequency or in the number of monitors; one (1) year of data is more than adequate to make a determination that the monitoring is unnecessary.

In addition, more clarity is needed with respect to continuous compliance with all other rule requirements. A single deviation from a rule requirement should not invoke a requirement to

43

resume Fenceline Monitoring. Ongoing compliance more than 95% of the operating time on a 365 day rolling average basis is a reasonable trigger.

As described herein, the futility of requiring Fenceline Monitoring at HNR facilities was demonstrated by SunCoke's Haverhill facility, which performed almost ten (10) years of monitoring demonstrating that Haverhill had no impact on ambient HAP levels and that emissions were below risk-based screening levels. *See* Attachment E (Letter from Ohio EPA to Haverhill Coke Company, July 14, 2014).

If EPA once again compels SunCoke to perform fenceline monitoring when all available information recognizes the futility of doing so, there should be a permanent offramp for when SunCoke inevitably demonstrates that the monitoring is unnecessary.

### 7.    The Proposed Frequency of Fenceline Sampling Poses Data Risks and Should be Revised

EPA solicited comments on its proposed approach for reducing fenceline monitoring "for facilities that consistently measure fenceline concentrations below the concentration action level," and on the measurement level that should be used to provide such relief." 88 Fed. Reg. at 55888. SunCoke supports EPA's efforts to reduce fenceline monitoring requirements but requests that EPA revise its proposal in the manner described below. The current proposal is complicated and unworkable:

> In the interest of reducing the cost burden on facilities to comply with this rule, if a coke oven facility maintains the fenceline concentration below 0.3 ug/m³ (a concentration that is 10 percent of the benzene action level) at any individual monitor for 2 years, the sampling frequency at that monitor can be reduced by 50 percent (e.g., 2 weeks of sampling for every 4-week period). For each sample location and monitor that continues to register below 0.3 ug/m³ for an additional 2 years, the sampling may be reduced further to approximately once per quarter, with sampling occurring every sixth two-week period (i.e., five two-week periods are skipped between active sampling periods). If a monitor at the quarterly frequency continues to maintain a concentration of 0.3 ug/m³ for an additional 2 years, sampling at that monitor may be reduced further to annual sampling. However, if the concentration at any sample location that is allowed a reduced frequency of testing increases above 0.3 ug/m³ at any time, sampling would need to immediately return to the original continuous sampling requirement.

*Id.* EPA states that this proposed approach would be consistent with the fenceline alternate sampling frequency in the Refinery MACT I. That is true in that the sampling frequency reduction level is consistent with the Refinery MACT, i.e., 10% of the action level. However, the proposed action and sampling frequency reduction levels are both a third of the levels found in the Refinery MACT. Setting aside that SunCoke is unable to evaluate whether 3 ug/m³ is an appropriate action level in the first place—because, as previously discussed, EPA has not explained the extent to which it used the Section 114 data to inform the modeled data—the proposed sampling frequency reduction level of 0.3 ug/m³ is so low that it presents data quality risks.

44

EXH183

ED_018388_00000109-00045

The proposed sampling frequency reduction level of 0.3 ug/m³ highlights the challenges associated with M325 benzene sampling and analysis: the proposed level not only exceeds the lowest point on laboratory benzene calibration curves, it also fails to take into account sample-to-sample variability in the effective detection limit for benzene. As a result, the proposed 0.3 ug/m³ regulatory sample reduction level inevitably will be influenced by background benzene levels, which would contribute up to 0.1 ug/m³ of benzene that is not associated with the ambient air, but rather germane to laboratory bias. These technical shortcomings would render the data inaccurate and over-inclusive (i.e., it would include other sources' emissions) and have unreasonable adverse effects on a facility's ability to be relieved of unnecessary monitoring. For example, even after a successful six-year effort and stepwise reductions in sampling frequency, a single unreliable sample location reporting above 0.3 ug/m³ could cause the facility to immediately return to the original continuous sampling requirement.

If, despite SunCoke's comments, EPA proceeds with requiring fenceline monitoring for HNR facilities, SunCoke submits that the appropriate reduction level should be 0.9 ug/m3, which would be equivalent to that in the Refinery MACT, and should be based on an annual average similar to EPA's proposed corrective action threshold rather than a single sampling period. This would help mitigate against laboratory measurement bias and minimize decision outcome risk. In the Refinery MACT, EPA acknowledged the monitoring technology limitations, i.e., those related to equipment detection limits and the need to ensure reliable data quality, and set 0.9 ug/m³ as the appropriate level, including because it facilitated using alternative monitoring approaches (e.g., gas chromatographs and open path monitoring systems).[52] EPA's reasoning with respect to the reduction level in the Refinery MACT applies here as well. Moreover, if EPA were to set the reduction level at 0.3 ug/m³, the Agency effectively would eliminate the option to use non-M325 approaches to demonstrate compliance with the action level and make it exceedingly difficult to meet the sample reduction level due to non-ambient air contributions associated with analytical results at such a low level.

8.    **EPA Should Not Establish A One-Size-Fits-All Time Frame for Corrective Action or Require Corrective Action in Absence of Violation of Subpart L**

EPA is proposing to require coke oven facilities to take corrective action to reduce fugitive emissions if monitored fenceline concentrations exceed the action level on a rolling annual average basis (recalculated every fourteen (14) days).[53] With respect to the requirement to perform corrective action after exceeding the action level, EPA should not require a "one size fits all" timeline. Corrective actions are facility- and cause-specific, and it would be untenable for EPA to predetermine and dictate a timeframe for corrective action without any information on what may

---

[52] *See* EPA, Presentation, *National Air Toxics Monitoring and Data Analysis Workshop*, Oct. 28th, 2015, available at https://www3.epa.gov/ttnamti1/files/ambient/airtox/2015workshop/Petroleum%20Refinery.pdf.

[53] Several of the example root cause analyses identified by EPA in the redline version of MACT L do not represent root cause analysis of an event that has already occurred. Instead, they reference an event that is ongoing (e.g. "employing progressively more frequent sampling, analysis and meteorology (e.g. "using shorter sampling periods for Methods 325A and 325B or using active sampling techniques)." EPA-HQ-OAR-2003-0051-0753, EPA, Memorandum, *Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart L*, at 54–55 (Jul. 1, 2023) (amending 50 C.F.R. § 63.314(g)).

EXH184

ED_018388_00000109-00046

have triggered the corrective action or what work may be required. In addition, corrective action may take longer at certain facilities, like Jewell, because of its unique location.

The process proposed by EPA for investigating, completing, and reporting the corrective actions would be very burdensome to implement, particularly in the schedule being proposed by EPA. This new reporting burden adds to multiple other reporting requirements related to these MACT standards as well as other federal, state, and local laws and permitting obligations.

More fundamentally, regulated entities cannot be required to perform a root cause analysis or corrective action if they are in compliance with the standards in 40 C.F.R. §§ 63.302 63.308. If they are meeting those emissions standards, the emissions are necessarily coming from a non-source category and EPA has no legal authority to require either an investigation of the root cause or corrective action to control non-source category emissions. If EPA nevertheless requires regulated entities to perform root cause investigations and corrective actions, it should follow the well-established model typically used in settlement of enforcement actions rather than propose an unnecessary and overly burdensome process.

### 9.    EPA's Proposed Timeline for Installing and Operating a Fenceline Monitoring System is Too Short

If EPA proceeds with requiring fenceline monitoring for HNR facilities, SunCoke opposes EPA's proposed timeframe for affected sources to comply with the requirements because these timeframes are not feasible. EPA is proposing that facilities begin fenceline monitoring within one (1) year after publication of the final rule, which is entirely too little time, and that facilities perform root cause analysis and take corrective actions upon exceedance of the fenceline action level starting three (3) years after publication. 88 Fed. Reg. at 55893.

EPA's timeline for the installation of monitors is unrealistic both because it ignores real world supply chain delays and the unique configurations of some facilities, like SunCoke's Jewell plant. If EPA finalizes the requirement for Fenceline Monitoring, SunCoke will need to retain a consultant for each of its facilities, design the monitoring network, order and install the monitors and a meteorological station, develop a site specific monitoring plan, and have everything up and running in just one year, all for each plant. The expedited timeframe is unreasonable, particularly since the monitoring is entirely unnecessary. At a minimum, the heat recovery facilities should have two (2) years to install the required monitoring network.

If Jewell is required to conduct Fenceline Monitoring, it will need an additional year to comply for the reasons described above and because of the unique configuration of the Jewell facility. EPA has authority under 42 U.S.C. § 7412(i)(3)(A) to establish a compliance date of three (3) years after the effective date of any emissions standard, limitation, or regulation promulgated under that section. EPA may issue a permit that grants an extension permitting an existing source up to one (1) additional year to comply with standards under subsection (i)(3)(B) if such additional period is "necessary" for the installation of controls. Since Fenceline Monitoring is a control (a work practice that triggers corrective action), EPA should allow Jewell an additional year to comply with this new requirement.

46

EXH185

ED_018388_00000109-00047

## XII.   THE PROPOSED OVEN PRESSURE *AND* METHOD 303A MONITORING  ARE NOT "NECESSARY" TO ACHIEVE EMISSIONS STANDARDS

EPA lacks authority to require costly and onerous oven pressure monitoring as a means of policing HNR oven door leaks because there is no evidence that such a requirement is "necessary," taking into account developments in practices, processes, and control technologies. *See* 42 USC § 7412(d)(6) (requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section"). Indeed, EPA expressly stated that it "did not identify *any* developments in practices, processes or control technologies," 88 Fed. Reg. at 55883 (emphasis added), and also acknowledged that "[visible emissions] monitoring has been used as an effective surrogate for monitoring door leaks in the past."[54]  EPA provides no rationale for why it is necessary to abandon this practice.

As part of its technology review for coke oven batteries, EPA is proposing to add a requirement to Section 63.303(a)(i) that requires HNR facilities to conduct visual monitoring for visible emissions leaks using EPA Method 303 or 303A *and*  to monitor pressure in the ovens *and* common tunnel in order to detect leaks from coke oven doors, instead of allowing companies to choose one procedure over the other, as the NESHAP currently permits.  EPA appears to assume, incorrectly, that increased pressure monitoring is necessary to establish negative oven pressure and that the leak rate is necessary to reduce COE.  EPA also has raised a question concerning whether the "current practice," as EPA describes it, of operating one pressure monitor per common tunnel that may connect to 15-20 ovens, is sufficient.  88 Fed. Reg. at 55885.  The current pressure monitoring practice for HNR facilities, which is different from that described by EPA, is indeed sufficient, as explained herein.

Because EPA's review of the coke battery ovens is authorized not as part of the RTR, but solely as part of the periodic technology review, EPA's authority for requiring any changes to Subpart L is limited to CAA Section 112(d)(6).  Section 112(d)(6) authorizes EPA to "review, and revise as necessary (taking into account development in practices, processes, and control technologies), emissions standards promulgated under this section" every eight years.  42 U.S.C. § 7412(d)(6).  Yet there is no evidence that exceedances of the 0.0 leaks standard for HNR have resulted in any COE emissions, nor of any developments in "practices, processes, and control technologies" that would justify the proposed changes.  Indeed, EPA's proposed requirement "to measure pressure in the ovens during the main points in the entire oven cycle to include, at minimum, during pushing, coking, and charging," 88 Fed. Reg. 55884, is inconsistent with its findings that for pushing and charging, "no technology has been identified that demonstrates reduced emissions . . . beyond the current control technology in use."[55]  This proposed requirement also is inconsistent with EPA's review under CAA Section 112(d)(2) and (d)(3), which found that for pushing operations, battery stacks, and HNR HRSG main stacks, no cost-effective BTF options existed.  *Id.* at 55876.

---

[54] EPA-HQ-OAR-2002-0085-0873, EPA, *Memorandum, Technology Review for NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks (40 CFR part 63, subpart CCCCC), and NESHAP for Coke Oven Batteries (40 CFR part 63, subpart L)*, at 22 (May 1, 2023).

[55] EPA-HQ-OAR-2002-0085-0873, EPA, Memorandum, *Technology Review for NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks (40 CFR part 63, subpart CCCCC), and NESHAP for Coke Oven Batteries (40 CFR part 63, subpart L)*, at 6, 34 (May 1, 2023).

EXH186

ED_018388_00000109-00048

Subpart L clearly indicates that the purpose of monitoring visible emissions from the ovens is to minimize COE. *See* 40 C.F.R. § 63.303(a), (c). But if COE is the relevant criteria, additional pressure and visible emission monitoring of the ovens is not necessary. Section 63.302(c), adopted previously with respect to byproduct coke oven batteries, acknowledges that it is not necessary to determine the percent of leaking coke oven doors when ovens are operated under negative pressure: "The emission limitations in paragraph (b) of this section do not apply to the owner or operator of a by-product coke oven battery that utilizes a new recovery technology, including but not limited to larger size ovens, operation *under negative pressure* and processes with emission points different from those regulated under this subpart." 40 C.F.R. § 63.302(e) (emphasis added). This same logic should apply to HNR coke ovens.

SunCoke previously provided 10 years of interior monitoring data and recent fenceline monitoring data from SunCoke's Haverhill facility demonstrating that non-recovery coke plant batteries using Jewell-Thompson ovens do not emit COE.[56] Both types of datasets further demonstrate that HNR facilities meet EPA's proposed benzene action level of 3 ug/m$^3$, which is a surrogate for COE.

As the data show, the practices that SunCoke already has in place are wholly effective at achieving COE limits. That is not surprising given the company's extensive existing measures. In addition to operating ovens under negative pressure, SunCoke employees monitor the coke ovens for door leaks throughout all stages of the coking cycle and make adjustments to the ovens by reviewing electronic data and physically walking the coke oven batteries.[57] Any door leaks due to positive pressure are corrected by adjusting oven uptakes, dampers, and/or sole flues, and are then recorded, and reported as required under Section 63.303(c). SunCoke's work practices are already consistent with Section 63.303(c)(2) in that SunCoke monitors the ovens for the entirety of the coking cycle and responds to any observed door leaks. It is not necessary for EPA to impose conflicting and more burdensome regulations on an activity that is already regulated. This is equivalent to both Method 303 and 303A and additional monitoring in the common tunnel at key points throughout the oven cycle because ovens are monitored on a continuous basis; therefore, no additional requirements are necessary.

SunCoke's heat recovery facilities also monitor negative pressure in the common tunnel electronically on a continuous basis and have one pressure transmitter for every seven (7) ovens in the battery on average. Monitoring for negative pressure in the common tunnel, in conjunction with monitoring for coke oven leaks throughout all stages of coking as previously described, accurately captures any time that an oven is experiencing positive pressure. SunCoke's existing negative pressure monitoring system accurately monitors for pressure and allows personnel to take action in a timely and safe manner when necessary.

There is no evidence to suggest that SunCoke's current practices are ineffective at achieving COE limits. EPA may not simply presume that tests that rely on monitoring devices are

---

[56] Tab 4, July 1, 2023 Memorandum Fugitive Monitoring at Coke Oven Facilities Ug/m^3, Summary of 2022-2023 Results for Coke Ovens Fugitive Fenceline Average (Ae) and Interior Maximum Concentration Results for Benzene and Napthalene.

[57] *See* Attachment F (Haverhill Coke Company, LLC, Startup, Shutdown, and Malfunction Plan, Oct. 5, 2016).

EXH187

ED_018388_00000109-00049

superior to a methodology that relies on the visual observations of trained personnel. *See, e.g., Sierra Club v. EPA*, 353 F.3d 976, 991 (D.C. Cir. 2004) (in context of CAA Section 114, "[t]here is no presumption in favor of any particular type of monitoring . . . and EPA has imposed different monitoring requirements in different situations"). Installing and maintaining pressure monitors in each oven  despite no demonstrated necessity to do so in order to comply with emissions standards under the Act  would also be exorbitantly expensive, challenging and unreliable. SunCoke estimates costs of $3-4 million for every 100 ovens subject to this requirement. SunCoke has 788 ovens, which translates to a total cost of $16 million. This would be a significant percentage of SunCoke's annual capital budget, and, for this and the other reasons described herein, should be dropped from the Proposed Rule.

In addition, based on SunCoke's experience, installing additional pressure monitors in the ovens would be ineffective and unduly burdensome because they are subject to plugging and therefore require extensive maintenance to maintain. Pressure monitors located in the ovens must be manually cleaned out by maintenance personnel 2-3 times per week, exposing personnel to excessive heat, which is an unnecessary safety risk given SunCoke's existing and abundant measures to maintain negative pressure in the ovens. SunCoke therefore urges EPA to not include its proposed changes to Section 63.303(a)(i) in the final rule; inclusion of these changes would be unnecessary, arbitrary and capricious.

## XIII. EPA'S TECHNOLOGY REVIEW DOES NOT SUPPORT THE PROPOSED NEW OPACITY LIMIT AND DAILY OBSERVATION REQUIREMENTS

EPA's redline version of its proposed amendments to Subpart L includes a proposed change to 40 C.F.R. § 63.303(d)(3) to impose a new opacity limit of 10% on the HNR facilities' bypass/waste heat stacks and to require a daily observation of all bypass or waste heat stacks when operating during charging to determine if visible emissions are present and record the results or the reason why conditions did not permit a daily observation. EPA lacks authority to impose the proposed new opacity limit and the related requirements. There is no evidence that they are "necessary," taking into account developments in practices, processes, and control technologies. *See* 42 USC § 7412(d)(6) (requiring EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section"); 88 Fed. Reg. at 55883 (EPA "did not identify *any* developments in practices, processes or control technologies") (emphasis added). EPA provides no rationale for these changes.

It is not "necessary" nor does EPA have authority under its technology review to require a new opacity limit of 10% on the HNR facilities' bypass/waste heat stacks, nor is SunCoke aware of *any* coke plant (SunCoke or otherwise) that could meet this limit. SunCoke's permits and state regulating authorities already limit visible emissions from the bypass/waste heat stacks to 20% opacity. As demonstrated by the performance testing conducted and the deviation reports submitted in response to EPA's ICRs, SunCoke is in substantial compliance with the existing opacity limits for the bypass/waste heat stacks. When this equipment is in operation, SunCoke personnel monitor opacity from the waste/bypass/waste heat stacks and adjust oven dampers to minimize or eliminate visible emissions if present to ensure compliance with the existing opacity limits. At SunCoke's Jewell facility, which is the only facility where the waste heat stacks operate on a continuous basis, an equivalent weekly monitoring requirement is already established by its

49

EXH188

Title V requirement. As demonstrated by Jewell's vast history of complying with its opacity limit, more frequent monitoring is simply not necessary.

It also would not be appropriate to establish a daily observation requirement at heat recovery facilities since bypass vent stacks do not operate on a continuous basis. Because venting malfunctions at SunCoke's heat recovery facilities can be brief and intermittent, imposing such a requirement any time the bypass vent stacks are in operation would result in greater environmental harm because it would extend the duration of venting during malfunctions to allow SunCoke sufficient time to dispatch certified personnel to the appropriate location in the plant to conduct readings per Method 9. Furthermore, requiring Method 9 performance testing during periods of malfunction is specifically prohibited by other proposed MACT amendments. "§63.309 (a) . . . The performance test should be based on representative performance (i.e., performance based on normal operating conditions) of the affected source for the period being tested. Representative conditions exclude periods of startup and shutdown. *You shall not conduct performance tests during periods of malfunction. . . . .*" (emphasis added). SunCoke therefore urges EPA to not include its proposed changes to Section 63.303(d)(3) in the final rule; inclusion of these changes would be unnecessary, arbitrary and capricious. Moreover, SunCoke notes that EPA is attempting to regulate the same source—bypass/waste heat stacks—as part of two different source categories, Subparts L and CCCCC.

## XIV. EPA SHOULD NOT ALLOW USE OF ASTM D7520-16 AS AN ALTERNATIVE METHOD FOR OPACITY

EPA's redline version of its proposed amendments to Subpart L includes a proposed change to 40 C.F.R. § 63.305 to allow the use of ASTM D7520-16 as an alternative to the long-standing EPA Reference Method 9 ("Method 9") to measure the opacity of emissions from coke oven doors equipped with sheds—see proposed addition of (iii)(A)-(E) to section 63.305(c)(3). SunCoke is very troubled by EPA's decision to allow use of the experimental digital camera opacity technique ("DCOT") and associated test method, ASTM D7520-16, even as an alternative, in lieu of Method 9 to determine compliance with section 63.305(c)(3)'s opacity standards because the test method was not used in the development of the subject opacity standards and the method has not consistently been accurately demonstrated for use at the type of source being regulated (i.e., a source of fugitive emissions). These factors alone make the proposed addition of the alternative method unreasonable.

Method 9 has been the primary method for determining compliance with federal and state opacity standards since it was published in 40 C.F.R. Part 60 in 1974. As recognized in ASTM D7520-13, Method 9 "has been tested in the courts and in practice and has wide acceptance within the regulatory community." ASTM D7520-13, Annex, A.1.5.1.1. EPA's decision to allow use of the ASTM D7520-16 as an alternative to Method 9 implies that the Agency considers the DCOT technology and the associated test method to be an appropriate method for monitoring opacity. However, there are multiple potential technical issues associated with the DCOT technology and the associated test method, as described in substantial detail in other NESHAP rulemakings.[58] Rather than repeating the arguments here, SunCoke adopts its comments on this topic on EPA's

---

[58] *See, e.g.*, Docket ID No. EPA-HQ-OAR-2010-0895, *National Emission Standards for Hazardous Air Pollutants: Ferroalloys Production*, published at 81 Fed. Reg. 45089 (Jul. 12, 2016).

50

EXH189

ED_018388_00000109-00051

proposed reconsideration of the *National Emission Standards for Hazardous Air Pollutants for Ferroalloys Production*, 81 Fed. Reg. 45,089 (July 12, 2016), as though fully set forth herein. *See* Attachment G.

SunCoke is concerned that this proposed addition to 40 C.F.R. § 63.305 will set an unfortunate precedent and that the Agency, either on its own volition or due to pressure exerted by environmental groups and other biased parties, will ultimately require coke facilities to employ this experimental technology as the sole method for determining compliance with opacity.

## XV.    EXEMPTIONS FROM STARTUP, SHUTDOWN AND MALFUNCTION MUST BE REPLACED WITH ALTERNATIVE LIMITS, NOT ELIMINATED

SunCoke has not had sufficient time to evaluate all of the potential consequences from EPA's proposal to remove exemptions for periods of startup, shutdown, and malfunction ("SSM"), because of the short time frame provided for review of the Proposed Rule. With the limited time available, SunCoke knows, at least, that alternate limits must to be established for emissions from the main stacks during periods of startup and shutdown of the FGD because the proposed limits in 40 C.F.R. § 63.7297 for main stacks would be impossible to meet otherwise. In addition, rather than eliminating SSM plans wholesale as EPA has proposed, EPA should use the facilities' SSM plans to develop work practices that would apply during SSM.

Before the baghouse, spray dry absorber, and carbon injection system can be placed into service, the FGD system must be slowly heated to the minimum operating temperature. This heating is achieved by starting up multiple HRSGs and directing the flue gas from the bypass vent stacks to the FGD and main stack in a controlled manner. When the FGD reaches the minimum operating temperature, SunCoke restarts the baghouse, spray dry absorber, and carbon injection system. If flue gases were not directed to the main stack to facilitate this heating, the low temperature of the materials injected into the system for pollution control would severely corrode the pollution control equipment. During these periods, the bypass vent stack emission limits set forth in 40 C.F.R. § 63.7298 should be applicable to emissions from the main stacks because it will be impossible to meet the emission limitations proposed at section 63.7297 for HRSG main stacks until the minimum operating temperature is met and the FGD system is online.

EPA also proposes to eliminate the requirement to have a written SSM plan in 40 C.F.R. §§ 63.7310 and 63.310, and thus to eliminate the ability of facilities to demonstrate compliance if the regulated entity complies with the plan during SSM. Rather than eliminating SSM plans, EPA should adopt work practices that would apply during SSM.

The Proposed Rule requires sources to comply with the emission limits and requirements at all times. Notably, these limits would apply even during malfunctions or outages caused by third parties outside the control of the plant. Subjecting coke manufacturers to penalties based on events that cannot be avoided would be arbitrary. Instead, regulated entities should be deemed in compliance with the applicable limits provided they comply with the general duty clause in 40 C.F.R. § 63.6(e)(1)(i) and the reference to the general duty clause should not be identified as "inapplicable."

## XVI.   THE PROPOSED RULE INCLUDES SEVERAL INACCURATE DEFINITIONS

EXH190

ED_018388_00000109-00052

The redline versions of the Agency's proposed amendments to the current Subpart L and Subpart CCCCC include several new and revised terms and definitions. In the limited time SunCoke has had to comment on the Proposed Rule, SunCoke has evaluated the proposed redlines to 40 C.F.R. §§ 63.301 and 63.7352, and asks the Agency to make the below-requested changes to both sections. SunCoke has not attempted to identify every error or mischaracterization in the below table, nor has SunCoke included errors or mischaracterizations to the extent they are otherwise addressed earlier in these comments. An omission of an incorrect statement from this table is not an indication that SunCoke agrees with that error.[59]

SunCoke also notes that in this rulemaking, EPA uses a number of different terms to refer to its operations, including but not limited to "HNR," "heat and/or nonrecovery coke oven battery," "nonrecovery coke oven battery," "non-recovery," "heat/nonrecovery," "heat recovery," "HNR facilities that have HRSGs," and "HNR facilities that do not have HRSGs," among other terms. SunCoke suggests referring to its facilities as (1) heat recovery facilities (e.g., Haverhill, Granite City, Middletown, and Indiana Harbor) or (2) non-recovery facilities (e.g., Jewell).

| EPA's Proposed Redlined Text | SunCoke's Response |
|---|---|
| The redlined versions of the Proposed Rule's changes includes the following new term and definition:<br><br>*Bypass stack* at a heat and/or nonrecovery facility means a stack that allows coke oven gas to be vented to the atmosphere and not through a heat recovery unit. | SunCoke suggests deleting this term and its definition because the term is already defined under the new proposed term "*heat recovery steam generator bypass/waste heat stack*" and because, as written, this definition for "*bypass stack*" is an inaccurate description of the equipment and the process. |
| The redlined versions of the Proposed Rule's changes includes the following new term and definition:<br><br>*Heat and/or nonrecovery coke oven battery* means a group of ovens connected by common walls, where coal undergoes destructive distillation under negative pressure to produce coke and coke oven gas from which by-products are not recovered. For nonrecovery plants (i.e., no chemical recovery) with heat recovery, the oven gases are sent to a heat recovery steam generator that produces steam. For nonrecovery coke oven batteries (i.e., no chemical recovery) without heat recovery, oven gases are released to the atmosphere through waste heat stacks. Heat recovery coke oven batteries also may | EPA appears to be trying to distinguish between heat recovery and non-recovery ovens within these definitions, however the definitions themselves do not actually provide differentiation. This proposed definition, as written, is duplicative of EPA's definition of "*nonrecovery coke oven battery.*" If EPA believes a separate definition is warranted, this definition should be revised.<br><br>Additionally, the proposed changes provide an inaccurate description of the equipment and the process. SunCoke requests revising this definition as follows:<br><br>*Heat and/or nonrecovery coke oven battery* means a group of ovens connected by common walls and a common tunnel after burner, where coal undergoes destructive |

[59] SunCoke also requests the Agency make the definition changes identified in SunCoke's Initial Comments for Coke Oven MACT RTR Proposed Rule, submitted on May 22, 2023. *See* Attachment H.

EXH191

ED_018388_00000109-00053

| | |
|---|---|
| release oven gases to the atmosphere through bypass stacks when the heat recovery steam generators are not available due to maintenance or repair. | distillation under negative pressure to produce coke, and which is designed for the combustion of the coke oven gas from which by-products are not recovered. For nonrecovery plants (i.e., no chemical recovery) with heat recovery, the flue ~~oven~~ gases are sent to a heat recovery steam generator that produces steam. For nonrecovery coke oven batteries (i.e., no chemical recovery) without heat recovery, flue oven gases are treated in the common tunnel afterburner and then released to the atmosphere through waste heat stacks. Heat recovery coke oven batteries also may release flue ~~oven~~ gases that have been treated in the common tunnel afterburner to the atmosphere through bypass stacks when the heat recovery steam generators are not available due to maintenance, or repair, or malfunction. |
| The redlined versions of the Proposed Rule's changes includes the following new term and definition: | The proposed changes provide an inaccurate description of the equipment and the process. SunCoke requests revising this definition as follows: |
| *Heat recovery steam generator* is a process unit that recovers heat from coke oven gas in order to produce steam. | *Heat recovery steam generator* is a process unit that cools the gas by recovering heat and producing steam, so that flue gas can be treated by pollution control equipment ~~recovers heat from coke oven gas in order to produce steam.~~ |
| The redlined versions of the Proposed Rule's changes includes the following new term and definition: | The proposed changes provide an inaccurate description of the equipment and the process. SunCoke requests revising this definition as follows: |
| *Heat recovery steam generator bypass/waste heat stack* means a stack that exhausts coke oven gas into the atmosphere without passing through a HRSG. A HRSG bypass/waste heat stack exhausts coke oven gas directly from the oven batteries to the atmosphere. | *Heat recovery steam generator bypass/waste heat stack* means a stack that exhausts flue gas treated by the common tunnel afterburner coke oven gas into the atmosphere to maintain negative pressure within the oven when the HRSGs are not available due to maintenance, repair, or malfunction without passing through a HRSG. A HRSG bypass/waste heat ~~stack exhausts coke oven gas directly from the oven batteries to the atmosphere.~~ |

EXH192

ED_018388_00000109-00054

| The redlined versions of the Proposed Rule's changes includes the following new term and definition:<br><br>*Heat recovery steam generator main stack* means the exhaust stack from a HRSG that is the point of final discharge to the atmosphere of the gases emanating from a HRSG and any auxiliary processes, if present. | The proposed changes provide an inaccurate description of the equipment and the process. SunCoke requests revising this term and the definition as follows:<br><br>~~Heat recovery steam generator m~~ _Main stack_ means the exhaust stack from a HRSG that is the point of final discharge to the atmosphere of the <u>flue</u> gases emanating from a <u>heat recovery facility</u>HRSG and any auxiliary processes, if present. |
| --- | --- |
| The redlined versions of the Proposed Rule's changes includes the following revised definition for "*nonrecovery coke oven battery*":<br><br>*Nonrecovery coke oven battery* means a group of ovens connected by common walls and operated as a unit, where coal undergoes destructive distillation under negative pressure to produce coke, and which is designed for the combustion of the coke oven gas from which by-products are not recovered. Also known as heat/nonrecovery. Nonrecovery coke oven battery refers to units from which heat is recovered from the coke oven gas exhaust as well as units where heat is not recovered. | The proposed changes provide an inaccurate description of the equipment and the process. SunCoke requests revising this definition as follows:<br><br>*Nonrecovery coke oven battery* means a group of ovens connected by common walls and <u>a common tunnel after burner</u> ~~operated as a unit~~, where coal undergoes destructive distillation under negative pressure to produce coke, and which is designed for the combustion of the coke oven gas from which by-products are not recovered. Also known as heat/nonrecovery. Nonrecovery coke oven battery refers to units from which heat is recovered from the combusted coke oven gas exhaust <u>(i.e., flue gas)</u> as well as units where heat is not recovered. |
| The redlined versions of the Proposed Rule's changes includes the following new term and definition:<br><br>*Waste heat stack* at a heat and/or nonrecovery facility means a stack that allows coke oven gas to be vented directly to the atmosphere without control and where there are no units available for heat recovery. | SunCoke requests deleting this term and its definition because the term is already defined under the new proposed term "*heat recovery steam generator bypass/waste heat stack*" and because, as written, this definition for "*waste heat stack*" is an inaccurate description of the equipment and process. |

## XVII. CONCLUSION

In closing, SunCoke would like to express that if the Proposed Rule is finalized as written, the rule would impose onerous new limits and requirements that are unnecessary for environmental

EXH193

ED_018388_00000109-00055

protection, are technically and economically infeasible, and could impair the domestic steel and foundry industries. Despite the Agency's findings of acceptable risk and lack of developments in practices, processes or control technologies, the Proposed Rule (and the redlined changes) include a number of requirements for SunCoke's HNR facilities that are not "necessary," based on flawed assumptions and/or inaccurate or incomplete data, and not "achievable," and in some instances, make sense for only ByP facilities, which, as EPA has long recognized, operate and emit in very different ways. EPA's rushed information gathering and rulemaking process could therefore cause irreparable harm to SunCoke.

SunCoke appreciates the opportunity to submit these comments on the Proposed Rule. SunCoke remains ready to assist EPA with additional information[60] that it may need to come to a reasonable and appropriate final rule. In the meantime, please call if you have any questions.

Sincerely,

Heidi P. Knight
Beveridge & Diamond, P.C.
*Counsel for SunCoke Energy, Inc.*

---

[60] SunCoke also has identified minor changes to other sections of Subparts L and CCCCC that it believes should be incorporated into the final rule for technical accuracy among other reasons (e.g., resulting in an environmental benefit in certain cases). SunCoke provided these comments to EPA on May 22, 2023, and is attaching them to these comments for ease of review. *See* Attachment II (SunCoke's Initial Comments for Coke Oven MACT RTR Proposed Rule).

EXH194

ED_018388_00000109-00056

Attachments:

Attachment A – SunCoke's Request for Extension
Attachment B – EPA's Denial of SunCoke's Request for Extension
Attachment C    Jewell Facility Description and Pictures
Attachment D – TRC Technical Memorandum, Oct. 2, 2023
Attachment E – Letter from Ohio EPA to Haverhill Coke Company, Jul. 14, 2014
Attachment F    Haverhill Coke Company, LLC, Startup, Shutdown, and Malfunction Plan, Oct. 5, 2016
Attachment G – SunCoke's Prior Comments Related to Digital Camera Use, Jul. 12, 2016
Attachment H    SunCoke's Prior Comments Submitted to Donna Lee Jones, May 22, 2023

EXH195

ED_018388_00000109-00057

# TAB B

EXH196

ED_018388_00000109-00058

**Perkins Coie**

September 3, 2024

Perkins Coie LLP

700 13th Street, N.W.
Suite 800
Washington, D.C. 20005-3960

T: +1.202.654.6200

F: +1.202.654.6211

PerkinsCoie.com

LEANN M. JOHNSON KOCH
LeAnnJohnsonKoch@perkinscoie.com
D: +1.202.654.6209
F: +1.202.654.9943

VIA ELECTRONIC MAIL AND CERTIFIED MAIL

The Honorable Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave.
NW Washington, D.C. 20460

**Re:     Petition for Reconsideration and Request for Agency Stay
          Pending Reconsideration of Final Rule, Docket ID Nos. EPA–HQ–
          OAR–2002–0085; PA–HQ–OAR–2003–0051**

Dear Administrator Regan:

Please find enclosed a petition for reconsideration and request for stay for the U.S. Environmental Protection Agency's final rule, ***National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review***, Sections 112(d)(2), (d)(3), (d)(6), and (f)(2), 89 Fed. Reg. 55684, published in the Federal Register on July 5, 2024. This petition and request is filed on behalf of SunCoke Energy Inc.

Please contact me with any questions you may have.

Sincerely,

LeAnn M. Johnson Koch

cc:     Penny Lassiter, EPA
        Donna Lee Jones, EPA
        Chuck French, EPA
        Sarah Albert, SunCoke Energy, Inc.
        Michael R. Huston, Perkins Coie LLP

EXH197

September 3, 2024
Page 2

Aimee Ford, Perkins Coie LLP
Shae McPhee, Perkins Coie LLP
Aron Schnur, Beveridge & Diamond
Heidi Knight, Beveridge & Diamond

Perkins Coie LLP

## BEFORE THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

|  |  |
|---|---|
| In re: National Emission Standards for Hazardous Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review and Periodic Technology Review under the Clean Air Act | ) ) ) ) ) ) ) ) ) ) ) Docket Nos. EPA HQ OAR 2002 0085, EPA HQ OAR 2003 0051; FRL 8471 02 OAR |

## PETITION FOR RECONSIDERATION AND STAY OF THE FINAL RULE

SunCoke Energy, Inc. (SunCoke), pursuant to section 307(d)(7) of the Clean Air Act (CAA) and sections 705 and 553(e) of the Administrative Procedure Act (APA), petitions the Administrator of the Environmental Protection Agency (EPA) to reconsider the final rule titled, "*National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review*," 89 Fed. Reg. 55684 (July 5, 2024) (Final Rule), and to stay the effect of the Final Rule and compliance deadlines pending reconsideration and judicial review or initiate an action to amend the Final Rule.[1]

The Final Rule amends two separate, highly complex rules the rule governing emissions standards for coke ovens in 40 C.F.R. Part 63, Subpart CCCCC, and those governing residual risk and technology review in 40 C.F.R. Part 63, Subpart L. EPA's amendments to these two parts in the Final Rule will cost SunCoke many millions of dollars. EPA adopted these amendments, despite finding that "[t]here are no measurable air quality impacts from this rule that can be guaranteed," and that EPA cannot "quantif[y] any benefits associated with this final rule, because all covered facilities are expected to already have HAP [hazardous air pollutants] emissions levels that are below the final limits." 89 Fed. Reg. at 55723. In fact, EPA could not quantify any "potential public health benefits associated with such prevention" at all because "they correspond to hypothetical scenarios of emissions beyond those indicated by current facility data." *Id.* The best EPA can say of the Final Rule is that EPA "anticipates that this final rule's new requirements will increase the likelihood of facilities successfully detecting any HAP emissions in excess of the specified thresholds" that EPA has no evidence occurred.

For the reasons set forth in the Petition, SunCoke respectfully requests that EPA:

> 1. Grant SunCoke's Petition for Reconsideration to address issues that SunCoke could not have addressed in SunCoke's comments on the Proposed Rule and are of central relevance to the Final Rule and grant SunCoke a stay of the effect of the Final Rule

---

[1] 42 U.S.C. § 7607(d)(7)(B); 5 U.S.C. § 705; 5 U.S.C. § 553(e).

EXH199

ED_018388_00000109-00061

and the compliance deadlines contained therein, pursuant to section 307 of the CAA[2]; and

2. Grant SunCoke's request for a stay of the effect of the Final Rule and the compliance deadlines set forth therein under section 705 of the APA[3] or agree to amend the Final Rule to rectify EPA's violation of the procedural requirements of the CAA and the APA and issue a new rule establishing appropriate, scientifically sound emissions standards, with ample time for public notice and comment, pursuant to section 553(e) of the APA.[4]

## BACKGROUND

SunCoke is the largest independent coke producer in the United States, producing over one-third of the coke supply used by the domestic steel industry.[5] Coke is an essential ingredient in the blast furnace production of steel. Maintaining a strong domestic steel industry is critical to national defense, to the health of the nation's infrastructure, and to many manufacturing industries essential to a strong economy.[6]

Like EPA, SunCoke is committed to producing coke in the most environmentally responsible way possible. SunCoke has integrated cutting-edge practices, processes, and control technologies into its cokemaking plants to protect the environment and public health. In fact, EPA has declared SunCoke's cokemaking process to be the most environmentally friendly way to make coke and has adopted SunCoke's heat-recovery cokemaking process as the industry maximum achievable control technology (MACT).[7] Because SunCoke's patented heat recovery cokemaking process creates higher quality, higher strength coke, steelmakers use less coke in their blast furnaces, thereby lowering their GHG emissions.

In April 2019, several environmental groups sued EPA for failing to undertake the statutorily required residual risk and technology reviews for the two coke oven source categories: "Coke Oven Batteries," 40 C.F.R. Part 63, Subpart L, and "Coke Ovens: Pushing, Quenching, and Battery Stacks," 40 C.F.R. Part 63, Subpart CCCCC. There was no dispute that EPA had failed to meet its statutory obligations. On June 26, 2020, a federal district court ordered EPA to conduct both a

---

[2] 42 U.S.C. § 7607(d)(7)(B) ("The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.").

[3] 3 U.S.C. § 705.

[4] 5 U.S.C. § 553(e) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.").

[5] Letter from H. Knight, Beveridge & Diamond, P.C., to EPA at pp. 2, 5 (Oct. 2, 2023), Docket ID EPA-HQ-OAR-2002-0085-0968 [hereinafter "SunCoke comment letter"].

[6] During the shutdown caused by the COVID-19 pandemic, all companies in the coke and steel industry continued operations as critical members of the manufacturing sector that are crucial to the economic prosperity and continuity of the United States. *See* https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/critical-manufacturing-sector.

[7] *See, e.g.*, 66 Fed. Reg. 35326, 35328–29 (Jul. 3, 2001); 42 U.S.C. § 7412(d)(8)(A) (directing the Agency to establish emission standards for coke oven batteries, and, in establishing such standards, to evaluate "(ii) as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, *the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies*, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke") (emphasis added).

- 2 -

EXH200

ED_018388_00000109-00062

technology review and a residual risk review for the Subparts addressed in the Final Rule.[8] The court ordered EPA to complete these reviews within 30 months—by December 26, 2022, and later extended the deadline to May 23, 2024.

Throughout the proceedings, EPA maintained that it needed additional time due to the significant complexity of the rules governing coke ovens and coke oven batteries. It explained that it had "significant need for additional data and information in order to complete a robust risk and technology review for Subpart CCCCC sources and a similarly robust technology review for Subpart L sources."[9] EPA also decided to make the rulemaking significantly more complex by "expand[ing] the scope of the rulemaking to include the potential relisting of the chemical by-product plants under section 112 of the CAA and developing and proposing MACT standards for these chemical plants under CAA Section 112(d)," which would "require additional data collection as well."[10]

In June and July 2022, two years after the court's June 26, 2020 order, EPA issued two information collection requests (ICRs) to SunCoke and other affected sources.[11] It did not publish its Proposed Rule until August 16, 2023. Despite its complexity, EPA only allowed stakeholders 45 days to comment, despite the Proposed Rule including proposed amendments to two Subparts of the Code of Federal Regulations described by EPA as significantly complex. Because of the court's deadline, EPA was forced to deny all extension requests, including the extension requests from Sun-Coke, Coke Energy, LLC, United States Steel Corporation (U.S. Steel), and the Coke Oven Environmental Task Force (COETF).[12] Less than a year later, EPA published the Final Rule in July 2024—days after EPA filed a notice with the court on May 24, 2024 that the Final Rule was completed.[13]

The Final Rule reflects the hurried nature of the rulemaking compelled by the court-ordered deadline, and this Petition for Reconsideration provides an opportunity to fix the errors that would otherwise cause unnecessary and irreparable harm to an enormously important supplier to the American steel industry.

REQUESTED ACTIONS

## I. SunCoke's Petition for Reconsideration and a Stay Pending Reconsideration Under Section 307 of the CAA

Under section 307(d)(7)(B) of the CAA, EPA must "convene a proceeding for reconsideration" if two elements are satisfied: (1) that it was either "impracticable" to raise the objection during the comment period, or the grounds for such objection arose after the period for public comment but

---

[8] *Citizens for Pennsylvania's Future v. Wheeler*, 469 F. Supp. 3d 920, 934 (N.D. Cal. 2020).

[9] Motion to Amend Order and Judgment, *Citizens for Pennsylvania's Future*, No. 3:19-cv-02004 (June 2, 2022), Dkt. No. 46.

[10] *Id.*

[11] EPA issued the two ICRs in June and July 2022.

[12] *See* SunCoke's extension request (Sept. 1, 2023), Docket ID EPA-HQ-OAR-2002-0085-0949; Cokenergy, LLC's extension request (Sept. 9, 2023), Docket ID EPA-HQ-OAR-2002-0085-0951; U.S. Steel's extension request (Aug. 29, 2023), Docket ID EPA-HQ-OAR-2002-0085-1578; COETF's extension request (Aug. 28, 2023), Docket ID EPA-HQ-OAR-2002-0085-1572.

[13] Notice, *Citizens for Pennsylvania's Future*, No. 3:19-cv-02004 (May 24, 2024), Dkt. No. 82.

EXH201

ED_018388_00000109-00063

within the time specified for judicial review; and (2) the objection is of central relevance to the outcome of the rule.[14] An objection is of central relevance if it "provides substantial support for the argument that the regulation should be revised."[15] EPA may grant a 90-day stay pending reconsideration of the Final Rule.

Here, EPA deprived stakeholders of sufficient notice and opportunity to comment and introduced new provisions or rationales in the Final Rule for which commenters had no notice and that were not logical outgrowths of what was proposed.[16] Section 307(d)(7)(B) of the CAA thus requires EPA to "convene a proceeding for reconsideration of the rule" and impart all the procedural rights that "would have been afforded had the information been available at the time the rule was proposed."[17]

SunCoke respectfully requests that EPA grant this Petition for Reconsideration and Stay Pending Reconsideration. An administrative stay of the effect of the Final Rule and all compliance deadlines is necessary and appropriate while EPA considers and addresses the numerous errors in the Final Rule resulting from the rushed rulemaking.

### A. EPA failed to provide adequate opportunity to comment on this rulemaking, violating the APA.

It is indisputable that EPA was forced to rush this rulemaking to meet a federal district court's deadline, depriving EPA of its opportunity to thoughtfully consider all relevant information in this complex rulemaking proceeding. In turn, SunCoke was deprived of proper notice and adequate time to review and comment on the Proposed Rule, which is not permissible.[18]

Section 307(h) of the CAA provides: "It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, *including a regulation subject to a deadline*, shall ensure a reasonable period for public participation of at least 30 days, . . ."[19] The APA demands that agencies "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."[20] Public participation is "crucial" to sound rulemaking because it "ensure[s] that agency regulations are tested via exposure to diverse public comment . . . to ensure fairness to affected parties, and . . . to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby

---

[14] 42 U.S.C. § 7607(d)(7)(B).

[15] *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012), *aff'd in part, rev'd in part on other grounds sub. nom. Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014); *see also* 42 U.S.C. § 7607(d)(7)(B).

[16] *See Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). "[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). "[A]mbiguous comments and weak signals from the agency g[i]ve petitioners no . . . opportunity to anticipate and criticize the rules or to offer alternatives. Under these circumstances, the . . . rules exceed the limits of a logical outgrowth." *Int'l Union, UMW v. MSHA*, 407 F.3d 1250, 1261 (D.C. Cir. 2005) (internal citations omitted).

[17] 42 U.S.C. § 7607(d)(7)(B).

[18] *Citizens for Pennsylvania's Future*, 469 F. Supp. 3d at 934.

[19] 42 U.S.C. § 7607(h) (emphasis added).

[20] 5 U.S.C. § 553(c).

EXH202

ED_018388_00000109-00064

enhance the quality of judicial review."[21] How much time that requires necessarily depends on the nature and complexity of the issues involved.

EPA announced that it was proposing to amend two rules at once: the NESHAP for Coke Ovens: Pushing, Quenching, and Battery Stacks (PQBS) (40 C.F.R. Part 63, Subpart CCCCC) and the NESHAP for Coke Oven Batteries (COB) (40 C.F.R. Part 63, Subpart L) and described the two Subparts being amended as "among the most complex of the nearly 200 source categories." [22] Despite the complexity, EPA went from Proposed Rule to Final Rule in less than one year. It did so solely because it had to meet the court-ordered deadline, but a court-imposed deadline does not excuse an agency from providing stakeholders sufficient time to develop data and analyze the effects of its proposed amendments    particularly where those amendments are likely to cost many millions of dollars.[23]

SunCoke and other stakeholders requested that EPA either correct and reissue the Proposed Rule or extend the comment period by 45 days.[24] They explained that extra time was needed for several reasons, including that: EPA sought comments on two rules at once; both rules were technically complex; and EPA had added to the dockets hundreds of new documents filled with technical information totaling nearly 35,000 pages, including a 114-page MACT Standard Calculations, Cost Impacts, and Beyond-the-Floor Cost Impacts for Coke Ovens Facilities memorandum and multiple supporting appendices.[25] EPA issued a denial of SunCoke's and all other petitioners' extension requests, stating only that it was "not planning to extend the public comment period," though we presume the denial was the result of the court order requiring EPA to publish a Final Rule by May 23, 2024.[26]

The technical complexity of the Final Rule is well-illustrated by the time EPA spent preparing the Proposed Rule. EPA began collecting and analyzing relevant data in 2016.[27] EPA issued CAA section 114 information collection requests (ICRs) to SunCoke and other affected sources over a period of six years. The ICRs included lengthy questionnaires and source test requests, which were time-consuming and costly for SunCoke and other affected sources to address. SunCoke alone spent around $1.5–1.6 million to respond to the ICRs.

While EPA spent seven years collecting information and developing the Proposed Rule, SunCoke and other interested stakeholders only had 45 days to consider and respond to its work. That includes EPA's list of proposed HAP and MACT floor limits, which EPA only uploaded to the docket when it published the Proposed Rule. The short lead time prevented SunCoke from fully evaluating the proposed emission limits and other aspects of the Proposed Rule before the close of

---

[21] *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (internal quotation and citation omitted).

[22] *Citizens for Pennsylvania's Future*, 469 F. Supp. 3d at 933; 88 Fed. Reg. 55858 ("Comments must be received on or before October 2, 2023.").

[23] 42 U.S.C. § 7607(h).

[24] *Id.*; *see also* Notice, *Citizens for Pennsylvania's Future*, No. 3:19-cv-02004 (May 24, 2024), Dkt. No. 82.

[25] *Id.*, Notice at 3; SunCoke comment letter, Att. A.

[26] SunCoke comment letter, Att. B (Letter from P. Lassiter, EPA, to K. Batten, SunCoke (Sept. 19, 2023), Docket ID EPA-HQ-OAR-2002-0085-1576).

[27] 88 Fed. Reg. at 55866.

EXH203

ED_018388_00000109-00065

the public comment period.[28] SunCoke commented as best it could, but simply could not address a number of critical issues in 45 days.[29]

EPA's decision to make the Final Rule effective as of the date of publication is another example of EPA prioritizing meeting the court deadline in *Citizens for Pennsylvania's Future* over providing an adequate notice and comment period and according stakeholders important procedural rights. Under section 553(d) of the APA, agencies cannot publish a substantive rule "less than 30 days before its effective date."[30] Agencies can make a rule immediately effective if they meet the "good cause" exception, but that exception does not apply here. The good cause exception is "narrowly construed and only reluctantly countenanced."[31] It is generally limited to "emergency situations, or where delay could result in serious harm."[32] Its use is appropriate "in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest."[33] In any case, EPA did not publish in the Final Rule its explanation for immediately finalizing the rule, which is another important statutory requirement.[34]

The Final Rule contains numerous errors and omissions reflecting the agency's rush to meet the deadline imposed by the court in *Citizens for Pennsylvania's Future*.[35] SunCoke and other regulated entities' procedural rights to notice and an opportunity to comment were collateral damage. EPA understood that it would take time for stakeholders to evaluate the Final Rule and the underlying technical basis for the new requirements but did not have the luxury of giving SunCoke and others the time they needed to do so.

### B. The new MACT floor emission limits for SunCoke's HNR facilities are not "necessary," are based on limited and/or unreliable data, and are not achievable.

#### 1. *EPA's interpretation of the LEAN decision and disparate treatment of HAP is arbitrary and capricious.*

EPA's inconsistent regulation of HAP in the Final Rule is arbitrary and capricious. In the Proposed Rule, EPA stated it "is required to address regulatory gaps, such as missing MACT standards for listed air toxics known to be emitted from the source category" under *Louisiana Environmental Action Network (LEAN) v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020).[36] It cited *LEAN* as requiring

---

[28] The two dockets contained 2,300 documents, many of which are lengthy and complex compilations and analyses of emissions and modeling data that must be carefully reviewed for data accuracy and completeness. And many documents listed in the dockets as supporting materials were not available electronically from regulations.gov, in violation of CAA section 307(d)(3)(C). EPA cannot require the public to contact it directly to obtain missing documents and other missing information, while refusing stakeholders an extension on its 45-day timeframe.

[29] SunCoke comment letter, pp. 14–16.

[30] 5 U.S.C. § 553(d).

[31] *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 204 (2d Cir. 2004); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

[32] *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation omitted).

[33] *Mack Trucks*, 682 F.3d at 95.

[34] *See Env't Def. Fund v. EPA*, 515 F. Supp. 3d 1135, 1144 (D. Mont. 2021).

[35] *Citizens for Pennsylvania's Future*, 469 F. Supp. 3d 920.

[36] 88 Fed. Reg. at 55863.

EXH204

ED_018388_00000109-00066

MACT floor limits, also referred to as floor-based emission limits, for the 17 HAP and processes EPA identified in the Proposed Rule.[37]

SunCoke commented that *LEAN* does not require EPA to set MACT floor limits for every HAP, particularly those that are already controlled to an adequate margin of safety. It only requires that EPA "address" all HAP known to be emitted by a source category.[38] As SunCoke explained, the court in *LEAN* provides that "because the [CAA] necessitates section 112-compliant emission standards for each source category, and section 112(d)(6) requires EPA at least every eight years to review and revise emission standards 'as necessary,' EPA's section 112(d)(6) review of a source category's emission standard must *address* all listed air toxics the source category emits."[39] Put simply, it is not necessary to establish MACT floor-based standards where EPA found through its Risk and Technology Review (RTR) that risks due to the HAP emissions from coke ovens' PQBS are "acceptable"; that the existing PQBS rule "provides an ample margin of safety to protect public health"; and that there "are no developments in practices, processes or control technologies that necessitate revision of standards for this source category"[40] as it did here.

In the Final Rule, EPA rejected SunCoke's comments and adopted MACT floor limits for all 17 HAP and processes identified in the Proposed Rule, again citing the *LEAN* decision as requiring it.[41] However, EPA treated other HAP differently in the Final Rule. In the Final Rule, EPA identified eight HAP that it failed to include in the Proposed Rule    perhaps because EPA was rushing to meet the May 23, 2024 court deadline.[42] For the omitted HAP, EPA established a MACT floor work practice standard of "good combustion for three unregulated HAP (the organic HAP emissions of D/F, PAH, and VOHAP from battery stacks) and surrogacy determinations for the other five."[43] EPA determined that it could use work practice standards and surrogacy determinations, *instead of numeric MACT floor limits*, because "many of the test runs were BDL and seven of the eight had a majority of test runs BDL."[44]

But many of the tests for the other 17 HAP were also "below the detection limit." EPA does not explain why it read *LEAN* in the Proposed Rule to require MACT floor limits for all HAP, but not in the Final Rule. For the eight HAP it left out of the Proposed Rule, EPA determined that *LEAN* allowed it to use surrogates and work practices instead of the MACT floor limits it insisted were required for the 17 HAP, which also present minimal risk.

The APA does not allow EPA to insist that *LEAN* requires it to establish MACT floor limits for 17 HAP, but does not require the same for eight other HAP, when the risk profile is the same.[45] "[D]eciding a case one way today and a substantially similar case another way tomorrow,"[46]

---

[37] 88 Fed. Reg. at 55707, 55876 n.25.
[38] SunCoke comment letter, pp. 26–27.
[39] *Id.*; *LEAN*, 955 F.3d at 1091 (emphasis added).
[40] 88 Fed. Reg. at 55858.
[41] 89 Fed. Reg. at 55711 ("*LEAN* thus requires that the EPA promulgate 'as many limits as needed' so that all pollutants from a source category are regulated.").
[42] *Id.*
[43] *Id.*
[44] 89 Fed. Reg. at 55707.
[45] *Doubleday Broad. Co. v. FCC*, 655 F.2d 417, 423 (D.C. Cir. 1981).
[46] *Id.*

EXH205

ED_018388_00000109-00067

without a reasonable explanation, is arbitrary and capricious.[47] EPA's varying interpretations of *LEAN* and different treatment of HAP is of central relevance, because it has led the agency to establish MACT floor limits for SunCoke's HNR facilities that are not only unnecessary, but also unachievable, as discussed in Sections I.B.2 through I.B.7 below.

Further, EPA's failure to include eight newly added HAP, and an explanation of its different approach to regulating them, in the Proposed Rule was in error. In doing so, SunCoke did not have an opportunity to address the new HAP surrogacy determinations and work practice standard that were inserted into the Final Rule or argue why EPA's disparate treatment of the newly regulated HAP was impermissible.

The MACT floor limits, work practices, and surrogacy determinations are clearly central to the Final Rule, particularly where SunCoke may not be able to meet them even if it invested many millions of dollars. For these reasons, EPA should reconsider the Final Rule under section 307(d)(7)(B) of the CAA and, during its reconsideration, allow SunCoke and other facilities to provide additional data refuting the achievability of the MACT floor limits. EPA must allow notice and comment on the eight HAP it omitted from the Proposed Rule and the different regulatory approaches it adopted.

>   2.  *EPA should consider the cost, health and environmental, and energy considerations under CAA section 112(d)(2) when setting MACT floor emission limits.*

EPA takes the position that the CAA prevents it from taking costs into consideration when determining MACT floors.[48] At the same time, the agency claims that "all facilities should be able to meet the MACT floor limits developed for the previously unregulated HAP and unregulated sources of HAP without the installation of additional controls."[49] SunCoke will submit detailed declarations supporting its motion for a judicial stay describing the many millions of dollars it will spend on the design, and engineering, of new technology to meet the requirements of the Final Rule. EPA should have taken these costs into consideration when setting the new MACT floor limits.

EPA's practice of setting MACT floor-level controls based solely on emissions data from best performing sources is not the best reading of the statute. EPA should instead "tak[e] into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements," as Congress required in CAA section 112(d)(2). The notion advanced by EPA that section 112(d) actually prohibits the agency from considering costs and benefits when establishing MACT floors turns the plain statutory text on its head. EPA's current position is also contrary to the line of cases that touch on this issue, starting with *National Lime Association v. EPA*, 233 F.3d 625 (D.C. Cir. 2000), and is not based on a reasoned analysis of the plain language of the statute.

EPA should revisit its interpretation of section 112(d) and consider *all* of the relevant factors as required by Congress, including "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements" when establishing "gap

---

[47] *Doubleday Broad.*, 655 F.2d at 423.
[48] 89 Fed. Reg. at 55710.
[49] *Id.*; *see also* 89 Fed. Reg. at 55717.

EXH206

ED_018388_00000109-00068

filling" MACT floors. The Supreme Court in *Loper Bright* recently instructed that "courts use every tool at their disposal to determine the best reading of the statute."[50] In light of *Loper Bright*, the agency should reconsider its decision not to consider the cost of achieving the emission reductions and any non-air quality health and environmental impacts and energy requirements in EPA's gap-filling review of the existing standards.[51]

### 3. EPA failed to consider data relevant to the MACT floor limits.

In response to the 2017 ICR, SunCoke submitted additional stack test data—including at least five stack tests completed in April 2012, June 2012, August 2014, April 2015, and June 2015 for its Middletown facility    to EPA.[52] EPA had not considered these data in its determination of the proposed emission limits. SunCoke also submitted an analyses of the errors and omissions in the dataset used by EPA for the proposed emission limits.[53] In the Final Rule, EPA explained that, after issuing the Proposed Rule, the agency incorporated certain additional data into revised MACT floor calculations, including the June 2012 test data for the HRSG Bypass Stack and April 2015 test data for the main baghouse stack at SunCoke's Middletown facility.[54] EPA explains that it "reviewed the previous test reports submitted that were within five years prior to 2016 and that matched the requirements for testing in the CAA section 114 requests to add to the MACT data pool."[55] That explanation does not clarify why some of the data submitted by SunCoke were not incorporated into the final MACT floor calculations. For example, EPA did not incorporate at least some of the data provided by SunCoke.[56] EPA must consider the relevant data provided by SunCoke in its establishment of the MACT floor limits. Agencies "must examine the *relevant data* and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[57] Here, it has failed to do so.

### 4. New MACT floor limits for pushing from existing sources are arbitrary and capricious for several reasons. (40 C.F.R. § 63.7290).

EPA's new MACT floor limits for mercury (Hg), acid gases (AG), hydrogen cyanide (HCN), and polycyclic aromatic hydrocarbons (PAH) from pushing at existing HNR facilities are unnecessary,

---

[50] *Id.* ("*Chevron* cannot be reconciled with the APA by presuming that statutory ambiguities are implicit delegations to agencies. That presumption does not approximate reality. A statutory ambiguity does not necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question.").

[51] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247 (2024).

[52] *See* Docket IDs EPA-HQ-OAR-2002-0085-1551; EPA-HQ-OAR-2002-0085-1552; EPA-HQ-OAR-2002-0085-1553; EPA-HQ-OAR-2002-0085-1554; EPA-HQ-OAR-2002-0085-1555.

[53] *See* Email and attachments from K. Batten, SunCoke, to D. Jones and C. French, EPA (Jan. 18, 2024), Docket ID EPA-HQ-OAR-2002-0085-1566.

[54] 89 Fed. Reg. at 55715.

[55] *Id.*

[56] *See* Docket IDs EPA-HQ-OAR-2002-0085-1552; EPA-HQ-OAR-2002-0085-1554; EPA-HQ-OAR-2002-0085-1555.

[57] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also* EPA, Guidelines for MACT Determinations under Section 112(j) Requirements at 2-8 (Feb. 2002) ("It is not necessary for the MACT floor to be determined based on emissions information from every existing source in the source category or subcategory if such information is not available. The permitting authority, however, should check with EPA Regional Offices and EPA Headquarters for any available information that could be used in determining the MACT floor."), https://www3.epa.gov/ttn/atw/112j/guidance.pdf.

EXH207

ED_018388_00000109-00069

overly burdensome, lack scientific merit, and accomplish nothing in the way of emissions minimization.

The methods EPA used to establish the new pushing limits are arbitrary and capricious for the following reasons:

- EPA relied upon combined data from SunCoke's heat non-recovery plants and byproduct plants. Byproduct plants use dramatically different coking processes and emissions controls. In contrast, heat non-recovery plants have been declared by EPA as the maximum achievable control technology.[58] Conflating data from these two different processes is arbitrary and capricious.

- EPA not only used data from byproduct plants to set new pushing limits applicable to HNR facilities, EPA included data from *idled* byproduct plants as one of the "best performing sources." A source that is idled is not performing at all, so using data from a non-performing source is arbitrary and capricious.[59] Further, EPA confirmed that those idled plants permanently shut down before issuance of the Final Rule.[60]

- For heat non-recovery plants, EPA used HCN emission test data from an obsolete test method (2016 ICR test data from the SunCoke Middletown facility) that was collected using the Zinc Acetate method, which EPA earlier had abandoned due to its limited dynamic range of measurement.[61]

- For Hg, the emissions are too low to permit scientific measurement (at or below detection, within the noise of the test instrument) and the limit fails to consider the wide variability of Hg content in metallurgical coal (ranging from 0.008 to 0.360 parts per million). The variability in concentrations of Hg (and other HAP-related constituents) in emissions from these sources is directly proportional to the concentration of these constituents that naturally occur in raw materials (i.e., metallurgical coals) used in the HNR cokemaking process.

- With respect to HNR facilities, the emission of these HAP from pushing are de minimis. Pushing operations are intermittent (less than three hours per day) and emissions are less than one ton per year. EPA already set a PM limit on pushing prior to this rulemaking, which sufficiently minimizes pushing emissions, including emissions of Hg, AG, HCN, and PAH. EPA should have made surrogacy determinations, instead of establishing new MACT floor limits, to the extent that the *LEAN* decision required gap-filling. There is no reasonable basis for treating the HAP differently in the Final Rule.

- EPA's MACT floor limits for pushing are based on insufficient data.

Because the surrogacy determinations for the five newly regulated HAP were added after the close of the public comment period, SunCoke did not have an opportunity to comment on EPA's choice

---

[58] *See* SunCoke comment letter, p. 1, n.6.

[59] *See* SunCoke comment letter, p. 30.

[60] 89 Fed. Reg. at 55692 (confirming that Cleveland Cliffs' Follansbee, West Virginia, facility and Middletown, Ohio, facility permanently closed in 2022 and 2023, respectively).

[61] *Zinc Acetate Sampling Method for Hydrogen Cyanide*. N. Shappley, U.S. Environmental Protection Agency, Research Triangle Park, NC, and D. Maxwell, AECOME, Austin, TX. Presentation at the 41st Stationary Source Sampling and Analysis for Air Pollutants, Tucson, AZ, April 9–14, 2017. Docket IDs EPA-HQ-OAR-2002-0085 and EPA-HQ-OAR-2003-0051.

EXH208

ED_018388_00000109-00070

of a work practice standard or a surrogacy determination in lieu of a numeric emission limit for the miniscule emissions from pushing.

EPA must reconsider whether the new MACT floor emission limits from pushing at HNR plants (1) are legally required, (2) appropriately exclude emissions from ByP plants (as it did for fenceline monitoring), and (3) are based on valid emissions data. EPA must also consider whether, in light of the lack of data and small number of sources, it is more appropriate to limit the emissions through a work practice standard or a surrogacy determination, rather than a new MACT floor numeric emission limit, given that emissions are too low for valid detection methodologies. Sun-Coke identified these flaws in its comments.[62]

### 5. New MACT floor limits for HNR Main Stacks from existing HNR facilities are based on insufficient and unrepresentative data. (40 C.F.R. § 63.7297).

The MACT floor emission limits that EPA set for HNR Main Stacks from existing HNR facilities are burdensome and accomplish nothing in the way of minimization of emissions. EPA nevertheless established new MACT floor emission limits for AG, Hg, PAH, and PM from Main Stacks. In doing so, EPA used only a limited subset of the available data (from the 2016 and 2022 ICRs), ignored relevant data (from tests conducted more than five years prior to the 2016 ICR), and included data that is not representative of emissions from SunCoke's facilities.[63]

The error was then compounded when EPA applied the upper prediction limit (UPL) statistical method. The UPL statistical method was applied to the limited dataset to account for variability and uncertainty in emissions data. The UPL calculation estimates the true average and true variance. While the estimation of the true average can be done with a small number of samples, the estimation of the variance requires a substantially larger number of samples — in particular, samples that cover the range of varying factors. EPA offered no explanation for its exclusion of relevant data in performing its calculations and setting the new MACT floor limits, which do not account for variability and uncertainty (e.g., normal coking time vs. extending coking time, or variability in raw material inputs, such as coal characteristics).

For example, the emission limits in the Final Rule are not technologically and economically achievable because they do not account for the significant variability of chlorine and mercury in coal. Coal is formed from organic materials. The levels of chlorine in a coal seam will generally depend on a geological formation's proximity to ancient seas. Mercury levels will generally depend on the coal seam's overlay materials and how the coal was formed from those materials. Not only will levels of these substances vary greatly from mine to mine, they even vary within the same coal seam at a particular mine.[64] To ensure that the new MACT floor emission limits can be met with existing controls, it is necessary to use test data representing the range of possible concentrations of chlorine and mercury, or otherwise to adjust the limits to account for the range of

---

[62] SunCoke comment letter, p. 28.

[63] 89 Fed. Reg. at 55715.

[64] Considering the existing challenges of meeting sulfur limits in the metallurgical coal market—including a very aggressive limit at the Jewell facility to meet a standard of 0.88% sulfur—imposing further constraints on our coal supply with restrictive standards for chlorine and mercury to meet emission limits would make coal sourcing impossible.

EXH209

ED_018388_00000109-00071

chlorine and mercury limits to ensure, as EPA contends, the limits can be met with existing controls.

As described in Section I.B.4, EPA must reconsider whether surrogacy determinations or work practice standards are more appropriate for newly regulated HAP than new numeric MACT floor emission limits for Main Stacks. Work practice standards and surrogate emission limits were raised by EPA in the Final Rule, which prevented SunCoke from commenting on this point during the public comment period.

Further, due to the inadequate notice and comment period discussed in Section I.A above, it was impracticable for SunCoke to conduct a full analysis of EPA's data issues and provide that analysis to EPA within the comment period. These data issues result in MACT floor limits that do not approximate the limits "achieved" by the best-performing five sources, and therefore do not comply with the CAA using EPA's interpretation of the rule's requirements.

EPA should reevaluate and revise these MACT floor limits, including addressing the issues described in this section. Establishing appropriate MACT floor emission limits is of central relevance to the rulemaking.

> 6. *New MACT floor emission limits for HRSG Bypass/Waste Heat Stacks from existing HNR facilities are based on insufficient and unrepresentative data and fail to differentiate between Main Stacks and Bypass Vent Stacks. (40 C.F.R. § 63.7298).*

The MACT floor emission limits that EPA set for HRSG Bypass/Waste Heat Stacks from existing HNR facilities are burdensome and, in the event that SunCoke is required to install environmental controls to meet those limits, would negate the purpose of Bypass Vent Stacks as passive safety devices.

EPA established new MACT floor emission limits for AG, formaldehyde, Hg, PAH, and PM from Bypass Stacks in the same manner as Main Stacks, using an incomplete data set that is not representative of HNR's operating conditions. A limited subset of available data and the application of the UPL (to the limited data set) cannot account for variability and uncertainty with such limited data and does not consider the variability of chlorine and mercury in coal.[65] And for Bypass Stacks, the variability of chlorine and mercury in coal has an even greater impact on emissions than it does for Main Stacks. Like Main Stacks, EPA offered no explanation for its exclusion of relevant data and the result was unreasonably low emission limits that are not representative of SunCoke emissions and cannot be met.[66] The additional stack test data submitted to EPA on May 21, 2024, included ByPass Stack data that EPA had not previously considered.

In applying the same methodology to Main Stacks and Bypass Vent Stacks, EPA ignored a very material difference between the two sources of emissions. In HNR coke ovens, Bypass Vent Stacks act as a passive failsafe safety device. In the event of loss of negative pressure in the common

---

[65] 89 Fed. Reg. at 55711–55712; for discussion of variability of Hg in coal, *see, e.g.*, Mercury in U.S. Coal—Abundance, Distribution, and Modes of Occurrence, U.S. Geological Survey (Sept. 2001), https://pubs.usgs.gov/fs/fs095-01/fs095-01.pdf.

[66] *See* SunCoke comment letter, pp. 33–34.

EXH210

ED_018388_00000109-00072

tunnel, the stack lids are opened and natural thermal buoyancy draft up the height of the stack restores the negative pressure. Additionally in case of loss of power, the stack lids are opened by passive counterweights. In any case, the oven's negative pressure is maintained by passive lid opening and passive draft and does not require active measures. The negative pressure keeps the volatile organic compounds (VOCs) inside the oven and protects nearby personnel from fire and chemical exposure. Further, the negative pressure continues to draw in air to fully combust the VOCs and protects the environment from HAP release and protects the downstream equipment from potential gas build up to explosive concentration levels.

The key operating principle to the Bypass Vent Stack is the passive draft. If any HAP control equipment is installed on the Bypass Vent Stack, then the pressure drop associated with the control device will interfere with the passive draft and necessitate installation of a booster flue gas fan which then negates the passive safety purpose of the Bypass Vent Stack. The mass rate emission of HAP from a Bypass Vent Stack can be reduced by improved up-time of the downstream systems (HRSGs and flue gas desulfurization system (FGD)), but the concentration of HAP in the stream cannot be reduced in a vent stack flue gas. Bypass Stacks are used only when emissions cannot be vented through the Main Stacks. Therefore, the only appropriate limit on a Bypass Vent Stack is a work practice standard on upstream HRSGs and FGD, which EPA did not consider.

More generally, as described in Section I.B.4, EPA must reconsider whether work practice standards or surrogate determinations are more appropriate for emissions of unregulated HAP from Bypass Vent Stacks. Work practice standards and surrogate emission limits were raised by EPA in the Final Rule, which prevented SunCoke from commenting on this point during the public comment period.

EPA should reevaluate and revise these MACT floor limits, including addressing the issues described in this section. Establishing appropriate MACT floor emission limits is of central relevance to the rulemaking.

> 7. *If EPA does not revise the final MACT floor emission limits, it should offer a site-specific alternative standard consistent with its determination that no controls are required.*

As described in the sections above, there is data demonstrating that the new MACT floor emission limits cannot be met with existing controls, which is the foundation for EPA's rulemaking. If EPA will not revise the final MACT floor emission limits (by using all appropriate data, distinguishing between different sources with different operations and emissions, and evaluating the appropriateness of work practice versus surrogacy determinations versus numeric emission limits), EPA should take the protective steps of allowing regulated entities to apply for an alternative limit if the new MACT floor emission limit cannot be met with existing controls. An alternative limit was allowed in the Surface Coating of Metal Furniture MACT at 40 C.F.R. § 63.4890(b), and a suitable model could be developed for HNR emissions sources.

In the alternative, EPA must reconsider whether the limited number of sources, limited data, differences in operations, variability of coal, and other factors, warrant revising the new MACT floor limits upwards to ensure that the limits can be met with existing controls.

- 13 -

EXH211

ED_018388_00000109-00073

### C. EPA must reconsider whether its reading of the Clean Air Act is the best possible reading.

In its September 2, 2021 memorandum entitled "Use of the Upper Prediction Limit for Calculating MACT Floors,"[67] EPA noted that it had filled gaps in interpreting the Clean Air Act to address ambiguities as it applied to MACT floor emission limits, in reliance on deference afforded the agency under *Chevron*.[68] In *Nat'l Ass'n of Clean Water Agencies*, the court explained that EPA has significant discretion in establishing the MACT floors, including how to account for variability.[69]

This is no longer the case. In June 2024, the Supreme Court overruled *Chevron*, which required courts to defer to an agency's interpretation of an ambiguous statute. In *Loper Bright*, the Supreme Court held that "[t]he Administrative Procedure Act requires courts to exercise their independent judgment in deciding whether an agency has acted within its statutory authority, and courts may not defer to an agency interpretation of the law simply because a statute is ambiguous."[70]

In light of that decision, "what value the MACT floors are supposed to represent" will now be based on the best reading of the statute without deference to the agency's interpretation. EPA must revisit a number of aspects of the Final Rule, including but not limited to the following: whether EPA adequately accounted for variability in applying the UPL; EPA's failure to consider the variability of coal and the operational variability over the coking cycle in establishing the limits (and the achievability of those limits); the impact of the limits established by EPA on safety devices (e.g., Bypass Vent Stacks) used to protect personnel and equipment; whether EPA should have established MACT floor emission limits for some sources when it established work practice and surrogacy determinations for others; and EPA's exclusion of relevant test data.

### D. The deadlines for compliance with the new MACT floor emission limits are too short.

The new MACT floor emission limits for existing sources become effective on January 5, 2026, 18 months after the effective date of the Final Rule. As described throughout this Petition and in data provided to the agency in the docket for the rulemaking, available data exhibits substantial variability and shows that the MACT floor limits are not consistently achievable for all pollutants without additional controls, operational changes, or both.

A minimum three-year compliance schedule is needed because controls for these pollutants/sources have not been demonstrated for HNR facilities, either in the United States or internationally.

---

[67] Donna Lee Jones, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina, Docket ID EPA-HQ-OAR-2002-0085.

[68] *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright*, 144 S. Ct. 2244.

[69] *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1142–43 (D.C. Cir. 2013) ("EPA can decide what value the MACT floors are supposed to represent, as long as that decision is a reasonable interpretation of the statute.").

[70] *Loper Bright*, 144 S. Ct. at 2272.

EXH212

ED_018388_00000109-00074

- Controlling multiple pollutants and retrofitting controls into existing operations add complexity and time due to interactions of the requirements for control, including pollutant interactions, flow rates, chemistry, and temperatures.

- Developing first-of-a-kind applications to control HAP emissions requires testing to define the limits and potential issues; and some of these applications would increase $CO_2$ emissions, use more power, increase potential water-born pollutants, and create new waste streams.

- There is a general lack of confidence in any feasible control technologies for HCN. Vendors contacted thus far indicate that any potential solution for control of HCN in combustion stack or pushing emissions is not technically feasible.

- Any additional controls would require permitting from the local permitting agency; permitting would take 6 to 12 months after engineering is completed.

- Extensive testing, engineering, and physical modifications will be needed at each plant. Existing equipment would need to be modified and retrofitted to install new controls, e.g., water treatment.

- Engineering of equipment to condition flue gas streams will be needed.

- Adding controls on mobile hot cars, if an alternate test method is not approved, will involve unique engineering challenges compared to stationary sources.

EPA should reconsider the deadlines for compliance for the MACT floor limits, because SunCoke was impermissibly deprived of adequate time to review and comment on the Proposed Rule (*see* Section I.A), including the impracticability of EPA's proposed compliance deadlines for the MACT floor limits. Providing regulated entities like SunCoke a reasonable timeline for compliance is of central relevance.

### E. Alternate emission limits and work practice standards should have been adopted.

In its rush to publish the Final Rule, EPA removed all exemptions from startup, shutdown and malfunction (SSM), but did not replace the SSM exemptions with alternative limits or work practice standards.

#### 1. *EPA erred in not responding to SunCoke's request for alternate limits during startup of the flue gas desulfurization system.*

In the preamble to the Final Rule, EPA says that "[t]he commenters did not provide a description of specific situations where work practice standards, or any specific work practices, would be more appropriate than the numerical emissions standards we are finalizing in this rule (or standards that were already in the NESHAP) that would be appropriate during startup or shut down."[71] This statement is not accurate. SunCoke specified that "alternate limits" were necessary "for emissions from the Main Stacks during periods of startup and shutdown of the FGD because the proposed

---

[71] 89 Fed. Reg. at 55718.

- 15 -

EXH213

ED_018388_00000109-00075

limits in 40 C.F.R. § 63.7297 would otherwise be impossible to meet."[72] SunCoke described how the FGD system must be slowly heated to the minimum operating temperature before the baghouse, spray dry absorber, and carbon injection system can be placed into service and proposed application of the Bypass Stack emission limits set forth in 40 C.F.R. § 63.7298 (standards that were already in the NESHAP), because it would be impossible to meet the new emission limits in 40 C.F.R. § 63.7297 for HRSG main stacks until the minimum operating temperature is met and the FGD system is online.[73]

EPA also responded that it "expects control devices to be operating during startup and shutdown (SS); therefore no additional requirements should be needed for startup or shutdown," which conflicts with SunCoke's comment that controls, including the baghouse, spray dry absorber, and carbon injection system cannot be placed into service until the FGD reaches minimum operating temperature.[74]

This issue was also raised with EPA during a meeting on February 12, 2024, and in a follow-up communication to EPA on February 19, 2024, after the close of the public comment period, when SunCoke proposed additional work practice standards, including returning the FGD to full operation as expeditiously as possible and meeting the Bypass Vent Stack limits in the meantime.

In the Final Rule, EPA incorrectly stated that no alternate work practices had been proposed and that all controls would be operating during startup and shut down, both of which are in error, and should be reconsidered.

### 2.   EPA Impermissibly Rejected Other Appropriate Work Practice Standards.

In its Final Rule, EPA removed all exemptions from emission limits during startup, shutdown, and malfunction, and did not propose any alternate limits and works practice standards as it had done in numerous other rulemakings. In the Proposed Rule, EPA asked for comment on whether any *situations* existed where separate standards, such as work practices, would be more appropriate during periods of startup and shutdown, rather than the current standards. In response, SunCoke identified specific *situations* where separate standards should be applied (Section I.E.1, startup of the FGD) and general *situations*, where work practices would be more appropriate, situations identified in the startup, shutdown, and malfunction plan.[75]

EPA then rejected all of the comments and did not establish any alternate limits or work practice standards purportedly because the commenters did not identify specific *work practices* that would be more appropriate than the numerical emissions standards. In other words, EPA asked commenters to identify *situations* where alternate work practices would be needed and then rejected all of the comments because commenters did not identify "*specific work practices*."[76]

Because EPA specifically asked for comments on *situations* where alternate work practices would be more appropriate and SunCoke (and other commenters) responded by identifying *situations*

---

[72] SunCoke comment letter, p. 51.
[73] *Id.*
[74] 89 Fed. Reg. at 55718; SunCoke comment letter, p. 51.
[75] *Id.*
[76] 89 Fed. Reg. at 55718.

EXH214

ED_018388_00000109-00076

where alternate work practices would be more appropriate, EPA cannot reject all of the comments and refuse to establish any work practice standards because commenters did not provide *specific work practices*. Had EPA asked commenters to identify specific work practices that should be applied, SunCoke would have identified the following:

Common Tunnel

- 40 C.F.R. § 63.303(a)(1) requires monitoring and recording pressure in each oven or in each common battery tunnel once per day during pushing, charging, and coking to ensure that the ovens are operated under a negative pressure.

- Possible malfunctions: Pressure cells malfunction due to instrumentation failures, negatively affecting draft and resulting in positive pressure in common tunnels.

- Potential alternative limit: Visually observe relevant section of common tunnel to confirm absence of visible emissions from tunnel.

Pushing/Charging Machines

- For charging operations, the owner or operator shall implement, for each day of operation, the work practices specified in section 63.306(b)(6).[77]

- Requirement to continuously operate baghouse and maintain baghouse differential pressure within a certain range.

- Possible malfunctions: Failure of control system or electrical infrastructure components, causing baghouse to shut down; differential pressure outside of normal range.

- Possible startup concern: After PCM baghouse fabric filter cartridges are changed during routine maintenance, the fabric filter cartridges need to gather a layer of material to operate efficiently and keep the differential pressure within range.

- Potential alternative limit: Observe baghouse stack and hood PCM area for visible emissions greater than 20% over 6 minutes.

Flat Push Hot Car Machines

- 40 C.F.R. § 63.7290(f)(4) requires, for each multicyclone, maintaining the daily average pressure drop at or below the minimum level established during the initial performance test.

- Potential malfunctions: Loss of control system components or electrical service, failure of multiclone, differential pressure outside of normal range, fan amps outside of threshold values, failure of continuous monitoring system.

- Potential alternative limit: Observe hot car stack for visible emissions greater than 20% over six minutes.

---

[77] 40 C.F.R. § 63.303(b)(3).

EXH215

ED_018388_00000109-00077

EPA must reconsider this aspect of the Final Rule and seek feedback from commenters on specific work practices that should be adopted in light of the removal of exemptions from emission limits for startup, shutdown, and malfunction, since this request was not made in the Proposed Rule.

## F. EPA's performance testing schedule in section 63.7321 requires redundant and impracticable testing.

In the Final Rule, EPA requires performance testing for particulate matter (PM) from capture systems and control devices applied to pushing emissions under 40 C.F.R. § 63.7321(a) "once every 5 years or at the beginning of each term of your title V operating permit, whichever is less." EPA revised the regulatory language in response to a comment in which the commenter noted that Title V permits for coke plants can take more than five years to be issued and requested that EPA establish an outside deadline of every five years.[78] In making this change, EPA failed to give notice to the regulated community that it was contemplating changing the timeframe for PM testing and did so without considering whether it could revise the performance testing requirement in a way that would reduce the costs of unnecessary and redundant testing. EPA must reconsider the deadline for PM performance testing under section 63.7321(a), taking into account the consequences of unduly burdensome and redundant performance testing. At a minimum, the testing under section 63.7321(a) and under the Title V permit should be aligned to ensure that the Final Rule does not trigger new, redundant testing requirements. This issue is of central relevance to the outcome of the Final Rule, because regulated entities like SunCoke must have an opportunity to comment on meaningful regulatory requirements.

Further, EPA has finalized a new section 63.7321(b), which requires testing "once every five years" for emissions from Bypass Vent Stacks. SunCoke would face significant challenges at some of its plants if required to comply with that provision. For example, some of SunCoke's HNR plants only conduct planned bypass venting every two years. SunCoke, therefore, would not be able to meet the performance testing schedule at 63.7321(b) unless it intentionally opened the Bypass Vent Stack for the sole purpose of testing, thereby allowing emissions that would not otherwise occur. SunCoke expects that EPA did not intend to promulgate a regulatory provision that requires a source to emit where it otherwise would not, particularly where there are reasonable alternatives.

As discussed in Section I.A, SunCoke was impermissibly deprived of adequate time to review and comment on the Proposed Rule, including the implications of EPA's proposed performance testing schedule under section 63.7321(b). EPA should reconsider the deadline for performance testing under section 63.7321(b) and allow for testing when Bypass Vent Stacks are already open due to planned bypass venting, rather than requiring plants to open Bypass Vent Stacks, and emit, for the sole purpose of testing. Providing regulated entities like SunCoke a reasonable means of compliance is of central relevance to the outcome of the Final Rule.

---

[78] 89 Fed. Reg. at 55722; *see also id.* (EPA acknowledging that the Title V permit cycle "can extend for many years beyond five years due to delays in permit reviews.").

EXH216

ED_018388_00000109-00078

### G. The Final Rule adds redundant pressure monitoring requirements using Method 303A that are not authorized by the Clean Air Act, are unnecessary and unclear.

#### 1. Redundant Monitoring Using Method 303/303A Is Not Supported by EPA's Technology Review.

Because EPA's review of the coke oven batteries is authorized solely as part of the periodic technology review, EPA's authority for requiring any changes to Subpart L is limited to CAA section 112(d)(6). Section 112(d)(6) authorizes EPA to "review, and revise as necessary (taking into account development in practices, processes, and control technologies), emissions standards promulgated under this section" every eight years. 42 U.S.C. § 7412(d)(6). EPA acknowledged in the Proposed Rule, and did not state otherwise in the Final Rule, that there have been no developments in "practices, processes, and control technologies that would reduce charging emissions from ByP or HNR facilities regulated under the source category." 88 Fed. Reg. 55883.

Accordingly, EPA lacked authority to add new redundant monitoring requirement for HNR using EPA Method 303A and should reconsider the requirement.

#### 2. Method 303A performance testing is, according to EPA, unnecessary when operating coke ovens under negative pressure.

To monitor for emissions from coke oven doors, EPA previously required that HNR facilities either (1) meet the 0.0 percent leaking requirement, as determined using EPA Method 303A, *or* (2) conduct daily pressure monitoring in each oven or in each common battery tunnel to ensure that the ovens are operated under negative pressure. In the Final Rule, EPA is now requiring that HNR facilities do both. 40 C.F.R. § 63.303(a)(1).

Section 63.302(c), adopted previously with respect to ByP plant coke oven batteries, acknowledges that it is not necessary to determine the percent of leaking coke oven doors when ovens are operated under negative pressure:

> The emission limitations in paragraph (b) of this section do not apply to the owner or operator of a by-product coke oven battery that utilizes a new recovery technology, including but not limited to larger size ovens, *operation under negative pressure*, and processes with emission points different from those regulated under this subpart." 40 C.F.R. § 63.302(c) (emphasis added).

In requiring HNR facilities with coke ovens that operate under negative pressure to conduct daily Method 303A monitoring when ByP plants are not required to do so, is arbitrary and capricious and contrary to law, treating similarly situated entities differently. Accordingly, EPA should reconsider the new monitoring requirement.

#### 3. Redundant Monitoring Will Not Result in Earlier Detection of Door Leaks.

In the preamble to the Final Rule, EPA indicated that it had not quantified any benefits associated with the Final Rule because the final limits could be met with existing controls but speculated that

- 19 -

new requirements may lead to earlier detection of excess HAP emissions.[79] That is not true with respect to the addition of Method 303A monitoring.

Under Method 303A, a certified observer walks "the length of the battery on the outside of the pusher machine and quench car tracks at a steady, normal walking pace, pausing to make appropriate entries on the door area inspection sheet."[80] In contrast, SunCoke employs multiple layers of monitoring, including the following:

- Electronic monitoring of the pressure in the common tunnel is conducted using a draft cell at the end of the common tunnel to confirm continuous operation under negative pressure;

- SunCoke employees monitor the coke ovens for door leaks throughout all stages of the coking cycle and adjust the ovens by reviewing electronic data and physically walking the coke oven batteries. Employees in the field and in the control room are in constant radio contact to implement any required fixes; and

- After charging, SunCoke checks each door for leaks, and if a door leak due to positive pressure is detected, it is immediately corrected by adjusting oven uptakes, dampers, and/or sole flues, and is then recorded, and reported as required under section 63.303(c).

SunCoke's existing monitoring system already accurately monitors for pressure and allows personnel to take action in a timely and safe manner when necessary. Adding duplicative monitoring requirements will add to SunCoke's monitoring burden without leading to earlier detection of excess HAP emissions. Accordingly, EPA must reconsider its decision to require redundant monitoring using Method 303A.

    *4.  The Method 303A monitoring requirements are entirely unclear.*

The requirements for performing daily oven pressure monitoring using Method 303A are also entirely unclear. Section 63.303(a)(1)(i) requires HNR facilities to determine compliance with the 0.0 percent leaking coke oven door standards "as determined by the procedures in Section 63.309(d)(1)" but 63.309(d)(1) describes how an enforcement agency would calculate a 30-run rolling average of the percent leaking coke oven doors using the observations from "each performance test." Section 63.309(d)(1) says:

> (d) Using the observations ***obtained from each performance test, the enforcement agency shall compute and record***, in accordance with the procedures and requirements of Method 303 or 303A in appendix A to this part, for each day of operations on which a valid emissions value (or set of values) is obtained:
>
> (1) The 30-run rolling average of the percent leaking coke oven doors, topside port lids, and offtake systems on each coke oven battery, using the equations in sections 12.5, 12.6, and 12.7 of Method 303 (or section 12 of Method 303A) in appendix A to this part; . . .

---

[79] 89 Fed. Reg. at 55686.
[80] Method 303A at Section 11.2.

- 20 -

EXH218

ED_018388_00000109-00080

(Emphasis added).

In the first instance, there is no requirement for a performance test in 40 C.F.R. §§ 63.303(a)(1)(i) or 63.309(d)(1) and the reference to an enforcement agency performing the calculation based on observations from each performance test make it unclear who is required to do the testing. There is also no methodology or frequency specified for monitoring. EPA did not cross-reference other relevant sections of 40 C.F.R. § 63.309 requiring a daily performance test (63.309(a)), specifying the method to be used to perform the test (section 63.309(a)(1)), or specifying training and certification requirements for observers (63.309(a)(2) and (3)), etc. Further, section 63.309(d)(1) references topside port lids, which HNR plants do not have, and does not account for the differences between the offtake systems on HNR plants and Byproduct plants.

It is also worth noting that EPA concluded that the cost of daily Method 303A monitoring would be $21,000 per year, per facility,[81] yet the Final Rule appears to contemplate daily (7-days a week) monitoring and the involvement of the owner or operator, a certified observer, and "the enforcement agency" to whom the regulated entity pays a quarterly inspection fee "to defray the costs of the daily performance tests." The requirements of the rule are unclear, but it appears that EPA has grossly underestimated the costs for daily performance testing and should reconsider the requirements to clarify the agency's intent. The agency's explanations in the Final Rule do not at all align with the regulatory text. If EPA maintains the new requirement for HNR facilities to comply with Method 303A, then SunCoke requests that EPA extend the compliance deadline for one year after the agency clarifies the monitoring requirements.

This issue is of central relevance because EPA has imposed a new requirement for HNR facilities and it is not clear how to comply.

### H. EPA failed to provide a viable test method for HCN emissions from mobile hot cars.

In its comment letter, SunCoke noted that using either Method 320 or ASTM D6348 as the test method for HCN emissions from pushing (pursuant to the 40 C.F.R. § 63.7322(c)) would require the use of Fourier Transform Infrared Spectroscopy (FTIR), which is a relatively delicate analytical method requiring careful alignment of optical mirrors on mobile hot cars. SunCoke explained that hot cars ride on steel rails with limited suspension, are subject to high vibration and strong jolts, are susceptible to alignment errors caused by jostling and excessive vibrations, all of which adversely impact any measurements collected using FTIR and the reliability of those results. SunCoke also noted that space on the mobile hot cars is very limited, and it would be challenging to develop an application in which an instrument rack with FTIR equipment and calibration gas cylinders could fit on the hot cars.

EPA responded in the Response to Comments, acknowledging the difficulties of performing testing on "certain sources," specifically, that under certain circumstances, FTIR methods have interferences that prevent its use on certain sources. As a result, EPA approved alternative test methods (Methods 26 and 26A) for acid gases measurements, but EPA did not approve alternative test methods for HCN emissions.

---

[81] 89 Fed. Reg. at 55686.

EXH219

ED_018388_00000109-00081

> *The EPA agrees that under certain circumstances the FTIR methods, EPA Method 320 and ASTM D6348 (2020), may have interferences that prevent its use on certain sources.* The EPA is finalizing, as proposed, to allow the use of EPA Methods 26 or 26A in addition to EPA Method 320 and ASTM D6348 (2020) for determination of acid gases (40 CFR 63.7322(d)(1)(ii)).[82]

Therefore, for the measurement of acid gases on mobile hot cars, EPA approved an alternative method, but not for HCN. SunCoke raised this concern during a meeting with EPA on August 20, 2024, and EPA acknowledged that it had not approved an alternative test method for HCN but that SunCoke could propose an alternate test method:

> EPA Method 26 and 26A is not listed as alternatives for Method 320 for HCN per *63.7322(e)(1)*. The allowed methods to determine the concentration of HCN in stack gas are: (1) Method 320 in appendix A; and (2) voluntary consensus standard ASTM D6348–12 (Reapproved 2020) (incorporated by reference). We did not specify any alternative method, but *an alternative may be requested through 63.7(f)*.[83]

EPA's decision to provide an alternative test method for acid gases, acknowledges that an alternative test method is needed to measure HCN emissions from mobile hot cars. However, EPA did not provide one, leaving SunCoke with the obligation to test using a method (FTIR) that EPA has acknowledged is inappropriate or to develop its own method. The only other method of which SunCoke is aware is the zinc acetate method. EPA explained in its Summary of Coke Ovens Risk and Technology Review: Data Summary that "EPA abandoned the zinc acetate approach in mid-2017 due to its limited dynamic range of measurement, i.e., poor and inconsistent sample recovery."[84] It is not SunCoke's responsibility to step into the shoes of the regulators and develop a test method where none exists.

SunCoke is now in a position in which it is required to meet a certain HCN standard by January 5, 2026, without a prescribed method for doing so that would be technically feasible. Accordingly, EPA must reconsider this aspect of the rule and either waive testing (allow PM to be used as a surrogate for HCN) or develop a method for HCN testing.

SunCoke could not have anticipated that, despite EPA acknowledging in the Response to Comments that the FTIR methods cannot be used on certain sources, EPA still would not provide an alternative test method for HCN on pushing sources like mobile hot cars. It was, therefore, impracticable for SunCoke to raise this objection during the comment period. This objection is of "central relevance" to the outcome of the Final Rule, because it is arbitrary and capricious for EPA to establish a new MACT floor emission limit for HCN while requiring compliance testing that is not technically feasible.

---

[82] Response to Comments, Response 11-9, p. 185 (emphasis added), Docket ID EPA-HQ-OAR-2002-0085-1603.
[83] Email from D. Jones, EPA, to K. Batten, SunCoke, et al. (Aug. 21, 2024) (emphasis added).
[84] EPA Memorandum, Coke Ovens Risk and Technology Review: Data Summary, at 30, Table 13 (May 1, 2023), Docket ID EPA-HQ-OAR-2003-0051-0778.

EXH220

ED_018388_00000109-00082

**I. EPA's failure to sufficiently lower the Method 23 sampling volume for mobile hot cars will cause safety and operational issues for SunCoke.**

In the Proposed Rule, EPA proposed a minimum sample volume for Method 23 (PAH) of 140 dscf (dry standard cubic foot). SunCoke explained that the proposed sample volume was too high for the pushing tests.[85] While EPA agreed that a small volume allows a source to demonstrate compliance based upon the detection levels for pushing, EPA only lowered the sample volume to 105 dscf, which is not sufficient to address SunCoke's concerns associated with the length of time required for testing, specifically for the pushing process.[86] EPA also disagreed with SunCoke's evaluation of the amount of time required for testing and stated that "the longest duration of any test run during the CAA section 114 request was 21 hours."[87] But EPA clearly misunderstood SunCoke's comments because they state in their response "We also disagree with the commenter that a month would be required to complete three test runs. . . ."[88] SunCoke did not state that three test runs will require a month of testing. A clarification of SunCoke's comments and additional context is provided below.

Because pushing is a brief and intermittent activity that lasts between only two and four minutes for each oven, sampling must be conducted during the push of each oven on as many ovens as is necessary to achieve the specified sample volume. This means that to collect a sample volume of 105 dscf, each test run for PAH would have to span two days, as demonstrated in the 2017 ICR testing where for each test run of PAHs/DFs, approximately 90 dscf was collected on the first day of testing and the remaining volume (approximately 55 dscf) was collected on the second day of testing. Therefore, three test runs of PAH at the reduced volume of 105 dscf will still require six days of testing on the hot car. To this, we need to add nine days of testing for the other HAP (three days for Hg, three days for AG, and three days for HCN). If there are no production delays or testing issues, this is 15 straight days of testing on each hot car. This doesn't even consider the existing ongoing permit requirement to test PM on the hot car (derived from the existing MACT rule) every 2.5 years, which adds an extra three days of testing on each hot car. Therefore, it is very reasonable to expect that testing could take three weeks for each hot car based on the requirements in the Final Rule.

Ultimately, extended testing periods not only raise personnel safety concerns, but also serve to disrupt critical aspects of production and maintenance. SunCoke requests that EPA lower the Method 23 sample volume to 90 dscf or less to remedy these legitimate safety and operational concerns.

**J. EPA did not respond to SunCoke's comments on the definition of "acceptable makeup water."**

EPA did not respond to SunCoke's comments on the definition of "acceptable makeup water" in 40 C.F.R. § 63.7352.[89] Specifically, SunCoke requested that EPA also allow the use of "non-process wastewaters," as defined in 40 C.F.R. § 420.02(r), as acceptable makeup water for quenching.

---

[85] SunCoke comment letter, p. 35.
[86] Response to Comments, Response 11-10, p. 185.
[87] *Id.*
[88] *Id.*
[89] SunCoke comment letter, Att. H, pp. 1–2.

EXH221

ED_018388_00000109-00083

40 C.F.R. § 63.7295(a)(2). Non-process wastewaters are defined in the effluent limitation guidelines and standards for the Iron and Steel Manufacturing Plant Source Category as follows:

> [U]tility wastewaters (for example, water treatment residuals, boiler blowdown, and air pollution control wastewaters from heat recovery equipment; treated or untreated wastewaters from groundwater remediation systems; dewatering water for building foundations; and other wastewater streams not associated with a production process.

40 C.F.R. § 420.02(r). These wastewater streams are the same as or are better than several of the currently cited examples in section 63.7352, including process wastewater treated to meet effluent limitations guidelines in 40 C.F.R. part 420, production area clean-up water, and non-contact cooling water. In addition, recycling non-process wastewaters would result in conservation of water resources and reduce energy consumption, and the requirements for quenching set forth in section 63.7295 including the total dissolved solids (TDS) limits would continue to apply.

Accordingly, EPA should reconsider its decision not to revise the definition of "acceptable makeup water." SunCoke requests that EPA modify the definition as follows on the basis that the addition of non-process wastewater is the same or better than other cited examples allowed in Subpart CCCCC:

> *Acceptable makeup water* means surface water from a river, lake, or stream; water meeting drinking water standards; storm water runoff and production area clean up water except for water from the by-product recovery plant area; process wastewater treated to meet effluent limitations guidelines in 40 CFR part 420; *non-process wastewater as defined in 40 CFR § 420.02(r)*; water from any of these sources that has been used only for non-contact cooling or in water seals; or water from scrubbers used to control pushing emissions.

(Emphasis added).

### K. The Final Rule contains typographical and similar errors that must be corrected.

The Final Rule contains typographical and similar errors, in all likelihood a function of the court ordered deadline to finalize the rule. Typos and similar errors lead to confusion regarding compliance obligations. Therefore, ensuring that the Final Rule is free from typos and similar errors is central to the relevance of the Final Rule.

#### 1.    Inconsistent definitions of "coke oven battery"

The definitions of "coke oven battery" in Subparts L and CCCCC are inconsistent with each other. Subpart L defines a "coke oven battery" as "either a by-product or nonrecovery coke oven battery," 40 C.F.R. § 63.301, whereas Subpart CCCCC defines a "coke oven battery" as "a group of ovens connected by common walls, where coal undergoes destructive distillation to produce coke. A coke oven battery includes by-product and nonrecovery processes." 40 C.F.R. § 63.7352. We

- 24 -

EXH222

ED_018388_00000109-00084

request that EPA keep the "coke oven battery definition" in 40 C.F.R. § 63.301 (Subpart L) and change the definition in 40 C.F.R. § 63.7352 (Subpart CCCCC) to match.

### 2.    Inconsistent definitions of "pushing"

The definition of "pushing" is inconsistent in Subparts L and CCCCC. Subpart L defines "pushing" as, for the purposes of section 63.305 (alternative standards for coke oven doors equipped with sheds), "the coke oven operation that commences when the pushing ram starts into the oven to push out coke that has completed the coking cycle and ends when the quench car is clear of the coke side shed." 40 C.F.R. § 63.301. Subpart CCCCC defines "pushing" as "the process of removing the coke from the oven. Pushing begins with the first detectable movement of the coke mass and ends when the quench car enters the quench tower." 40 C.F.R. § 63.7352. These definitions do not accurately reflect the pushing process at SunCoke's HNR plants.

EPA should use the definition of "pushing" below, which SunCoke provided in Attachment H to its comment letter (EPA-HQ-OAR-2002-0085-0968). This definition accurately describes the operation of the flat push hot car at SunCoke's HNR plants and accounts for the facts that (1) the flat push hot car does not enter the quench tower; and (2) the quench car, which receives the coke from the flat push hot car, generally remains inside the quench tower.

> "Pushing means the process of removing the coke from the oven. Pushing using a quench car begins with the first detectable movement of the coke mass and ends when the quench car enters the quench tower. Pushing using a flat push hot car begins with the first detectable movement of the coke mass and ends when the flat push hot car completes its travel, locks into a stationary position adjacent to the quench tower, and lines up with the quench car."

### 3.    Reversed emission limits for acid gases

The final emission limits for total acid gases under section 63.7298(c) are 0.095 gr/dscf for existing HNR coke oven batteries and 0.12 gr/dscf for new HNR coke oven batteries. Those limits should be reversed. This change will make the limits consistent with Table 7 of the Final Rule. 89 Fed. Reg. at 55709.

### 4.    Ambiguous definition of a "battery waste heat flues"

The definition of "battery waste heat flues" must be clarified. Subpart CCCCC includes a new definition for "battery waste heat flues" in section 63.7352, but the definition does not make clear that is applies only to byproduct and not HNR facilities.

### 5.    Ambiguous work practice standard

The Final Rule includes a new requirement in section 63.7300(c)(4) to identify and implement "good combustion practices" for "maintaining the proper and efficient combustion within battery waste heat flues." The Final Rule does not specify that the work practice standard applies to by-product and not HNR facilities. But it is clear from the Final Rule's preamble, the supporting materials, and the equipment to be regulated (i.e., battery waste heat flues) that the new work practice standard applies solely to ByP facilities. The preamble states that the work practice

- 25 -

EXH223

ED_018388_00000109-00085

standard applies "during ByP waste heat combustion in battery flues," 89 Fed. Reg. at 55708. And Table 5 under 40 CFR part 63, subpart CCCCC specifically limits the work practice standard to "ByP battery (combustion) stacks." Moreover, HNR facilities do not operate "battery waste heat flues." To avoid unnecessary confusion among state regulatory agencies and the regulated community, section 63.7300(c)(4) should be clarified to specify that the new work practice standard is limited to byproduct facilities.

> ### 6.    Discrepancy in number of test runs required for initial compliance

Under the Final Rule, section 63.7322(e)(2) sets the number of test runs required to determine compliance with a process-weighted mass rate of HCN (lb/ton of coke) from a control device applied to pushing emissions and battery stacks. The Final Rule requires facilities to "[c]ollect a minimum of eight spectra for each of *six runs (or hours)* evenly spaced over the test period" (emphasis added). But only "[t]*hree valid test runs* are needed to comprise a performance test" (emphasis added). So, it is unclear whether three or six runs is sufficient to comply with section 63.7322(e)(2). Three runs should be sufficient and would be consistent with other sections using Method 320.

> ### 7.    Inconsistent pushing limits

Section 63.7326(a) establishes what regulated parties must do to demonstrate initial compliance with the emission limits from a control device applied to pushing emissions. Paragraphs (a)(2) through (a)(5) identify pushing emission limits for Hg, AG, HCN and PAH respectively, but these limits do not match the limits provided in section 63.7290(b) through (e) and in Table 7 of the Final Rule    5.1E-07 lb/ton. 89 Fed. Reg. at 55708. The limit in section 63.7326(a) should match the limit provided in section 63.7290 and Table 7.

> ### 8.    Cross reference error in PAH emission limits

The Final Rule's references to "§§ 63.7290(b) through (d)" should be changed to "§§ 63.7290(b) through **(e)**" in sections 63.7282 and 63.7283. Section 63.7290(e) provides the PAH emission limits for capture systems and control devices applied to pushing emissions. See attachment A for the corrections (in red) required to fix the typo throughout section.

> ### 9.    Cross reference error in recordkeeping requirements

40 C.F.R. § 63.311(f)(1)(v) requires keeping "[r]ecords to demonstrate compliance with the work practice requirements for oven uptake damper monitoring and adjustments in § 63.303(c)(1)(iv)." But section 63.303(c)(1)(iv) does not exist. The relevant recordkeeping requirement is in paragraph section 63.303(c)(1).

## II.    Stay Pending Reconsideration

While EPA is reconsidering a rule pursuant to section 307(d)(7)(B), the CAA permits EPA to stay "the effectiveness of the rule" . . . for a period not to exceed three months."[90] This stay gives the Agency time to reconsider its position and review the Final Rule's requirements without imposing

---

[90] 42 U.S.C. § 7607(d)(7)(B).

EXH224

ED_018388_00000109-00086

unnecessary compliance costs on regulated entities. EPA may also use a stay pending reconsideration to avoid any confusion in the regulated industry from EPA implementing and then quickly revising its regulatory requirements. Staying the effective date of the rule until the agency completes its reconsideration process avoids any concerns about regulatory whiplash.

SunCoke respectfully requests that EPA exercise its full authority to stay the effectiveness of the Final Rule pending reconsideration. The Final Rule imposes compliance obligations on SunCoke and its facilities that would require immediate and significant costs to comply by the Final Rule's compliance deadline. Staying the Final Rule during reconsideration will avoid imposing these compliance costs prematurely and avoid confusion among facility personnel from learning the Final Rules' potentially unnecessary requirements. A stay would afford EPA the time needed to fully reconsider its Final Rule without imposing costs on the regulated industry in the meantime.

## III.   Request for Stay Pending Judicial Review Pursuant to Section 705 or for EPA to Amend the Final Rule

Pursuant to 5 U.S.C. § 705, SunCoke respectfully requests that EPA stay the Final Rule pending judicial review on the grounds that EPA exceeded its statutory authority, failed to follow procedures required by the APA and CAA for agency rulemaking, did not adequately consider costs or assess benefits, and did not adequately respond to all significant comments. While judicial review is pending, section 705 of the APA allows EPA to stay the effective date of a final rule if it "finds that justice so requires." SunCoke requests that EPA make such a finding here. Alternatively, Sun-Coke requests that EPA amend the Final Rule pursuant section 553(e).[91] Where, as here, there are several overarching and interrelated objections made to a rule, EPA may properly amend the Final Rule to address those concerns and rectify its procedural violations.

EPA may stay the effective date of the Final Rule, July 5, 2024, if it "finds that justice so requires." EPA and courts have applied the four-part test for preliminary injunctions to determine whether "justice so requires" a stay of agency action pending judicial review. Under that standard, the agency must consider and moving parties must demonstrate: (1) a likelihood of success on the merits of the judicial challenge, (2) irreparable harm to the moving party if the stay is not granted, (3) the potential for harm to others if the stay is granted, and (4) whether the public interest weighs in favor of granting the stay. Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. Factors (3) and (4) merge, however, when the government is the opposing party.[92]

As explained below, each of these factors weighs in favor of staying this Final Rule until the resolution of judicial review.

---

[91] *See* 5 U.S.C. § 553(e) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."); *Nat'l Ass'n of Homebuilders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (denying petition for review of EPA's repeal of a recently amended rule because "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances.") (citation and internal quotation marks omitted).
[92] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

EXH225

ED_018388_00000109-00087

### L. SunCoke is likely to succeed on the merits.

> *1.  SunCoke's petition for a stay pending review is likely to be granted on the merits.*

As set forth above in Section I, EPA denied SunCoke and other stakeholders adequate notice and opportunity. The CAA requires EPA to provide "a reasonable period for public participation of at least 30 days."[93] The APA requires agencies to provide "a reasonable opportunity to comment and submit data in support of, or in opposition to, the rules proposed."[94] Because both statutes demand a reasonable opportunity to comment, cases addressing APA's standard should also apply in the CAA context.

Courts are not blind to the complexity of a rulemaking when determining whether a comment period is sufficient. For example, in *Centro Legal de la Raza v. Executive Office for Immigration Review*, the court concluded that the plaintiffs were likely to succeed on their claim that a 30-day comment period was insufficient under the APA on a final rule that changed the procedures and regulations governing immigration courts.[95] Because the rule was technical and procedural in nature, the court considered 30 days insufficient because of "COVID-19 pandemic and the numerous other concurrent regulatory changes to the immigration system."[96] The court issued a nationwide injunction of the rule.

The D.C. Circuit agreed with the rationale set forth in *Centro Legal de la Raza*, explaining that a 30-day comment period is viewed as "generally the *shortest time* period for interested persons to meaningfully review a proposed rule and provide informed comment."[97] Thirty days is "cut[ting] the comment period to the bone").[98] In fact, two Executive Orders state that agencies should "generally" or "in most cases" provide *at least 60 days for comments*.[99] Agencies are also directed to provide "timely online access to the rulemaking docket on regulations.gov, including relevant scientific and technical findings, in an open format that can be easily searched and downloaded."

EPA did not follow these directives. Not only did it not provide the recommended comment period of "at least 60" days, EPA only provided 45 days for the public to address amendments to *two separate rules*—rules that regulate "among the most complex of the nearly 200 source categories," as well as a large volume of highly technical documents.[100] EPA could have sought another extension to meet the court's May 23, 2024 deadline, but it chose not to. Instead, it opted to limit the

---

[93] 42 U.S.C. § 7607(h).

[94] 5 U.S.C. § 553; *see also Action For Children's Television v. FCC*, 564 F.2d 458, 471 (D.C. Cir. 1977).

[95] *Centro Legal de la Raza v. Executive Office for Immigration Review*, 524 F. Supp. 3d 919 (N.D. Cal. 2021).

[96] *Id.* at 920.

[97] *Catholic Legal Immigration Network, Inc. v. Executive Office for Immigration Review*, Not Reported in Fed. Supp. 2021 WL 3609986, at *3 (D.D.C. Apr. 4, 2021) *(citing Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (holding "two-week period . . . was not an adequate period for eliciting meaningful comments"); *see also Petry v. Block*, 737 F.2d 1193, 1202 (D.C. Cir. 1984) (describing a 30-day period as "cut[ting] the comment period to the bone").

[98] *Petry v. Block*, 737 F.2d 1193, 1202 (D.C. Cir. 1984).

[99] *See* Exec. Order 13,563, Improving Regulation and Regulatory Review, 76 Fed. Reg. 3821 (Jan. 18, 2011); Exec. Order 12,866, Regulatory Planning and Review, 58 Fed. Reg. 51735 (Sept. 30, 1993) (emphasis added).

[100] 88 Fed. Reg. 55858 ("Comments must be received on or before October 2, 2023."); *Citizens for Pennsylvania's Future*, 469 F. Supp. 3d at 933.

EXH226

ED_018388_00000109-00088

comment period so that SunCoke and others could not address critical issues in the Proposed Rule. Due to the short comment period, SunCoke was forced to submit additional comments and data after the close of the comment period, including data that EPA refused to address.

### 2. The decision violated the CAA and the APA.

EPA's decision to establish 17 numerical MACT floor emission limits, despite its acknowledgement that those limits are not required to address any residual risk associated with HAP emissions from the PQBS source category, is arbitrary and capricious.

EPA found through its Risk and Technology Review (RTR) that risks due to the HAP emissions from coke ovens' PQBS are "acceptable"; that the existing PQBS rule "provides an ample margin of safety to protect public health"; and that there "are no developments in practices, processes or control technologies that necessitate revision of standards for this source category."[101] Yet EPA nonetheless proposed new MACT floor limits under CAA sections 112(d)(2) and 112(d)(3) for the stated purpose of complying with its interpretation of *LEAN*, 955 F.3d 1088  despite the fact that these new limits will have crippling effects on companies like SunCoke, forcing the installation of many millions of dollars in new technology.[102]

In its comments on the Proposed Rule, SunCoke objected to EPA's proposed MACT floor emission limits on the basis that they were inconsistent with EPA's RTR findings for the PQBS source category.[103] SunCoke explained that, contrary to EPA's interpretation of *LEAN*, the agency is not required to set numeric MACT floor emission limits when it has already determined that risks are acceptable pursuant to CAA section 112(f)(2).

EPA rejected SunCoke's comment, explaining that "[t]he Court in *LEAN* did not consider the relationship of risk review under CAA section 112(f)(2) and technology review under CAA section 112(d)(6) . . . ." In EPA's view, *LEAN* requires that the EPA promulgate 'as many limits as needed' so that all pollutants from a source category are regulated."[104] The agency further argued that:

> EPA has an independent statutory authority and obligation to conduct the technology review separate from the EPA's authority to conduct a residual risk review. The EPA's finding that there is an ample margin of safety under the residual risk review in no way obviates the EPA's obligation to require more stringent standards under the technology review where developments warrant such standards.[105]

EPA had other options. It could have considered surrogate emission limits or work practice standards for the 17 previously unregulated HAP. In fact, EPA implicitly recognized its authority to do that in the Final Rule, when EPA set a MACT work practice standard for three HAP (the organic

---

[101] 88 Fed. Reg. 55858.
[102] 88 Fed. Reg. at 55863 ("The EPA is required to address regulatory gaps, such as missing MACT standards for listed air toxics known to be emitted from the source category. *Louisiana Environmental Action Network (LEAN) v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020)."); *id.* at 55876 n.25 (citing to *LEAN* as support for its proposal of MACT standards).
[103] SunCoke comment letter, p. 25.
[104] 89 Fed. Reg. at 55711.
[105] 89 Fed. Reg. at 55710.

EXH227

ED_018388_00000109-00089

HAP emissions of D/F, PAH, and VOHAP from battery stacks) and surrogate standards and process combinations for five other HAP. EPA did this after realizing that it failed to propose standards for those eight previously unregulated HAP in the Proposed Rule. That EPA set numerical MACT floor limits (which SunCoke will not be able to meet) for some HAP and process combinations while establishing surrogates and work practice standards for others without sufficient explanation is arbitrary and capricious.

EPA's interpretation of *LEAN* is not entitled to deference. Nor is EPA's interpretation of law, as the Court's decision in *Loper Bright* makes clear. [106] When EPA's overly expansive interpretation of *LEAN* leads it to impose unnecessary and ill-informed MACT floor limits on an industry (heat/non-recovery cokemaking) that EPA recognizes adequately control HAP emissions, its decision is arbitrary and capricious. "[A]s a general matter, EPA has stated that where we determine that existing standards are adequate to protect public health with an ample margin of safety and prevent adverse effects, it is unlikely that EPA would revise MACT standards merely to reflect advances in air pollution control technology."[107] The same should be true for a rule where EPA found that "[t]here are *no measurable air quality impacts* from this rule that can be guaranteed," and it cannot "quantif[y] any benefits associated with this final rule, because all covered facilities are expected to already have HAP emissions levels that are below the final limits."[108]

SunCoke is likely to prevail on the merits for several other reasons. EPA's inconsistent designation of MACTs, coupled with its failure to consider SunCoke's analyses of the errors and omissions in the dataset used by EPA for the proposed emission limits was arbitrary and capricious.[109] EPA's disparate treatment of the 17 HAP included in the Proposed Rule versus the eight new HAP in the Final Rule is arbitrary and capricious. "[D]eciding a case one way today and a substantially similar case another way tomorrow," without a reasonable explanation, is arbitrary and capricious.[110] In fact, EPA's decision to add eight new HAP in the Final Rule also violates basic APA requirements. EPA's failure to consider the cost of achieving emissions reductions, as well as any non-air quality health and environmental impacts and energy requirements when setting MACT floor-level controls based solely on emissions data from best performing sources violates CAA section 112(d)(2).

For these reasons and the others set forth in this Petition, SunCoke's petition is likely to succeed on the merits.[111]

---

[106] 144 S. Ct. 2244.

[107] 72 Fed. Reg. 5510, 5532-33 (Feb. 6, 2007).

[108] 89 Fed. Reg. at 55723 (emphasis added).

[109] *See* Email and attachments from K. Batten, SunCoke, to D. Jones and C. French, EPA (Jan. 18, 2024), Docket ID EPA-HQ-OAR-2002-0085-1566.

[110] *Doubleday Broad. Co. v. FCC*, 655 F.2d 417, 423 (D.C. Cir. 1981).

[111] 42 U.S.C. § 7607(d)(l) states that the "provisions of section 553 through 557 and section 706 of title 5 [the APA] shall not, except as expressly provided in this subsection, apply to actions to which this subjection [307(d)] applies." *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 23–26 (D.D.C. 2012). Notwithstanding the Petition for Reconsideration, SunCoke reserves the right to bring any argument in a judicial proceeding that it raised with reasonable specificity during the period for public comment.

EXH228

ED_018388_00000109-00090

## M. SunCoke will suffer irreparable harm absent a stay or amendment of the Final Rule.

An agency may grant a stay under section 705 to "maintain the status quo" and "allow judicial review of the underlying regulation to proceed in a just manner."[112] EPA can also amend a Final Rule pursuant to section 553(e) of the APA. Absent a stay to preserve the status quo or amendment, judicial review of the Final Rule cannot proceed in a just manner.

The Final Rule will cause SunCoke irreparable harm because EPA incorrectly assumed that the Final Rule will not require SunCoke to install new controls in order to comply. EPA relied on that assumption to analyze the cost impacts, calculate the compliance deadlines, and make other decisions in the Final Rule. But EPA's assumption is wrong. SunCoke will have to expend approximately *a half a billion dollars* in new technologies, which will require at least three years to design, engineer, and install. SunCoke cannot meet EPA's deadline, which will put it out of compliance as of December 5, 2025.[113]

The Supreme Court recently validated the principle that non-recoverable expenditures constitute irreparable harm in *Ohio v. EPA*.[114] There, a number of states challenged EPA's implementation of a federal implementation plan (FIP) for 23 states, in lieu of their proposed state implementation plans. The States involved stressed that "complying with the FIP during the pendency of this litigation would require them to incur "hundreds of millions[,] if not billions of dollars" in costs that are "nonrecoverable."[115] Other courts, including the D.C. Circuit, have also "recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation."[116] "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance cost."[117]

SunCoke easily meets the standard for irreparable harm. For the reasons explained below, EPA should stay the effect of the compliance deadlines or amend the Final Rule.

---

[112] *Bauer v. DeVos*, 325 F. Supp. 3d 74, 106–07 (D.D.C. 2018) (internal quotation marks omitted).

[113] SunCoke will provide detailed declarations with its motion for judicial stay demonstrating that the Final Rule will cause it to spend many millions of dollars to comply with the Final Rule, if SunCoke is able to at all.

[114] 144 S. Ct. 2040 (2024) (finding that injuries to the States' sovereign interests and the extraordinary costs of complying with EPA's regulations were sufficient to balance the government's interests).

[115] *Ohio*, 144 S. Ct. at 2053 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–221 (1994) (Scalia, J., concurring in part and concurring in judgment) ("Because each side has strong arguments about the harms they face and equities involved, our resolution of these stay requests ultimately turns on the merits and the question who is likely to prevail at the end of this litigation."); *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.").

[116] *In re NTE Conn., LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022) (cleaned up); *see also Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) (explaining that the loss of rent payments with no guarantee of eventual recovery would subject landlords to irreparable harm).

[117] *See Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).

EXH229

ED_018388_00000109-00091

*1. SunCoke will expend vast sums installing new controls to meet MACT floor limits.*

EPA takes the position that "[r]equiring the consideration of costs in setting the MACT floor would conflict with the plain language of CAA."[118] Under *Loper Bright*, that interpretation is not entitled to deference. But even assuming EPA's interpretation of the statute is correct, it increases the need to ensure in the first instance that EPA (1) has considered all the data and (2) properly wields legal authority to set the MACT floors. That is especially true where, as here, EPA is establishing floors for multiple HAP emission limits for the first time. This drives SunCoke to develop first of a kind applications to control these HAP emissions. When the EPA does not or cannot consider the costs of the regulation it imposes on stakeholders, a regulate-now-and-determine-legality-later approach is certain to inflict irreparable harm. The D.C. Circuit has stayed one of EPA's new rules when it was based on bad data and industry would be irreparably harmed complying with "expensive" regulations before the error could be corrected.[119]

Installing additional controls to meet the requirements of the Final Rule will be exorbitantly "expensive."[120] As an initial matter, SunCoke must spend significant time and money evaluating how to comply with the new floor limits. This would require substantial testing to collect the data that EPA did not in its rulemaking regarding the sources and the emissions, as well as engineering, modifying additional equipment, and other efforts. Because of the agency's truncated timeline—and because EPA forgot to include new HAP surrogate limits and work practice standards in the Proposed Rule—SunCoke has not yet been able to determine the total cost of installing the new controls. As SunCoke explained in its comments, the rule as proposed would severely impact SunCoke's Jewell coke plant, costing it at least $474.9 million in capital investments and $66 million (not $4.7 million) in annual costs, if it is feasible to install the necessary controls at all.[121]

SunCoke has a year of testing before it can know whether it can meet many of these limits. In the case of HH1 Hg, SunCoke will need a year of testing because of unknown issues it can have, based on its experience installing PAC at Granite City Operations and Middle Town Operations. Testing potentially impacts the $SO_3$/FGD operation requiring a second spray dry absorber and an expanded baghouse costing over an extra $15-20 million. Beyond the costs associated with identifying and developing these new controls, SunCoke will incur yet more costs by limiting production during installation. SunCoke will inevitably suffer opportunity costs during this downtime. The D.C. Circuit has held that revenues forever lost because of unauthorized agency action amount to irreparable harm.[122]

All told, these errors will cost SunCoke many millions of dollars. SunCoke can never expect to recover these costs, no matter the outcome of the litigation pending before the D.C. Circuit.

---

[118] 89 Fed. Reg. at 55710.
[119] *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 189 (D.C. Cir. 2011).
[120] *Id.*
[121] SunCoke will submit detailed declarations explaining the financial impact of the new controls required to ensure compliance with SunCoke's motion for a judicial stay.
[122] *In re NTE Conn.*, 26 F.4th at 990–91.

- 32 -

EXH230

ED_018388_00000109-00092

## 2. *Meeting EPA's 18-month compliance deadline is impossible.*

When EPA established 17 new HAP emission limits—purportedly based on MACT—it wrongly concluded that SunCoke could comply with the new floor emission limits with its existing controls.[123] This conclusion was not supported by the data.[124] SunCoke has exceeded the new limits. EPA's overconfidence in SunCoke's ability to comply with the new emission limits caused the agency to commit a cascade of costly errors. For example, in overestimating SunCoke's ability to comply, EPA underestimated the time SunCoke needs to achieve full compliance with the new limits (assuming full compliance is even possible). The expedited timeline, in turn, needlessly increases SunCoke's costs to comply with the new limits, which EPA significantly underestimated in the first place.

It is impossible for SunCoke to meet the 18-month compliance deadline imposed by EPA. Contrary to EPA's conclusion that no new technology needs to be installed to meet the Final Rule's emission limits, meeting the requirements of the Final Rule will require engineering, design, and installation of brand new, state of the art technology. No matter how much SunCoke spends, the work of designing, engineering, and installing the new technology cannot be done in the 18-month timeline. Assuming compliance is even feasible, EPA overestimated SunCoke's ability to comply with the new emission limits and underestimated the amount of time that SunCoke needs to comply. EPA gave SunCoke only "18 months after publication of the final rule."[125] This places SunCoke in the difficult position of having to *immediately* design, engineer, and install new controls, at exorbitant cost, or risk enforcement in 18 months.

For SunCoke to use HH1 Hg controls, for example, it would need to significantly expand the scope of its controls. The cost of the basic carbon injection system $3 million. That FGD is smaller and has more challenges. SunCoke knows that upgrades and modifications to its existing system would need to be made before SunCoke could put in carbon injection and have it function without compromising operation and SO2 control. SunCoke does not know what upgrades and modifications would be, but it believes they would cost far more than $3M for the carbon injections system.

Even if the court ultimately concludes that EPA lacked legal authority to set the new MACT floor limits, the ruling could offer little more than cold comfort to SunCoke. By the time SunCoke could obtain a favorable ruling, it would have already spent the time and money designing and installing the required, expensive controls. That time and money is unrecoverable. And installation of such controls would benefit nobody in light of EPA's determination that the existing PQBS rule "provides an ample margin of safety to protect public health."[126] EPA should grant a § 705 stay to avoid inflicting unnecessary, irreparable harm on SunCoke.

---

[123] *See* 89 Fed. Reg. at 55707 ("Based on the data we had at proposal, we expected all sources could meet the 17 new MACT floor limits without additional controls."); *id.* at 55710 ("[B]ased on the data submitted to the EPA by the industry, all facilities should be able to meet the MACT floor limits developed for the previously unregulated HAP and unregulated sources of HAP without the installation of additional controls.").

[124] *See* 89 Fed. Reg. at 55710 ("Commenters who raised claims of exorbitant costs to meet the new MACT floors did not provide any additional data contradicting the EPA's findings; thus, the EPA does not find any support for these claims."). SunCoke collected additional data, but EPA did not consider it.

[125] 89 Fed. Reg at 55721.

[126] *Id.* at 55685.

EXH231

ED_018388_00000109-00093

### N. Temporarily Staying the Rule Will Not Harm Anyone and the Public Interest Supports Staying the Rule or Amending It.

EPA concedes in the Final Rule that there will be no harm to the public from staying the effect of the Final Rule or the Final Rule's compliance dates. EPA states:

- "The EPA has not quantified *any benefits* associated with this final rule because all covered facilities are expected to already have HAP emissions levels that are below the final limits, based on facility data available to the EPA."[127]

- "[W]e conclude that the current [MACT] standards in the PQBS NESHAP provide an ample margin of safety to protect public health and are finalizing no changes based on the risk review."[128]

- "The potential public health benefits associated with such prevention are difficult to estimate, given that they correspond to *hypothetical scenarios of emissions beyond those indicated by current facility data*, and are thus not quantified in EPA's analysis."[129]

- "We did not identify any potential cost-effective controls or other measures to reduce risk further under our CAA section 112(f) risk review."[130]

In short, EPA cannot quantify "*any benefits*" associated with the Final Rule and that the only potential health benefits are based on hypothetical emissions—not those supported with any data. And the only possible public benefit is hypothetical—"EPA *anticipates* that the final rule's new requirements will increase the likelihood of facilities successfully detecting any HAP emissions in excess of the specified thresholds, allowing for earlier corrective action."[131]

SunCoke is unaware of any time EPA has promulgated a Final Rule that will cost facilities many millions of dollars to comply with (assuming they can) that does not have any quantifiable public interest. Those admissions obviously raise serious questions about the arbitrary and capricious nature of EPA's rulemaking. But for purposes of staying the effect of the Final Rule, there is little to no public interest that a stay will harm.

EPA will likely argue that a stay of the Final Rule could result in years of delays, delaying the effective date of the new monitoring requirements for years after the current July 7, 2025 deadline.[132] But that delay will not cause any public harm because all of the covered facilities already have "HAP emissions levels that are below the final limits."[133] EPA also claims in the Final Rule that "we expect facilities will be able to comply with these limits without the need for any new controls or operating costs."[134] If EPA is right, a stay will not injure the public interest because all

---

[127] 89 Fed. Reg. at 55686.
[128] *Id.*
[129] *Id.*
[130] *Id.* at 55689.
[131] *Id.*
[132] *See, e.g.*, Response in Opposition to the Applications for Stay at *12, *Ohio v. EPA*, Nos. 23A349, 23A350, 23A351 (S. Ct. Oct. 30, 2023).
[133] 89 Fed. Reg. at 55686.
[134] *Id.* at 55696.

EXH232

ED_018388_00000109-00094

the measures that are required are already installed. Therefore, staying implementation of the Final Rule's requirements pending judicial review cannot cause any harm to anyone.

In fact, the public interest favors imposing the stay. If the Final Rule is not amended by EPA, the entire coke industry will suffer a devastating blow and coke plants may be forced to shut down in the face of crippling costs of compliance. The coke industry serves a key function in society, facilitating the production of strong, lightweight steel that is necessary to produce electric vehicles, bridges, critical infrastructure, and defense equipment needed for national security. SunCoke is the proud employer of over 900 individuals, with its 40 percent of its entire workforce comprised of United Steelworkers, and many of SunCoke's plants are in economically disadvantaged areas where jobs are scarce. For these reasons alone, EPA must grant a stay pending judicial review or amend the Final Rule.

Agencies have voluntarily stayed the effect of a rule, not only because of the compliance costs, but because doing so would be efficient for all parties and to prevent the expenditure of exorbitant compliance costs on the regulated community. The Securities and Exchange Commission, for example, recently stayed the effect a rule that will require registrants to provide extensive climate-related information in their registration statements and annual reports.[135] The Commission explained:

> [A] stay of the Final Rules meets the statutory standard. Among other things, given the procedural complexities accompanying the consolidation and litigation of the large number of petitions for review of the Final Rules, a Commission stay will facilitate the orderly judicial resolution of those challenges and allow the court of appeals to focus on deciding the merits. Further, a stay avoids potential regulatory uncertainty if registrants were to become subject to the Final Rules' requirements during the pendency of the challenges to their validity.[136]

The basis for the SEC's decision applies equally here. A number of stakeholders will be challenging the Final Rule, and their cases will likely be consolidated. In the absence of EPA action, the parties will need to seek a stay from the D.C. Circuit, which will distract the court from focusing on the merits. And without a stay, SunCoke and others will be forced to undertake costly measures to conduct tests, develop new technologies, and install controls.

EPA should stay the effect of the compliance dates pending judicial review or amend the Final Rule for the same reasons. EPA vastly underestimates the costs SunCoke will incur, and § 705 has the express purpose of "prevent[ing] irreparable injur[ies]."[137] EPA also has the authority under Section 553 to amend the Final Rule, at least with respect to the compliance dates. Under traditional equitable principles, so long as "the threatened harm is more than de minimis, it is not so

---

[135] U.S. Securities and Exchange Commission, Release Nos. 33-1128034-99908, File No. S7-10-22, Order Issuing Stay, *In re: In the Matter of the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Apr. 4, 2024), https://www.sec.gov/files/rules/other/2024/33-11280.pdf.

[136] *Id.* at 2–3.

[137] 5 U.S.C. § 705.

- 35 -

EXH233

ED_018388_00000109-00095

much the magnitude but the irreparability that counts."[138] SunCoke is certain to incur significant, unrecoverable costs attempting to comply with the Final Rule before judicial review comes to an end.

CONCLUSION

For the reasons described above, SunCoke urges EPA to convene a proceeding for reconsideration of the Final Rule pursuant to Clean Air Act section 307(d)(7)(B) and to stay the effective date and all compliance deadlines pending reconsideration. In the alternative, EPA should modify or rescind the Final Rule so that EPA can develop statistically reliable data and allow all stakeholders sufficient time to address the technical complexities of the Rule. SunCoke further requests that EPA stay the effective date of the Final Rule pending judicial review, pursuant to APA section 705.

---

[138] *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (internal quotation omitted).

EXH234

ED_018388_00000109-00096

ATTACHMENT A

**Typo carried throughout § 63.7282 and § 63.7283.**

§ 63.7282(d) An affected source at your coke plant is new if you commenced construction or reconstruction of the affected source on or after July 3, 2001. An affected source is reconstructed if it meets the definition of "reconstruction" in § 63.2. This paragraph (d) does not apply to the emission limitations listed in §§ 63.7290(b) through (dc), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (c) for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively.

(e) An affected source at your coke plant is existing for the emissions limitations listed in §§ 63.7290(b) through (dc), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (c) for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively if you commenced construction or reconstruction of the affected source before August 16, 2023.

(f) An affected source at your coke plant is new for the emissions limitations listed in §§ 63.7290(b) through (dc), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (c) for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively if you commenced construction or reconstruction of the affected source on or after August 16, 2023.

§ 63.7283(a) If you have an existing affected source, you must comply with each emission limitation, work practice standard, and operation and maintenance requirement in this subpart that applies to you no later than April 14, 2006. This paragraph does not apply to the emission limitations listed in §§ 63.7290(b) through (dc), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (c) for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively.

(b) If you have a new affected source and its initial startup date is on or before April 14, 2003, you must comply with each emission limitation, work practice standard, and operation and maintenance requirement in this subpart that applies to you by April 14, 2003. This paragraph does not apply to the emission limitations listed in §§ 63.7290(b) through (dc), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (c) for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively.

(c) If you have a new affected source and its initial startup date is after April 14, 2003, you must comply with each emission limitation, work practice standard, and operation and maintenance requirement in this subpart that applies to you upon

- 37 -

EXH235

ED_018388_00000109-00097

initial startup. This paragraph does not apply to the emission limitations listed in §§ 63.7290(b) through (de), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (e) for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively.

**(d)** With regard to the §§ 63.7290(b) through (de), 63.7296(c) through (f), 63.7297(a) through (d), and 63.7298(a) through (e) emission limitations for capture systems and control devices applied to pushing emissions, battery stacks, HNR HRSG main stacks, and HNR HRSG bypass/waste heat stacks, respectively . . .

- 38 -

EXH236

ED_018388_00000109-00098

# TAB C

EXH237

ED_018388_00000109-00099

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

American Coke and Coal Chemicals
Institute, et al.,

                Petitioners,

      v.

Environmental Protection Agency and
Michael S. Regan, Administrator,

                Respondents.

No. 24-1287
(and consolidated cases)

## DECLARATION OF JOHN QUANCI IN SUPPORT OF MOTION FOR STAY PENDING REVIEW FILED BY SUNCOKE ENERGY, INC.

I, John Quanci, declare as follows:

1.  I am the Vice President of Technology and Chief Technology Officer for SunCoke Energy, Inc. ("SunCoke"). I have worked for SunCoke since 2010. In my role, I am responsible for the evaluation, monitoring, and continuous improvement of plant operations. I evaluate capital projects related to the heat recovery cokemaking process at SunCoke's plants—including the development of new technologies to reduce emissions from the process.

2.  I earned my bachelor's degree in chemical engineering from the Cooper Union for the Advancement of Science and Art in 1984. I

EXH238

ED_018388_00000109-00100

earned my master's and doctorate degrees in chemical engineering from Princeton University in 1986 and 1988, respectively.

3.    Prior to my time at SunCoke, I was the Director of Corporate Technology within Sunoco's Corporate Engineering & Technology organizations. I have more than 35 years of experience in process research, development, plant optimization, plant manufacturing, rebuilding/turning around of plants, and taking new technologies from ideation through to full production.

4.    I am a registered engineer, and I have more than 95 issued United States patents on heat recovery/nonrecovery cokemaking— related to coke plant operation, optimization, repair, environmental improvement, and control.

5.    I am deeply familiar with all aspects of the operations of each of SunCoke's facilities: SC-Vansant-VA ("JWO") (in operation since 1969), SC-EastChicago-IN ("IHO") (in operation since 1998), SC-FranklinFurnace-OH ("HHO" or "HH1" (in operation since 2005) and "HH2" (in operation since 2008)),[1] SC-GraniteCity-IL ("GCO") (in operation since 2009), and SC-Middletown-OH ("MTO") (in operation

---

[1] This facility is divided into two units, HH1 and HH2.

- 2-

EXH239

ED_018388_00000109-00101

since 2011).

6.    For these reasons, I have personal knowledge of the facts and
information in this declaration.

### SunCoke's Unique Heat Recovery Process Provides Environmental Advantages.

7.    Coke is an essential ingredient in the blast furnace production
of steel. Maintaining a strong domestic steel industry is critical to
national defense, the health of the nation's infrastructure, and many
manufacturing industries.

8.    Metallurgical coke is produced by the destructive distillation
of coal in coke ovens. There are only 11 active coke facilities in the United
States—6 of these are byproduct recovery (ByP) facilities and 5 are heat
and/or nonrecovery (HNR) facilities. Heat recovery facilities use the
waste heat from coke oven gas to produce steam in on-site heat recovery
steam generators (HRSG) which is then used to make electricity (which
is considered green electricity and green process steam since it is
recovered from waste heat). SunCoke owns all five of the HNR facilities,
and all but one of the facilities (JWO) use HRSGs, producing both coke
for the steel industry and process steam/electricity.

(Page 3 of Total)

EXH240

ED_018388_00000109-00102

9.    Unlike HNR facilities, ByP facilities recover chemicals from coke oven gas in an on-site chemical plant. Another important difference between ByP and HNR facilities is that the ByP ovens operate under *positive* pressure, whereas HNR facilities' ovens operate under *negative* pressure. Because HNR facilities operate under negative pressure, they have very low fugitive emissions.

10.    EPA has recognized that SunCoke's cokemaking process is the most environmentally friendly way to make coke, and it has adopted SunCoke's heat-recovery cokemaking process as the industry maximum achievable control technology ("MACT"). *See, e.g.*, 66 Fed. Reg. 35326, 35328–29 (Jul. 3, 2001); 42 U.S.C. § 7412(d)(8)(A).

### **EPA Finalized a Rule that Established 17 Numerical MACT Floor Limits for Previously Unregulated HAPs.**

11.    On August 16, 2023, EPA published a proposed rule that would amend two National Emissions Standards for Hazardous Air Pollutants (NESHAP) for the coke ovens industry. 88 Fed. Reg. 55858, 55858 (August 16, 2023) (The Proposed Rule).

12.    On October 2, 2023, SunCoke submitted comments to EPA on the agency's Proposed Rule. Attached as Exhibit A to this Declaration is a true and correct copy of SunCoke's comments on the Proposed Rule

EXH241

ED_018388_00000109-00103

submitted to EPA.

13.    On July 5, 2024, EPA finalized the rule. 89 Fed. Reg. 55684, 55689 (July 5, 2024) (The Final Rule). The Final Rule establishes 17 new MACT floor emission limits for previously unregulated Hazardous Air Pollutants (HAPs), 1 work practice standard, and 5 HAP surrogacy standards. Thirteen of the MACT emissions standards apply to SunCoke's operations.

14.    Each of the SunCoke plants is unique in some fashion, which means the MACT floor limits have different implications for each facility. For example, with the exception of HH1 and IHO, all of SunCoke's plants are equipped with either a powdered activated carbon (PAC) injection system or a hydrated PAC to control emissions of mercury.

15.    In the Final Rule, EPA concluded that all the new MACT floor limits could be met with existing controls and, as a result, the Final Rule provided only 18 months for regulated facilities to achieve compliance— December 5, 2025.

EXH242

ED_018388_00000109-00104

## The Final Rule Is Based on Multiple Errors and Omissions.

16.    In setting the new MACT floor limits, EPA made numerous errors including: (1) ignoring relevant data clearly demonstrating that the limits cannot be met with existing controls; (2) failing to account for variability in coal (the raw material); (3) failing to account for operational differences among SunCoke's plants; (4) failing to account for differences in controls between SunCoke's facilities; (5) using a methodology for calculating emissions with a too-limited data set; (6) adopting numeric emission limits, rather than work practice standards or surrogacy determinations  for sources with emissions where no data exists or emissions are near or below detection; and (7) setting limits without regard to technical achievability. All these errors result in limits that are not achievable using existing controls.

17.    Due to the Final Rule's deadline for compliance with the new MACT floor limits, and the substantial evidence that the new limits cannot be met with existing controls, SunCoke is forced to immediately perform testing. It must begin to design, engineer, procure and install controls—at exorbitant cost to the company—while this case is pending before this Court. SunCoke must do all this despite the fact that EPA

EXH243

ED_018388_00000109-00105

concluded that SunCoke could meet the new limits with existing controls. As a result, SunCoke will suffer severe and irreparable harm without a stay.

## EPA Ignored Relevant Data When Setting the Numerical MACT Floor Standards.

18.    When calculating the MACT floor limits for the Proposed Rule, EPA used *only* the data that it collected from two EPA-issued Information Collection Requests (ICRs) in 2016 and 2022, claiming that it was all the available data. *See* 89 Fed. Reg. at 55712 ("The data used for the proposed MACT limits were all the data that were available to the EPA at that time. The EPA used these data to calculate the proposed limits.").

19.    Based solely on data from the two EPA-issued ICRs, EPA concluded that "all sources could meet the 17 new MACT floor limits without additional controls." 89 Fed. Reg. at 55707.

20.    Dissatisfied with the limited dataset that EPA employed, and recognizing that many of the new limits could not be met with existing controls, SunCoke provided EPA with data dating "from 2006 through 2022." 89 Fed. Reg. at 55713. As SunCoke explained in its comments,

- 7 -

EXH244

ED_018388_00000109-00106

these data "better accounted for test-to-test and plant-to-plant variations." Ex. A at 33–34.

21.    Contrary to EPA's expectations, SunCoke's data reveal that *multiple* SunCoke facilities cannot meet the MACT floor limits.

22.    Here are two examples from only *one* facility's main stack to illustrate the point.

    a.  In March of 2022, a trial was conducted at the main stack of SunCoke's facility, HH1, to ascertain its particulate matter emissions. The relevant MACT floor is 4.90E-03 gr/dscf. Here are the measurements taken from the trial: (1) 4.10E-03, (2) 5.26E-03, and (3) 6.43E-03. The test result was 5.26E-03, which is 107% of the Final Rule's MACT floor. So if the Final Rule were in effect in 2022, HH1 would have exceeded the PM limit for its main stack.

    b.  In January of 2006, a trial was conducted at the main stack of HH1 to ascertain its mercury emissions. The Final Rule's MACT floor is 3.00E-06 gr/dscf for main stack mercury emissions. These are the measurements obtained from the trial: (1) 5.08E-06, (2) 4.89E-06, and (3) 4.33E-06. The test

EXH245

ED_018388_00000109-00107

result was 4.77E-06, which is 159% of the MACT floor limit.
So if the Final Rule were in effect in 2006, HH1 would have
failed.

23.    Although EPA did incorporate some of the additional data
that SunCoke provided during the notice and comment period, it did not
consider all the data. According to EPA, it chose to consider only data
"within five years prior to 2016 . . . that matched the requirements for
testing in the CAA section 114 requests." 89 Fed. Reg. at 55715. In doing
so, EPA ignored relevant data demonstrating that the new limits cannot
be met with existing controls.

24.    By ignoring relevant data, EPA significantly overestimated
SunCoke's ability to comply with the numerical MACT floor limits. In
overestimating SunCoke's ability to comply, EPA underestimated the
time SunCoke needs to achieve full compliance with the new limits. EPA
also significantly underestimated SunCoke's costs of compliance. And it
did not consider employing work practice standards or surrogate limits
in lieu of numeric emission limits, despite testing results in the parts per
billion or at or below detection.

EXH246

ED_018388_00000109-00108

## The Data EPA Used Were Insufficient to Calculate the MACT Floor Limits.

25.    Even based on its limited dataset, EPA's conclusion that SunCoke's facilities can meet the new numerical MACT floor emissions limits without any additional controls is unsupportable. To draw this conclusion, EPA had to assume that all SunCoke's facilities with a main stack, for example, could satisfy the new MACT floor limit for mercury merely because *one* of SunCoke's facilities (IHO) met the limit (though not by much). EPA's assumption is baseless. As discussed, SunCoke has data showing that HH1's main stack *failed* to meet the MACT floor limit for mercury emissions. That is not surprising. Different SunCoke facilities are equipped with different controls and therefore perform differently.  So EPA was wrong to assume that all of SunCoke's facilities' main stacks could perform as well IHO's main stack.

26.    EPA also did not consider other important factors that can alter how a facility performs on a given day, such as the naturally occurring variability of the coal that SunCoke puts into its ovens. The coal that SunCoke purchases has variable concentrations of different chemicals, including mercury. Change in the coal mercury levels will change the amount of mercury emissions at a plant like HH1, which is

- 10-

EXH247

ED_018388_00000109-00109

not equipped with mercury controls, such as a PAC injection system.

27.    EPA's lack of data is compounded by another problem. In the Final Rule, EPA admitted that setting numerical MACT floor limits for emissions with test runs consistently below the detection limit (BDL) "is not economically and technically feasible." 89 Fed. Reg. at 55707–08. Yet it did exactly that here. For example, EPA adopted MACT floor limits for acid gases in SunCoke's HRSG main stacks and polycyclic aromatic hydrocarbons (PAHs) for SunCoke's pushing operations—even though these HAPs tested "below the detection limit" 50% of the time. 89 Fed. Reg. at 55707. In the pushing category, mercury tested BDL 40% of the time. This means EPA had even *fewer* data to work with when setting the MACT floor limits.

28.    To calculate the MACT floors, EPA applied its UPL statistical method to its limited dataset to account for variability and uncertainty in emissions data. The UPL calculation estimates the true average and true variance. Estimating the true average is possible with a small number of samples, but the same is not true of the estimation of the variance, which requires a substantially larger number of samples. Specifically, samples that cover the range of varying factors are required

- 11 -

EXH248

ED_018388_00000109-00110

to accurately predict the UPL limit. EPA offered no explanation for its exclusion of relevant data—including facilities with different controls and variation driven by coal sourcing variation—in performing its calculations and setting the new MACT floor limits.

### SunCoke Must Conduct Testing and Install Additional Controls to Meet the Requirements of the Final Rule.

29.    As explained above, EPA ignored relevant data and employed inapt data when it set the new MACT floor limits. With the wrong inputs, EPA's analysis yielded limits that were incorrect. This places SunCoke in a difficult position.

30.    As an initial matter, SunCoke's biggest difficulty is its current lack of data. Although SunCoke is sure its facilities cannot meet some of the limits, considering the lack of data available, SunCoke simply does not know whether its facilities can meet many of the new limits.

31.    The cost of a full dataset for all the plants is estimated to be $1.3 million and would take about one year. A second dataset is also necessary to adequately capture variation driven by seasonal effects and coal sourcing variation, and this will cost another $1.3 million and require almost another year of testing. This does not include the cost of SunCoke personnel—who would be needed to assist with obtaining and

- 12-

EXH249

ED_018388_00000109-00111

analyzing the data. This will push the cost of the necessary testing to nearly $3 million.

32.     SunCoke has already begun to incur nonrecoverable testing costs. SunCoke has retained AECOM—a consulting firm with expertise in source testing, environmental compliance evaluations, and environmental engineering—to complete the following work:

a. First, AECOM has provided significant technical assistance to SunCoke, including data analysis (based on the available data) about whether each of SunCoke's plants will be able to meet the numeric emission limits in the Final Rule.

b. Second, AECOM continues to assist SunCoke in developing a testing survey of all the HAPs, sources, and plants in SunCoke's fleet. It will likely execute the field trials to identify which of SunCoke's plants will need additional controls installed.

c. Third, for SunCoke's plants that cannot meet the numeric emission limits in the Final Rule, or that are at significant risk of failing those limits, AECOM will also assist in

EXH250

ED_018388_00000109-00112

designing, engineering, and validating feasible and practicable emissions controls (where such controls exist).

33.     Based on the data currently available, and despite EPA's assertions to the contrary, it is clear that SunCoke *must* install at least some controls to meet the new MACT floor limits.

34.     One example that conclusively demonstrates this fact is, as discussed, SunCoke has data showing that its HH1 facility's main stack fails to meet the MACT floors for *mercury* and *particulate matter* emissions.

35.     As discussed, unlike some other SunCoke plants, HH1 has no mercury controls—such as a PAC or a hydrated PAC. SunCoke does not yet know whether bringing HH1 into compliance with the new MACT floor for mercury main stack emissions is as simple as adding a hydrated PAC system at a cost of about $4 million ($3 million for equipment and $1 million for additional testing), which would be the absolute minimum cost to control the mercury emissions. SunCoke might also need more expensive equipment to ensure that the newly installed hydrated PAC does not degrade HH1's ability to control other pollutants—such as sulfur dioxide. In that event, an extra spray dryer absorber, a baghouse, and a

EXH251

ED_018388_00000109-00113

slaker, would be necessary—which together would increase the cost to over $59 million to successfully install mercury controls at HH1.

36.    To control the particulate matter emissions from HH1's main stack, SunCoke will need to spend least $37 million—and perhaps as much as $54 million depending on whether the extra mercury controls are necessary. (Installing the extra mercury controls would bring down the cost of controlling the particulate matter emissions from $54 million to $37 million because, among other reasons, there are some common equipment between the two pollution control technologies).

37.    In short, at the bare minimum, SunCoke must spend $3 million on testing, $4 million on mercury controls, and $37 million on particulate matter controls (though, as discussed, this number is $54 million if only $4 million of mercury controls are necessary). So to conduct testing and ensure that HH1's main stack is in compliance with the Final Rule for these two HAPs by December 5, 2025, SunCoke must pay at least $61 million ($3 million for testing + $4 million for mercury controls/testing + $54 million for particulate matter controls). But the cost to conduct testing and to correct HH1's main stack mercury and particulate matter emissions could easily balloon to as much as *$99*

- 15-

EXH252

ED_018388_00000109-00114

*million* ($3 million for testing + $59 million for mercury controls/testing + $37 million for particulate matter controls) depending on whether more equipment is needed. These are necessary costs to control only *two* HAPs from *one* source for *one* SunCoke facility.

### If Further Testing Reveals More Failures, the Projected Costs of Installing Additional Controls Are Exorbitant.

38.    To determine what SunCoke needs to do to bring its facilities into compliance, I have separated the results of the limited data into five groups: (1) **clear fails**, which necessitate additional controls; (2) **marginal passes**, which likely necessitate additional controls to maintain a comfortable margin of compliance; (3) **passes, but an insufficient amount of data** to feel confident in the results of the testing; (4) **no data**; and (5) **clear passes**, requiring no further controls.

39.    As discussed, based on the **clear fail** category, SunCoke must immediately spend, at minimum, $62 million to bring its facilities into compliance with the new MACT floor emission limits. For the reasons provided above, more testing may reveal significant additional costs in this category, which could increase to $99 million.

40.    Depending on what future testing reveals, SunCoke will also need to install additional controls wherever the data show that emissions

- 16-

EXH253

ED_018388_00000109-00115

are near numerical MACT floors (i.e., the **marginal passes** category described above). SunCoke has data showing that *many* of its facilities are meeting the new MACT floor limits, but not with a comfortable margin of error.

    a.  For example, in June of 2017, a trial was conducted on the main stack of SunCoke's facility, MTO, to ascertain its PAH emissions. The Final Rule's MACT floor for main stack PAH emissions is 4.80E-07 gr/dscf. Here are the measurements that were obtained from the trial: (1) 3.05E-07, (2) 4.48E-07, and (3) 3.16E-07. The test result was 3.56E-07, which is 74% of the MACT floor limit. So if the Final Rule were in effect in 2017, MTO would have passed—but only marginally. This is only one example of a marginal pass.

41.    SunCoke is uncomfortable operating anywhere close to the edge of noncompliance. Correcting all marginal passes in all SunCoke's facilities—based on the limited data currently available—could require expenditures of up to $260,000,000.

42.    If testing reveals that additional controls are needed for emissions that currently appear to satisfy the MACT floor limits (i.e, the

- 17-

EXH254

ED_018388_00000109-00116

**pass, but an insufficient amount of data** category), or where there is simply no data at all (i.e., the **no data** category), I anticipate that SunCoke may need to spend as much as $874,000,000 to bring its facilities into compliance.

43.    All told, depending on what additional testing reveals, SunCoke could be required to spend $1,200,000,000 to bring its facilities into compliance.

44.    To design, test, and install such significant controls would require at least 6–7 years. And it is not clear that SunCoke could obtain the supplies it would need—which could further extend the compliance timeline.

45.    To be clear, it is not known at this time whether SunCoke will be forced to spend such exorbitant sums. But this places SunCoke in an untenable position because the compliance deadline of December 5, 2025, is not far away. Without more testing, SunCoke cannot justify spending hundreds of millions of dollars on additional controls. Without those controls, however, it might fall into noncompliance and incur severe penalties in December 2025.

EXH255

ED_018388_00000109-00117

46.    Any money SunCoke spends bringing its facilities into compliance is lost forever. SunCoke can never expect EPA to cover any of SunCoke's costs for testing or additional controls—even if a court eventually vacates the Final Rule. And any additional controls would not benefit the coke production process in any way.

**Complying with Some Limits Is Simply Impossible.**

47.    In some instances, for safety reasons, SunCoke will *never* be able to comply with the new MACT floor limits for the bypass vent stacks.

48.    According to SunCoke's data, there are particulate matter failures at *four* of its six plants, marginal passes for mercury and acid gas, and a lack of data for PAHs and formaldehyde.

49.    Here are just two examples:

a. In November of 2020, a trial was conducted at the bypass vent stack of SunCoke's facility, IHO, to ascertain its particulate matter emissions. The MACT floor is 3.20E-02 gr/dscf. Here are the measurements obtained: (1) 4.54E-02, (2) 1.43E-01, (3) 4.48E-02, and (4) 2.79E-02. The test result was 6.52E-02, which is 204% of the Final Rule's MACT floor limit. So if the

- 19-

EXH256

ED_018388_00000109-00118

Final Rule were in effect in 2020, IHO would have exceeded the particulate matter limit for its bypass vent stacks.

b. Similarly, in October of 2021, a trial was conducted at the bypass vent stack of HH1 to ascertain its particulate matter emissions. Here are the measurements obtained: (1) 3.23E-02, (2) 5.97E-02, and (3) 4.94E-02. The test result was 4.72E-02 gr/dscf, which is 147% of the Final Rule's MACT floor. So if the Final Rule were in effect in 2021, IHO would have exceeded the PM limit for its bypass vent stacks.

50. *There are no controls that can be applied to correct these failures.* As discussed, a heat recovery coke oven normally operates under negative pressure (under vacuum) when in operation. The negative pressure is pulled by a set of induced draft fans, which require power to run. The operation of a heat recovery coke oven/battery under negative pressure stops volatile matter and flue gases from leaking out of the ovens and system.

51. If the system fails for any reason, including power loss, the facility's flue gas must be released in a safe manner or else the pressure build-up will find a path to exit the gas handling system, creating a

EXH257

ED_018388_00000109-00119

severe fire hazard. In other words, if the induced draft fans are shut down or out of commission from a power failure or other failure, the whole system—including the ovens—would have positive pressure. When under positive pressure, the volatile matter at the oven can be released from the doors, air-inlets, or other openings. The uncontrolled release path would likely put plant personnel at a safety risk, cause an environmental release, and potentially damage plant equipment.

52.     The vent stack is the means to maintain negative pressure even during a power failure. Generally, bypass stacks are held closed by powered pistons and negative pressure on the ovens is maintained by other means. If the pistons ever cease operating, the by-pass stacks open automatically. When open, the resulting draft creates negative pressure. A passive safety device is crucial for personnel safety around the ovens. But if any control is applied to the vent stack, the natural draft will be blocked and the back pressure will cause the dangerous and damaging uncontrolled release.

53.     In any event, applying a control to the vent stack would be futile because controls require power to run. As discussed, one of the central purposes of the vent stack is to maintain negative pressure in the

- 21-

EXH258

ED_018388_00000109-00120

event of a power loss. If there is no power, the controls on the vent stack would not function to prevent emissions.

54.    If SunCoke were to install a full back-end control system on the vent stacks to comply with any of the new MACT vent stack limits, the new pathway (post-treatment) would be a new main stack by definition. So the vent stack limits would not apply. Instead, the new main stack limits would come into play. And SunCoke would need to create additional bypass vent stacks to ensure negative pressure can always be maintained. And then the same problems would apply to the new bypass vent stacks. Thus, for safety reasons, compliance with the new limits is impossible.

## SunCoke Supplies Coke to the Steel Industry and Serves the Public Interest.

55.    The United States steel industry depends on SunCoke to supply it with a significant portion of the Country's blast furnace coke and foundry coke. Blast furnace coke is used by steelmakers to produce strong, lightweight steel that is necessary for automobiles (including electric vehicles), infrastructure such as pipelines and bridges, defense equipment, and more. Foundry coke, which SunCoke produces solely at JWO, is used to produce auto parts (e.g., brakes and engine parts),

- 22-

EXH259

ED_018388_00000109-00121

railroads, municipal/water infrastructure (e.g., piping, fire hydrants, and manhole covers), military equipment (e.g., vehicles, gear, and firearm parts).

56. Without steel, the United States economy and its infrastructure would collapse. SunCoke produces approximately 40% of the entire domestic coke supply used by the domestic steel industry. SunCoke is the largest independent blast furnace coke producer in North America, with an annual 4.2 million tons of coke production capacity. JWO is one of only two domestic foundry coke producers, and it supplies a significant amount of foundry coke in the United States market. If SunCoke could not produce its coke, the existing United States blast furnaces would be forced to find a foreign source of coke, most likely from China, to replace SunCoke's much cleaner coke. SunCoke is such a substantial supplier of coke to the United States steel industry that there is no way that SunCoke's blast furnace coke could be replaced by any domestic supplier.

57. SunCoke has the youngest, most advanced fleet of cokemaking facilities in the United States. The average age of the SunCoke facility is 23 years—which compares favorably to the average

- 23-

EXH260

ED_018388_00000109-00122

age (45 years) of all other United States/Canadian ByP cokemaking facilities. In fact, in the past ten years, many coke plants owned by SunCoke's competitors have closed their doors because of deteriorating facilities and environmental challenges.

58.     SunCoke provides approximately 900 well-paying jobs in the United States. Forty percent of SunCoke's workforce belongs to the United Steelworkers' Union.

59.     For the reasons described above, it is my opinion that if this Final Rule is not stayed and corrected, it will financially cripple the coke industry, likely cause shutdowns of some cokemaking facilities, and thereby severely impair the production of blast furnace steel in the United States.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Dated on September 30, 2024

By: _John F. Quanci_

_____

John Quanci

- 24-

EXH261

ED_018388_00000109-00123

 **United States Steel**

March 31, 2025

Hon. Lee M. Zeldin
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

**VIA E-MAIL**
airaction@epa.gov

Dear Administrator Zeldin:

*Re:*     ***Request for Clean Air Act Section 112(i)(4) Presidential Exemption from***
          ***National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing,***
          ***Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and***
          ***Technology Review, and Periodic Technology Review, 89 Fed Reg. 55684 (July 5, 2024)***
          ***("Coke RTR Rule")***
          ***United States Steel Corporation – Mon Valley Works, Clairton Coke Plant***

United States Steel Corporation (U. S. Steel) respectfully requests a Presidential
Exemption for the compliance with the National Emission Standards for Hazardous Air
Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries;
Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed. Reg. 55684
(July 5, 2024) (the "Coke RTR Rule") for its Clairton Coke Plant in Clairton, Pennsylvania.
Among other things, the Coke Ovens Rule promulgated new and revised National Emission
Standards for Hazardous Air Pollutants (NESHAP) for the Coke Ovens: Pushing, Quenching,
and Battery Stacks (PQBS) source category (40 C.F.R. Part 63 Subpart CCCCC) and the Coke
Oven Batteries (COB) source category (40 C.F.R. Part 63 Subpart L). As specifically noted
herein, technology to implement these requirements are not available and it is in the national
security interests of the United States that such an exemption be granted.

On March 12, 2025, EPA announced that it was taking appropriate action to advance
President Trump's initiative of "Powering the Great American Comeback." As part of that effort,
EPA indicated that it was reconsidering the Coke RTR rule as well as several other rules; and
advised that "any source interested in a Presidential Exemption, should provide their
recommendations to EPA by March 31, 2025;" and that sources need only provide why
technology is unavailable and why it is the national security interests of the United States to
provide the exemption. In response to that announcement, and consistent with our previously
submitted petition for judicial review, petition for administrative stay and reconsideration, and
request for extension pursuant to Clean Air Act Section 112(i)(3)(B), U. S. Steel is submitting its
request for a Presidential Exemption pursuant to Clean Air Act Section 112(i)(4) for the Coke
RTR for its Clairton plant, the largest coke plant in North America, located in Clairton,
Pennsylvania.

EXH262

ED_018388_00000141-00001

Hon. Lee M. Zeldin
March 31, 2025
Page 2

## EXECUTIVE SUMMARY

U. S. Steel is respectfully requesting a two-year Clean Air Act § 112(i)(4) Presidential Exemption from all of the 2024 Coke MACT amendments -the Coke RTR Rule- because, as U. S. Steel has clearly shown in prior submissions to EPA, no coke plant is actually meeting the HAP limits; nor does any coke plant employ technology that demonstrates the limits can consistently be met. Furthermore, even outside the coke industry, no technology exists that has demonstrated that the limits can consistently be met. U. S. Steel's efforts to comply with the 2024 amendments to the Coke RTR Rule would result in significant, adverse financial and operational impacts to the company and the domestic steel industry. Without a Presidential Exemption, U. S. Steel's and the domestic steel industry's ability to provide for the critical infrastructure, investments and national security would be significantly compromised.

## EXEMPTION REQUEST

The President has the authority to grant exemptions from NESHAP emissions standards of up to two years pursuant to Clean Air Act (CAA) § 112(i)(4) and 40 C.F.R. § 63.6(j).

U. S. Steel is requesting a two-year Presidential Exemption, with the possibility to extend the period for additional periods if necessary and appropriate as authorized under the Clean Air Act, of the following Coke RTR Rule compliance requirements for U. S. Steel's Mon Valley Works Clairton Coke Plant, 400 State Street, Clairton, Pennsylvania 15025:

1. July 7, 2025, compliance date to begin fenceline monitoring (*see* § 63.314);

2. July 7, 2025, compliance date to begin complying with the revised limits for allowable leaks from coke oven battery doors, lids, and offtakes and related reporting (*see* § 63.302(a)(4), § 63.302(d), § 63.304(b)(8), and § 63.311(h); and

3. January 5, 2026, and July 7, 2026, compliance dates to begin complying with MACT standards for sources in the PQBS NESHAP and related reporting (*see* § 63.7283(d), § 63.7341(f), and § 63.7300(c)(4)).

A two-year Presidential Exemption of these compliance dates is necessary and appropriate to prevent irreparable harm to the domestic metallurgical coal and domestic steel industry and is supported for the reasons provided below.

## BACKGROUND

In CAA § 112(i)(4), Congress gave exclusive authority to the President to "exempt any stationary source from compliance with any standard or limitation under this section [Clean Air Act Section 112] for a period of not more than 2 years if the President determines that the technology to implement such standard, which has been recognized as including "unavailable in time for

EXH263

ED_018388_00000141-00002

Hon. Lee M. Zeldin
March 31, 2025
Page 3

installation and operation,"[1] is not available and that it is in the national security, which includes economic security,[2] interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph." While the provision has very little precedent in being exercised, if there were ever a time to exercise such authority, the time to do so is now with respect to the Coke RTR rule as the Coke RTR rule, without such an exemption and if left in place, would result in materially adverse consequences on U. S. Steel and domestic steel industry. These consequences would significantly and harmfully alter domestic steel production as well as the United States' infrastructure, investments and economic security landscape which as the current and prior administrations have determined that the domestic steel industry is a key, vital component.

While the President has broad authority in issuing such exemptions and while not controlling to issuing Presidential Exemptions, we note that in implementing extensions under Clean Air Act Section 112(i)(3)(B), EPA has broadly construed "standards" to include compliance measures. (See 66 Fed. Reg. 16318, 16328 (Mar. 23, 2001) Such "other compliance measures" include, among other things, "… obtaining or implementing technology hardware or software systems and process changes to accommodate pollution prevention or other emission reduction measures." Id.

U. S. Steel, individually, and as part of the American Coke and Coal Chemicals Institute (ACCCI) and Coke Oven Environmental Task Force (COETF), submitted comments on the proposed Coke RTR Rule and filed petitions for administrative reconsideration and applications for stay of the final Coke RTR Rule urging EPA to reconsider numerous aspects of the Coke Ovens Rule and to stay the effective date pending promulgation of replacement regulations.[3] These comments, petitions, and applications are incorporated into this request by reference. In addition, these concerns are subject to petitions for judicial review with the United States Court of Appeals for the District of Columbia Circuit.

We appreciate EPA's recent granting reconsideration of the Coke RTR Rule. Granting the Presidential Exemption is critical to prevent disruption of the domestic steel industry and is appropriate while EPA reconsiders the Coke RTR Rule.

---

[1] 90 Fed. Reg. 6,773, 6,774 (Jan. 17, 2025).

[2] See America First Investment Policy, https://www.whitehouse.gov/presidential-actions/2025/02/america-first-investment-policy/ (Feb. 21, 2025) ("Economic security is national security.")

[3] See U. S. Steel Petition for Reconsideration and Stay of the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (Sept. 3, 2024); and American Coke and Coal Chemicals Institute (ACCCI) and Coke Oven Environmental Task Force (COETF) Petition for Reconsideration and Stay of the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (Sept. 3, 2024).

EXH264

Hon. Lee M. Zeldin
March 31, 2025
Page 4

## TECHNOLOGY IS UNAVAILABLE

### A. Fenceline Monitoring Requirements

For the reasons set forth in U. S. Steel's and the ACCCI/COETF petitions for reconsideration, the fenceline monitoring benzene action level in the Coke Ovens Rule is overly stringent and is not based on modeling showing the correct highest benzene concentration at the facility fenceline using allowable (vs. actual) emissions.

To implement the fenceline monitoring requirements, new currently undeveloped emission controls and new leak detection/repair programs must be evaluated, designed and installed to comply with the action level.   The technology that would be used to comply with the fenceline monitoring requirements and action level are not known and, therefore, are unavailable at this time.  Due to the complex nature of coke facilities, this potentially involves engineering suitable capture and control systems at multiple locations.  Identifying these locations and engineering controls for them takes much longer than one year, and may involve permitting new emission controls, which would delay installation of controls.  In addition, additional time is needed to install the benzene fenceline monitoring and meteorological stations.  Siting the monitoring locations, specifically the locations around the non-source category operations will take additional time to determine the delta c.  In addition, for the reasons set forth in the ACCCI/COETF and U. S. Steel petitions for reconsideration, the fenceline monitoring benzene action level in the Coke RTR Rule, which is not health-based, was incorrectly determined, is overly stringent, and is not based on modeling showing the correct highest benzene concentration at the facility fenceline using allowable (vs. actual) emissions.

In further support of the Presidential Exemption, additional compliance time beyond one year is also needed to develop (and for EPA to approve) the facility-specific monitoring plans, which are a compliance measure technology, that are required under the rule.  Thus, the technology to implement the requirements is not available.  Identifying specific source contributors to each fenceline monitoring location poses significant challenges due to the closely located sources (e.g., coke batteries, byproduct recovery plant, storage tanks, marine barges, etc.) within a coke facility, which is unlike more widely spaced sources common in the petroleum refinery sector.

Likewise, "root cause" investigations required by the Coke RTR Rule add significant time and complexity, considering the many miles of piping and thousands of valves and flanges at a coke facility.  Projects to reduce benzene emissions further include redesign, fabrication, and installation or modification of process vessels, tar decanters, gas blanketing and vapor collection systems, replacing sections of coke oven gas piping, and redesign of tar and light oil loadout systems to reduce allowable fugitive emissions or leak rates.

Because the Clairton plant is complex and has numerous "non-categorical" operations – which fall outside the scope of the requirements, the standard fenceline monitoring requirements are not appropriate or feasible.  It will take U. S. Steel more time to generate sufficient data and

EXH265

Hon. Lee M. Zeldin
March 31, 2025
Page 5

information necessary to determine any sources of benzene and to implement any additional controls or operational modifications to reduce benzene emissions as well as to develop a site-specific monitoring plan. Furthermore, because EPA is given 120-days to review and approve any site-specific monitoring plan, and there may be additional time needed to respond to any inquiries, a Presidential Exemption from this standard is appropriate and necessary.

The technology to appropriately install and implement real-time monitors is not currently available for the Clairton plant. The Final Rule failed to address multiple issues with real-time monitors, including the technical feasibility of locating and installing real-time monitors, the difficulty using real-time benzene monitor data and the 2-week average benzene monitor data at the fenceline to determine an appropriate delta c, the complexity of using these monitors at coke facilities, and the cost of installing and operating monitors. U. S. Steel had no opportunity to raise objections to this change or to provide information on the feasibility and reasonableness of requiring real-time monitors for these purposes. These provisions were not proposed and are not a logical outgrowth of the proposed coke RTR rule. Had EPA provided this opportunity, U. S. Steel would have provided information on the cost and infeasibility of real-time monitors, demonstrating that the use of real-time monitoring requirement for the purposes of the Coke RTR Rule is not appropriate or feasible.

## B. Unsupported and Arbitrary Revised Standards for Coke Oven Battery Doors, Lids, and Offtakes

The Coke RTR Rule lowered allowable leak limits for coke battery doors, lids, and offtakes and for the first time imposes more stringent leak rate allowables for coke battery doors on a single facility (U. S. Steel – Clairton Plant) based on annual coke production. However, U. S. Steel and industry commenters informed EPA that there have been no improvements or other changes in leak control practices in the industry, which means that facilities cannot consistently meet the revised leak rate allowables without additional time to develop and install controls or measures that would be needed to achieve compliance.

For coke oven doors, more time is needed to perform technical evaluations to identify ways to reduce door leaks to comply with the new limits. This may include replacing door machines, rebuilding or replacing oven doors, and redesigning door-jamb cleaning mechanisms, all of which are means to control leaks around coke oven doors. The time needed to engineer, fabricate, and install two new door machines could take 5-6 years to complete and costs approximately $20 million. The time to rebuild or replace oven doors on a typical battery with 82 doors is up to three years to engineer, fabricate, and install.

For coke battery lids and offtakes, more time is needed to research and trial ways to reduce leaks to comply with the revised limits. Control methods include redesigning or replacing lids or developing different sealing materials. The time needed to engineer, fabricate, and install replacement lid and offtake components is a minimum of 2-3 years to complete.

In the Coke RTR Rule, EPA removed startup, shutdown and malfunction (SSM) provisions that are important to U. S. Steel's Clairton Plant's ability to meet the existing limits. For example, with the loss of beneficial carbon in the battery during SSM events, stack, charging

EXH266

Hon. Lee M. Zeldin
March 31, 2025
Page 6

and potentially other emissions are adversely affected. In addition, during certain SSM events, flares must be used, which EPA already has recognized as a necessary practice. Any limits must include allowances for SSM events; or alternatively, have SSM-specific work practice requirements in lieu of the MACT limits.

Finally, while in 2020, EPA determined that no technology developments warranted any technology changes to the existing MACT standards, in 2024, EPA did an about-face, and without identifying any specific technology developments, unlawfully lowered the acceptable leak rates for coke plants simply because in response to information collection requests, some facilities, including most significantly, U. S. Steel's Clairton plant, provided data that was better than the existing leak rate limits. This unlawful action was further exacerbated as applied to U. S. Steel, since it singled out the Clairton plant, and arbitrarily and capriciously imposed an even lower door leak rate that only applies to the Clairton plant — based upon coke production rates — without identifying any technology or practice development in use by U. S. Steel — just that it's leak rates were the lowest. When U. S. Steel commented on this absurdity, EPA simply threw up its hands and asserted that, "there is a strong basis to infer" that larger facilities are more effective at employing work practices. U. S. Steel respectfully notes that "more effective at employing work practices" is not a technological development. Even more astonishing, in response to the comments, EPA tries to boldly, but inappropriately, shift the burden on U. S. Steel by responding that commenters have not suggested an alternative basis on why the data at Clairton are better than other sources. The "inferences" asserted by EPA are not a sound or legal basis for setting more stringent standards under its authority under Section 112(d)(6) of the Clean Air Act. EPA has an obligation to support its basis and determinations with facts with a nexus to the standards – and not simply impose lower standards because a certain source or sources in implementing a program to comply with the existing MACT standards perform better than others.

## C. New Improper, Incorrect MACT Standards for the PQBS Source Category

The Coke RTR Rule includes 18 new MACT standards covering multiple hazardous air pollutants (HAP). However, the technology to control these HAP at these sources is not available because no such technology has been demonstrated to control and meet the Coke RTR Rule HAP limits for the coke byproduct recovery industry, either in the US or internationally.

The 18-month compliance period (i.e., January 5, 2026) provided in the Coke RTR Rule was based on EPA's incorrect and unsupported assumption that the only thing sources subject to the Coke RTR Rule would need to do to comply with the new limits would be to test to confirm EPA's assumption that facilities *can meet* all of the new MACT limits. EPA failed to address specific concerns and data submitted by U. S. Steel and other commenters showing that facilities *cannot meet* the new standards without costly and time-consuming projects to install additional control equipment and other measures. EPA slightly revised some of the final MACT limits compared to EPA's original proposal. However, the Hg MACT limit is unchanged; and EPA did not address data submitted by commenters showing raw material (i.e., coal) and process variability that affect emissions.

EXH267

Hon. Lee M. Zeldin
March 31, 2025
Page 7

Facilities that cannot meet these unachievable standards need much longer than 18 months to complete the testing, engineering, fabrication, and installation of controls and other equipment, assuming compliance with the new MACT standards is even feasible. A Presidential Exemption is warranted for several reasons:

- No technologies employed at any coke facility have demonstrated the ability to meet the new MACT standards.

- Contrary to the Clean Air Act, the Coke RTR Rule imposes requirements that no source, domestically or globally, is known to actually achieve.

- Contrary to the Clean Air Act and EPAs obligations, EPA failed to consider the Coke RTR Rule's impacts to the domestic coke and integrated iron and steel industry and the nation's economic security and national growth interests

- Because the Coke RTR Rule is based upon insufficient data, attempts to continuously comply with the new limits will require the addition of controls. Furthermore, even with the installation of and operation of additional controls, continuous compliance with the new limits remains uncertain as there are no proven controls at this time. The estimated cost effectiveness of controls for the by-product coke industry would be unprecedented and exorbitant. Because the new limits are not based upon proven technologies as Congress intended and as EPA has historically done to comply with Section 112 of the Clean Air Act, U. S. Steel must incur substantial unrecoverable costs in its attempt to design and implement controls that will attempt to consistently meet the new limits in an impossible time period resulting in irreparable harm to U. S. Steel. Contrary to EPA's claim that no coke plant would be required to put on controls to meet the new MACT limits, data in EPA's possession suggests that continuous compliance cannot be met without modifications at coke facilities.

- Sources, including the Clairton plant, need to generate additional data to better account for raw material and process variability. The MACT floor datasets are too limited, are not representative of the coke industry, and do not adequately reflect variability in operating conditions (e.g., normal coking time vs. extending coking time) or variability in raw material inputs, such as coal characteristics. As a result, no technology is available that has demonstrated that the new limits are achievable under all reasonably foreseeable conditions. To address these issues, U. S. Steel and other commenters suggested that EPA include a process to address such variability when determining the MACT standards as EPA did with the Brick MACT by including an intra-quarry variability (IQV) factor when developing the MACT standards. In promulgating the Coke RTR Rule, EPA rejected these comments and did not include a variability factor when setting the MACT standards.

- Controlling multiple pollutants and retrofitting controls into existing equipment and operations adds complexity and time due to interactions of the requirements for control, including pollutant interactions, flow rates, chemistry, and temperatures.

EXH268

Hon. Lee M. Zeldin
March 31, 2025
Page 8

- There is a general lack of confidence that there is any feasible control technology for hydrogen cyanide (HCN). Air pollution control vendors indicate that any potential solution for control of HCN is not technically feasible for coke battery combustion stack or pushing emissions.

- Any additional controls would require permitting, which takes 6-12 months after engineering is completed.

- The coke battery underfiring system is naturally drafted, with the underfire gas stream predominantly located underground. Added equipment such as heat exchangers, sorbent injection systems, etc., result in static pressure loss, necessitating installation of an induced draft fan. The impacts of added fans and equipment need to be studied to ensure adequate heating of the batteries, as well as enough physical space to install additional equipment, which may not be feasible. This poses obstacles and engineering challenges for any new add-on equipment, which could include construction of a new battery combustion stack.

- Changes to the underfiring system requires coke battery outages, during which purchased natural gas is needed to keep the battery hot. All coke production would cease; and battery refractory brick and other equipment could suffer unanticipated damage, which takes more time and expense to correct. Furthermore, for a plant like U. S. Steel's Clairton plant, outages will require staggering across batteries to prevent upset conditions at downstream processes.

- Limited available physical space within coke oven battery areas requires vertical construction, adding complexity and time to all related construction, and may be infeasible altogether.

- Adding controls on mobile pushing emission control devices involves unique engineering challenges compared to stationary sources.

- As noted above, EPA failed to appropriately address SSM events in setting the MACT limits and requirements. U. S. Steel believes a work practice requirement in lieu of hard limits is appropriate to account for SSM events.

Unfortunately, U. S. Steel's concerns as provided in comments submitted to EPA as well as those raised with the Office of Management and Budget before the Coke RTR Rule was finalized were almost entirely ignored. First, during the rule development, EPA grossly underestimated the cost impacts of the rule to the domestic steel industry Second, the compliance schedule required by EPA is woefully inadequate. In addition, EPA cherry-picked data to be used in the derivation of limits and requirements, and, most astonishingly, excluded valid data as the process fell short of EPA's statutory obligation and precedent in setting MACT floors.

Given numerous concerns regarding the feasibility in implementing the new Coke RTR Rule requirements and the fact that technology to achieve the standards in the Coke RTR Rule is unavailable, industry commenters, including U. S. Steel, requested a full three-year compliance

EXH269

ED_018388_00000141-00008

Hon. Lee M. Zeldin
March 31, 2025
Page 9

schedule to implement the Coke RTR Rule because that time is necessary for facilities to, among other things, better determine process and raw material variability impacts on emissions, evaluate additional emission controls and to assess technical feasibility and to test, engineer, permit, fabricate, and install the new equipment and other controls before the date compliance is required. Additional compliance time would also be needed to retrofit new equipment into existing facilities with limited space and to allow facilities to streamline and consolidate compliance testing of battery stacks and pushing emission control devices with other required source testing. The Presidential Exemption is necessary to account for these factors and to prevent irreparable harm to the domestic steel industry; and is appropriate as EPA reviews petitions for reconsideration.

## THE EXEMPTION IS IN THE INTEREST OF NATIONAL SECURITY

### A. The Clairton Plant is Vital to the Production of Steel at U. S. Steel

U. S. Steel's Clairton plant is the largest coke plant in North America. The Clairton plant is an essential operation of U. S. Steel and is critical for U. S. Steel to produce steel. The Clairton Plant operations have a tremendous impact on the local, regional, and national economy. The Clairton Plant employs approximately 1,400 highly skilled United Steelworker union-represented and non-represented employees. Since the Clairton Plant is the nation's largest producer of coke and coal chemicals, its operations have a multiplier effect in supporting thousands of additional steel plant, chemical, energy, transportation, and supplier jobs, not only in the Clairton area in Allegheny County, and the Southwestern Pennsylvania region, but also across the United States.

### B. U. S. Steel Contributes to the Economic Security of the United States, and Economic Security is National Security

U. S. Steel is a leading steel manufacturer in the United States and Europe. U. S. Steel has over 22,000 dedicated employees and produces over 1,000 grades of steel. For more than 100 years, while consistently meeting new challenges, U. S. Steel has been a vital part of America's history, economy, and infrastructure. U. S. Steel's operations located throughout the United States include, among others, coke production, taconite production and integrated iron and steel production, which contribute to the U.S. economy and key industries.

Continued domestic coke production, including the production by U.S. Steel, is critical to national infrastructure investments and national economic growth. The domestic steel industry is responsible for over $520 billion in economic output, supporting over 2 million jobs. It generates over $56 billion in tax revenues annually. U. S. Steel specifically supplies steel to the U.S. transportation and automotive sectors, including major U.S. automakers; the construction sector; containers and packaging sector; appliances and electrical equipment sector; and oil, gas, and petrochemicals sector. For these industries which are critical to U.S. economic security U. S. Steel provides high quality domestically produced steel. U. S. Steel is also a major contributor to the communities in which it operates – including, among others, those in Alabama, Arkansas, Pennsylvania, Indiana, Illinois, and Michigan directly and indirectly supporting jobs and economic growth, which underpin the United States' economic security. As stated in the

EXH270

ED_018388_00000141-00009

Hon. Lee M. Zeldin
March 31, 2025
Page 10

President's America First Investment Policy, "economic security is national security." Consistent with this, the Federal government has determined that the steel industry is "critical to minimum operations of the *economy* and *government*."[4]

In the case of steel, the history of U.S. Government actions to ensure the continued viability of the domestic steel industry demonstrates that, across decades and Administrations, there has been consensus that domestic steel production is vital to our national interest. The overall security of the nation is dependent upon a strong economy and investments in industry and infrastructure. All of these goals are supported by the steel industry, and it needs to have protection from the proposed rules until such time as a proper review can take place.

The unprecedented and exorbitant costs that U. S. Steel would need to incur to attempt to comply with the Coke RTR Rule would risk U. S. Steel losing viable commercial production capabilities and will jeopardize the domestic industry's ability to meet the full spectrum of infrastructure and investment needs. Ensuring that U. S. Steel and other steel producers are able to continue to produce steel in the market for U.S. commercial and infrastructure needs is necessary to grow the U. S. market and economy.

The Coke RTR Rule, as well as the other rules affecting the domestic steel industry, will result in unprecedented costs which will jeopardize the long-term operations of U. S. Steel (and other steel producers.) If U. S. Steel is not financially viable to invest in the latest technologies, facilities, and long-term research and development, nor retain skilled workers while attracting a next-generation workforce, it will be unable to support the nation's infrastructure, economy and commercial needs.

### C. Cumulative Burden

In 2024, EPA promulgated three new steel sector rules[5] resulting in dozens of new emission limits and work practices materially impacting the domestic iron and steel critical operations in the United States. A Presidential Exemption is necessary to prevent significant direct adverse impacts and irreparable harm to domestic steel production and infrastructure.

The promulgation of these three rules, simultaneously with other recent significant EPA actions, including most notably, the lowering of the PM2.5 NAAQS and the adoption of the

---

[4] Department of Commerce, Bureau of Export Administration; *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security*, October 2001

[5] The three rules at issue are:

1) National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-EPA-OAR-2002-0083), April 3, 2024, *Federal Register*, (89 Fed. Reg. 23294)

2) National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries, (EPA HQ OAR 2002 0085 and EPA HQ OAR 2003 0051), July 5, 2024, *Federal Register*, (89 Fed. Reg. 55684); and

3) National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments (EPA-HQ-OAR-2017-0664), March 6, 2024, *Federal Register*, (89 Fed. Reg. 16408).

Hon. Lee M. Zeldin
March 31, 2025
Page 11

overreaching Good Neighbor Rule, harm the competitiveness of the domestic steel industry and jeopardizes the domestic steel industry's ability to support the economy, growth and critical needs of the nation. These rules, individually and collectively, result in marginal, if any, benefits, yet result in unprecedented capital expenditures of billions of dollars for the domestic steel industry. These draconian, job-killing, unlawful rules were promulgated notwithstanding that EPA determined that the existing MACT regulations provide acceptable risks with an ample margin of safety.

In addition, it is significant to note that in 2020 EPA previously completed its statutory obligation to determine risks and to review technological developments for the taconite and integrated iron and steel categories and determined that no significant revisions to these rules were necessary. However, in 2024, EPA unilaterally reversed course and mandated that the industry comply with dozens of new limits and requirements that will require hundreds of millions if not billions in capital expenditures   and even then   compliance with some of the new limits cannot be assured as the limits are based upon insufficient data and are based upon unproven, untested technologies for the limits imposed. If left in place, the domestic steel industry may be left to choose between prematurely shuttering mills, resulting in job losses and irreparable harm to their local communities, or making huge investments to develop technologies that have no proven application in the steel sector. In short, these rules stand to paralyze an industry that currently leads the world in the pathway to clean steel production. These rules, if left in place, would further skew the market to the benefit of foreign manufacturers and state-owned enterprises   in particular, Chinese state-owned steel producers, which dominate the global steel industry – and which are held to less stringent environmental standards.

Without a Presidential Exemption, the Coke RTR Rule would create significant, unprecedented burdens for domestic metallurgical coke production and steel industry as well as manufacturers and negatively impact the workforce, who are a vital part of the U.S. economy. In addition, the Coke RTR Rule would substantially raise costs to consumers across the country and would likely cause harm to the domestic economy and supply of materials for infrastructure and growth.

The importance of avoiding these harms to the coke and steel industry is emphasized in a December 6, 2023 letter from eight U.S. Senators – including then-Senator JD Vance – to EPA warning that the Coke Ovens Rule and two other rules aimed at the steel sectors "… would dramatically undermine the domestic steel industry and national security while driving production overseas likely resulting in no net reduction in emissions from the steel industry globally."[6]

Likewise, in a June 14, 2024 letter six U.S. Senators – again including then-Senator Vance   urged EPA to reconsider the Coke Ovens Rule and two other rules aimed at the steel industry, warning that "… the steel industry will be forced to proceed with planning and spending for unproven technologies and work practices while the final provisions of the rules remain uncertain. Given that these regulations will impact nearly every aspect of the integrated

---

[6] Letter from U.S. Senators Vance, Brown, Braun, Manchin, Casey, Klobuchar, Capito, and Young to Administrator Regan, p. 1 (Dec. 6, 2023) (Att. A).

Hon. Lee M. Zeldin
March 31, 2025
Page 12

iron and steelmaking process, it is imperative that EPA grant both the petitions for reconsideration and requests for stay of the rules."[7]  Similar concerns were raised in a letter to EPA from Congress Members Crawford and Mrvan of the Congressional Steel Caucus.[8]

Without a Presidential Exemption, the Coke RTR Rule would require immediate actions by U. S. Steel that unfairly burden U. S. Steel, impose actions that are either unsafe, unlawful, impossible, impractical and/or are ineffective; and require U. S. Steel to spend tens of millions if not hundreds of millions of dollars on unproven technologies, thereby impacting its ability to support the nation's growing economy, infrastructure needs, and continued thriving national investments.

## **CONCLUSION**

Thank you for the opportunity to provide this Request for a Presidential Exemption.  The bases of granting an exemption are well grounded in the facts that support a clear finding that the technologies to implement the Coke RTR Rule are not available, and because of the financial and infrastructure implications, it is in the interest of national security to grant the request. Furthermore, while not a factor specifically listed as a basis for the exemption, it is important to note that granting the request will not result in any unacceptable risks to the public or the environment as EPA has determined that the integrated iron and steel source category presents acceptable risks with an ample margin of safety with the present controls, and requirements and limits already in effect to which U. S. Steel consistently demonstrates compliance.  If you have questions or need additional information, please contact me (412) 233-1200.

Sincerely,

Matthew J. DeLibero
U. S. Steel Mon Valley Works
Director Environmental, Reliability, & Operational Excellence

cc:    A. Szabo, EPA OA
       J. Schwab, EPA OA
       A. Tardif, EPA OAR
       S. Hamilton, EPA OAR
       P. Tsirigotis, EPA OAQPS

---

[7] Letter from U.S. Senators Vance, Brown, Braun, Casey, Klobuchar, and Young to Administrator Regan, p. 2 (June 14, 2024) (Att. B).
[8] Letter from Congressmen Crawford and Mrvan to Administrator Regan, p. 1 (Dec. 18, 2023) (Att. C).

Hon. Lee M. Zeldin
March 31, 2025
Page 13

       P. Lassiter, EPA OAQPS
       M. Dzurinko, USS
       C. Hardin, USS
       M. Jeffrey, USS
       B. Tunno, USS
       T. Woodwell, USS

# ATTACHMENT A

EXH275

ED_018388_00000141-00014

# United States Senate

WASHINGTON, DC 20510

December 6, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Dear Administrator Regan:

We write to you today regarding the U.S. Environmental Protection Agency's (EPA) three proposed rules related to steel manufacturing and related supply chains. We have serious concerns with these proposed rules because they would dramatically undermine the domestic steel industry and national security while driving production overseas likely resulting in no net reduction in emissions from the steel industry globally. Reducing the emission of harmful air pollutants should be done based upon sound science and with proven technology that is both technically and economically feasible. The irony is that the United States' steel industry is world's cleanest major producer of steel[1]. American steel manufacturers take seriously their commitment to protecting the environment; however, rules that drive production overseas are bad for our economy, bad for national security, and bad for the environment.

These rules:

1) National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-EPA-OAR-2002-0083), 2) National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries. (EPA  HQ  OAR  2002  0085 and EPA  HQ  OAR  2003  0051), and 3) National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments (EPA-HQ-OAR-2017-0664), if finalized as proposed, would require billions of dollars in capital investments and increased annual operating costs for the U.S. steel industry.

We support reducing harmful air pollution. We also support rules that are durable, realistic, and based upon proven technology and reflect a consensus view among stakeholders on how to best improve public health while protecting good paying jobs and supporting industries essential to our national and economic security.  These rules fail to meet those standards.

As you move forward with these rulemakings, we urge you to take an inclusive approach – working directly with major stakeholders in developing technically-sound final rules that achieve further emissions reductions while not harming the competitiveness of our American steel companies. Written properly, regulations can help American steel manufacturers lead the world in clean steel production.  Poorly written rules undermine domestic manufacturing and promote reliance upon inputs made by foreign manufacturers    manufacturers that pollute more than their American counterparts.  Regulations that cost

---

[1] "Steel Climate Impact - An International Benchmarking of Energy and $CO_2$ Intensities." Found at:
https://www.bluegreenalliance.org/wp-content/uploads/2022/04/Steelclimateimpact-
benchmarkingreport7April2022.pdf

American jobs, undermine national security, and are likely to result in no net reduction in emissions globally must be rejected.

Sincerely,

Sherrod Brown
United States Senator

J.D. Vance
United States Senator

Mike Braun
United States Senator

Joe Manchin
United States Senator

Robert P. Casey, Jr.
United States Senator

Amy Klobuchar
United States Senator

Shelley Moore Capito
United States Senator

Todd Young
United States Senator

EXH277

ED_018388_00000141-00016

# ATTACHMENT B

EXH278

ED_018388_00000141-00017

# United States Senate

WASHINGTON, DC 20510

June 14, 2024

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Dear Administrator Regan:

We write to you today regarding three U.S. Environmental Protection Agency (EPA) rules that together threaten the economic competitiveness of the American integrated steel industry. We urge EPA to grant the petitions filed by the domestic integrated steel industry seeking administrative reconsiderations and stays of all three final rules until the EPA can complete a comprehensive review of each rule through the administrative reconsideration process.

Working together, EPA and industry have achieved notable reductions in environmental impacts to air, water, and land over the past 50 years. The steel industry in the U.S. is the world's cleanest major producer of steel and is already subject to more environmental regulation than its global competitors, resulting in a cleaner environment. While we appreciate EPA's efforts to address concerns raised by multiple stakeholders – including steel companies, the United Steelworkers (USW), coke producers, and numerous Members of Congress – throughout the rulemaking process, we remain concerned that the final rules contain flaws that will undermine the domestic steel industry and national security while driving production overseas. We are specifically concerned about the following three rules:

- National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing (EPA-HQ-OAR-2017-0664)
- National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-OAR-2002-0083)
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries (EPA–HQ–OAR–2002–0085 and EPA HQ OAR 2003 0051).

A failure to get these regulations right will not only have a negative impact on domestic steel production and American steelworkers, but it will also likely fail to achieve a net reduction in emissions from the steel industry globally. In fact, emissions will likely rise as production moves to countries, like China, with far less stringent rules and regulations. By granting the requested administrative reconsideration and stay of the rules, the EPA and industry can build on their shared track record of success and continue to work together in a constructive manner to achieve durable rules that both protect the environment and our domestic integrated steel industry.

EXH279

Throughout the rulemaking process, EPA worked to address technical and analytical flaws with these rules raised by multiple stakeholders. The modifications incorporated into the final rules in response to stakeholder feedback were important steps in the right direction, but we remain concerned they did not go far enough in addressing fundamental flaws with the rules. Further modifications are needed to address new information provided to EPA by stakeholders to ensure the rules are achievable by the industry, as required by the Clean Air Act, and that the regulations do not induce unintended consequences, such as loss of domestic steelmaking capacity and jobs. Given all that is at stake in terms of our country's advanced steel manufacturing capabilities and the good-paying, middle class union jobs the steel industry sustains, it is critically important that these rules are technically and economically feasible and do not undermine the competitiveness of the industry.

A stay of these rules will allow EPA to continue to work with industry stakeholders, including domestic companies and the USW, to obtain a complete and thorough understanding of the new information, equipment, and processes and ensure regulations moving forward are sound policy. Absent a stay, the steel industry will be forced to proceed with planning and spending for unproven technologies and work practices while the final provisions of the rules remain uncertain. Given that these regulations will impact nearly every aspect of the integrated iron and steelmaking process, it is imperative that EPA grant both the petitions for reconsideration and requests for stay of the rules.

We urge EPA to grant the industry's petitions for reconsideration and stay requests to ensure that these regulations both safeguard our environment and preserve production capacity and jobs in our strategically important integrated iron and steel sector. Thank you for your work to date with us on these important matters.

Sincerely,

Sherrod Brown
United States Senator

Mike Braun
United States Senator

Robert P. Casey, Jr.
United States Senator

J.D. Vance
United States Senator

Amy Klobuchar
United States Senator

Todd Young
United States Senator

cc: Janet McCabe, Deputy Administrator, U.S. Environmental Protection Agency

EXH280

# ATTACHMENT C

EXH281

ED_018388_00000141-00020

# Congress of the United States
## House of Representatives
### Washington, DC 20515

December 18, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Dear Administrator Regan:

As Chairman and Vice Chairman of the Congressional Steel Caucus, we write to express our concerns regarding the proposed rules below from the U.S. Environmental Protection Agency (EPA):

- National Emission Standards for Hazardous Air Pollutants: National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments (EPA-HQ-OAR-2017-0664)
- Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-EPA-OAR-2002-0083)
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries (EPA–HQ–OAR–2002–0085 and EPA– HQ–OAR–2003–0051).

The American steel industry and its manufacturing workforce produces the world's cleanest steel, made possible by years of substantial investments into climate initiatives. According to the American Iron and Steel Institute, the steel industry has reduced its energy intensity per ton of production by 35 percent and carbon dioxide emissions intensity by 37 percent in the past three decades. We also would highlight that these efforts will continue to be augmented by research and technology investments being made under current law.

We are grateful for your efforts to assist in the implementation of these laws and want to ensure that the proposed rules do not hinder the ability of the American steel industry to make robust investments into these important environmental initiatives.

Industry leaders have shared with us that these rules, as drafted, pose a threat to the competitiveness of steel producers and tens of thousands of good-paying union jobs. Our understanding is that these rules do not consider current technology capabilities and economic feasibility and may jeopardize the industry's ability to meet other environmental initiatives and health requirements for workers. We also are concerned that any action to diminish the ability of the American steel industry to meet the demands of our economy will be manufactured by

foreign-made and illegally subsidized steel entities that do not meet our current environmental, labor, and accountability standards.

As you move forward, we would strongly encourage you to more openly communicate with steel industry experts and other stakeholders to ensure that proposed requirements are based on proven technology and robust scientific data. It is essential to ensure that proposed rules are technically feasible, financially reasonable, and continue protecting the livelihoods, health, and safety of workers and steel-producing communities throughout our nation.

Sincerely,

Eric A. "Rick" Crawford
Member of Congress
Chair, Congressional Steel Caucus

Frank Mrvan
Member of Congress
Vice-Chair, Congressional Steel Caucus

EXH283

ED_018388_00000141-00022



CLEVELAND-CLIFFS INC.

March 31, 2025

U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460
Submitted by Electronic Mail to: airaction@epa.gov

Re:    **Presidential Exemption: National Emission Standards for Hazardous Air Pollutants
for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries;
Residual Risk and Technology Review, and Periodic Technology Review (89 FR
55684; July 5, 2024) (Coke Ovens Rule)**

Cleveland-Cliffs Inc. hereby requests a Presidential Exemption under Clean Air Act (CAA)
section 112(i)(4) for Cleveland-Cliffs Burns Harbor LLC; Cleveland-Cliffs Cleveland Works LLC,
Warren Location; and Cleveland-Cliffs Monessen Coke LLC (collectively "Cleveland-Cliffs")
from compliance with the standards and limitations in the National Emission Standards for
Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke
Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed.
Reg. 55684 (July 5, 2024) (collectively, the "Coke Ovens Rule").

Cleveland-Cliffs operates three coke oven plants that feed our five integrated steel mills
across Indiana, Michigan, and Ohio. We also purchase coke from merchant suppliers including
Sun Coke and ESS Coke. Cliffs invested $1 billion to build a facility to produce Hot Briquetted
Iron (HBI), consumption of which in our furnaces has reduced coke consumption. However,
Cliffs' ironmaking operations must still rely on coke as a key raw material to meet critical
production needs.

On July 5, 2024, EPA promulgated the final Coke Ovens Rules, which establishes:

1) New maximum achievable control technology (MACT) standards for acid gases (AG),
dioxin and furans (D/F), formaldehyde, hydrogen cyanide (HCN), mercury (Hg),
polycyclic aromatic hydrocarbons (PAH), and volatile organic HAP (VOHAP) from coke
oven pushing operations;

2) MACT and work practice standards for AG, D/F, HCN, Hg, PAH, particulate matter (PM),
HAP metals, and VOHAP from coke oven battery stacks;

3) New facility fenceline emission monitoring and corrective action requirements; and

11040958771/3\AMERICAS

Coke Ovens Rule Presidential Exemption Request
March 31, 2025
Page 2 of 7

4) Lowered limits for leaks from coke oven doors, lids, and offtakes.

The American Coke and Coal Chemicals Institute (ACCCI) and Coke Oven Environmental Task Force (COETF), in which Cleveland-Cliffs participates, filed a petition for reconsideration and administrative stay of the Coke Ovens Rule, urging EPA to reconsider numerous aspects of the Coke Ovens Rule and to stay the effective date pending promulgation of replacement regulations.[1] On March 12, 2025, EPA announced it will reconsider several National Emission Standards for Hazardous Air Pollutants (NESHAPs) affecting a broad range of American industry, including the Coke Ovens Rule. On March 21, 2025, EPA informed the COETF that it will reconsider all the issues included in our petition for reconsideration for the Coke Ovens Rule.

CAA section 112(i)(4) provides that the President may exempt any stationary source from compliance with any standard or limitation under section 112 for up to two years if the President determines that the technology to implement such standard is not available and it is in the national security interests of the United States to do so. Section 112(i)(4) further provides that an exemption may be extended one or more additional periods, each additional period not to exceed two years.

Cleveland-Cliffs is requesting a two-year Presidential Exemption for each of the following Coke Ovens Rule requirements:

1) Fenceline monitoring, root cause and corrective action, and related reporting requirements;

2) Limits for allowable leaks from coke oven battery doors, lids, and offtakes and related reporting requirements; and

3) New MACT and work practice standards for coke oven pushing and battery stacks and related testing and reporting requirements.

A Presidential Exemption is warranted for the reasons detailed below.

## I.    This Request is Timely

This request has been submitted by the March 31, 2025 date indicated in EPA's Clean Air Act Section 112 Presidential Exemption Information fact sheet.

---

[1] The ACCCI/COETF's comments on the proposed rule and petition for reconsideration and stay are hereby incorporated by reference in support of this request. *See* ACCCI/COETF Petition for Reconsideration and Stay of the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries: Residual Risk and Technology Review, and Periodic Technology Review (Sept. 3, 2024) ("ACCCI/COETF Petition for Reconsideration and Stay"); COETF Comments on the Proposed Rule National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries: Residual Risk and Technology Review, and Periodic Technology Review (Oct. 2, 2023) ("COETF Comments"), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2003-0051-1380.

Coke Ovens Rule Presidential Exemption Request
March 31, 2025
Page 3 of 7

## II.     The Technology Needed to Implement the Coke Ovens Rule is Not Available

### A.     Fenceline Monitoring Requirements

For the reasons set forth in the ACCCI/COETF petition for reconsideration, the fenceline monitoring benzene action level in the Coke Ovens Rule is overly stringent and is not based on modeling showing the correct highest benzene concentration at the facility fenceline using allowable (vs. actual) emissions. As a result, new and currently unavailable emission controls and leak detection/repair technology would be necessary to comply with the unlawful action level. Due to the complex nature of coke facilities, developing new control strategies and technologies would involve engineering suitable capture and control systems at multiple locations. The technologies needed to identify and engineer controls suitable for each location are not currently demonstrated or available for the coke ovens or associated coke byproducts recovery systems.

Likewise, the "root cause" investigation and corrective action requirements add significant complexity and technology challenges, considering the many miles of piping and thousands of valves and flanges at a coke facility. Methods to further reduce benzene emissions are not currently demonstrated for coke facilities and would include redesign or modification of process vessels, tar decanters, gas blanketing and vapor collection systems, replacing sections of coke oven gas piping, and redesign of tar and light oil loadout systems to reduce fugitive emissions and/or leak rates.

### B.     Revised Standards for Coke Oven Battery Doors, Lids, and Offtakes

The Coke Ovens Rule lowers the long-standing allowable leak limits for coke battery doors, lids, and offtakes including for the first time more stringent leak rate allowables on a single coke facility based on annual coke production. However, industry commenters informed EPA that there have been no changes or improvements in leak control technology or practices across the industry, which means facilities cannot consistently achieve the lower leak rate limits without developing novel new leak control methods or technologies for both coke ovens and associated coke byproduct operations.

For coke oven doors, this requires a technical evaluation to identify new ways to reduce the number of already very low door leaks in order to comply with the new Coke Ovens Rule limits. This may include replacing door machines, rebuilding or replacing oven doors, and redesigning door-jamb cleaning mechanisms, or other currently unidentified means to control leaks around coke oven doors. For coke battery lids and offtakes, this requires research and trials on new ways to reduce leaks to comply with the revised limits. Control methods could include redesigning or replacing lids or developing different sealing materials.

None of the technologies needed to comply with these new standards are currently available or demonstrated in the coke byproduct recovery industry.

### C.     New MACT and Work Practice Standards for Coke Oven Pushing and Battery Stacks

110409587713\AMERICAS

EXH286

Coke Ovens Rule Presidential Exemption Request
March 31, 2025
Page 4 of 7

The Coke Ovens Rule imposes numerous new MACT and work practice standards covering multiple hazardous air pollutants (HAP), which EPA claimed are in response to the D.C. Circuit decision in *Louisiana Environmental Action Network v. EPA* (*LEAN*), 955 F.3d 1088 (D.C. Cir. 2020). However, the technologies that would be needed to control these HAP are not available and have not been demonstrated to work for the coke byproduct recovery industry, either in the US or internationally.

The very short 18-month compliance period (i.e., January 5, 2026) in the Coke Ovens Rule is one-half the time allowed under the Clean Air Act and was based on EPA's incorrect and unsupported assumption that facilities would only need to do testing to confirm EPA's assumption that all coke facilities *can meet* the new MACT limits. EPA failed to address specific concerns and data submitted by commenters showing that facilities *cannot meet* the new standards without costly and undemonstrated control technologies. EPA also did not address data submitted by commenters showing raw material (i.e., coal) and process variability that affect emission performance, which make these limits unachievable without developing and installing novel emission control technology that is not commercially available.

As provided in numerous technical reports and declarations, [2] emission control technologies to achieve compliance with the PQBS emission limitations and coke oven leak rates and benzene action levels are not commercially available. [3] Even assuming that facilities are ultimately able to research and develop the new technologies needed to implement these new MACT standards, facilities need much longer than the 18-month compliance period under the Coke Ovens Rule. A Presidential Exemption is warranted for several reasons:

- The technologies used in some other industries to control these HAP have not been demonstrated to work in the coke byproduct recovery industry. Controlling multiple pollutants and retrofitting controls into existing equipment and operations adds technical and engineering complexity due to process interactions of the requirements for control, including pollutant interactions, flow rates, chemistry, and temperatures.

- The Coke Ovens Rule includes first-time emission limits for hydrogen cyanide (HCN); however, it is widely acknowledged that there are no existing technologies available to control HCN. Air pollution control vendors indicate that any potential solution for control of HCN is not technically feasible for coke battery combustion stack or pushing emissions. [4]

- The coke battery underfiring system is naturally drafted, with the underfire gas stream predominantly located underground. Added equipment such as heat exchangers, sorbent injection systems, etc., result in static pressure loss, necessitating installation of an induced draft fan. The impacts of added fans and equipment need to be studied to ensure adequate

---

[2] *See* ACCCI/COETF Petition for Reconsideration and Stay (Sept. 3, 2024); COETF Comments (Oct. 2, 2023); COETF Motion for Stay, filed Sept. 30, 2024, in *Am. Coke and Coal Chemicals Inst. and Coke Oven Env't Talk Force v. U.S. EPA*, Case No. 24-1287 (D.C. Cir.) ("COETF Motion for Stay"); COETF Reply, filed November 5, 2024, in *Am. Coke and Coal Chemicals Inst. and Coke Oven Env't Talk Force v. U.S. EPA*, Case No. 24-1287 (D.C. Cir.) ("COETF Reply") and associated exhibits/attachments.
[3] *Id.*
[4] *Id.*

Coke Ovens Rule Presidential Exemption Request
March 31, 2025
Page 5 of 7

heating of the batteries have never been implemented for a by-product battery. Furthermore, enough physical space to install potential additional new equipment may not be feasible. This poses obstacles and engineering challenges for any new add-on equipment, which could include construction of a new battery combustion stack.[5]

- Changes to the underfiring system requires coke battery outages, during which purchased natural gas is needed to keep the battery hot. All coke production would cease; and battery refractory brick and other equipment could suffer unanticipated damage, which takes more time and expense to correct.

- Limited available physical space within coke oven battery areas requires vertical construction, adding complexity and time to all related construction, and may be infeasible altogether.

- Retrofitting additional controls on mobile pushing emission control devices involves unique engineering challenges compared to non-mobile sources, this type of retrofit is not commercially available.

## III.   An Exemption is in the National Security Interests of the United States

The impact of the Coke Rule is far-reaching and undermines U.S. national security interests given that metallurgical coke is an essential raw material input for the integrated iron and steel industry, which is an industry critical to national security interests of the U.S. The Coke Ovens Rule will have far-reaching consequences, given that the American iron and steel industry is the backbone of the nation's defense and transportation industries and is critical to national security. Steel is one of the most important building materials in America and an essential component for all types of buildings, transportation infrastructure, and military hardware. Currently, approximately 70% of steel produced globally is made using metallurgical coke, a high-quality fuel and reductant used in blast furnaces to separate iron from iron ore to make steel.[6] A strong, competitive coke and steel manufacturing industry is vital to building and maintaining critical infrastructure and military readiness.

The U.S. Department of Commerce recognized that domestic steel production is essential for national security applications which it indicated encompasses transportation systems, the electric power grid, water systems, and energy generation systems in its report summarizing the findings of an investigation conducted by the Department of Commerce pursuant to Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862 ("Section 232")), into the effect of imports of steel mill products ("steel") on the national security of the United States.[7] In a 2021 Congressional Research Service Report on U.S. Steel Manufacturing: National Security

---

[5] *Id.*

[6] See R. Nolan, *Build Back Better with America's Met Mines* (May 20, 2021) https://nma.org/2021/05/20/met-coke-steel-infrastructure

[7] See U.S. Department of Commerce Bureau of Industry and Security Office of Technology Evaluation, *The Effect of Imports of Steel on the National Security Report, Report by the January 11, 2018*, https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf

110409587\3\AMERICAS

**EXH288**

Coke Ovens Rule Presidential Exemption Request
March 31, 2025
Page 6 of 7

and Tariffs, it was noted that under the Defense Production Act, 50 U.S.C. §4533, "Congress provides the President with a broad set of authorities …, including Title III, which authorizes the use of economic incentives to secure domestic industrial capabilities essential to meet national defense and homeland security needs. DOD has funded several Title III projects to increase domestic production of steel products," including a $56 million agreement in 2020 to boost steel plate production signed by the predecessor owner of a Cliffs' facility.[8]

A Presidential Exemption would advance all of the following national security interests while EPA goes about reconsidering and revising the Coke Ovens Rule: (1) maintaining a strong domestic steelmaking industry; (2) avoiding regulatory mandates that lead to coke and steel shortages, offshoring of coke production, and resulting supply chain impacts; (3) promoting economic and job growth made possible by the coke and steel industries; and (4) avoiding wasteful commitments of resources on regulatory mandates that provide no discernable public health or environmental benefit.

Without a Presidential Exemption, the coke production industry would be faced with an estimated $1.3 billion in new capital costs, plus more than $220 million in annual operating costs. Coke facilities would be forced to install new, unproven pollution control technologies in an effort to comply with the new standards, even though compliance may not be feasible using available technology. The cost associated with the Coke Ovens Rule would substantially impact local and national economies and would undermine the coke and steel sectors' vital role in producing the iron and steel needed to support critical infrastructure, defense, and national security.

The importance of avoiding these harms to the coke and steel industry is emphasized in a December 6, 2023 letter from eight current and former U.S. Senators   including then-Senator JD Vance   to EPA warning that the Coke Ovens Rule and two other rules aimed at the steel sectors "… would dramatically undermine the domestic steel industry and national security while driving production overseas likely resulting in no net reduction in emissions from the steel industry globally."[9]  Likewise, in a June 14, 2024 letter six current and former U.S. Senators   again including then-Senator Vance   urged EPA to reconsider the Coke Ovens Rule and two other rules aimed at the steel industry, warning that "… the steel industry will be forced to proceed with planning and spending for unproven technologies and work practices while the final provisions of the rules remain uncertain.  Given that these regulations will impact nearly every aspect of the integrated iron and steelmaking process, it is imperative that EPA grant both the petitions for reconsideration and requests for stay of the rules."[10]  Similar concerns were raised in a letter to EPA from Congress Members Crawford and Mrvan of the Congressional Steel Caucus.[11]

---

[8] Congressional Research Service Report, U.S. Steel Manufacturing: National Security and Tariffs (August 12, 2021), https://www.congress.gov/crs-product/IF11897.

[9] Letter from U.S. Senators Vance, Brown, Braun, Manchin, Casey, Klobuchar, Capito, and Young to Administrator Regan, p. 1 (Dec. 6, 2023).

[10] Letter from U.S. Senators Vance, Brown, Braun, Casey, Klobuchar, and Young to Administrator Regan, p. 2 (June 14, 2024).

[11] Letter from Congressmen Crawford and Mrvan to Administrator Regan, p. 1 (Dec. 18, 2023).

EXH289

Coke Ovens Rule Presidential Exemption Request
March 31, 2025
Page 7 of 7

The threat of global steel imports raised by the Senators in the letters to EPA is a material threat. Foreign steel imports risk the competitiveness and advancement of the domestic steel industry, to the point of potentially threatening U.S. domestic production capacity and continued investment in taconite iron mining, coke manufacturing, and iron and steelmaking capacity based on the costs outlined above. As emphasized by the U.S. Department of the Treasury's Committee on Foreign Investment in the United States ("CFIUS"), without such domestic steelmaking investment, there could be ripple effects on the supply chains that depend on such steel, particularly supply chains that are part of our national defense infrastructure such as "critical manufacturing, energy, transportation, and communications (all vital to national security)." [12] National defense infrastructure, for example, needs ready access to high purity steel from blast furnaces. [13] Once these complex iron and steel making operations are shut down and/or idled, it is no simple matter to restart them. In short: "The loss of domestic production is a critical national security concern given the ubiquitous nature of steel throughout multiple critical industries." [14]

## IV.    Conclusion

For all the reasons stated above, Cliffs urges the issuance of a 2-year exemption from the compliance deadlines in the Coke Ovens Rule, pending EPA's review of the rule.

Thank you for your consideration of this Presidential Exemption request. If additional information is needed, please contact Walter Tamukong at walter.tamukong@clevelandcliffs.com or 216-649-4862.

Sincerely,

Traci L. Forrester
Executive Vice President, Environmental & Sustainability
Cleveland-Cliffs Inc.

cc:    P. Tsirigotis, EPA OAQPS @ tsirigotis.peter@epa.gov
       P. Lassiter, EPA OAQPS @ lassiter.penny@epa.gov
       M. Long, Cleveland-Cliffs Inc

---

[12] Letter from Andrew Fair, Acting Assistant Secretary for Investment Security, U.S. Department of the Treasury, to Ama Adams, Ropes & Gray LLP, and Mark Plotkin, Covington & Burling LLP, Re: CFIUS Case 24-154 (Dec. 14, 2024) ("CFIUS Letter"), p. 28.
[13] *See id.* at p. 24.
[14] *Id.* at p. 28.